**No. 20-_____**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

*In re* MARCO RUBIO, *et al.*,

*Petitioners.*

MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES OF AMERICA,

*Petitioners–Defendants,*

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS,

*Respondent,*

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

*Real-Parties-in-Interest–Plaintiffs.*

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS AND EMERGENCY MOTION FOR STAY PENDING CONSIDERATION OF THE PETITION AND FOR AN IMMEDIATE ADMINISTRATIVE STAY

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
AMANDA L. MUNDELL
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*
  *202-353-9018*

# TABLE OF CONTENTS

Docket Report ................................................................................................Add.1

Complaint (Dkt. 1) ......................................................................................Add.60

Order Granting In Part and Denying in Part the Government's
Motion to Dismiss (Dkt. 73) .....................................................................Add.109

May 6, 2025 Hearing Transcript (Dkt. 87) ..............................................Add.177

Government's Motion for Protective Order and Motion to Dispense
with Trial (Dkt. 94).....................................................................................Add.213

Government's Motion to Seal (Dkt. 105)..................................................Add.273

Certified Administrative Record Submitted by Government
(Dkt. 106).......................................................................................................Add.279

June 2, 2025 Hearing Transcript (Dkt. 115)............................................Add.319

June 11, 2025 Submissions by the Government for *In Camera* Review
(Cover Page only) (Dkt. 131).....................................................................Add.356

Protective Order  (Dkt. 147) .....................................................................Add.360

Plaintiffs' Motion to Compel (Dkt. 155) .................................................Add.373

June 26, 2025 Hearing Transcript  (Dkt. 165) ........................................Add.395

Government's Opposition to Plaintiff's Motion to Compel (Dkt.
170) and supporting declarations and exhibits (Dkts. 170-1, 170-2,
170-3, 170-4, 170-5, 170-6, 170-7, 170-8, 170-9, 170-10, 170-
11)    ................................................................................................................Add.423

Order Denying Plaintiffs' Motion to Compel (Dkt. 174) .....................Add.516

July 2, 2025 Submissions by the Government for *In Camera* Review
(Cover Page only) (Dkt. 181).....................................................................Add.520

July 8, 2025 Submissions by the Government for *In Camera* Review
(Dkt. 189)......................................................................................................Add.522

Government's Second Motion for Reconsideration (Dkt. 190) ...........................Add.526

Government's Motion for Clarification (Dkt. 193) ................................................Add.534

Trial Transcripts (excerpted)

    July 7, 2025 Bench Trial Transcript (Vol. 3)..................................................Add.537

    July 9, 2025 Bench Trial Transcript (Vol. 2)..................................................Add.563

    July 10, 2025 Bench Trial Transcript (excerpts)...........................................Add.607

# United States District Court
## District of Massachusetts (Boston)
### CIVIL DOCKET FOR CASE #: 1:25-cv-10685-WGY

| | |
|---|---|
| American Association of University Professors et al v. Rubio et al | Date Filed: 03/25/2025 |
| Assigned to: Judge William G. Young | Jury Demand: None |
| Cause: 28:1331 Fed. Question | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **American Association of University Professors** | represented by | **Ahilan Arulanantham** |

American Civil Liberties Union of Southern
California
1313 West 8th Street
Los Angeles, CA 90017
213-977-5211
Fax: 213-977-5297
Email: arulanantham@law.ucla.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Tremonte**
Sher Tremonte LLP
90 Broad Street
23rd Floor
New York, NY 10004
212-202-2603
Fax: 212-202-4156
Email: mtremonte@shertremonte.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noam Biale**
Sher Tremonte LLP
90 Broad Street
Ste 23rd Floor
New York, NY 10004
212-202-2600
Email: nbiale@shertremonte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Abdo**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Ste 302

Add.1

New York, NY 10115
646-745-8502
Email: alex.abdo@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Alexandra Conlon**
Sher Tremonte LLP
90 Broad Street
23rd Floor
New York, NY 10004
212-202-2600
Email: aconlon@shertremonte.com
*ATTORNEY TO BE NOTICED*

**Caroline DeCell**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115
646-745-8500
Email: carrie.decell@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Courtney Gans**
Sher Tremonte LLP
90 Broad Street
23rd Floor
New York, NY 10004
212-540-0675
Email: cgans@shertremonte.com
*ATTORNEY TO BE NOTICED*

**David Jacob Zimmer**
Zimmer, Citron & Clarke LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
617-676-9421
Email: dzimmer@zimmercitronclarke.com
*ATTORNEY TO BE NOTICED*

**Edwina Bullard Clarke**
Zimmer, Citron & Clarke LLP
130 Bishop Allen Drive
Cambridge, MA 02139
518-637-1311
Email: edwina@zimmercitronclarke.com
*ATTORNEY TO BE NOTICED*

**Jackson Thomas Busch**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302

New York, NY 10115
646-745-8500
Email: jackson.busch@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Jameel Jaffer**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115
646-745-8503
Email: jameel.jaffer@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Ramya Krishnan**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115
646-745-8500
Email: ramya.krishnan@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Scott B. Wilkens**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115
646-745-8500
Email: scott.wilkens@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Talya Nevins**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115
646-745-8500
Email: talya.nevins@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Xiangnong Wang**
Knight First Amendment Institute at
Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115
503-206-2936
Email: george.wang@knightcolumbia.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **American Association of University Professors-Harvard Faculty Chapter** | represented by | **Ahilan Arulanantham** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Tremonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noam Biale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Abdo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexandra Conlon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline DeCell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Gans**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Jacob Zimmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Edwina Bullard Clarke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jackson Thomas Busch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jameel Jaffer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ramya Krishnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott B. Wilkens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talya Nevins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xiangnong Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**American Association of University Professors at New York University**          represented by          **Ahilan Arulanantham**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Tremonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noam Biale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Abdo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexandra Conlon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline DeCell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Gans**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Jacob Zimmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Edwina Bullard Clarke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jackson Thomas Busch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jameel Jaffer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ramya Krishnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott B. Wilkens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talya Nevins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xiangnong Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rutgers American Association of University Professors-American Federation of Teachers**

represented by

**Ahilan Arulanantham**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Tremonte**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noam Biale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Abdo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexandra Conlon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline DeCell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Gans**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Jacob Zimmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Edwina Bullard Clarke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jackson Thomas Busch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jameel Jaffer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ramya Krishnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott B. Wilkens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talya Nevins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xiangnong Wang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
Salahi PC
505 Montgomery St.
Ste 11th Floor
San Francisco, CA 94111
415-236-2352
Email: yaman@salahilaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Middle East Studies Association** | represented by | **Ahilan Arulanantham** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Tremonte**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noam Biale**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Abdo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexandra Conlon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline DeCell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Gans**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Jacob Zimmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Edwina Bullard Clarke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jackson Thomas Busch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jameel Jaffer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ramya Krishnan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott B. Wilkens**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Talya Nevins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Xiangnong Wang**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Marco Rubio**
*in his official capacity as Secretary of State*

represented by **Ethan B. Kanter**
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
202-616-9123
Email: ethan.kanter@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Harry Graver**
DOJ-Civ
950 Pennsylvania Avenue NW
Washington, DC 20530
202-514-2000
Email: harry.graver@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
DOJ-Civ
P.O Box 878
Ben Franklin Station
Washington, DC 20044
202-616-8779
Email: jessica.d.strokus@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
P.O. Box 878, Ben Franklin Station
Washington, DC 20001
202-616-4018
Email: lindsay.m.murphy@usdoj.gov
*TERMINATED: 05/21/2025*
*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
DOJ-Civ
Poc Agostinho, Jean
1100 L St., N.W.
8142
Washington, DC 20530
202-307-0340
Email: nancy.safavi@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
U.S. Dept. of Justice, Civil Division, Office
of Immigration

Ben Franklin Station
P.O. Box 878
Washington, DC 20044
202-405-9647
Email: paul.f.stone@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
Fax: 617-748-3971
Email: rayford.farquhar@usdoj.gov
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
DOJ-USAO
1 Courthouse Way
Ste 9200
Boston, MA 02210
617-748-7104
Email: shawna.yen@usdoj.gov
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
DOJ-Civ
Office of Immigration Litigation
PO Box 878
Ben Franklin Station
Washington, DC 20044
202-616-5573
Email: victoria.m.santora@usdoj.gov
*ATTORNEY TO BE NOTICED*

**William Kanellis**
DOJ-Civ
Commercial Litigation Branch
1100 L St NW
Ste 10140
Washington, DC 20530
202-251-4937
Email: dinthemovie@gmail.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of State**                   represented by   **Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harry Graver**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
(See above for address)
*TERMINATED: 05/21/2025*
*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
(See above for address)
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Kanellis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kristi Noem**
*in her official capacity as Secretary of Homeland Security*

represented by **Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harry Graver**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
(See above for address)
*TERMINATED: 05/21/2025*

*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
(See above for address)
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Kanellis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Department of Homeland Security**          represented by   **Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harry Graver**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
(See above for address)
*TERMINATED: 05/21/2025*
*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
(See above for address)
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Kanellis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Todd Lyons**
*in his official capacity as Acting Director of*
*U.S. Immigration and Customs Enforcement*

represented by **Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harry Graver**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
(See above for address)
*TERMINATED: 05/21/2025*
*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
(See above for address)
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Kanellis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Donald J. Trump**
*in his official capacity as President of the United States*

represented by **Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harry Graver**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
(See above for address)
*TERMINATED: 05/21/2025*
*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
(See above for address)
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Kanellis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States of America**     represented by     **Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harry Graver**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Danielle Strokus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay M Murphy**
(See above for address)
*TERMINATED: 05/21/2025*
*ATTORNEY TO BE NOTICED*

**Nancy Safavi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul F. Stone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*TERMINATED: 06/01/2025*
*ATTORNEY TO BE NOTICED*

**Shawna Yen**
(See above for address)
*TERMINATED: 07/07/2025*
*ATTORNEY TO BE NOTICED*

**Victoria M Santora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Kanellis**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Council of UC Faculty Associations**     represented by     **Joshua M. Daniels**
The Law Office of Joshua M. Daniels
P.O. Box 300765
Jamaica Plain, MA 02130
617-942-2190
Email: jdaniels@danielsappeals.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur Liou**

Leonard Carder, LLP
1999 Harrison Street
Ste 2700
Oakland, CA 94612
510-272-0169
Fax: 510-272-0174
Email: aliou@leonardcarder.com
*ATTORNEY TO BE NOTICED*

**Julia Lum**
Leonard Carder, LLP
1999 Harrison Street, Suite 2700
Oakland, CA 94612
510-272-0169
Email: jlum@leonardcarder.com
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
Leonard Carder, LLP
1999 Harrison Street
Suite 2700
Oakland, CA 94612
510-272-0169
Fax: 510-272-0174
Email: psaltzman@leonardcarder.com
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
Leonard Carder, LLP
1999 Harrison Street
Suite 2700
Oakland, CA 94612
510-272-0169
Fax: 510-272-0174
Email: pmonrad@leonardcarder.com
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Berkeley Faculty Association** | represented by | **Arthur Liou**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Joshua M. Daniels**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Julia Lum**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Davis Faculty Association**                    represented by    **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Irvine Faculty Association**                   represented by    **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**UC Merced Faculty Association**                    represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Riverside Faculty Association**                    represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**San Diego Faculty Association**                    represented by  **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**UCSF Faculty Association**                    represented by  **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**UC Santa Barbara Faculty Association**                    represented by  **Arthur Liou**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of California Los Angeles Faculty Association**  represented by **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ethan B. Kanter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Santa Cruz Faculty Association**  represented by **Arthur Liou**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**University CouncilAmerican Federation of Teachers Local 1474**   represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Boston University AAUP Chapter**   represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>
**Brown University Chapter of the AAUP**     represented by     **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>
**Concerned Stanford Faculty**     represented by     **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Dartmouth College Chapter of the AAUP**     represented by  **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Del Mar College Chapter of the AAUP-AFT**     represented by  **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Massachusetts Institute of Technology Chapter of the AAUP**          represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**AAUP Princeton**          represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Rice University Advocacy Chapter of the AAUP**          represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Tufts University Chapter of the AAUP**          represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Houston Chapter of the AAUP**   represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**John Hopkins University Chapter of the AAUP**   represented by   **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Minnesota Twin Cities Chapter of the AAUP**

represented by **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Northwestern University Chapter of the AAUP**

represented by **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Dallas Chapter of the AAUP**

represented by **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**AAUP Advocacy Chapter at the University of Texas at Austin**

represented by **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**AAUP Advocacy Chapter at the University of Texas at Dallas**

represented by **Arthur Liou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Yale University Chapter of the AAUP** | represented by | **Arthur Liou** |

(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter W Saltzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Monrad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Yaman Salahi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Wesleyan University Chapter of the AAUP** | represented by | **Arthur Liou** |

(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Daniels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Lum**
(See above for address)
*ATTORNEY TO BE NOTICED*

Peter W Saltzman
(See above for address)
*ATTORNEY TO BE NOTICED*

Philip Monrad
(See above for address)
*ATTORNEY TO BE NOTICED*

Yaman Salahi
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Commonwealth of Massachusetts**          represented by **David Rassoul Rangaviz**
Massachusetts Attorney General's Office
1 Ashburton Place
Boston, MA 02108
617-963-2816
Email: david.rangaviz@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Presidents Alliance on Higher Education and Immigration**          represented by **Joel Anderson Fleming**
Equity Litigation Group LLP
1 Washington Mall #1307
Boston, MA 02108
617-388-0622
Email: jfleming@equitylitigation.com
*ATTORNEY TO BE NOTICED*

**Lauren G. Milgroom**
Equity Litigation Group LLP
1 Washington Mall
#1307
Boston, MA 02108
617-475-0039
Email: lmilgroom@equitylitigation.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC-10910511 (Fee Status: Filing Fee paid), filed by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form) (Clarke, Edwina) (Entered: 03/25/2025) |
| 03/25/2025 | 2 | Proposed Document(s) submitted by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American |

| | | |
|---|---|---|
| | | Association of University Professors-American Federation of Teachers, Middle East Studies Association. Document received: Requests for Summonses. (Attachments: # 1 Request for Summons, # 2 Request for Summons, # 3 Request for Summons, # 4 Request for Summons, # 5 Request for Summons, # 6 Request for Summons, # 7 Request for Summons)(Clarke, Edwina) (Entered: 03/25/2025) |
| 03/25/2025 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge William G. Young assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jessica D. Hedges. (SEC) (Entered: 03/25/2025) |
| 03/25/2025 | 4 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (JKK) (Entered: 03/25/2025) |
| 03/26/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Ramya Krishnan Filing fee: $ 125, receipt number AMADC-10913799 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration)(Clarke, Edwina) (Entered: 03/26/2025) |
| 03/26/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Carrie DeCell Filing fee: $ 125, receipt number AMADC-10913838 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration)(Clarke, Edwina) (Entered: 03/26/2025) |
| 03/26/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Alex Abdo Filing fee: $ 125, receipt number AMADC-10913861 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration)(Clarke, Edwina) (Entered: 03/26/2025) |
| 03/26/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice for admission of Jameel Jaffer Filing fee: $ 125, receipt number AMADC-10913880 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration)(Clarke, Edwina) (Entered: 03/26/2025) |
| 03/26/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Xiangnong Wang Filing fee: $ 125, receipt number AMADC-10913909 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration)(Clarke, Edwina) (Entered: 03/26/2025) |

| 03/26/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Jackson Busch Filing fee: $ 125, receipt number AMADC-10913924 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration)(Clarke, Edwina) (Entered: 03/26/2025) |
|---|---|---|
| 03/26/2025 | 11 | Judge William G. Young: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added Ramya Krishnan, Carrie DeCell, Alex Abdo, Jameel Jaffer, Xiangnong Wang, Jackson Busch. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. ; granting 6 Motion for Leave to Appear Pro Hac Vice Added Ramya Krishnan, Carrie DeCell, Alex Abdo, Jameel Jaffer, Xiangnong Wang, Jackson Busch. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. ; granting 7 Motion for Leave to Appear Pro Hac Vice Added Ramya Krishnan, Carrie DeCell, Alex Abdo, Jameel Jaffer, Xiangnong Wang, Jackson Busch. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. |

; granting 8 Motion for Leave to Appear Pro Hac Vice Added Ramya Krishnan, Carrie DeCell, Alex Abdo, Jameel Jaffer, Xiangnong Wang, Jackson Busch.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

; granting 9 Motion for Leave to Appear Pro Hac Vice Added Ramya Krishnan, Carrie DeCell, Alex Abdo, Jameel Jaffer, Xiangnong Wang, Jackson Busch.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

; granting 10 Motion for Leave to Appear Pro Hac Vice Added Ramya Krishnan, Carrie DeCell, Alex Abdo, Jameel Jaffer, Xiangnong Wang, Jackson Busch.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(MAP) (Entered: 03/26/2025)

| 04/01/2025 | 12 | NOTICE of Appearance by Ramya Krishnan on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Krishnan, Ramya) (Entered: 04/01/2025) |
| 04/01/2025 | 13 | MOTION for Preliminary Injunction , MOTION to Expedite *Briefing* ( Responses due by 4/15/2025) by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University |

| | | |
|---|---|---|
| | | Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association.(Krishnan, Ramya) (Entered: 04/01/2025) |
| 04/01/2025 | 14 | MEMORANDUM in Support re 13 MOTION for Preliminary Injunction MOTION to Expedite *Briefing* filed by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration of Veena Dubal, # 2 Declaration of Asli U. Bali, # 3 Declaration of Ramya Krishnan, # 4 Exhibit A to Krishnan Declaration, # 5 Exhibit B to Krishnan Declaration, # 6 Exhibit C to Krishnan Declaration, # 7 Exhibit D to Krishnan Declaration, # 8 Exhibit E to Krishnan Declaration, # 9 Exhibit F to Krishnan Declaration, # 10 Exhibit G to Krishnan Declaration, # 11 Exhibit H to Krishnan Declaration, # 12 Exhibit I to Krishnan Declaration, # 13 Exhibit J to Krishnan Declaration, # 14 Exhibit K to Krishnan Declaration, # 15 Exhibit L to Krishnan Declaration, # 16 Exhibit M to Krishnan Declaration, # 17 Exhibit N to Krishnan Declaration, # 18 Exhibit O to Krishnan Declaration, # 19 Exhibit P to Krishnan Declaration, # 20 Exhibit Q to Krishnan Declaration, # 21 Exhibit R to Krishnan Declaration, # 22 Exhibit S to Krishnan Declaration, # 23 Exhibit T to Krishnan Declaration, # 24 Exhibit U to Krishnan Declaration, # 25 Exhibit V to Krishnan Declaration, # 26 Exhibit W to Krishnan Declaration, # 27 Exhibit X to Krishnan Declaration, # 28 Exhibit Y to Krishnan Declaration, # 29 Exhibit Z to Krishnan Declaration, # 30 Exhibit AA to Krishnan Declaration, # 31 Exhibit BB to Krishnan Declaration, # 32 Exhibit CC to Krishnan Declaration, # 33 Exhibit DD to Krishnan Declaration, # 34 Exhibit EE to Krishnan Declaration, # 35 Exhibit FF to Krishnan Declaration, # 36 Exhibit GG to Krishnan Declaration, # 37 Exhibit HH to Krishnan Declaration, # 38 Exhibit II to Krishnan Declaration)(Krishnan, Ramya) (Entered: 04/01/2025) |
| 04/02/2025 | 15 | ELECTRONIC NOTICE issued requesting PAPER courtesy copy for 13 MOTION for Preliminary Injunction MOTION to Expedite *Briefing*, 14 Memorandum in Support of Motion. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (MAP) (Entered: 04/02/2025) |
| 04/02/2025 | 16 | Judge William G. Young: ELECTRONIC ORDER entered re 13 MOTION for Preliminary Injunction, MOTION to Expedite Briefing. In view of the profound constitutional questions raised by this complaint, the public interest strongly favors prompt adjudication and expedited briefing is warranted. Accordingly, responsive briefs and affidavits shall be filed no later than noon April 21, 2025 (sooner is better) and the motion for preliminary injunction shall be heard at 10:00 a.m. in Courtroom 18 on Wednesday, April 23,2025.(KB) (Entered: 04/02/2025) |
| 04/02/2025 | 17 | ELECTRONIC NOTICE Setting Hearing on Motion 13 MOTION for Preliminary Injunction MOTION to Expedite *Briefing* : Motion Hearing set for 4/23/2025 10:00 AM in Courtroom 18 (In person only) before Judge William G. Young. Counsel for plaintiffs shall notify defense counsel of hearing date. (KB) (Entered: 04/02/2025) |
| 04/02/2025 | 18 | NOTICE of Appearance by Rayford A. Farquhar on behalf of Todd Lyons, Donald J. Trump, United States of America, Marco Rubio, Department of State, Kristi Noem, Department of Homeland Security (Farquhar, Rayford) (Entered: 04/02/2025) |
| 04/03/2025 | 19 | NOTICE of Appearance by Caroline DeCell on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty |

| | | |
|---|---|---|
| | | Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (DeCell, Caroline) (Entered: 04/03/2025) |
| 04/03/2025 | 20 | NOTICE of Appearance by Jameel Jaffer on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Jaffer, Jameel) (Entered: 04/03/2025) |
| 04/03/2025 | 21 | NOTICE of Appearance by Alexander Abdo on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Abdo, Alexander) (Entered: 04/03/2025) |
| 04/03/2025 | 22 | NOTICE of Appearance by Xiangnong Wang on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Wang, Xiangnong) (Entered: 04/03/2025) |
| 04/03/2025 | 23 | NOTICE of Appearance by Jackson Thomas Busch on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Busch, Jackson) (Entered: 04/03/2025) |
| 04/04/2025 | 24 | NOTICE of Appearance by Ethan B. Kanter on behalf of Todd Lyons, Donald J. Trump, United States of America, Marco Rubio, Department of State, Kristi Noem, Department of Homeland Security (Kanter, Ethan) (Entered: 04/04/2025) |
| 04/07/2025 | 25 | SUMMONS Returned Executed Marco Rubio. (Krishnan, Ramya) **Modified on 4/7/2025 to Correct Docket Text and Answer Deadlines as Counsel Filed the Returns of Service Under the Wrong Event in CM/ECF NexGen. (MAP).** (Entered: 04/07/2025) |
| 04/07/2025 | 26 | SUMMONS Returned Executed Department of State.. (Krishnan, Ramya) **Modified on 4/7/2025 to Correct Docket Text and Answer Deadlines as Counsel Filed the Returns of Service Under the Wrong Event in CM/ECF NexGen. (MAP).** (Entered: 04/07/2025) |
| 04/07/2025 | 27 | SUMMONS Returned Executed Kristi Noem (Krishnan, Ramya) **Modified on 4/7/2025 to Correct Docket Text and Answer Deadlines as Counsel Filed the Returns of Service Under the Wrong Event in CM/ECF NexGen. (MAP).** (Entered: 04/07/2025) |
| 04/07/2025 | 28 | SUMMONS Returned Executed Department of Homeland Security. (Krishnan, Ramya) **Modified on 4/7/2025 to Correct Docket Text and Answer Deadlines as Counsel Filed the Returns of Service Under the Wrong Event in CM/ECF NexGen. (MAP).** |

| | | |
|---|---|---|
| | | (Entered: 04/07/2025) |
| 04/07/2025 | 29 | SUMMONS Returned Executed Todd Lyons (Krishnan, Ramya) **Modified on 4/7/2025 to Correct Docket Text and Answer Deadlines as Counsel Filed the Returns of Service Under the Wrong Event in CM/ECF NexGen. (MAP).** (Entered: 04/07/2025) |
| 04/07/2025 | 30 | SUMMONS Returned Executed by American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Krishnan, Ramya) (Entered: 04/07/2025) |
| 04/08/2025 | 31 | Joint MOTION for a Briefing Schedule re 16 Order on Motion to Expedite,, by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association.(Krishnan, Ramya) (Entered: 04/08/2025) |
| 04/08/2025 | 32 | MOTION for Leave to Appear Pro Hac Vice for admission of Ahilan Arulanantham Filing fee: $ 125, receipt number AMADC-10939863 by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration of A. Arulanantham)(Clarke, Edwina) (Entered: 04/08/2025) |
| 04/08/2025 | 33 | Judge William G. Young: ELECTRONIC ORDER entered granting 32 Motion for Leave to Appear Pro Hac Vice Added Ahilan Arulanantham. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAP) (Entered: 04/08/2025) |
| 04/08/2025 | 34 | Amicus Curiae APPEARANCE entered by Joshua M. Daniels on behalf of Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University Council American Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP (Daniels, Joshua) |

| | | |
|---|---|---|
| | | **Modified on 4/9/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Daniels Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen. (MAP).**<br><br>(Entered: 04/08/2025) |
| 04/08/2025 | 35 | MOTION for Leave to Appear Pro Hac Vice for admission of Yaman Salahi, Philip Monrad, Peter Saltzman, Arthur Liou, Julia Lum, Filing fee: $ 625, receipt number AMADC-10941087 by Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University CouncilAmerican Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP. (Attachments: # 1 Exhibit Exhibit A - PHV Attorney Declarations)(Daniels, Joshua) (Entered: 04/08/2025) |
| 04/08/2025 | 36 | MOTION for Leave to File *[Proposed] Amici Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction* by Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University CouncilAmerican Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP. (Attachments: # 1 [Proposed] Amici Curiae Brief in Support of Plaintiffs' Motion for Preliminary Injunction)(Daniels, Joshua) (Entered: 04/08/2025) |
| 04/09/2025 | 37 | Judge William G. Young: ELECTRONIC ORDER entered granting 31 Joint MOTION for a Briefing Schedule re 16 Order on Motion to Expedite,, by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (KB) (Entered: 04/09/2025) |
| 04/09/2025 | 38 | SUMMONS Returned Executed by American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors, American Association of University Professors at New York University, Rutgers American |

| | | |
|---|---|---|
| | | Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Krishnan, Ramya) (Entered: 04/09/2025) |
| 04/09/2025 | 39 | Judge William G. Young: ELECTRONIC ORDER entered granting 36 MOTION for Leave to File Amici Curiae Brief; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MAP) (Entered: 04/09/2025) |
| 04/09/2025 | 40 | Amicus Curiae APPEARANCE entered by David Rassoul Rangaviz on behalf of Commonwealth of Massachusetts. (Rangaviz, David)<br><br>**Modified on 4/9/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Rangaviz Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen. (MAP).**<br><br>(Entered: 04/09/2025) |
| 04/09/2025 | 41 | MOTION for Leave to File *Brief of Amici Curiae States (Unopposed)* by COMMONWEALTH OF MASSACHUSETTS.(Rangaviz, David) (Entered: 04/09/2025) |
| 04/09/2025 | 42 | Judge William G. Young: ELECTRONIC ORDER entered granting 35 Motion for Leave to Appear Pro Hac Vice Added Yaman Salahi, Philip Monrad, Peter Saltzman, Arthur Liou, and Julia Lum.<br><br><span style="color:red">**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**</span><br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 04/09/2025) |
| 04/09/2025 | 43 | AMICUS BRIEF filed by Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University CouncilAmerican Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP *Leave Granted 04/09/2025*. (Daniels, Joshua) (Entered: 04/09/2025) |

| 04/09/2025 | 44 | NOTICE of Appearance by Lindsay M Murphy on behalf of Todd Lyons, Donald J. Trump, United States of America, Marco Rubio, Department of State, Kristi Noem, Department of Homeland Security (Murphy, Lindsay) (Entered: 04/09/2025) |
|---|---|---|
| 04/09/2025 | 45 | Amicus Curiae APPEARANCE entered by Lauren G. Milgroom on behalf of The Presidents Alliance on Higher Education and Immigration (Milgroom, Lauren)<br><br>**Modified on 4/9/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Milgroom Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen. (MAP).**<br><br>(Entered: 04/09/2025) |
| 04/09/2025 | 46 | MOTION for Leave to File *[Proposed] Brief of Amicus Curiae* by The Presidents Alliance on Higher Education and Immigration. (Attachments: # 1 [Proposed] Brief of Amicus Curiae The Presidents' Alliance on Higher Education and Immigration in Support of Plaintiffs' Motion for a Preliminary Injunction)(Milgroom, Lauren) (Entered: 04/09/2025) |
| 04/09/2025 | 47 | Amicus Curiae APPEARANCE entered by Joel Anderson Fleming on behalf of The Presidents Alliance on Higher Education and Immigration. (Fleming, Joel) (Entered: 04/09/2025) |
| 04/10/2025 | 48 | Judge William G. Young: ELECTRONIC ORDER entered **allowed** 41 MOTION for Leave to File Brief of Amici Curiae States (Unopposed) ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MAP) (Entered: 04/10/2025) |
| 04/10/2025 | 49 | Judge William G. Young: ELECTRONIC ORDER entered **allowed** 46 MOTION for Leave to File of Amicus Curiae Brief; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MAP) (Entered: 04/10/2025) |
| 04/10/2025 | 50 | AMICUS BRIEF filed by The Presidents Alliance on Higher Education and Immigration . (Milgroom, Lauren) (Entered: 04/10/2025) |
| 04/10/2025 | 51 | Amicus Curiae APPEARANCE entered by Yaman Salahi on behalf of Council of UC Faculty Associations, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University Council American Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP, Rutgers American Association of University Professors-American Federation of Teachers (Salahi, Yaman) |

| | | |
|---|---|---|
| | | **Modified on 4/11/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Salahi Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen. (MAP). (Entered: 04/10/2025)** |
| 04/10/2025 | 52 | MOTION for Leave to Appear Pro Hac Vice for admission of Zachary Smith Filing fee: $ 125, receipt number AMADC-10945533 by The Presidents Alliance on Higher Education and Immigration. (Attachments: # 1 Affidavit)(Milgrom, Lauren) (Entered: 04/10/2025) |
| 04/10/2025 | 53 | MOTION for Leave to Appear Pro Hac Vice for admission of Kayla Chen Filing fee: $ 125, receipt number AMADC-10945552 by The Presidents Alliance on Higher Education and Immigration. (Attachments: # 1 Affidavit)(Milgrom, Lauren) (Entered: 04/10/2025) |
| 04/10/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrew Dunlap Filing fee: $ 125, receipt number AMADC-10945600 by The Presidents Alliance on Higher Education and Immigration. (Attachments: # 1 Affidavit Affidavit in Support of Motion to Admit Andrew Dunlap Pro Hac Vice)(Milgrom, Lauren) (Entered: 04/10/2025) |
| 04/11/2025 | 55 | Judge William G. Young: ELECTRONIC ORDER entered granting 52 Motion for Leave to Appear Pro Hac Vice Added Zachary Smith.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>An Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 04/11/2025) |
| 04/11/2025 | 56 | Judge William G. Young: ELECTRONIC ORDER entered granting 53 Motion for Leave to Appear Pro Hac Vice Added Kayla Chen.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>An Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 04/11/2025) |
| 04/11/2025 | 57 | Judge William G. Young: ELECTRONIC ORDER entered granting 54 Motion for Leave to Appear Pro Hac Vice Added Andrew Dunlap. |

| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |
| | | An Amicus Curiae APPEARANCE must be entered on the docket by the newly admitted attorney. |
| | | (MAP) (Entered: 04/11/2025) |
| 04/11/2025 | 58 | Amicus Curiae APPEARANCE entered by Julia Lum on behalf of Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University Council American Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP (Lum, Julia) (MAP). **Modified on 4/13/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Lum Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen.** (Entered: 04/11/2025) |
| 04/11/2025 | 59 | Amicus Curiae APPEARANCE entered by Arthur Liou on behalf of Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University Council American Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP (Liou, Arthur) |

| | | **Modified on 4/13/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Liou Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen.** |
| | | (Entered: 04/11/2025) |
| 04/11/2025 | [60](#) | AMICUS BRIEF filed by Commonwealth of Massachusetts *and 18 other states*. (Rangaviz, David) (Entered: 04/11/2025) |
| 04/11/2025 | [61](#) | Amicus Curiae APPEARANCE entered by Philip Monrad on behalf of Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University CouncilAmerican Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP (Monrad, Philip) <br><br> **Modified on 4/13/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Monrad Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen.** <br><br> (Entered: 04/11/2025) |
| 04/11/2025 | [62](#) | Amicus Curiae APPEARANCE entered by Peter W Saltzman on behalf of Council of UC Faculty Associations, Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, UC Merced Faculty Association, Riverside Faculty Association, San Diego Faculty Association, UCSF Faculty Association, UC Santa Barbara Faculty Association, University of California Los Angeles Faculty Association, Santa Cruz Faculty Association, University Council American Federation of Teachers Local 1474, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Concerned Stanford Faculty, Dartmouth College Chapter of the AAUP, Del Mar College Chapter of the AAUP-AFT, Massachusetts Institute of Technology Chapter of the AAUP, AAUP Princeton, Rice University Advocacy Chapter of the AAUP, Tufts University Chapter of the AAUP, University of Houston Chapter of the AAUP, John Hopkins University Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Northwestern University Chapter of the AAUP, University of Dallas Chapter of the AAUP, AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, Yale University Chapter of the AAUP, Wesleyan University Chapter of the AAUP (Saltzman, Peter) <br><br> **Modified on 4/13/2025 to Correct Docket Text and CM/ECF Filing Event As Counsel Saltzman Filed the Notice of Appearance Under the Wrong Event in CM/ECF NextGen.** <br><br> (Entered: 04/11/2025) |
| 04/14/2025 | [63](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Talya Nevins Filing fee: $ 125, receipt number AMADC-10949148 by American Association of University |

| | | |
|---|---|---|
| | | Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration of T. Nevins)(Clarke, Edwina) (Entered: 04/14/2025) |
| 04/14/2025 | 64 | Judge William G. Young: ELECTRONIC ORDER entered granting 63 Motion for Leave to Appear Pro Hac Vice Added Talya Nevins.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 04/14/2025) |
| 04/14/2025 | 65 | MEMORANDUM in Opposition re 13 MOTION for Preliminary Injunction MOTION to Expedite *Briefing* filed by Todd Lyons, Donald J. Trump, United States of America, Marco Rubio, Department of State, Kristi Noem, Department of Homeland Security. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Declaration)(Kanter, Ethan) (Entered: 04/14/2025) |
| 04/15/2025 | 66 | NOTICE of Appearance by David Jacob Zimmer on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Zimmer, David) (Entered: 04/15/2025) |
| 04/15/2025 | 67 | NOTICE of Appearance by Talya Nevins on behalf of American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association (Nevins, Talya) (Entered: 04/15/2025) |
| 04/18/2025 | 68 | ~~REPLY to Response to 13 MOTION for Preliminary Injunction MOTION to Expedite *Briefing* filed by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Supplemental Declaration of R. Krishnan, # 2 Ex. A, # 3 Ex. B, # 4 Ex. C, # 5 Ex. D, # 6 Ex. E, # 7 Ex. F, # 8 Ex. G, # 9 Ex. H)(Krishnan, Ramya)~~ Modified on 4/21/2025 as Counsel filed a Corrected Version of the Reply - See ECF No. 69 (MAP). Modified on 4/21/2025 (MAP). (Entered: 04/18/2025) |
| 04/18/2025 | 69 | REPLY to Response to 13 MOTION for Preliminary Injunction MOTION to Expedite *Briefing (corrected pdf)* filed by American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association. (Attachments: # 1 Declaration of Ramya Krishnan, # 2 Exhibit A, # |

| | | |
|---|---|---|
| | | 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H)(Krishnan, Ramya) (Entered: 04/18/2025) |
| 04/21/2025 | 70 | NOTICE of Appearance by Harry Graver on behalf of Todd Lyons, Donald J. Trump, United States of America, Marco Rubio, Department of State, Kristi Noem, Department of Homeland Security (Graver, Harry) (Entered: 04/21/2025) |
| 04/23/2025 | 71 | NOTICE of Appearance by Shawna Yen on behalf of Todd Lyons, Donald J. Trump, United States of America, Marco Rubio, Department of State, Kristi Noem, Department of Homeland Security (Yen, Shawna) (Entered: 04/23/2025) |
| 04/23/2025 | 72 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 4/23/2025 re 13 MOTION for Preliminary Injunction filed by American Association of University Professors-Harvard Faculty Chapter, Rutgers American Association of University Professors-American Federation of Teachers, Middle East Studies Association, American Association of University Professors, American Association of University Professors at New York University. The Court enters an order on # 13 Motion for Preliminary Injunction; the motion is collapsed with trial on the merits in accordance with Rule 65(a). The parties agree to treat defendants' opposition as a motion to dismiss and wish to proceed with argument today. Court hears argument on the opposition treated as a motion to dismiss. Court takes the matter under advisement. The Court will issue a written order on the motion to dismiss. If the case survives the motion, the Court will hold a prompt status conference to discuss the trial. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Ramya Krishnan, Jameel Jaffer, Talya Nevins, Caroline DeCell for plaintiffs and Harry Graver and Shawna Yen for defendants) (KB) (Entered: 04/23/2025) |
| 04/29/2025 | 73 | Judge William G. Young: ORDER entered.<br><br>MEMORANDUM AND ORDER<br><br>For the reasons stated above, the Motion to Dismiss is ALLOWED in part as to count three and DENIED in part as to counts one, two, and four.<br><br>A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.<br><br>(Sonnenberg, Elizabeth) (Entered: 04/29/2025) |
| 04/29/2025 | 74 | ELECTRONIC NOTICE of Hearing. Case Management Conference set for 5/6/2025 10:00 AM in Courtroom 18 (In person only with remote access provided) before Judge William G. Young. (KB) (Entered: 04/29/2025) |
| 04/30/2025 | 75 | Transcript of Preliminary Injunction/Motion to Dismiss Hearing held on April 23, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 5/21/2025. Redacted Transcript Deadline set for 6/2/2025. Release of Transcript Restriction set for 7/29/2025. (DRK) (Entered: 04/30/2025) |
| 04/30/2025 | 76 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/30/2025) |
| 05/05/2025 | 77 | MOTION for Leave to Appear Pro Hac Vice for admission of Scott Wilkens Filing fee: $ 125, receipt number AMADC-10987709 by American Association of University Professors, American Association of University Professors at New York University, |

| | | |
|---|---|---|
| | | American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of S. Wilkens)(Clarke, Edwina) (Entered: 05/05/2025) |
| 05/05/2025 | 78 | Judge William G. Young: ELECTRONIC ORDER entered granting 77 Motion for Leave to Appear Pro Hac Vice Added Scott Wilkens.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 05/05/2025) |
| 05/05/2025 | 79 | MOTION for Leave to Appear Pro Hac Vice for admission of Noam Biale Filing fee: $ 125, receipt number AMADC-10989695 by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Delaration of N. Biale)(Clarke, Edwina) (Entered: 05/05/2025) |
| 05/05/2025 | 80 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael Tremonte Filing fee: $ 125, receipt number AMADC-10989707 by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of M. Tremonte)(Clarke, Edwina) (Entered: 05/05/2025) |
| 05/05/2025 | 81 | Judge William G. Young: ELECTRONIC ORDER entered granting 79 Motion for Leave to Appear Pro Hac Vice Added Noam Biale.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 05/05/2025) |
| 05/05/2025 | 82 | Judge William G. Young: ELECTRONIC ORDER entered granting 80 Motion for Leave to Appear Pro Hac Vice Added Michael Tremonte. |

| | | |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(MAP) (Entered: 05/05/2025) |
| 05/06/2025 | 83 | NOTICE of Appearance by Scott B. Wilkens on behalf of American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers (Wilkens, Scott) (Entered: 05/06/2025) |
| 05/06/2025 | 84 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Case Management Conference held on 5/6/2025. Court discusses case and expectations for the bench trial. After hearing from the parties, the Court sets the bench trial for July 7, 2025 at 9:00 AM. For trials the Court generally sits from 9am- 1pm. The Court will take witnesses out of order if necessary. Defendants do not need to file a formal answer. The Court will hold a status hearing Thursday May 22, 2025, at 2:00PM in Courtroom 18 (In person only with remote access provided). (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Ramya Krishnan, Jameel Jaffer, Scott B. Wilkens, Noam Biale, and Michael Tremonte for plaintiffs and Shawna Yen for the defendants) (KB) (Entered: 05/06/2025) |
| 05/06/2025 | 85 | NOTICE of Appearance by Noam Biale on behalf of American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers (Biale, Noam) (Entered: 05/06/2025) |
| 05/06/2025 | 86 | NOTICE of Appearance by Michael Tremonte on behalf of American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers (Tremonte, Michael) (Entered: 05/06/2025) |
| 05/08/2025 | 87 | Transcript of Case Management Conference held on May 6, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 5/29/2025. Redacted Transcript Deadline set for 6/9/2025. Release of Transcript Restriction set for 8/6/2025. (DRK) (Entered: 05/08/2025) |
| 05/08/2025 | 88 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/08/2025) |
| 05/14/2025 | 89 | ELECTRONIC NOTICE OF RESCHEDULING: Status Conference reset for 5/22/2025 02:45 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. **Note: change is to time only!** (KB) (Entered: 05/14/2025) |

| 05/21/2025 | 90 | NOTICE of Appearance by Lindsay M Murphy on behalf of Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Murphy, Lindsay) (Entered: 05/21/2025) |
|---|---|---|
| 05/21/2025 | 91 | MOTION MOTION TO APPEAR REMOTELY AT HEARING, OR ALTERNATIVELY, STAY HEARING UNTIL COUNSEL IS AVAILABLE FOR IN-PERSON APPEARANCE by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America.(Murphy, Lindsay) (Entered: 05/21/2025) |
| 05/21/2025 | 92 | Judge William G. Young: ELECTRONIC ORDER entered granting 91 MOTION TO APPEAR REMOTELY AT HEARING, OR ALTERNATIVELY, STAY HEARING UNTIL COUNSEL IS AVAILABLE FOR IN-PERSON APPEARANCE by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. Counsel may appear remotely for the 5/22/2025 hearing. (KB) (Entered: 05/21/2025) |
| 05/21/2025 | 93 | NOTICE of Withdrawal of Appearance by Lindsay M Murphy (Murphy, Lindsay) (Entered: 05/21/2025) |
| 05/21/2025 | 94 | MOTION for Protective Order *and Motion to Dispense With Rule 65(a) Trial on the Merits* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America.(Kanter, Ethan) (Entered: 05/21/2025) |
| 05/21/2025 | 95 | Letter/request (non-motion) from Noam Biale *re: status of discovery*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Biale, Noam) (Entered: 05/21/2025) |
| 05/22/2025 | 96 | NOTICE of Appearance by William Kanellis on behalf of Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Kanellis, William) (Entered: 05/22/2025) |
| 05/22/2025 | 97 | Letter/request (non-motion) from Ramya Krishnan *re: Defendants' Motion for a Protective Order and Motion to Dispense with Rule 65(a) Trial on the Merits*. (Krishnan, Ramya) (Entered: 05/22/2025) |
| 05/22/2025 | 98 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Status Conference held on 5/22/2025. Court addresses how the case will proceed. Parties are not to file letters going forward. They may file the appropriate motion or opposition etc. The Court will consider all motions filed in this case as emergency motions and oppositions shall be filed within three business days. Defendants shall produce full administrative record as discussed by noon on Thursday, May 27th and the Court will review it. The Court sets a motion hearing on #94 MOTION for Protective Order and Motion to Dispense With Rule 65(a) Trial on the Merits for June 2, 2025 at 11am. Discovery will be produced related to five people named by plaintiffs in Court. Defendants will produce documents already produced in other cases by noon Thursday, May 29th. Parties discuss trial logistics. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Ramya Krishnan, Noam Biale, Michael Tremonte, Alexander Abdo, Jameel Jaffer, Scott B. Wilkens for plaintiffs and Ethan B. Kanter and William Kanellis for defendants) (KB) (Entered: 05/22/2025) |
| 05/22/2025 | 99 | ELECTRONIC NOTICE Setting Hearing on Motion 94 MOTION for Protective Order *and Motion to Dispense With Rule 65(a) Trial on the Merits*. Motion Hearing set for 6/2/2025 11:00 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. Audio access to the hearing may be available to the media and |

| | | |
|---|---|---|
| | | public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(KB) (Entered: 05/22/2025) |
| 05/22/2025 | 100 | MOTION for Leave to Appear Pro Hac Vice for admission of Courtney Gans Filing fee: $ 125, receipt number AMADC-11026223 by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of C. Gans)(Clarke, Edwina) (Entered: 05/22/2025) |
| 05/23/2025 | 101 | Judge William G. Young: ELECTRONIC ORDER entered granting 100 Motion for Leave to Appear Pro Hac Vice Added Courtney Gans.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAP) (Entered: 05/23/2025) |
| 05/28/2025 | 102 | Transcript of Status Conference held on May 22, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/18/2025. Redacted Transcript Deadline set for 6/30/2025. Release of Transcript Restriction set for 8/26/2025. (DRK) (Entered: 05/28/2025) |
| 05/28/2025 | 103 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/28/2025) |
| 05/28/2025 | 104 | ELECTRONIC NOTICE Resetting Hearing on Motion 94 MOTION for Protective Order *and Motion to Dispense With Rule 65(a) Trial on the Merits* : At request of the parties the Motion Hearing is reset for 6/2/2025 12:00 PM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. **Note: change is to time only! Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.** |

| | | |
|---|---|---|
| | | **For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.**<br><br>**(KB) (Entered: 05/28/2025)** |
| 05/29/2025 | 105 | MOTION to Seal by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Text of Proposed Order)(Kanter, Ethan) (Entered: 05/29/2025) |
| 05/29/2025 | 106 | Certified Administrative Record by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Kanter, Ethan) Modified on 5/29/2025 (MAP). (Entered: 05/29/2025) |
| 05/29/2025 | 107 | Assented to MOTION Unopposed motion to file administrative record out of time re 106 Notice (Other) by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America.(Kanter, Ethan) (Entered: 05/29/2025) |
| 05/29/2025 | 108 | NOTICE of Appearance by Courtney Gans on behalf of American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers (Gans, Courtney) (Entered: 05/29/2025) |
| 05/30/2025 | 109 | NOTICE of Appearance by Paul F. Stone on behalf of Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Stone, Paul) (Entered: 05/30/2025) |
| 05/30/2025 | 110 | NOTICE of Withdrawal of Appearance by Rayford A. Farquhar (Farquhar, Rayford) (Entered: 05/30/2025) |
| 06/02/2025 | 111 | Judge William G. Young ELECTRONIC ORDER entered: **allowed** 107 Motion Assented to MOTION Unopposed motion to file administrative record out of time (MAP) (Entered: 06/02/2025) |
| 06/02/2025 | 112 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 6/2/2025 re 94 MOTION for Protective Order *and Motion to Dispense With Rule 65(a) Trial on the Merits* filed by Kristi Noem, Department of Homeland Security, Department of State, Marco Rubio, Todd Lyons, United States of America, Donald J. Trump. Court hears from parties about whether they have agreed upon protective order. Plaintiffs agree to provisionally sealing admin record. Administrative record has been filed under seal. Court hears argument on the motion. Court denies the motion. The Court will proceed to trial on July 7th. Court to set final pretrial conference in late June. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Alexander Abdo, Caroline DeCell, Courtney Gains, for plaintiffs and Ethan Kanter, Shawna Yen, and William Kanellis for defendants) (KB) (Entered: 06/03/2025) |
| 06/03/2025 | 113 | ELECTRONIC NOTICE of Hearing. Final Pretrial Conference set for 6/26/2025 03:00 PM in Courtroom 18 (In person only with remote access provided) before Judge William G. Young. (KB) (Entered: 06/03/2025) |
| 06/04/2025 | 114 | MOTION for Protective Order *Barring Retaliation and Restricting Defendants' Use of Information Disclosed in the Course of Litigation* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American |

| | | |
|---|---|---|
| | | Federation of Teachers. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Busch, Jackson) (Entered: 06/04/2025) |
| 06/05/2025 | 115 | Transcript of Motion Hearing held on June 2, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. (DRK) (Entered: 06/05/2025) |
| 06/05/2025 | 116 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 06/05/2025) |
| 06/07/2025 | 117 | MOTION for Protective Order *To Preclude Discovery That Contradicts Limitations Set By The Court* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kanellis, William) (Entered: 06/07/2025) |
| 06/09/2025 | 118 | Opposition re 117 MOTION for Protective Order *To Preclude Discovery That Contradicts Limitations Set By The Court* filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of S. Wilkens, # 2 Exhibit A to Declaration of S. Wilkens)(Wilkens, Scott) (Entered: 06/09/2025) |
| 06/09/2025 | 119 | RESPONSE to Motion re 114 MOTION for Protective Order *Barring Retaliation and Restricting Defendants' Use of Information Disclosed in the Course of Litigation* filed by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Kanter, Ethan) (Entered: 06/09/2025) |
| 06/10/2025 | 120 | MOTION for Leave to File by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Kanter, Ethan) (Additional attachment(s) added on 6/10/2025: # 1 Exhibit A) (MAP). (Main Document 120 replaced on 6/10/2025) (MAP). (Entered: 06/10/2025) |
| 06/10/2025 | 121 | MOTION for Leave to Appear Pro Hac Vice for admission of Alexandra Conlon Filing fee: $ 125, receipt number AMADC-11059277 by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of A. Conlon)(Clarke, Edwina) (Entered: 06/10/2025) |
| 06/10/2025 | 122 | Judge William G. Young: ELECTRONIC ORDER entered granting 121 Motion for Leave to Appear Pro Hac Vice Added Alexandra Conlon.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAP) (Entered: 06/10/2025) |
| 06/10/2025 | 123 | MOTION for Leave to File *Reply* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 [Proposed] Reply)(Busch, Jackson) (Entered: 06/10/2025) |
| 06/10/2025 | 124 | Judge William G. Young ELECTRONIC ORDER entered: 114 MOTION for Protective Order Barring Retaliation and Restricting Defendants' Use of Information Disclosed in the Course of Litigation. <br><br> **No noncitizen providing evidence shall, by reason thereof, suffer any adjustment in their immigration status.** <br><br> (MAP) (Entered: 06/10/2025) |
| 06/10/2025 | 125 | Judge William G. YoungELECTRONIC ORDER entered: 117 MOTION for Protective Order To Preclude Discovery That Contradicts Limitations Set By The Court. <br><br> **The defendant's misquote the plaintiffs' discovery requests in seeking a protective order. The plaintiffs nowhere seek governmental deliberations. Nevertheless, the plaintiffs' requests are overbroad in that they seek data on 9 specific individuals. Request for production 1 is limited to the 5 individuals named in the recent hearing and the word "concerning" is substituted for the phrase "related to." In all other respects the motion for a protective order is DENIED.** <br><br> (MAP) (Entered: 06/10/2025) |
| 06/10/2025 | 126 | Joint MOTION Enter Stipulation and Proposed Order Regarding Statements of Government Officials by American Association of University Professors, Middle East Studies Association. (Attachments: # 1 Text of Proposed Order, # 2 Appendix Certificate of Service)(Biale, Noam) (Entered: 06/10/2025) |
| 06/10/2025 | 127 | NOTICE of Appearance by Victoria M Santora on behalf of Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Santora, Victoria) (Entered: 06/10/2025) |
| 06/11/2025 | 128 | MOTION for Protective Order *for the Production of Documents and Exchange of Confidential Information* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A)(Wilkens, Scott) (Entered: 06/11/2025) |
| 06/11/2025 | 129 | Judge William G. Young: ELECTRONIC ORDER entered **allowed** 123 MOTION for Leave to File Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MAP) (Entered: 06/11/2025) |

| 06/11/2025 | 130 | Judge William G. Young ORDER entered: STIPULATION AND ORDER.(MAP) (Entered: 06/11/2025) |
|---|---|---|
| 06/11/2025 | 131 | NOTICE OF MANUAL FILING by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Kanter, Ethan) (Entered: 06/11/2025) |
| 06/11/2025 | 132 | REPLY to Response to 114 MOTION for Protective Order *Barring Retaliation and Restricting Defendants' Use of Information Disclosed in the Course of Litigation* filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Busch, Jackson) (Entered: 06/11/2025) |
| 06/11/2025 | 133 | Joint MOTION for Order by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Text of Proposed Order)(Kanter, Ethan) (Entered: 06/11/2025) |
| 06/11/2025 | 134 | NOTICE of Appearance by Alexandra Conlon on behalf of American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers (Conlon, Alexandra) (Entered: 06/11/2025) |
| 06/11/2025 | 135 | RESPONSE to Motion re 128 MOTION for Protective Order *for the Production of Documents and Exchange of Confidential Information* filed by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Kanter, Ethan) (Additional attachment(s) added on 6/12/2025: # 1 Exhibit A, # 2 Exhibit B) (MAP). (Main Document 135 replaced on 6/12/2025) (MAP). (Entered: 06/11/2025) |
| 06/15/2025 | 136 | MOTION to Compel *Identity of Plaintiffs' Witnesses* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Kanellis, William) (Entered: 06/15/2025) |
| 06/16/2025 | 137 | Assented to MOTION for Protective Order by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America.(Kanter, Ethan) (Entered: 06/16/2025) |
| 06/16/2025 | 138 | Opposition re 136 MOTION to Compel *Identity of Plaintiffs' Witnesses* filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of N. Biale, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration)(Abdo, Alexander) (Entered: 06/16/2025) |
| 06/17/2025 | 139 | Judge William G. Young: ELECTRONIC ORDER entered 136 MOTION to Compel Identity of Plaintiffs' Witnesses.<br><br>**Allowed. The Court has already entered a protective order to guard those giving testimony from retribution.**<br><br>(MAP) (Entered: 06/17/2025) |

| 06/17/2025 | 140 | Judge William G. Young: ELECTRONIC ORDER entered **allowed** 137 Assented to MOTION for Protective Order. (MAP) (Entered: 06/17/2025) |
|---|---|---|
| 06/18/2025 | 141 | Joint MOTION to Adjourn Deadline for Joint Pretrial Memorandum by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers.(Biale, Noam) (Entered: 06/18/2025) |
| 06/18/2025 | 142 | Judge William G. Young: ELECTRONIC ORDER entered granting 141 Joint MOTION to Adjourn Deadline for Joint Pretrial Memorandum by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers.Joint Pretrial Memorandum due June 25, 2025. (KB) (Entered: 06/18/2025) |
| 06/18/2025 | 143 | Assented to MOTION for Protective Order by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers.(Nevins, Talya) (Entered: 06/18/2025) |
| 06/18/2025 | 144 | Assented to MOTION to Seal Document *Motion to Compel Answers to Plaintiffs Interrogatories, the Production of Documents, and the Production of Information Improperly Withheld as Privileged* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Text of Proposed Order)(Wilkens, Scott) (Entered: 06/18/2025) |
| 06/19/2025 | 145 | Amended MOTION for Protective Order by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers.(Nevins, Talya) (Entered: 06/19/2025) |
| 06/23/2025 | 146 | ELECTRONIC NOTICE OF RESCHEDULING: Final Pretrial Conference reset for 6/26/2025 11:30 AM in Courtroom 18 (In person with remote access provided) before Judge William G. Young. **Note: change is to time only!** Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(KB) (Entered: 06/23/2025) |
| 06/23/2025 | 147 | Judge William G. Young: ORDER entered. PROTECTIVE ORDER for the Production of Documents and Exchange of Confidential Information. (MAP) (Entered: 06/23/2025) |
| 06/23/2025 | 148 | Judge William G. Young: ELECTRONIC ORDER entered **allowed** 145 Amended MOTION for Protective Order (MAP) (Entered: 06/23/2025) |

| 06/23/2025 | 149 | Judge William G. Young: ELECTRONIC ORDER entered **allowed** 144 Assented to MOTION to Seal Document Motion to Compel Answers to Plaintiffs Interrogatories, the Production of Documents, and the Production of Information Improperly Withheld as Privileged. (MAP) (Entered: 06/23/2025) |
|---|---|---|
| 06/23/2025 | 150 | NOTICE of Appearance by Jessica Danielle Strokus on behalf of Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Strokus, Jessica) (Entered: 06/23/2025) |
| 06/23/2025 | 151 | Judge William G. Young: ORDER entered granting 133 Joint MOTION for Order by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (KB) (Entered: 06/23/2025) |
| 06/23/2025 | 152 | MOTION for Reconsideration by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America, University of California Los Angeles Faculty Association.(Kanter, Ethan) (Entered: 06/23/2025) |
| 06/24/2025 | 153 | MOTION to Compel (FILED UNDER SEAL) by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit B)(MAP) (Entered: 06/24/2025) |
| 06/24/2025 | 154 | MOTION in Limine to Preclude Introduction of Evidence Involving Factual Disputes that Should Be Resolved in the Identified Noncitizens' Litigation ( Responses due by 7/8/2025) by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Exhibit A-F)(Kanter, Ethan) **Modified on 6/25/2025 to Correct Docket Text and CM/ECF Filing Event** (MAP). (Entered: 06/24/2025) |
| 06/24/2025 | 155 | MOTION to Compel *Complete Answers to Plaintiffs Interrogatories, Production of Documents, and Disclosure of Information Improperly Withheld as Privileged* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A (Decl. of Scott Wilkens), # 2 Exhibit 1 (to Decl. of Scott Wilkens), # 3 Exhibit 2 (to Decl. of Scott Wilkens), # 4 Exhibit 3 (to Decl. of Scott Wilkens), # 5 Exhibit 4 (to Decl. of Scott Wilkens), # 6 Exhibit 5 (to Decl. of Scott Wilkens), # 7 Exhibit 6 (to Decl. of Scott Wilkens), # 8 Exhibit 7 (to Decl. of Scott Wilkens), # 9 Exhibit 8 (to Decl. of Scott Wilkens), # 10 Exhibit 9 (to Decl. of Scott Wilkens), # 11 Exhibit 10 (to Decl. of Scott Wilkens), # 12 Exhibit B)(Wilkens, Scott) (Entered: 06/24/2025) |
| 06/25/2025 | 156 | RESPONSE to Motion re 152 MOTION for Reconsideration filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A)(Wilkens, Scott) (Entered: 06/25/2025) |
| 06/25/2025 | 157 | MOTION to Permit Remote Testimony by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American |

| | | |
|---|---|---|
| | | Federation of Teachers. (Attachments: # 1 Declaration of N. Biale, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Exhibit C to Declaration)(Biale, Noam) (Entered: 06/25/2025) |
| 06/25/2025 | 158 | NOTICE of Appearance by Nancy Safavi on behalf of Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Safavi, Nancy) (Entered: 06/25/2025) |
| 06/25/2025 | 159 | RESPONSE to Motion re 154 MOTION in Limine to Preclude Introduction of Evidence Involving Factual Disputes that Should Be Resolved in the Identified Noncitizens' Litigation filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Abdo, Alexander) (Entered: 06/25/2025) |
| 06/25/2025 | 160 | PRETRIAL MEMORANDUM by AAUP Advocacy Chapter at the University of Texas at Austin, AAUP Advocacy Chapter at the University of Texas at Dallas, AAUP Princeton, Berkeley Faculty Association, Boston University AAUP Chapter, Brown University Chapter of the AAUP, Commonwealth of Massachusetts, Concerned Stanford Faculty, Council of UC Faculty Associations, Dartmouth College Chapter of the AAUP, Davis Faculty Association, Del Mar College Chapter of the AAUP-AFT, Department of Homeland Security, Department of State, Irvine Faculty Association, John Hopkins University Chapter of the AAUP, Todd Lyons, Massachusetts Institute of Technology Chapter of the AAUP, Kristi Noem, Northwestern University Chapter of the AAUP, Rice University Advocacy Chapter of the AAUP, Riverside Faculty Association, Marco Rubio, San Diego Faculty Association, Santa Cruz Faculty Association, The Presidents Alliance on Higher Education and Immigration, Donald J. Trump, Tufts University Chapter of the AAUP, UC Merced Faculty Association, UC Santa Barbara Faculty Association, UCSF Faculty Association, United States of America, University CouncilAmerican Federation of Teachers Local 1474, University of California Los Angeles Faculty Association, University of Dallas Chapter of the AAUP, University of Houston Chapter of the AAUP, University of Minnesota Twin Cities Chapter of the AAUP, Wesleyan University Chapter of the AAUP, Yale University Chapter of the AAUP. (Kanter, Ethan) (Entered: 06/25/2025) |
| 06/25/2025 | 161 | MOTION to Correct 160 Pretrial Memorandum,,,,, by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America.(Kanter, Ethan) (Entered: 06/25/2025) |
| 06/25/2025 | 162 | Plaintiffs' ADDENDUM (FILED UNDER SEAL) to 153 MOTION to Compel by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A) (MAP) (Entered: 06/25/2025) |
| 06/26/2025 | 163 | ADDENDUM re 155 MOTION to Compel *Complete Answers to Plaintiffs Interrogatories, Production of Documents, and Disclosure of Information Improperly Withheld as Privileged* filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A)(Wilkens, Scott) (Entered: 06/26/2025) |
| 06/26/2025 | 164 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 6/26/2025. Bench trial to commence Monday, July 7, 2025 |

| | | |
|---|---|---|
| | | and is expected to last nine days (The Court will not sit July 16th). The Court will sit 9:00am-1:00pm. The Court reviews joint pretrial memo with counsel and goes over trial procedures. 15 minutes per side for openings and 30 minutes per side for closings. A joint exhibit list to be prepared marking any agreed to exhibits with numbers (one joint list, not a plaintiff's exhibit list and defendant's exhibit list) and any objected to exhibits to be marked with letters (A-Z, AA, AB, AC, etc.). Court addresses parties regarding video exhibits and depositions. Parties shall submit proposed findings and rulings before the close of trial. The Court makes rulings on motions as stated on the record. The Court allows # 157 Motion to Permit Remote Testimony in part as to the one witness for plaintiffs and one witness for defendants as stated in Court. Parties to confer about anonymization. If the case were to settle counsel shall notify the Clerk. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Noam Biale, Ramya Krishnan, Scott Wilkens, Michael Tremonte, Alexander Abdo, Courtney Gans for the plaintiffs and William Kanellis, Victoria Santora and Jessica Danielle Strokus for defendants) (KB) (Entered: 06/26/2025) |
| 06/27/2025 | 165 | Transcript of Final Pretrial held on June 26, 2025, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/18/2025. Redacted Transcript Deadline set for 7/28/2025. Release of Transcript Restriction set for 9/25/2025. (DRK) (Entered: 06/27/2025) |
| 06/27/2025 | 166 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 06/27/2025) |
| 06/27/2025 | 167 | NOTICE OF MANUAL FILING by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America (Kanter, Ethan) (Entered: 06/27/2025) |
| 06/27/2025 | 168 | Assented to MOTION to Seal by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Kanter, Ethan) (Entered: 06/27/2025) |
| 06/27/2025 | 169 | MOTION to Seal Document by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Text of Proposed Order)(Krishnan, Ramya) (Entered: 06/27/2025) |
| 06/27/2025 | 170 | Opposition re 155 MOTION to Compel *Complete Answers to Plaintiffs Interrogatories, Production of Documents, and Disclosure of Information Improperly Withheld as Privileged*, 153 MOTION to Compel filed by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Kanter, Ethan) (Entered: 06/27/2025) |
| 06/27/2025 | 171 | MOTION for Leave to File *Defendant's Response to (153) Plaintiffs' motion to compel* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America.(Kanter, Ethan) (Entered: 06/27/2025) |
| 06/30/2025 | 172 | Second MOTION to Compel by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. |

| | | |
|---|---|---|
| | | (Kanter, Ethan) (Additional attachment(s) added on 6/30/2025: # 1 Exhibit A) (MAP). (Main Document 172 replaced on 6/30/2025) (MAP). (Entered: 06/30/2025) |
| 06/30/2025 | 173 | Joint MOTION for Order to To Enter Revised Protective Order Covering Exchange of Confidential Information by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Kanter, Ethan) (Additional attachment(s) added on 6/30/2025: # 1 Proposed Protective Order, # 2 Exhibit A) (MAP). (Main Document 173 replaced on 6/30/2025) (MAP). (Entered: 06/30/2025) |
| 06/30/2025 | 174 | Judge William G. Young: ORDER entered (KB) (Entered: 06/30/2025) |
| 06/30/2025 | 175 | RESPONSE to Motion re 172 Second MOTION to Compel filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Biale, Noam) (Entered: 06/30/2025) |
| 07/01/2025 | 176 | Judge William G. Young: ELECTRONIC ORDER entered re 172 Second MOTION to Compel by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. Motion denied in light of plaintiffs' representations re providing discovery. Any inadequacy may be addressed and remedied at trial. (KB) (Entered: 07/01/2025) |
| 07/01/2025 | 177 | Judge William G. Young: ORDER entered. ADDENDUM to the PRETRIAL ORDER. (KB) (Entered: 07/01/2025) |
| 07/01/2025 | 178 | Judge William G. Young: AMENDED PROTECTIVE ORDER entered granting 173 Joint MOTION for Order to To Enter Revised Protective Order Covering Exchange of Confidential Information by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (KB) (Entered: 07/01/2025) |
| 07/01/2025 | 179 | TRIAL BRIEF *of Plaintiffs* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibits)(Krishnan, Ramya) (Entered: 07/01/2025) |
| 07/02/2025 | 180 | MOTION to Compel *Deposition of Nadje Al-Ali* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Exhibit A)(Kanellis, William) (Entered: 07/02/2025) |
| 07/02/2025 | 181 | NOTICE OF MANUAL FILING by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America Submission for In Camera Ex Parte Review (Kanter, Ethan) (Entered: 07/02/2025) |
| 07/02/2025 | 182 | RESPONSE to Motion re 180 MOTION to Compel *Deposition of Nadje Al-Ali* filed by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibit A) (Biale, Noam) (Entered: 07/02/2025) |
| 07/03/2025 | 183 | Judge William G. Young: ELECTRONIC ORDER entered 180 MOTION to Compel Deposition of Nadje Al-Ali. |

| | | |
|---|---|---|
| | | **Denied. The defendants have waived their right to depose this witness.**<br><br>(MAP) (Entered: 07/03/2025) |
| 07/07/2025 | 184 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial Day 1 held on 7/7/2025. Parties make opening statements. Court issues sequestration order regarding witnesses. Plaintiffs call Megan Hyska. Witness sworn. Direct by plaintiffs. Cross by defendants. Re-direct. Witness steps down. Plaintiffs call Nadje Al-Ali. Witness sworn. Direct by plaintiffs. Exhibits moved into evidence: 65, 66, 67, 68, 69. Exhibit I marked for identification only. Trial to resume 7/8/2025 at 9:00 AM. Court resumes in afternoon. Government submitted documents for in camera review. Court discusses limits of law enforcement privilege and its view on what documents it would consider to be privileged. By Friday, July 11th at noon the defendants shall submit a detailed privilege log. The amended protective order is allowed. After discussing with the parties, the Court finds as moot # 169 Plaintiff's Motion to Seal the Pretrial Brief. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Noem Biale, Alexander Abdo, Alexandra Conlon, Ramya Krishnan, Michal Tremonte, Courtney Gans, Scott Wilkens for plaintiffs and Jessica Strokus, William Kanellis, Victoria Santora, Ethan Kanter for defendants ) (KB) (Entered: 07/07/2025) |
| 07/07/2025 | 185 | NOTICE of Withdrawal of Appearance by Shawna Yen (Yen, Shawna) (Entered: 07/07/2025) |
| 07/07/2025 | 186 | TRIAL BRIEF *of Plaintiffs* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Exhibits 1-7, # 2 Exhibits 8-20)(Krishnan, Ramya) (Entered: 07/07/2025) |
| 07/07/2025 | 187 | ELECTRONIC NOTICE issued requesting PAPER courtesy copy for 186 Trial Brief,. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (MAP) (Entered: 07/07/2025) |
| 07/08/2025 | 188 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial Day Two held on 7/8/2025. Parties have submitted joint exhibit list (Exhibits 1-222). Court has all numbered exhibits. Plaintiffs recall Nadje Al-Ali. Court reminds witness she remains under oath. Direct testimony continues. Cross by defendants. Witness steps down. Plaintiffs call Michael Mathis. Witness sworn. Direct by plaintiffs. Cross by defendants. Witness steps down. Plaintiffs call Bernhard Nickel. Witness sworn. Direct by plaintiffs. Cross by defendants. Re-direct. Witness steps down. Plaintiffs call Sara Johnson. Witness sworn. Direct by plaintiffs. Witness steps down. Plaintiffs call Nadia Abu El-Haj. Witness sworn. Direct by plaintiffs. Trial to resume 7/9/2025 at 9:00AM. Exhibits admitted into evidence: 223, 224, 225, 226, 227. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Noem Biale, Alexander Abdo, Alexandra Conlon, Ramya Krishnan, Michal Tremonte, Courtney Gans, Scott Wilkens, Xiangnong Wang for plaintiffs and William Kanellis, Victoria Santora, Ethan Kanter for defendants)(KB) Modified on 7/9/2025 (KB). (Entered: 07/08/2025) |
| 07/08/2025 | 189 | NOTICE OF MANUAL FILING by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America *DEFENDANTS OBJECTIONS TO DISCLOSURE OF, AND ASSERTIONS OF PRIVILEGE OVER, SUBSET OF IN CAMERA DOCUMENTS IDENTIFIED BY THE COURT ON JULY 8, 2025* (Kanter, Ethan) (Entered: 07/08/2025) |

| | | |
|---|---|---|
| 07/08/2025 | 190 | Second MOTION for Reconsideration re 184 Bench Trial - Begun,,,,, *order that privilege is waived* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Marco Rubio, Donald J. Trump, United States of America. (Attachments: # 1 Exhibit Notice of Sealed Submission, # 2 Exhibit Armstrong Delib Proc Declaration, # 3 Exhibit Armstrong Law Enf Priv Declaration, # 4 Exhibit Lowkowski Presidential Priv Declaration, # 5 Exhibit Privilege log)(Kanter, Ethan) (Entered: 07/08/2025) |
| 07/08/2025 | 191 | MOTION to Compel *Deposition of DSAC McCormack* by American Association of University Professors, American Association of University Professors at New York University, American Association of University Professors-Harvard Faculty Chapter, Middle East Studies Association, Rutgers American Association of University Professors-American Federation of Teachers. (Attachments: # 1 Declaration of N. Biale, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Exhibit C to Declaration, # 5 Exhibit D to Declaration)(Biale, Noam) (Entered: 07/08/2025) |
| 07/09/2025 | 192 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial Day Three held on 7/9/2025. Plaintiffs recall Nadia Abu El-Haj. Witness is reminded she remains under oath. Continued direct testimony. Cross by defendants. Witness steps down. Plaintiffs call Peter Hatch. Witness sworn. Direct by plaintiffs. Court hears argument on # 190 Defendants' Motion to Partially Reconsider the Court's Order. The Court reconsiders its order as to email addresses and phone numbers. The Court orders defendants to produce the subset of documents to plaintiffs by 5pm 7/9/2025 with redactions to cell phone numbers and email addresses. The documents are subject to claw back, are for Attorney's eyes only and are for use in this litigation only. Defendants make an oral motion to stay the order. The Court allows the oral motion to stay until 9:00AM on 7/10/2025. Parties address # 191 Motion to Compel Deposition. Court denies motion. Parties to work out issues relating to the deposition. Direct examination of Peter Hatch continues. Trial to resume 9:00 AM 7/10/2025. Exhibits admitted in evidence: 228, 229, 230, 231 (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Noem Biale, Alexandra Conlon, Ramya Krishnan, Courtney Gans, Xiangnong Wang, Scott B. Wilkens for plaintiffs and Jessica Strokus, William Kanellis, Victoria Santora, Ethan Kanter for defendants ) (KB) (Entered: 07/09/2025) |
| 07/09/2025 | 193 | First MOTION for Clarification re 192 Order on Motion for Reconsideration,,,,,, Order on Motion to Compel,,,,, Bench Trial - Held,,,,, *of Court's order concerning Defendants' motion to reconsider* by Department of Homeland Security, Department of State, Todd Lyons, Kristi Noem, Donald J. Trump, United States of America. (Attachments: # 1 Exhibit A)(Kanter, Ethan) (Entered: 07/09/2025) |
| 07/10/2025 | 194 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Bench Trial Day Four held on 7/10/2025. Court addresses 193 Motion to Clarify July 9 Bench Ruling. Defendants will submit privilege log by Friday 7/11/25 at noon for the Court's review. Defendants confirm all documents in the subset have been turned over to plaintiffs per the Court order. Court will provide copies of ROA's to plaintiffs. Plaintiffs recall Peter Hatch. Court reminds the defendant he remains under oath. Continued direct by plaintiffs. Cross by defendants. Re-direct. Witness steps down. Plaintiffs call Amy Greer. Witness sworn. Direct by plaintiffs. Cross by defendants. Witness steps down. Plaintiffs will call witnesses next week and informs the Court of the schedule for witness testimony. Plaintiffs rest. Court has sidebar with counsel. Trial to resume 9:00 AM 7/11/2025. Exhibits admitted into evidence: 232, 233, 234, 235, 236, 237 (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)Attorneys present: Noem Biale, Alexandra Conlon, Ramya Krishnan, Scott B. Wilkens, Michael Tremonte, for plaintiffs and William Kanellis, Victoria Santora, Ethan Kanter for defendants ) (KB) (Entered: 07/10/2025) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, <br><br> RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and <br><br> MIDDLE EAST STUDIES ASSOCIATION, <br><br>           Plaintiffs, <br><br>     v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, <br><br> TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and <br><br> UNITED STATES OF AMERICA, <br><br>           Defendants. | Civil Action No. 1:25-cv-10685 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.    Implementing executive orders issued by President Trump in January, the defendant agencies have announced that they intend to carry out large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association (the "ideological-deportation policy"). The defendant agencies arrested Mahmoud Khalil, a recent Columbia University graduate and a legal permanent resident, pursuant to this policy earlier this month; they revoked the visas of at least four others, one of whom fled to Canada in fear of arrest; they supplied universities with the names of other students they intend to target under the policy; and they launched new social media surveillance programs aimed at identifying still others. After federal agents seized Khalil in the lobby of his university-owned student housing, President Trump warned: "This is the first arrest of many to come."

2.    While President Trump and other administration officials have described pro-Palestinian campus protests as "pro-Hamas," they have stretched that label beyond the breaking point to encompass any speech supportive of Palestinian human rights or critical of Israel's military actions in Gaza. They have left no doubt that their new policy entails the arrest, detention, and deportation of noncitizen students and faculty for constitutionally protected speech and association. In an interview twelve days ago on NPR's *Morning Edition*, Deputy Secretary of Homeland Security Troy Edgar responded this way to questions from journalist Michel Martin about the arrest of Mahmoud Khalil:

> **Edgar:** This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.

> **Martin:** He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?

**Edgar:** Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.

**Martin:** Is any criticism of the United States government a deportable offense?

**Edgar:** Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point . . .

**Martin:** Is any criticism of the government a deportable offense?

**Edgar:** Let me put it this way, Michel, imagine if he came in and filled out the form and said, "I want a student visa." They asked him, "What are you going to do here?" And he says, "I'm going to go and protest." We would have never let him into the country.

3.      By design, the agencies' policy has created a climate of repression and fear on university campuses. Out of fear that they might be arrested and deported for lawful expression and association, some noncitizen students and faculty have stopped attending public protests or resigned from campus groups that engage in political advocacy. Others have declined opportunities to publish commentary and scholarship, stopped contributing to classroom discussions, or deleted past work from online databases and websites. Many now hesitate to address political issues on social media, or even in private texts. The agencies' policy, in other words, is accomplishing its purpose: it is terrorizing students and faculty for their exercise of First Amendment rights in the past, intimidating them from exercising those rights now, and silencing political viewpoints that the government disfavors.

4.      Plaintiffs are associations whose members include thousands of faculty and students at universities across the country. They commence this action because the ideological-deportation policy, and the repressive climate it has engendered, has far-reaching implications for the expressive and associational rights of their U.S. citizen members, and for Plaintiffs themselves. The policy prevents or impedes Plaintiffs' U.S. citizen members from hearing from, and associating with, their noncitizen students and colleagues. It makes it practically impossible for

them to organize with those students and colleagues and to participate in political expression alongside them. It also makes it more difficult for them to benefit from those individuals' insights and scholarship and to collaborate with them on academic projects. Plaintiffs themselves have also been harmed because they are no longer able to learn from and engage with noncitizen members to the extent they once did, and because they have had to divert resources from other projects to address the all-too-real possibility that their noncitizen members will be arrested, imprisoned, and deported for exercising rights that the Constitution guarantees.

5.    The First Amendment protects the rights of Plaintiffs and their U.S. citizen members to hear from, and associate with, noncitizen students and faculty. Because the ideological-deportation policy abridges these rights without adequate justification, the policy is unconstitutional. Plaintiffs respectfully request that the Court declare that the policy violates the First and Fifth Amendments, as well as the Administrative Procedure Act, and enjoin Defendants from further implementation of it. They also seek a declaration that Defendants' campaign of coercive threats to arrest, detain, and deport noncitizen students and faculty based on their pro-Palestinian expression and association violates the First Amendment.

## JURISDICTION AND VENUE

6.    The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, the First and Fifth Amendments, and Article III of the U.S. Constitution.

7.    The Court has authority to issue the requested relief pursuant to 5 U.S.C. § 706(2), 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## PLAINTIFFS

9.    Plaintiff American Association of University Professors ("AAUP") is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at colleges and universities throughout the country. The AAUP's mission is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to accomplish their goals; and to ensure higher education's contribution to the common good. Founded in 1915, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in the country's colleges and universities. The AAUP is headquartered in Washington, DC.

10.    Plaintiff AAUP-Harvard Faculty Chapter ("Harvard-AAUP") is a nonprofit membership association of faculty across Harvard University's many departments and schools, and it is a chapter of the AAUP. Harvard-AAUP advocates for meaningful and democratic shared university governance, for academic freedom, and for the economic security of those who perform the institution's core instructional work. Harvard-AAUP is headquartered in Cambridge, Massachusetts.

11.    Plaintiff AAUP at New York University ("NYU-AAUP") is a membership association of faculty across NYU's many schools and campuses, and it is a chapter of the AAUP. NYU-AAUP is focused on defending academic freedom, encouraging participation in university governance, and advancing the interests of NYU faculty, students, and staff. NYU-AAUP is headquartered in New York City, New York.

12.     Plaintiff Rutgers AAUP-American Federation of Teachers ("Rutgers AAUP-AFT") is a membership association representing more than 5,000 full-time faculty, graduate workers, postdoctoral associates, and Education Opportunity Fund counselors at Rutgers University, and it is a chapter of the AAUP. Rutgers AAUP-AFT is one of the oldest higher education unions in the country, negotiating collective bargaining agreements for full-time faculty since 1970 and graduate workers since 1972. Rutgers AAUP-AFT's mission includes promoting the well-being of its unit members; protecting and improving the university's teaching, research, and service activities as a public good; promoting the development of the intellectual capacities and economic interests of students, the public, and workers at the university; advancing academic freedom and shared governance within the university; and building community and labor coalitions to achieve educational and economic justice. Rutgers AAUP-AFT is headquartered in New Brunswick, New Jersey.

13.     Plaintiff Middle East Studies Association ("MESA") is a 501(c)(3) nonprofit membership association of scholars, educators, and those interested in the study of the Middle East (including Southwest Asia, the Arab world, and North Africa). MESA's mission is to foster the study of the Middle East; to promote high standards of scholarship and teaching; and to encourage public understanding of the region and its peoples through programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom. MESA is incorporated in Arizona and its principal place of business is in Washington, DC.

## DEFENDANTS

14.     Defendant U.S. Department of State is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1).

15.    Defendant Marco Rubio is the Secretary of State and has ultimate authority over the operations of the State Department. In that capacity and through his agents, Defendant Rubio has broad authority over the operation and enforcement of the immigration laws. Defendant Rubio and the department he leads have adopted and begun implementing the ideological-deportation policy. Defendant Rubio is sued in his official capacity.

16.    Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the Executive Branch of the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). DHS includes various component agencies, including U.S. Immigration Customs and Enforcement ("ICE").

17.    Defendant Kristi Noem is the Secretary of Homeland Security and has ultimate authority over DHS. In that capacity and through her agents, Defendant Noem has broad authority over the operation and enforcement of the immigration laws. Defendant Noem and the department she leads have adopted and begun implementing the ideological-deportation policy. Defendant Noem is sued in her official capacity.

18.    Defendant Todd Lyons is the Acting Director of ICE and has authority over the operations of ICE. In that capacity and through his agents, Defendant Lyons has broad authority over the operation and enforcement of the immigration laws. Defendant Lyons and the agency he leads have adopted and begun implementing the ideological-deportation policy. Defendant Lyons is sued in his official capacity.

19.    Defendant Donald J. Trump is President of the United States. He issued Executive Order 14,161 and Executive Order 14,188 (together, the "Executive Orders"), which the defendant agencies have cited as the basis for the ideological-deportation policy. He is sued in his official capacity.

20.    Defendant United States of America includes all other government agencies and departments responsible for the promulgation and implementation of the ideological-deportation policy.

## FACTUAL BACKGROUND

### *The 2023 and 2024 Campus Protests*

21.    Following the Hamas-led attacks on Israel of October 7, 2023, and Israel's subsequent bombing and invasion of Gaza, students and faculty organized protests on campuses across the United States. Many of the pro-Palestinian protests included calls for a ceasefire and for humanitarian aid to displaced or wounded Palestinians. Others centered on calls for institutional divestment from Israel. Many included criticism or condemnation of Israel's campaign in Gaza; and some included denunciations of Zionism. Others featured calls for a "free Palestine" and included chants—such as "from the river to the sea, Palestine will be free" and "intifada revolution"—that protesters said were calls for liberation and justice but that some listeners interpreted as calls for discrimination or violence. A small minority of protesters and counter-protesters engaged in violence and property damage, but the protests were overwhelmingly peaceful, even when they violated universities' rules.

22.    The pro-Palestinian protests on campus took different forms. They included teach-ins, sit-ins, walk-outs, marches, exhibitions, vigils, encampments, and in some instances the occupation of buildings. On April 17, 2024, student protesters at Columbia University erected a "Gaza Solidarity Encampment" on the university's Morningside campus, and more than one hundred solidarity encampments were established at universities across the United States in the weeks thereafter. Some universities eventually persuaded student protesters to dismantle their encampments; others immediately called in the police. At Columbia University, police arrested more than a hundred students in an effort to clear the encampment on April 18, 2024, the day after

the encampment was established. Later, after a smaller group of protesters broke into and occupied Hamilton Hall—a building that students had also occupied in earlier protests relating to the Vietnam War and Apartheid South Africa—Columbia's administration called in the police again.

23.    The students and faculty who participated in the pro-Palestinian protests on campus came from diverse backgrounds and held a wide range of political views. Some protesters viewed their participation as an extension of an American protest tradition, encompassing the anti-war and anti-apartheid protests of the 1960s, 70s, and 80s. Some protesters were Palestinians whose family members had been killed in or displaced by the war. Some protesters were Jewish, and many of them joined the protests to express their opposition to what they viewed as the displacement and even genocide of Palestinians in their name. While most of the protesters were likely U.S. citizens, many foreign citizens with visas or green cards joined the protests, and sometimes even led them.

24.    Despite the diversity of the protesters and the wide range of views they expressed, President Trump repeatedly characterized the protests as "pro-Hamas," "pro-terrorist," "antisemitic," and "anti-American" during his 2024 campaign. He also promised that, if elected, he would deport the noncitizen students and faculty who had participated in the protests. At an event in May 2024, for example, he told donors to his campaign: "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."

### *The Executive Orders*

25.    The defendant agencies adopted the ideological-deportation policy challenged here to implement two executive orders that President Trump issued shortly after taking office. President Trump issued Executive Order No. 14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," on January 20, 2025.

He issued Executive Order No. 14,188, titled "Additional Measures to Combat Anti-Semitism," on January 29, 2025.

26.    Executive Order 14,161 states that it is the policy of the United States to protect its citizens from noncitizens who "espouse hateful ideology," and to ensure that noncitizens who are already present in the United States "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles" and "do not advocate for, aid, or support designated foreign terrorists and other threats to [America's] national security." The order directs the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to promptly "vet and screen" all noncitizens who are already inside the United States "to the maximum degree possible."

27.    Executive Order 14,188 states that it is the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." It reaffirms Executive Order 13,899, issued during the first Trump administration, which adopted a definition of antisemitism that encompasses constitutionally protected criticism of Israel and Israeli policies. (The definition encompasses, for example, speech that claims that Israel "is a racist endeavor," speech that holds Israel to standards "not expected or demanded of any other democratic nation," and speech that compares contemporary Israeli policies to those of the Nazis.) The order directs the head of each executive department or agency, within 60 days, to submit a report to the President "identifying all civil and criminal authorities or actions within the jurisdiction of that agency" that might be used "to curb or combat anti-Semitism." It also directs the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security to include in their reports "recommendations for familiarizing institutions of higher education with

the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens."

28.    The "grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" are the security and related grounds of inadmissibility, including various terrorism- and foreign policy–related provisions, 8 U.S.C. § 1882(a)(3)(B), (a)(3)(C), which also serve as grounds for deportation, *see* 8 U.S.C. § 1227(a)(4)(B), (C). Under the terrorism-related provisions, noncitizens who have engaged in or incited terrorist activity are inadmissible to the country, *id.* § 1182(a)(3)(B)(i)(I), (III); the same is true of noncitizens who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization," *id.* § 1182(a)(3)(B)(i)(VII), or who are representatives of "a political, social, or other group that endorses or espouses terrorist activity," *id.* § 1182(a)(3)(B)(i)(IV)(bb) (together, the "endorse or espouse" provisions). The foreign policy provision renders inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." *Id.* § 1182(a)(3)(C)(i). This provision also states, however, that individuals may not be excluded based on "past, current, or expected beliefs, statements, or associations [that] would be lawful within the United States" unless "the Secretary of State personally determines that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest," *id.* § 1182(a)(3)(C)(iii), and provides timely notice of that determination to Congress, *id.* § 1182(a)(3)(C)(iv).

29.    After President Trump signed Executive Order 14,188, the White House released a fact sheet about the order "promis[ing]" to "Deport Hamas Sympathizers and Revoke Student Visas." The fact sheet included this warning from the President:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.

### *The Ideological-Deportation Policy*

30.    To implement the two executive orders described above, the defendant agencies adopted the ideological-deportation policy challenged here, announcing that they intend to carry out large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association. Pursuant to this policy, they arrested Mahmoud Khalil, a recent Columbia University graduate and a legal permanent resident, earlier this month; they revoked the visas of at least four others, one of whom fled to Canada in fear of arrest; they supplied universities with the names of other students they intend to target under the policy; and they launched new social media surveillance programs aimed at identifying still others.

31.    On March 6, 2025, Secretary of State Rubio posted to X: "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law—including international students—face visa denial or revocation, and deportation." A news report published that same day revealed that the State Department had already launched a new social media surveillance program, called "Catch and Revoke," to identify noncitizen students for deportation pursuant to the new policy of ideological deportation. According to senior State Department officials cited by *Axios*, the program involves "AI-assisted reviews of tens of

thousands of student visa holders' social media accounts" to find "evidence of alleged terrorist sympathies expressed after Hamas' [October 7] attack on Israel." According to the report, "[i]f officials find a social media post from a foreign national that appears to endorse the [October 7] attack on Israel and looks 'pro-Hamas,' . . . that could be grounds for visa revocation."

32.     Two days later, on March 8, 2025, ICE agents arrested Mahmoud Khalil, a 30-year-old legal permanent resident and recent Columbia graduate, at his Columbia University student housing. The agents initially told Khalil that they were detaining him because his student visa had been revoked by the State Department, but when Khalil's lawyer informed the agents that Khalil was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too. The deportation notice later filed by the government cites the foreign policy provision and states: "The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States."

33.     Khalil has not been charged with any crime, and an administration official stated to *The Free Press* that "[t]he allegation here is not that he was breaking the law." Instead, the administration has made clear that it arrested Khalil because of his role in organizing protests that the administration characterizes as pro-Hamas. In a post made to X on March 9, 2025, DHS asserted that Khalil had led activities "aligned to" Hamas, and that ICE had arrested Khalil "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." At a news briefing on March 11, 2025, Press Secretary Karoline Leavitt stated that "Mahmoud Khalil was an individual who was given the privilege of coming to this country to study at one of our nation's finest universities and colleges. And he took advantage of that opportunity, of that privilege by siding with terrorists." She asserted that "pro-Hamas

propaganda" fliers had been distributed at a protest that Khalil had led, though she did not provide any evidence that Khalil had produced, distributed, or even known about them.

34.     When Deputy Secretary of Homeland Security Troy Edgar appeared on NPR's *Morning Edition* two days later, he indicated even more clearly that the government had targeted Khalil for deportation based on his political speech. Edgar initially stated that the State Department revoked Khalil's green card "for supporting a terrorist type organization," namely Hamas. But when asked to clarify how Khalil had supported Hamas, Edgar pointed to his involvement in pro-Palestinian protests generally: "Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity." When asked if that meant any criticism of Israel or the United States is "a deportable offense," he said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country."

35.     On March 17, 2025, after Khalil had challenged the State Department's decision to revoke his green card on the basis of his speech, ICE filed an additional (and transparently pretextual) justification for the State Department's decision. This additional charge alleged that Khalil had, at the time of his adjustment of status in March 2024, sought to procure an immigration benefit by fraud because he failed to disclose that he was "a member" of the United Nations Relief and Works Agency for Palestine Refugees ("UNWRA") and Columbia University Apartheid Divest ("CUAD"), and that he had continued working for the British government.

36.     The State Department has revoked the visas of at least four other students and faculty pursuant to the ideological-deportation policy.

37.     On March 5, 2025, the State Department revoked the student visa of Ranjani Srinivasan, an Indian national, doctoral student at Columbia University, and Adjunct Assistant Professor of Urban Planning at NYU's Robert F. Wagner Graduate School of Public Service, also under the foreign policy provision. Three federal immigration agents showed up at her apartment looking for her two days later, but she did not open the door. They showed up again the following night, just hours before Khalil was arrested, but she was not home because, fearing arrest, she had already fled the United States for Canada. On March 13, 2025, agents returned to her home with a judicial warrant. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them. Srinivasan appears to be active, however, in protesting what she believes to be human rights violations in Gaza, and in December 2023 she signed an open letter published by the Society of Architectural Historians in support of "Palestinian liberation."

38.     On March 8, 2025, ICE signed an arrest warrant for Yunseo Chung, a 21-year-old legal permanent resident and Columbia University student who has lived in the United States since she was seven. A few days earlier, Ms. Chung protested outside a Barnard College building where pro-Palestinian student demonstrators were holding a sit-in. She was arrested by police officers, given a desk ticket by the New York City Police Department for "obstruction of governmental administration," and released. On March 10, a federal law enforcement official advised Ms. Chung's attorney that her legal permanent resident status had been revoked. On March 13, federal law enforcement agents executed a judicial search warrant at Ms. Chung's dormitory. The warrant appears to have been issued in connection with an investigation of Columbia University for an alleged violation of the federal harboring statute.

39.    On March 17, 2025, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding, which is part of Georgetown University's School of Foreign Service. Suri's student visa was revoked pursuant to the foreign policy provision. In a statement given to *Fox News*, DHS asserted that Suri had "spread[] Hamas propaganda," "promot[ed] antisemitism on social media," and had "close connections to a known or suspected terrorist, who is a senior advisor to Hamas." Suri has no criminal record and has not been charged with a crime. DHS's allegations appear to reference the fact that Suri's father-in-law, Ahmed Yousef, is a former advisor to Ismael Haniyeh, the Hamas leader assassinated by Israel last year in Iran. But Yousef left his position in the Hamas-run government in Gaza more than a decade ago and has publicly criticized Hamas's decision to attack Israel on October 7, 2023. DHS has not alleged that Suri himself has taken any action on behalf of Hamas.

40.    On March 21, 2025, the Justice Department wrote to counsel for Momodou Taal, a student visa holder and doctoral candidate in Africana Studies at Cornell University, to convey ICE's intention to serve a deportation notice on Taal and request that Taal voluntarily "surrender to ICE custody." Taal is a prominent and outspoken pro-Palestinian advocate. The Justice Department wrote to Taal's lawyers after Taal sought a temporary restraining order to enjoin DHS from attempting to detain, remove, or otherwise enforce the Executive Orders against him, and while that application remained pending. In response to that application, the government informed the court that the State Department had revoked Taal's student visa.

41.    Defendants and other administration officials have made clear that they intend to target other foreign students and faculty for arrest, detention, and deportation under the policy.

42.     On March 9, 2025, the Secretary of State shared a news story about Khalil's arrest on X and warned: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." The same day, DHS posted to X: "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."

43.     The next day, President Trump posted on Truth Social:

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

44.     The White House Press Secretary Karoline Leavitt reiterated this message at the news briefing she gave on March 11, 2025. When asked how many arrests the administration planned to make, she said that she did not have an estimate, but that DHS "is actively working on it." She stated that DHS had gathered "very good intel" "at the direction of the President's executive order, which made it very clear . . . that engaging . . . in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated." This intelligence was, she said, aimed at "identify[ing] individuals on our nation's colleges and universities, on our college campuses who have engaged in such behavior and activity, and especially illegal activity." She also added that "Columbia University has been given the names of other individuals who have engaged in pro-Hamas activity, and they are refusing to help DHS identify those individuals on campus." She concluded: "We expect all America's colleges and universities to comply with this administration's policy."

45.    On March 12, 2025, the *New York Times* reported that "[i]nvestigators from a branch of [ICE] that typically focuses on human traffickers and drug smugglers [had] scoured the internet for social media posts and videos that the administration could argue showed sympathy toward Hamas" and "handed over reports on multiple protesters to the State Department."

46.    On March 13, 2025, Vice President J.D. Vance gave an interview on Fox News in which he commented on Khalil's arrest, stating: "This is not fundamentally about free speech. And to me, yes, it's about national security, but it's also more importantly about who do we as an American public decide gets to join our national community. And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that." Asked whether he saw "more such deportations happening," he said "I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interests of the United States to have them in our country, so yeah, I don't know how high that number is going to be, but you're going to see more people."

47.    On March 16, 2025, Secretary of State Rubio gave an interview on CBS's *Face the Nation* in which he promised that the administration would continue enforcing its policy of ideological deportation: "[W]e're going to do more. In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well."

### A Climate of Fear and Repression for Noncitizen Students and Faculty

48.    The ideological-deportation policy has created a climate of fear and repression on university campuses across the country and forced many noncitizen students and faculty into silence. Out of fear that pro-Palestinian expression might lead to arrest, detention, and deportation, many noncitizen students and faculty are no longer willing to participate in, or even attend, public political protests. Some have stepped back from leadership roles and participation in groups that engage in advocacy related to Israel and Palestine. Some are abstaining from public writing or

scholarship that they would otherwise have pursued. Others have attempted to purge their earlier public writings, including online articles, blog posts, and social media posts. Some students have stopped contributing to classroom discussions of Israel and Palestine; others are skipping class altogether. Some faculty have even fled their cities of residence, effectively forced to abandon their academic communities.

49.    The chill on university campuses flows directly from the policy challenged here, as well as from Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their lawful expressive and associational activities.

50.    Plaintiffs all have noncitizen faculty and student members who have been compelled to curtail their exercise of expressive and associational rights in the ways described above. Some of these members are described below. These individuals have been anonymized because they fear that their connection to this lawsuit could lead to them being targeted for arrest, detention, and deportation. Some noncitizen members interviewed by undersigned counsel were too fearful even to have their experiences described anonymously.

51.    **<u>AAUP Member A.</u>** AAUP Member A is a legal permanent resident, a member of the AAUP, and a lecturer at a university in the Northeast whose research interests include race and migration.

52.    Before the administration adopted the ideological-deportation policy, AAUP Member A regularly posted on social media and engaged in other public advocacy on issues related to Israel and Palestine. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, AAUP Member A has taken down previously published social media posts about Israel and Palestine and stopped assigning materials about Palestine in the courses they teach.

53.     They have also been chilled from engaging in peaceful political protest and assembly. AAUP Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of the fear that they will be arrested and deported for doing so.

54.     **AAUP Member B.** AAUP Member B is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

55.     Although AAUP Member B's academic work has obvious relevance to issues relating to Israel and Palestine, they have decided to forgo opportunities to write about these issues due to concerns that they may face immigration consequences stemming from the policy. They also decided against teaching a class they have offered in the past because the class syllabus would necessarily have included materials related to Palestine. AAUP Member B made this decision out of concern that including that material would put them at risk of deportation under the policy.

56.     AAUP Member B has also been chilled from associating with AAUP colleagues. AAUP Member B has worked for over a year with university faculty across the United States, including other AAUP members, on a national organization addressing the concerns of Jewish faculty, including on issues related to Israel and Palestine. Due to the ideological-deportation policy, AAUP Member B no longer feels comfortable having their name associated with the prospective organization or doing any public-facing work for the prospective organization.

57.     AAUP Member B has also been chilled from engaging in peaceful political protest and assembly. They previously participated in pro-ceasefire protests and other public demonstrations but no longer do so because of the fear that their lawful advocacy will lead to arrest and deportation.

58.     **AAUP Member C.** AAUP Member C is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

59.     Before the administration adopted the ideological-deportation policy, AAUP Member C regularly published their writing and participated in public advocacy on issues related to academic freedom. Now, due to fears that they will be targeted for deportation based on that writing and advocacy, AAUP Member C has felt compelled to remove previously published writing and scholarship from the internet, and to turn down opportunities to speak at academic talks and other public-facing events that they would otherwise have accepted.

60.     The individual has also been chilled from associating with colleagues at their local AAUP chapter. AAUP Member C values the ability to engage in collective action with other chapter members, but because they fear that public association with the chapter could expose them to deportation, they have forgone leadership opportunities within the chapter, reduced their participation in the chapter's public-facing work, and declined to participate in political organizing with the chapter.

61.     AAUP Member C has also been chilled from engaging in peaceful political protest and assembly. Although they would like to gather with others to engage in pro-Palestinian advocacy, they no longer do so out of fear of arrest and deportation for lawful political speech.

62.     **AAUP Member D.** AAUP Member D is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

63.     AAUP Member D recently withdrew from presenting on a topic related to Israel and Palestine at an academic conference out of concern that this could expose them to deportation under the policy. Also due to the concern about the policy, they have stopped traveling abroad for academic conferences.

64.    The individual has also been chilled from associating with colleagues at their local AAUP chapter and colleagues nationally. AAUP Member D no longer signs their name to open letters that their colleagues circulate—including open letters related to Israel and Palestine—for fear of being targeted for deportation. For the same reason, they have also ruled out pursuing a leadership position at their local AAUP chapter.

65.    The individual has also been chilled from engaging in peaceful political protest and assembly. AAUP Member D wishes to gather with others to engage in pro-Palestinian speech and advocacy, but now fears that they will be deported for doing so. They do not plan to attend future protests, but, if they do attend, they intend to wear a mask and other clothing to obscure their identity.

66.    **AAUP member E.** AAUP Member E is a legal permanent resident, a member of the AAUP, and a professor in at a university in the Northeast. As a noncitizen, AAUP Member E was already hesitant to speak about political issues on social media. The ideological-deportation policy has made them reluctant to participate in protests and to engage in expressive or associational activities that require them to disclose their name. As a result of the policy, AAUP Member E no longer feels that they can safely exercise their free speech rights in the United States and will be spending most of the Spring semester outside of the country. Although they are able to conduct research abroad, an extended stay would substantially disrupt their professional activities and daily life.

67.    **MESA Member A.** MESA Member A is a legal permanent resident, a member of MESA, and a professor at a university in the southern United States whose research interests include topics related to Israel and Palestine.

68.     Before the administration adopted the ideological-deportation policy, MESA Member A regularly posted on social media about Israel and Palestine, including on topics related to their area of academic expertise, and engaged in other public advocacy on issues related to Israel and Palestine. Other MESA members followed MESA Member A on social media and frequently engaged with their posts. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, MESA Member A has significantly reduced their engagement on social media, and feels compelled to self-censor when posting about Israel and Palestine.

69.     The policy has also interfered with MESA Member A's academic research and writing. Out of concern that their current immigration status could be revoked at any moment based on their past expressive activity, MESA Member A now refrains from traveling internationally. This has prevented them from engaging in key aspects of their research, including conducting interviews with people abroad and accessing research materials that are available only abroad. It has disrupted MESA Member A's ability to conduct research for a new book project that relies on those methods. MESA Member A also had to cancel plans to travel to academic conferences in Europe that they otherwise would have attended, preventing them from associating with their colleagues, including other MESA members.

70.     They have also been chilled from engaging in peaceful political protest and assembly. MESA Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of fear that they will be arrested and deported for doing so.

71.     **MESA Member B.** MESA Member B is a legal permanent resident, a member of MESA and the AAUP, and a professor at a university in the Northeast whose research interests include gender studies and Middle East studies.

72.     Before the administration adopted the ideological-deportation policy, MESA Member B regularly organized workshops, teach-ins, and meetings related to Palestine and shared information about Palestine-related events on social media. Now, due to fears that these activities could lead to deportation, they have declined opportunities to chair academic committees, refrained from publishing work related to Palestine, stopped going to protests or demonstrations, and taken down all their social media posts about events related to Palestine.

73.     MESA Member B has also forgone research grants and opportunities that would have required them to travel to the Middle East, due to the risk of being denied reentry based on their pro-Palestinian expression and association. This has harmed their ability to pursue their scholarship, which requires traveling abroad to interview people and attend cultural events that are the subject of their research.

74.     **Noncitizen Student A.** Noncitizen Student A is a student visa holder and a graduate student who studies history and has been involved in pro-Palestinian advocacy at a university in the Northeast. They have worked closely with members of their local AAUP chapter in academic and political settings.

75.     Before the administration adopted the ideological-deportation policy, Noncitizen Student A regularly posted on social media, including about their academic work related to Israel and Palestine. Following the policy, however, Noncitizen Student A deleted their account on the social media platform X out of concern that their posts related to Palestine would make them a target for ideological deportation. They used their X account primarily for academic purposes; X

had been an important forum for them to publicize their academic work, to learn about research findings and opportunities in their discipline, and to network with other scholars, including members of the AAUP, their local AAUP chapter, and MESA. They also removed information about the content of their work from university-hosted websites.

76.     Noncitizen Student A has also been chilled from associating publicly with their peers and colleagues, including members of the AAUP, their local AAUP chapter, and MESA. Because of the ideological-deportation policy, they have declined to give speeches at campus protests and stayed away from rallies where law enforcement could be present; decided to pull out of a film screening and panel discussion related to indigenous studies that they had previously agreed to moderate; and cancelled their plans to attend a conference at which they had planned to speak on a panel about pro-Palestinian student movements.

### *Expressive and Associational Harms to Plaintiffs and their U.S. Citizen Members*

77.     The chill resulting from the ideological-deportation policy has caused significant harm to Plaintiffs and their U.S. citizen members.

<u>Plaintiffs</u>

78.     **<u>AAUP.</u>** Founded in 1915, the AAUP is one of the nation's oldest and largest membership associations and is dedicated to the advancement of higher education and academic freedom. Today, the AAUP has over 44,000 members, including faculty, graduate students, and other academic professionals based at universities across the country. These members are the lifeblood of the organization. The AAUP's leadership operates through a democratic process of engaging with its members in developing its positions and priorities and carrying out its initiatives. Throughout the year, the AAUP hosts in-person and virtual gatherings to facilitate discussions with its members about pressing topics in higher education and academic freedom. The gatherings

often draw hundreds of members. The leadership relies on these conversations in making virtually every decision of substance about the organization's work.

79.    The ideological-deportation policy has dramatically undermined the AAUP's ability to pursue its mission by deterring noncitizen members from participating in AAUP events. Many noncitizen members have also stayed away from AAUP gatherings over the last few weeks, particularly those that touch upon the Trump administration's efforts to deport pro-Palestinian students and to investigate universities for their handling of campus protests over the last eighteen months. The AAUP has heard directly from some of these noncitizen members, who explained that their decisions to disengage were based on fear. Noncitizen members who have nonetheless attended recent AAUP events on these topics have generally been silent. All of this has deprived the AAUP of the input of a significant segment of its membership, undermining the ability of the organization to learn from those members and represent their interests in the organization's policymaking, report writing, and public advocacy.

80.    For example, the AAUP recently hosted the first of a series of member gatherings to discuss the destruction of schools in Gaza. The purpose of the series was to inform the AAUP's position on and advocacy relating to the allegation that Israel has engaged in "scholasticide." Crucial to that purpose was hearing from a diverse range of the AAUP's membership, but some noncitizen members did not attend out of fear that the government might target them for their association with the event, and most of the noncitizen members who did appear kept their videos off and voices muted. The AAUP has had similar experiences with a range of other events, including conversations organized to allow discussion of academic freedom and Israel and Palestine, and an event last week at Columbia University directed at students and focused on the Trump administration's attacks on the university and how the AAUP should respond.

81.     The ideological-deportation policy has also required the AAUP to divert resources that it would otherwise devote to its mission. Its leadership has spent a significant percentage of its time counseling its noncitizen members on the risks of deportation for participating in pro-Palestinian protests and connecting noncitizen members with immigration attorneys. At the same time, the policy has caused many noncitizen leaders at AAUP chapters to step back from leadership positions and public appearances out of fear that they will be labeled as pro-Hamas or pro-terrorist and targeted for deportation on that basis.

82.     **Harvard-AAUP.** Harvard-AAUP is a membership association of Harvard faculty and researchers, with approximately 70 members, that advocates for meaningful and democratic shared university governance, academic freedom, and the economic security of those who perform the university's core instructional work. Harvard-AAUP seeks to advance that mission through organizing, advocacy, and coalition-building at Harvard, as well as by working with other AAUP chapters and the AAUP on issues of broad concern across the higher education sector.

83.     The ideological-deportation policy has impaired Harvard-AAUP's ability to pursue its mission by deterring noncitizen faculty and students from joining Harvard-AAUP. Harvard-AAUP has learned that some noncitizens who would have been eligible to become members of Harvard-AAUP have declined to join the organization out of fear that their membership and association with Harvard-AAUP could put them at risk of deportation. The participation of noncitizen members in Harvard-AAUP is uniquely important to the organization's mission. Given the large population of international faculty and students within the Harvard University community, noncitizen member participation contributes to Harvard-AAUP's strategic decision-making, event planning, recruiting, and engagement with the university. The ideological-deportation policy has deprived Harvard-AAUP of opportunities to hear from and associate with

an important segment of the community it serves, undermining the ability of the organization to learn from those prospective members and to represent their interests in pursuing the organization's goals.

84.    The ideological-deportation policy has also diverted the resources and attention that the Harvard-AAUP would otherwise use to focus on its core mission. Prior to the policy, Harvard-AAUP focused primarily on promoting more robust shared governance at the university, advancing the economic justice and institutional security of academic workers, and preserving academic freedom. Now, Harvard-AAUP devotes significant attention to advising and engaging the concerns of noncitizens on Harvard's campus who fear immigration consequences stemming from the ideological-deportation policy. For instance, Harvard-AAUP has worked with other groups at Harvard to organize information security trainings to help members of the university community protect against potential surveillance of their expressive activities online.

85.    **NYU-AAUP.** NYU-AAUP is a membership association made up of faculty across NYU's schools and campuses, with over 100 individual members. NYU-AAUP is dedicated to defending academic freedom at NYU and throughout the academy, encouraging participation in shared governance at NYU, and advancing the professional interests of NYU faculty and researchers. To fulfill its mission, NYU-AAUP holds two full membership meetings a semester, where members communicate and collaborate with one another on addressing important issues in higher education. Throughout the year, NYU-AAUP also hosts events open to the broader NYU community focused on advancing academic freedom. As a reflection of NYU's large population of international and noncitizen faculty and students, NYU-AAUP's membership includes many noncitizen members, who play a vital role in fulfilling NYU-AAUP's goals.

86.     The ideological-deportation policy has impaired NYU-AAUP's ability to advocate for its interests in concert with noncitizen faculty and students at NYU. For example, members of NYU-AAUP recently delivered a petition to the NYU administration urging the university to drop disciplinary charges against students who had engaged in pro-Palestinian activism. NYU-AAUP members felt the need to remove the names of all the signatories from the petition due to concerns that noncitizen signatories, including both faculty and students, could be targeted for deportation or visa revocation based on their decision to participate. The NYU administration discounted the petition in part because it lacked the names of the signatories. This undermined NYU-AAUP's ability to effectively advocate before the NYU administration, one of the organization's primary missions.

87.     The ideological-deportation policy has also required NYU-AAUP to divert resources that it would otherwise have used to pursue its core mission. NYU-AAUP's primary goals are to advance academic freedom and better facilitate faculty-university relations at NYU. But since the policy began, NYU-AAUP has been forced to devote increasing attention and resources to addressing the potential immigration consequences of the policy for noncitizen faculty and students. For example, NYU-AAUP is devoting resources to preparing "know your rights" materials related to immigration enforcement on NYU's campus. NYU-AAUP members and others in the NYU community have asked NYU-AAUP for immigration consultations, and it now often falls on NYU-AAUP to connect and guide members through NYU's immigration resources. Additionally, the policy has had an impact on the content of NYU-AAUP's events. For instance, NYU-AAUP recently hosted a faculty town hall to discuss the state of the university. The organizers of the event intended to spend much of the event discussing how federal funding freezes and executive orders targeting diversity, equity, and inclusion programs would impact life at NYU.

In the end, a significant part of the town hall focused on the threat of deportation noncitizen faculty and students face under the policy.

88.     **Rutgers AAUP-AFT.** Rutgers AAUP-AFT is a union representing more than 5,000 full-time faculty, graduate workers, postdoctoral associates, and Education Opportunity Fund counselors at Rutgers University. Rutgers AAUP-AFT is one of the oldest higher education unions in the country. It is also a chapter of the AAUP.

89.     The ideological-deportation policy has undermined Rutgers AAUP-AFT's ability to represent all bargaining unit members. Rutgers AAUP-AFT's research, pedagogy, and outreach depend on creating academic and community spaces where all members of its community, whether citizen or noncitizen, can fully participate. Noncitizen members, however, have shared with leadership that they are concerned that engaging on some research topics, such as racism and Israel and Palestine, could expose them to deportation. Many have also refrained from speaking out publicly or taking political action on these topics within the union because of the threat of deportation. Some noncitizen bargaining unit members have also expressed fears about joining the union because they are concerned it could invite targeting. When noncitizens do not join or speak out in the union, it becomes more difficult for Rutgers AAUP-AFT to represent the needs and priorities of all bargaining unit members, including by involving all union members in union leadership and decision making.

90.     The ideological-deportation policy has also required Rutgers AAUP-AFT to divert resources it would otherwise dedicate to its mission. Rutgers AAUP-AFT has had to devote time and resources to support noncitizen members who fear deportation, including by spending time organizing trainings, finding legal support for individual members, and engaging with university management to ensure that the university is taking appropriate action.

91.    **MESA.** MESA is a 501(c)(3) non-profit membership association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples. Today, MESA has over 2,000 individual members, including faculty and students at universities across the country. MESA provides its members with programs, publications, and services that enhance research and education, recognize professional distinction, and defend academic freedom. MESA hosts an annual meeting that is the premiere conference for scholars who research the Middle East. The conference, which is the largest such gathering in the world, consists of four days of academic programming, professional development, job market interviews, networking, and special events. For MESA's members, the annual meeting is a critical forum for scholarship, intellectual exchange, and pedagogical innovation. MESA also publishes the *International Journal of Middle East Studies*, the leading peer-reviewed scholarly journal on the region, the *MESA Review of Middle East Studies*, a biannual newsletter, and frequent advocacy letters.

92.    The ideological-deportation policy has substantially harmed MESA's ability to pursue its mission by deterring noncitizen scholars of the Middle East from joining MESA or participating in MESA's events. A substantial portion of MESA's members are interested in studying the Middle East because of their own personal or family background in the region, which makes them invaluable members of MESA's academic community. Due to their personal connections, heritage, and language skills, these members are often the most effective ethnographers and most skilled archival researchers working in the discipline. Many of these members are also noncitizens who, due to fears of being targeted for deportation based on the content of their scholarship, have scaled back their participation in MESA's events and projects. This chill has undermined MESA's core function as a scholarly association that facilitates the

exchange of pedagogical insights, academic expertise, and novel research between its members and advocates for their academic freedom.

93.    For example, noncitizen members of MESA have expressed concern about attending MESA's annual meeting, which is scheduled to take place in November 2025 in Washington, DC, for fear that their attendance at the conference will expose them to the attention of immigration authorities. As described above, MESA's annual meeting is a landmark conference in the discipline and is MESA's marquee event. Each year, MESA solicits paper proposals for the conference by mid-February. This year, after the administration's adoption of the ideological-deportation policy, a number of scholars who would usually submit proposals informed MESA that they were unable to meet the deadline, or afraid of attending the meeting, due to its location. In particular, international members outside of the United States expressed fears that they would be denied entry or harassed because of the policy of ideological deportation. Noncitizen members also reported being overwhelmed and unable to focus on making medium-term plans because of their fear that their scholarship and speech about the Middle East might become the basis for targeting by the government. Because submissions at the initial deadline were almost 40 percent below where they should have been, based on past meetings in Washington, DC, MESA granted an across-the-board extension. After MESA extended the deadline, there was still a sharp drop in the number of submissions compared to prior years. At present, participation in the 2025 annual meeting is projected to fall 10 percent below the expected level. Due to its members' fears of ideological deportation, including harassment by officials based on their scholarly activities, MESA's annual meeting will have lower attendance, garner fewer contributions to the scholarly field, and provide a less effective opportunity for intellectual exchange. Moreover, members' reports of self-censorship in research and scholarship for fear of being targeted by the government

is expected to depress participation in the meeting and reduce submissions to MESA's publications, particularly concerning Israel and Palestine.

94.     The ideological-deportation policy has also required MESA to divert resources it would otherwise devote to its mission. The annual meeting is a key recruitment vehicle for MESA, and reduced attendance means fewer dues-paying MESA members. MESA's leadership, staff, and volunteer faculty now spend more time and energy responding to crises stemming from the policy than on scholarship. For example, MESA's Committee on Academic Freedom and MESA's Task Force on Civil and Human Rights have both been inundated with requests for assistance from noncitizen members who fear ideological deportation. Before the policy, these advocacy committees addressed each member's request for assistance individually. Now, they spend time developing triage criteria for prioritizing certain requests. MESA leadership has worked to develop new and different programming, such as know your rights workshops and meetings with legal services groups, that would not typically fall under the purview of a scholarly association. Because so many MESA members are fearful of ideological deportation, MESA is beginning a new monthly message to provide members with resources and information about MESA's response to the policy. As a result, MESA has far fewer resources available for its regular academic programming.

<u>Plaintiffs' Members</u>

95.     **<u>Aslı Bâli.</u>** Aslı Bâli is a professor of law at Yale Law School. Bâli's scholarship and teaching focus on international human rights law and comparative constitutional law. She is a U.S. citizen, a member of the AAUP and MESA, and the president of MESA.

96.     The ideological-deportation policy has harmed Bâli's ability to hear from and engage with her noncitizen colleagues and students. As the president of MESA, Bâli is receiving a cascade of requests for advice and assistance from noncitizen students and colleagues who fear

that they will be targeted for deportation based on their speech. Many of these individuals have deleted their social media profiles, removed online references to their involvement in campus groups that have supported Palestinian rights, and taken down previously public writing about Palestine. One noncitizen colleague is considering declining an offer to chair their department out of concern that they might be limited in what they could say or do in the role without making themselves a target for deportation. Bâli has lost the benefit of these colleagues' and students' participation in events and programming and is no longer able to freely communicate with them about their views and opinions.

97.     The policy has also limited Bâli's ability to associate with noncitizen members of the AAUP and MESA, and it has undermined her academic work. Because of her noncitizen colleagues' fears of ideological deportation, Bâli now hesitates to approach noncitizens to be co-authors, which harms her ability to produce scholarly work. Additionally, Bâli recently felt she had to propose moving the participation of some colleagues in a conference scheduled to take place in April at Yale Law School entirely online because of concerns for the safety of noncitizen participants. This change would mean that participants will no longer be together in the same space to mingle and discuss ideas, which significantly reduces the value of an academic conference.

98.     **<u>Beth Baron.</u>** Beth Baron is a distinguished professor of History at the City University of New York. Baron's scholarship focuses on the history of medicine in Egypt. She is a U.S. citizen and a member of MESA.

99.     The ideological-deportation policy has harmed Baron's ability to receive information from her noncitizen students. Several of Baron's noncitizen students, some of whom are members of MESA, are now afraid to travel abroad to visit archives and libraries that have historical sources critical to their research because they fear they will not be allowed back into the

country. This fear of travel due to the policy significantly limits the set of topics Baron's students can research or write about, which diminishes her own, and her department's, ability to benefit from these students' work. Baron has also heard from noncitizen students who have removed content from their social media accounts, taken down images and content from websites, and who are self-censoring in their teaching, especially on topics related to Israel and Palestine and U.S. foreign policy. These students have taken these actions out of a fear that their speech could lead to them being targeted for deportation. Baron has been deprived of these students' insights and experiences, which she otherwise would have valued engaging with.

100.    The policy has also limited Baron's ability to associate and assemble with noncitizen colleagues and students. Baron recently attended an academic event related to Palestine that was accessible only in-person because the organizers decided not to allow people to access the event remotely, out of fear that doing so would expose noncitizen participants to deportation. Prior to the policy, Baron attended anti-war demonstrations with noncitizen students and colleagues. Now, many of those individuals have stopped attending protests because they are afraid of being deported.

101.    **Patricia Dailey.** Patricia Dailey is an associate professor of English and Comparative Literature at Columbia University. She specializes in medieval literature and critical theory. Dailey is a U.S. citizen and a member of the AAUP.

102.    The ideological-deportation policy has harmed Dailey's ability to hear perspectives she values as a member of her university community, and to associate with other members of the AAUP. Dailey was a member of an independent and long-running online community made up of Columbia faculty and staff, including other AAUP members. The goal of this community was to share information about the university and facilitate collective organizing. Dailey relied on the

community to engage with other members of the Columbia community, including AAUP members, and to stay informed about university-related topics as well as political issues, including issues related to Israel and Palestine. Fearing that the community's content about Israel and Palestine could now jeopardize the immigration status of noncitizen members, however, the organizer of the online community, who is a noncitizen, recently decided to delete it. As a result, Dailey has lost access to views and information she found valuable, and she is no longer able to engage with other AAUP members as she once did.

103.    **Nadia Abu El-Haj.** Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Abu El-Haj's scholarship focuses on Zionism, Israel, and Palestine. She is a U.S. citizen and a member of MESA and the AAUP.

104.    The ideological-deportation policy has harmed Abu El-Haj's ability to hear from and associate with her noncitizen colleagues and students. One of her noncitizen students, who previously contributed to many events on campus and posted useful updates from Arabic language news reports on social media, has now ceased participating in events and deleted their social media accounts for fear of losing their student visa. Another noncitizen student, who was once a leading pro-Palestinian voice on campus, has stopped speaking publicly and has gone into hiding since Khalil's arrest, out of fear that ICE might arrest or detain them. In response to her noncitizen students' and colleagues' concerns about ICE raids at campus events, Abu El-Haj cancelled a CPS event that was scheduled to take place in February. She is considering cancelling another upcoming CPS event for the same reason. The policy has thus impaired Abu El-Haj's ability to learn from and meet with these students and to host CPS events.

105.    **Noura Erakat.** Noura Erakat is a professor of Africana studies and Criminal Justice at Rutgers University. Her research and teaching focus on international law, including human rights law. She is a U.S. citizen and a member of MESA.

106.    The ideological-deportation policy has harmed Erakat's ability to hear from her noncitizen colleagues and students. Noncitizen colleagues with whom Erakat collaborates closely have paused work on ongoing projects related to Palestine out of concern that they will be targeted for ideological deportation. One colleague, for example, paused their contributions to a legal research project that they are drafting in collaboration with Erakat after learning of Khalil's arrest. Erakat has also observed that noncitizens students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their personal experiences. Because her scholarship relies on narratives from conflict zones, her work suffers when noncitizens are chilled from sharing their experiences.

107.    **Joseph Howley.** Joseph Howley is an associate professor of Classics and the Paul Brooke Program Chair for Literature Humanities at Columbia. Howley's current scholarship and teaching focus on the history of the book and Greek and Latin literature, among other topics. He is a U.S. citizen and a member of the AAUP.

108.    The ideological-deportation policy has limited Howley's ability to hear from and engage with his noncitizen colleagues and students, and it has undermined his teaching. As program chair of the year-long Literature Humanities course in Columbia's Core Curriculum, Howley supervises graduate students who instruct weekly seminars with undergraduate students to discuss significant works from a range of perspectives across time and cultures. In his regular teaching sessions with instructors, he has observed that many noncitizen instructors have stopped attending in recent weeks, and that those who do attend are preoccupied with fears of deportation

and unable to focus on the course material. One noncitizen instructor told Howley they feared deportation based on their attendance merely as a bystander at a protest last year. Howley has also heard from noncitizen colleagues that are considering not teaching topics related to Israel and Palestine or political activism that they might otherwise have taught.

109.    The policy has also harmed Howley's right to assemble with his noncitizen colleagues and students to engage in public advocacy. Howley joined other faculty and staff members in de-escalation efforts outside the Columbia solidarity encampment in April 2024. Following the police sweep of the encampment on April 18, he appeared alongside Mahmoud Khalil and other speakers at an emergency press conference, to criticize the school president's decision to have police arrest students at the encampment. On April 22, Howley joined hundreds of citizen and noncitizen faculty at Columbia in a walkout protesting that same decision. But when he spoke at a press conference convened by the AAUP following Khalil's arrest this month, he was backed only by citizen members of faculty and staff. He understood that noncitizen members who previously would have joined him were too afraid to do so now, given the threat of deportation under the policy. It is now much more difficult for Howley to coordinate de-escalation efforts with noncitizen colleagues, including one who is now afraid to move freely around the Columbia campus and surrounding neighborhood.

110.    **Maya Jasanoff.** Maya Jasanoff is a professor of History at Harvard. Jasanoff's scholarship and teaching focus on the history of the British empire. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

111.    The ideological-deportation policy has harmed Jasanoff's ability to hear from her noncitizen colleagues and students. She has recently observed that noncitizen colleagues and students are reluctant to speak publicly about politics and world affairs out of concern that they

will be targeted for ideological deportation. The silencing of noncitizen colleagues and students directly impacts Jasanoff's work. Because she studies the British empire, which covered nearly a quarter of the globe at its peak, she relies on the perspectives of students and colleagues from around the world to inform her scholarship and teaching.

112.    **Lauren Kaminsky.** Lauren Kaminsky is an associate senior lecturer and the director of studies for the Committee on Degrees in History and Literature at Harvard. Kaminsky's scholarship and teaching focus on European history. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

113.    The ideological-deportation policy has harmed Kaminsky's ability to hear from, as well as associate and assemble with, her noncitizen colleagues and students. She has observed that noncitizen colleagues—even those who previously felt secure in their immigration status—have recently refrained from teaching classes or speaking publicly on increasingly politicized topics, including Palestine, and noncitizen colleagues and students have recently refrained from writing on these topics. Kaminsky is also aware of several noncitizens who have declined to join Harvard-AAUP in recent weeks out of fear that their membership could put them at risk. She has observed that noncitizen colleagues have been less willing to attend political gatherings in recent weeks.

114.    **Rebecca Karl.** Rebecca Karl is a professor of History at NYU. Karl's research and teaching focus on modern Chinese history, as well as the history of social theory, feminism, Mao Zedong Thought and Marxism, and global revolution. Karl is a U.S. citizen, a member of the AAUP, and a former president and now member-at-large of NYU-AAUP.

115.    The ideological-deportation policy has limited Karl's ability to hear and engage with perspectives and scholarship she values. As a student of and researcher on histories of repressive regimes, Karl is interested in the multiple ways in which marginalized people

understand their lives and worlds. As a Jew, she is particularly interested in the history of antisemitism and Zionism and has helped organize educational events at NYU on those topics. In doing so, she has sought out and engaged with the views of citizen and noncitizen colleagues. Following the adoption of the policy, however, some noncitizen colleagues have been forced to take down research and scholarly work that was previously available online, and have ceased speaking publicly about issues related to Israel and Palestine; others have declined public speaking opportunities.

116.    The policy has undermined Karl's ability to assemble with noncitizen faculty and students to engage in public advocacy. Over the last year and a half, Karl has regularly engaged in pro-Palestinian protests and public advocacy at NYU. Since the implementation of the policy, however, Karl has noticed a significant decrease in the participation of noncitizen faculty and students in pro-Palestinian expression, including petition-signing and public letter signing.

117.    **Chenjerai Kumanyika.** Chenjerai Kumanyika is an assistant professor at NYU's Arthur L. Carter Journalism Institute. He specializes in using audio journalism to critically investigate the way Americans understand issues such as race, the Civil War, and policing. He is also the Peabody Award–winning host of the *Empire City* podcast, which focuses on the history of the New York Police Department. Kumanyika is a U.S. citizen, a member of the AAUP and NYU-AAUP, and an elected at-large council member of the AAUP.

118.    The ideological-deportation policy has limited Kumanyika's ability to hear and engage with perspectives and scholarship critical to his work. Kumanyika has collaborated in his research and scholarship with scholars across the university working on interdisciplinary initiatives that address issues of inequality and justice in the U.S. and transnationally. These scholars include noncitizens who have concerns about the public visibility of their research and scholarship because

of the ideological-deportation policy. Some of these scholars have removed research and scholarship from the internet because they fear this research and scholarship could expose them to deportation.

119.    **David Kurnick.** David Kurnick is a professor of English at Rutgers University. His research and teaching interests include the history and theory of the novel, narrative theory, and sexuality and gender, with an emphasis on the nineteenth century. He is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

120.    The ideological-deportation policy has limited Kurnick's ability to associate with his noncitizen colleagues and students. Several graduate and undergraduate students that Kurnick associates with have informed him that they have decided to refrain from signing anything related to Israel and Palestine, and to refrain from participating in any pro-Palestinian marches or demonstrations, out of fear of being targeted for deportation. Kurnick has also abstained from any public discussion of matters relating to Israel and Palestine with his noncitizen students. Instead, he has limited his communications with noncitizen students to in-person conversations. Kurnick is also responsible for the English Department's graduate admissions process this year, and some admitted students outside the U.S. have expressed hesitation about coming to study inside the United States because of concerns that the ideological-deportation policy would force them to self-censor.

121.    **Zachary Lockman.** Zachary Lockman is a professor of Middle Eastern and Islamic Studies and of History at NYU. His research and teaching focus on the modern history of the Middle East. He is a U.S. citizen and a member of the AAUP, NYU-AAUP, and MESA. He chairs the subcommittee of MESA's Committee on Academic Freedom that seeks to address threats to academic freedom in the United States and Canada.

122.    The ideological-deportation policy has harmed Lockman's ability to hear from and engage with his noncitizen colleagues and students. Lockman relies on the perspectives of noncitizen colleagues and students to enrich his work in Middle East studies. Some of his noncitizen colleagues in MESA have recently declined invitations to speak at academic events, however, due to concern that increased visibility could lead to their deportation. Others have censored their syllabi for the same reason. Lockman has also observed that noncitizen students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their countries of origin. And he is aware of noncitizen graduate students who have altered their research plans to avoid international travel because they fear having their visas or green cards revoked based on their pro-Palestinian expression or association. As a result, Lockman and his colleagues are deprived of the results of this research.

123.    **Vasuki Nesiah.** Vasuki Nesiah is a professor of practice at NYU's Gallatin School of Individualized Study, and faculty director of the Gallatin Global Fellowship in Human Rights. Nesiah's scholarship and teaching focus on human rights and international law. She is a U.S. citizen and a member of the AAUP and NYU-AAUP.

124.    The ideological-deportation policy has limited Nesiah's ability to hear from and engage with her noncitizen colleagues and students, and it has undermined her teaching. Prior to the policy's adoption, Nesiah frequently talked with noncitizen colleagues about Israel and Palestine and academic freedom to discuss these and other sensitive issues. Since the policy's implementation, Nesiah's noncitizen colleagues have become increasingly unwilling to discuss these topics in public or private. In a recent academic panel that Nesiah participated in, for example, the panel was simply advertised as a conversation without the names of the panelists or their institutional affiliations because another panelist feared retaliation under the policy. These

measures reduced attendance and hindered the dialogue and sharing of research that is critical to Nesiah's academic work. Similarly, many of her noncitizen colleagues who live outside of the United States are now unwilling to attend academic events inside the country for fear that they will be detained and deported. For instance, several colleagues who typically attend the Law and Society Association Annual Meeting (to be held in Chicago in May 2025) have informed her that they will not attend for this reason. Because her field of international law is particularly engaged with the work of scholars who live abroad, these withdrawals hamper Nesiah's research. The policy has also chilled student discussion on campus, with many noncitizen students now avoiding the topic of Israel and Palestine out of fear that they will be targeted for deportation if they discuss it. Some noncitizen students have also expressed concern about even showing up to class, and there have been conversations among her colleagues about conducting classes over Zoom, which Nesiah considers to be a poor substitute for in-person teaching.

125. The policy has also limited Nesiah's ability to associate with noncitizen colleagues. For example, a noncitizen colleague who had signed an open letter related to academic freedom that Nesiah and her colleagues had recently organized asked that their name be removed from the letter, because they feared that signing the letter would make them a target for deportation under the policy.

126. **Sonya Posmentier.** Sonya Posmentier is an associate professor of English at NYU and the director of graduate studies in the NYU English department. Her research and teaching interests include African American and Black Diasporic literature and culture, poetry and poetics, and abolition. She is a U.S. citizen, a member of the AAUP and NYU-AAUP, and a member of NYU-AAUP's executive committee.

127.    The ideological-deportation policy has limited Posmentier's ability to hear and engage with perspectives and scholarship critical to her work. For example, Posmentier had planned to attend a conference concerning Israel and Palestine to hear a noncitizen scholar deliver a talk in their area of expertise, but that individual was forced to pull out of the conference due to a fear of deportation under the policy. As a result, Posmentier missed an opportunity to engage with and learn from that scholar, distorting Posmentier's academic community, which depends on the exchange of ideas and information between scholars. In addition, the NYU chapter of a pro-Palestinian faculty group recently removed all videos of teach-ins and public-facing events since October 2023 out of a fear that leaving the videos up would expose noncitizen colleagues featured in the videos to deportation. These videos focus on a range of topics, including definitions of antisemitism, the global university, and scholasticide. The removal of these videos prevents Posmentier and many others from listening to and learning from those conversations, as well as using them as a resource in research and teaching.

128.    The policy has limited Posmentier's ability to associate with her noncitizen colleagues and students. Posmentier has been working with her students on a collaborative publication about abolition movements that addresses the intersection of the incarceration of Black and Brown Americans, immigrant detention in the United States, the war in Gaza and the Israeli occupation, and the criminalization of pro-Palestinian protest on university campuses. The group had planned to publish and distribute the publication and hold a launch event including readings and performance. In consultation with her students, however, Posmentier has decided not to move forward with this plan because of student fears that it could lead to noncitizen contributors to being targeted for deportation. This deprives the entire department of the contributors' many valuable insights.

129.    **Judith Surkis.** Judith Surkis is a professor of History at Rutgers University and Director of Graduate Studies in the History Department. She specializes in Modern European History, with an emphasis on France and the French Empire, gender and sexuality, and intellectual, cultural, and legal history. She is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

130.    The ideological-deportation policy has limited Surkis's ability to associate with her noncitizen colleagues and students. As a member of Rutgers Faculty for Justice in Palestine, she has witnessed a radical decline in public engagement by noncitizen students and faculty on the question of Palestine since the announcement of the ideological-deportation policy. She has also noticed that noncitizen faculty are more hesitant to speak about or even attend events that address Palestine. The inability of noncitizen students and faculty to freely participate in these events deprives Surkis of their experiences and insights.

131.    The policy has also forced Surkis to modify how she advises noncitizen graduate students in her department. Surkis previously encouraged students to travel abroad to conduct the necessary field research to write their seminar papers, devise their dissertation topics, and ultimately write their dissertations. Now, she is reluctant to recommend that they travel for their studies, because she fears some of these students may be denied re-entry, detained, and even stripped of their visas on return.

132.    **Kirsten Weld.** Kirsten Weld is a professor of History at Harvard. Weld's research focuses on modern Latin America and explores struggles over inequality, justice, historical memory, and social inclusion. She is a U.S. citizen and a member of the AAUP and Harvard-AAUP. She also serves as Harvard-AAUP's president.

133.    Weld has observed that following the administration's adoption of the ideological-deportation policy, many noncitizen students, staff, and faculty colleagues, particularly those who had been involved in pro-Palestinian organizing, have retreated from ordinary university life. Rather than engaging with the university community and participating in educational and developmental activities, noncitizen students, staff, and faculty have devoted significant attention and resources to preparing for potential immigration consequences that may result from their past expressive activities. Additionally, some noncitizen students who had previously spoken or written publicly about Israel and Palestine have now ceased participating publicly on those issues out of fear that doing so will lead to deportation. Weld valued hearing from noncitizen students on these topics, and is now deprived of receiving the speech of those who have been chilled by the policy.

## CAUSES OF ACTION

### COUNT I
### The ideological-deportation policy
### violates the First Amendment

134.    The ideological-deportation policy violates the First Amendment because it entails the arrest, detention, and deportation of noncitizen students and faculty on the basis of, or in retaliation for, their political viewpoints; because it burdens the rights of Plaintiffs and their U.S. citizen members to hear from, and associate with, those noncitizen students and faculty; and because the policy is not narrowly tailored to any compelling governmental interest.

135.    To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, those provisions violate the First Amendment as applied for substantially the same reasons.

**COUNT II**
**Defendants' threats to punish constitutionally protected speech**
**violate the First Amendment**

136.    Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their political viewpoints violates the First Amendment because the threats are coercive and would chill individuals of ordinary firmness from exercising their expressive and associational rights.

**COUNT III**
**The ideological-deportation policy**
**violates the Fifth Amendment**

137.    The ideological-deportation policy violates the Fifth Amendment because it invites arbitrary and discriminatory enforcement.

138.    To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, those provisions violate the Fifth Amendment as applied because they invite arbitrary and discriminatory enforcement; and because they fail to give noncitizen students and faculty fair warning as to what speech and association the government believes to be grounds for arrest, detention, and deportation.

**COUNT IV**
**The ideological-deportation policy**
**violates the APA**

139.    The ideological-deportation policy violates the APA because it is arbitrary, capricious, an abuse of discretion, and contrary to constitutional right, and because it exceeds Defendants' statutory authority. 5 U.S.C. § 706(2)(A)–(C).

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

A.    Declare that the ideological-deportation policy violates the First and Fifth Amendments and the APA, and set the policy aside.

B.    Enjoin Defendants from implementing or enforcing the ideological-deportation policy—including, without limitation, through investigation, surveillance, arrest, detention, deportation, or any other adverse action.

C.    Declare that Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their political viewpoints violates the First Amendment, and enjoin Defendants from continuing to make those threats.

D.    To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for carrying out the policy, declare that those provisions violate the First and Fifth Amendments as applied, and enjoin Defendants from applying those provisions.

E.    Award Plaintiffs reasonable costs and attorneys' fees incurred in this action.

F.    Grant such other and further relief as the Court may deem just and proper.


March 25, 2025                           Respectfully submitted,

/s/ Edwina Clarke                        /s/ Ramya Krishnan
Edwina Clarke, BBO 699702                Ramya Krishnan*
Zimmer, Citron & Clarke, LLP             Carrie DeCell*
130 Bishop Allen Drive                   Xiangnong Wang*
Cambridge, MA 02139                      Talya Nevins**
(617) 676-9423                           Jackson Busch*
edwina@zimmercitronclarke.com            Alex Abdo*
                                         Jameel Jaffer*
                                         Knight First Amendment Institute
                                           at Columbia University
                                         475 Riverside Drive, Suite 302
                                         New York, NY 10115
                                         (646) 745-8500

ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham* (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs*

**pro hac vice* application forthcoming
**admission to the bar pending

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                     )
AMERICAN ASSOCIATION OF              )
UNIVERSITY PROFESSORS,               )
                                     )
AMERICAN ASSOCIATION OF              )
UNIVERSITY PROFESSORS -- HARVARD     )
FACULTY CHAPTER,                     )
                                     )
AMERICAN ASSOCIATION OF              )
UNIVERSITY PROFESSORS AT NEW         )
YORK UNIVERSITY,                     )
                                     )   CIVIL ACTION NO.
RUTGERS AMERICAN ASSOCIATION OF      )   25-10685-WGY
UNIVERSITY PROFESSORS-AMERICAN       )
FEDERATION OF TEACHERS, and          )
                                     )
MIDDLE EAST STUDIES ASSOCIATION,     )
                                     )
                 Plaintiffs,         )
                                     )
        v.                           )
                                     )
MARCO RUBIO, in his official         )
capacity as Secretary of State,      )
and the DEPARTMENT OF STATE,         )
                                     )
KRISTI NOEM, in her official         )
capacity as Secretary of Homeland    )
Security, and the                    )
DEPARTMENT OF HOMELAND SECURITY,     )
                                     )
TODD LYONS, in his official          )
capacity as Acting Director of       )
U.S. Immigration and                 )
Customs Enforcement,                 )
                                     )
DONALD J. TRUMP, in his official     )
Capacity as President of             )
the United States, and               )
                                     )
UNITED STATES OF AMERICA,            )
                                     )
                 Defendants.         )
_____)

YOUNG, D.J.                              April 29, 2025

### MEMORANDUM AND ORDER

The right of free speech enshrined in the Bill of Rights in the First Amendment to the Constitution "[a]s a general matter, . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." <u>United States</u> v. <u>Stevens</u>, 559 U.S. 460, 468 (2010). It "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests," and "safeguards an individual's right to participate in the public debate through political expression and political association." <u>McCutcheon</u> v. <u>Federal Election Comm'n</u>, 572 U.S. 185, 203 (2014) (quoting <u>Cohen</u> v. <u>California</u>, 403 U.S. 15, 24 (1971)). Indeed, "[p]olitical speech is the primary object of First Amendment protection and the lifeblood of a self-governing people." <u>Id.</u> at 228 (Thomas, J., dissenting). This case raises the issue of whether certain Public Officials can enforce a policy of arresting, detaining and deporting non-citizens who are otherwise here legally based

[2]

solely upon their pro-Palestine or anti-Israel political speech.
Here, the American Association of University Professors (the
"AAUP"), the AAUP-Harvard Faculty Chapter, the AAUP at New York
University, the Rutgers AAUP-American Federation of Teachers,
and the Middle East Studies Association (collectively, "the
Plaintiffs") sue Secretary of State Marco Rubio in his official
capacity, the Department of State, Secretary of Homeland
Security Kristi Noem in her official capacity, the Department of
Homeland Security, Acting Director of U.S. Immigration and
Customs Enforcement Todd Lyons in his official capacity,
President Donald J. Trump in his official capacity,[1]
(collectively, "the Public Officials"), and the United States of
America[2] based on the Public Officials' alleged policy of
targeting noncitizens who engage in pro-Palestinian or anti-
Israel speech and association for arrest, detainment, and
deportation (the so-called "ideological-deportation policy").
Compl., ECF No. 1.

---

[1] The President, who is sued in his official capacity, is
not a proper party to this suit at least as to injunctive
relief, and is dismissed to the extent that such relief is
sought against him. See State of Miss. v. Johnson, 71 U.S. 475,
501 (1866); Franklin v. Massachusetts, 505 U.S. 788, 802-03
(1992); Trump v. United States, 603 U.S. 593, 639-40 (2024).

[2] The United States of America is dismissed as a party from
this action inasmuch as it is, in the context of this action,
the living embodiment of the Constitution, and the claims for
declaratory and injunctive relief against the Public Officials
are in their official capacities.

The Plaintiffs bring four counts: (1) a claim based upon the First Amendment to the Constitution, challenging the ideological-deportation policy itself; (2) a claim based upon the First Amendment to the Constitution, challenging the Public Officials' threats to punish noncitizens' constitutionally protected speech;, (3) a claim based upon the Fifth Amendment to the Constitution, alleging that the ideological-deportation policy invites arbitrary and discriminatory enforcement; and (4) a violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C), also based on the ideological-deportation policy. Compl. ¶¶ 134-39.  The Plaintiffs seek declaratory and injunctive relief, and an award of costs and attorneys' fees. Id. 47-48.

The Public Officials move to dismiss[3] on the grounds that: (1) this Court lacks jurisdiction because the Plaintiffs seek class-wide relief against immigration enforcement actions, which

---

[3] At the April 23, 2025, hearing on the Plaintiffs' Motion for Preliminary Injunction, ECF No. 13, the Court collapsed the motion into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, which is this Court's usual practice.  The Court construed the Public Officials' opposition to the Motion for a Preliminary Injunction as a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and the Plaintiffs' Reply, ECF No. 69, as the opposition to the motion. The parties were offered an opportunity to adjourn until a later date to argue the motion to dismiss, but were content with having their motion to dismiss arguments heard forthwith.  The Court heard argument and took the matter under advisement. Elec. Clerk's Notes, ECF No. 72.

is barred by two provisions of the federal immigration laws; (2) the Plaintiffs lack standing because they allege only incidental harms based on the possible choices of third parties in response to a vaguely defined policy, rather than the concrete and imminent harm that constitutional standing requires; (3) the Plaintiffs' First Amendment claims fail because this Amendment applies differently in the immigration context, and the Plaintiffs challenge an ill-defined policy that is really a generic political initiative, which challenge is foreclosed by the rule against selective deportation claims and in any case must be dealt with on an individual basis; (4) the Plaintiffs' Fifth Amendment claim fails because only statutes can be challenged as unconstitutionally vague; and (5) the Plaintiffs' APA claim fails because, given the ill-defined nature of the policy and the exclusive administrative scheme through which removal challenges must be channeled, the Plaintiffs point to no final agency action for which there is no other adequate remedy.

For the reasons stated below, the motion to dismiss is ALLOWED in part as to count three, and DENIED in part, as to counts one, two, and four. A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.

I.    **INTRODUCTION**

    A.    **Procedural History**

    The Plaintiffs filed suit against the Public Officials on March 25, 2025. <u>See</u> Compl. On April 1, 2025, the Plaintiffs moved for a preliminary injunction to enjoin the Public Officials and their agents from implementing or enforcing the ideological-deportation policy, and from threatening to arrest, detain, or deport noncitizen students and faculty based on political expression, and requested that this Court stay the policy under the Administrative Procedure Act, 5 U.S.C. § 705. Pls.' Mot. Prelim. Inj. & Expedited Briefing Sched., ECF No. 13. This motion was fully briefed. Mem. Law. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 14; Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 65; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 69.[4]

    This Court promptly scheduled a hearing on the preliminary injunction motion. As set forth above, <u>see</u> <u>supra</u> n.2, the motion for preliminary injunction was collapsed into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the opposition to the motion was construed as a motion to dismiss, and the Plaintiffs' reply was construed as an

---

    [4] The Court also received submissions from amici. The Court is grateful for these helpful, educational submissions.

opposition.  The Court heard argument on the motion to dismiss and took the matter under advisement.

### B.  Facts Alleged

The Court takes the following facts alleged in the Complaint as true for purposes of the motion to dismiss.

The Plaintiffs allege that the Public Officials have announced and begun to carry out an "ideological-deportation policy" entailing "large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association."  Compl. ¶ 1.  Pursuant to this policy, the agents of these Public Officials have arrested recent Columbia University graduate and lawful permanent resident Mahmoud Khalil ("Khalil") and revoked the visas of at least four others, supplied universities with the names of other students they intend to target, and launched new social media surveillance programs to identify other targets.  Id.  While occasionally referring to "pro-Hamas" speech, officials have in fact "stretched that label beyond the breaking point to encompass any speech supportive of Palestinian human rights or critical of Israel's military actions in Gaza," thus squarely targeting "constitutionally protected speech and association."  Id. ¶ 2.

The Plaintiffs allege that this policy "has created a climate of repression and fear on university campuses," such

that some noncitizen students and faculty have stopped attending
protests, resigned from politically-oriented groups, declined
opportunities to publish commentary and scholarship, stopped
contributing to classroom discussions, deleted past work from
the internet, and in general now hesitate to speak on political
issues in public or even in private text messages.  Id. ¶ 3.
The Plaintiffs allege that this shows the policy "is
accomplishing its purpose: it is terrorizing students and
faculty for their exercise of First Amendment rights in the
past, intimidating them from exercising those rights now, and
silencing political viewpoints that the government disfavors."
Id.  The Plaintiffs' counsel confirmed at oral argument that the
ideological-deportation policy here is limited to speech related
to Palestine and Israel.

## 1. The Plaintiffs

The Plaintiffs are associations whose members include
thousands of faculty and students at universities across the
country.  Id. ¶ 4.  They allege that the ideological-deportation
policy prevents their citizen members from hearing from and
associating with their noncitizen students and colleagues, to
organize with them or engage in political speech with them, to
benefit from their insights and scholarship, and to collaborate
with them on academic projects.  Id.  The organizations
themselves have also been harmed because they cannot learn from

and engage with noncitizen members like they once did, and must divert resources to address the possibility that their noncitizen members will be arrested, imprisoned, and deported for exercising their First Amendment rights.  Id.

The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at universities across the country. Id. ¶ 9.  Its mission is to advance academic freedom and shared governance and to help the academic community organize to accomplish its goals, among other things.  Id.

The AAUP-Harvard Faculty Chapter is the AAUP chapter for Harvard faculty, headquartered in Cambridge, Massachusetts, the AAUP at New York University is the AAUP chapter for NYU faculty, headquartered in New York City, New York, and the Rutgers AAUP-American Federation of Teachers is the Rutgers AAUP chapter for at Rutgers University, headquartered in New Brunswick, New Jersey.  Id. ¶ 10-12.

The Middle East Studies Association ("MESA") is a nonprofit membership association of scholars, educators, and those interested in the study of the Middle East, whose mission is "to foster the study of the Middle East; to promote high standards of scholarship and teaching; and to encourage public understanding of the region and its peoples" through programs, publications, and services.  Id. ¶ 13.

## 2. The Ideological-Deportation Policy

The Plaintiffs trace the origins of the policy to the wave of pro-Palestinian protests that occurred across campuses in the wake of the October 7, 2023 Hamas-led attacks on Israel and Israel's subsequent bombing of Gaza, including the widely publicized encampment at Columbia University in mid-April 2024. Id. ¶¶ 21-23.  They point out that, during his 2024 presidential campaign, President Trump characterized these protests as "pro-Hamas," "pro-terrorist," "antisemitic" and "anti-American," and promised to deport noncitizen students and faculty who participated, including a statement to donors in May 2024 that, "any student that protests, I throw them out of the country." Id. ¶ 24.

The Plaintiffs allege that "[t]he defendant agencies adopted the ideological-deportation policy . . . to implement two executive orders" issued by President Trump shortly after he took office: Executive Order No. 14,161, issued on January 20, 2025 and titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which states that it is the policy of the United States to protect citizens from noncitizens who "espouse hateful ideology" and to ensure that noncitizens "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles" and "do not advocate for,

aid, or support designated foreign terrorists and other threats
to national security," and which directs the Secretary of State
promptly to "vet and screen" all noncitizens "to the maximum
degree possible," id. ¶¶ 25-26; and Executive Order 14,188,
which states that it is the policy of the United States "to
combat anti-Semitism vigorously" and "to prosecute, remove, or
otherwise hold to account the perpetrators of unlawful anti-
Semitic harassment and violence," and directs each agency or
executive department head to identify all authorities or actions
that might be used "to curb and combat anti-Semitism," including
"recommendations for familiarizing institutions of higher
education with the grounds for inadmissibility under 8 U.S.C. §
1182(a)(3)" so that universities and colleges "may monitor for
and report activities by alien students and staff relevant to
those grounds" and ensure "that such reports about aliens lead,
as appropriate and consistent with applicable law, to
investigations and, if warranted, actions to remove such
aliens," id. ¶ 27.  This second Order also reaffirms Executive
Order 13,899, issued during the first Trump administration,
which adopted a definition of antisemitism that includes
constitutionally protected speech, such as claiming that Israel
is "a racist endeavor," holding Israel to standards "not
expected or demanded of any other democratic nation," or
"comparing Israeli policies to those of the Nazis."  Id.

The "grounds for inadmissibility" referred to in Executive Order 14,188 are the security and related grounds, including terrorism-related provisions rendering noncitizens who engage in or incite terrorist activity, or endorse or espouse or persuade others to endorse or espouse the same, or represent "a political, social, or other group" that endorses or espouses such activity, inadmissible under 8 U.S.C. § 1182(a)(3)(B); and a foreign policy provision rendering inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States"; provided that, if such belief is grounded on beliefs, statements, or associations that are otherwise lawful, the Secretary of State must "personally determine[] that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest" and provide timely notice of this determination to Congress, id. § 1182(a)(3)(C).  Compl. ¶ 28.

The Plaintiffs also cite a White House fact sheet about Executive Order 14,188, which "promise[s]" to "Deport Hamas Sympathizers and Revoke Students Visas," and which included a warning from the President that resident aliens who "joined in the pro-jihadist protests" would be found and deported "come 2025," and that "student visas of all Hamas sympathizers on

[12]

college campuses, which have been infested with radicalism like never before," would be canceled.  Id. ¶ 29.

As an example of the direct impact of the alleged policy, Plaintiffs cite the arrest of Mahmoud Khalil, a lawful permanent resident and recent Columbia graduate who was arrested at his Columbia student housing and had his green card revoked, whose deportation notice cites the foreign policy provision, and whom officials have stated was leading activities "aligned to" Hamas or that were "pro-Palestinian" but was not breaking the law; the revocation of at least four other student or faculty visas; the government's supplying universities with the names of other students to be targeted; and the launch of a new social media surveillance campaign to identify new targets.  Id. ¶¶ 30, 32-34, 36.  The Plaintiffs allege that the subsequent justification for revoking Khalil's green card, namely that he failed to disclose he was a member of the United Nations Relief and Works Agency for Palestine Refugees and Columbia University Apartheid Divest, and that he had continued to work for the British government, was pretextual.  Id. ¶ 35.

The Plaintiffs also recount the stories of four other students and faculty whose visas have been revoked on ideological grounds: Columbia doctoral student and NYU adjunct professor Ranjani Srinivasan, who fled the United States when threatened with arrest, including ICE agents' showing up at her

apartment after her student visa was revoked, and who was later accused (without evidence, as alleged) of being a terrorist sympathizer who advocated violence, but who is active in protesting human rights violations in Gaza and signed an open letter in support of Palestinian liberation, id. ¶ 37; Columbia student and lawful permanent resident Yunseo Chung, who engaged in a pro-Palestinian protest and sit-in where she was arrested by police and given a ticket for obstructing governmental administration, and whose lawful permanent resident status was subsequently revoked after ICE issued a warrant for her arrest, id. ¶ 38; Georgetown University postdoctoral fellow Badar Khan Suri, who was arrested and whose student visa was revoked pursuant to the foreign policy provision, based on spreading "Hamas propaganda" and promoting antisemitism on social media and for having connections to a senior advisor to Hamas, despite those connections' being greatly attenuated, id. ¶ 39; and Cornell University doctoral candidate Momodou Taal, who is a prominent pro-Palestinian advocate, and whose student visa was revoked after he refused a request to "surrender to ICE custody," id. ¶ 40.[5]

_____

[5] In their subsequent briefs, the Plaintiffs also refer to Rümeysa Öztürk, a doctoral student at Tufts University who was detained and whose visa was revoked, allegedly for writing an op-ed critical of Israel, Pls.' Mem. 3, and to Mohsen Mahdwani, a Columbia student and lawful permanent resident who led pro-

The Plaintiffs also cite a number of statements from executive officials, including Secretary of State Rubio's statement on X (formerly Twitter) referring to a "zero tolerance" policy for foreign students who "support terrorists," notice of a new social media surveillance program called "Catch and Revoke," which uses Artificial Intelligence to find relevant evidence to support visa revocations, and statements expressing a clear intent to target more foreign students and faculty, including Vice President J.D. Vance's statement that Khalil's arrest was not about free speech or even fundamentally about national security, but about the American people's deciding who "gets to join our national community" and Secretary Rubio and the President's deciding "this person shouldn't be in America," and Secretary Rubio's statement that "every day now" the government is approving more visa revocations, id. ¶¶ 31, 41-47.

As a result of this policy, the Plaintiffs allege, many noncitizen students and faculty no longer participate in public protests, some have stepped back from leadership roles or participation in advocacy groups related to Palestine, some abstain from public writing or scholarship and have purged past writing and online posts, some skip class or classroom discussion, and some faculty have fled their home cities in the

---

Palestinian demonstrations at Columbia and whom DHS has now detained and seeks to deport, Pls.' Reply 2; id., Ex. H.

United States.  Id. ¶ 48.  "This chill," the Plaintiffs allege, "flows directly from the policy challenged here," and from the Public Officials' "threats" to arrest, detain, and deport noncitizen students and faculties based on their lawful expression and association.  Id. ¶ 49.  "Plaintiffs all have noncitizen faculty and student members who have been compelled to curtail their exercise of expressive and associational rights" in these ways.  Id. ¶ 50.

In support of these allegations, the Plaintiffs describe the chill experienced by five anonymous members of the AAUP, two anonymous members of MESA, and one anonymous student who has worked closely with their AAUP chapter.  Id. ¶¶ 51-76.  AAUP Members A-E are lawful permanent resident professors or lecturers who have, variously, taken down social media posts and previously published writing and scholarship, stopped assigning material about Palestine in class, withdrawn from a conference presentation, ceased traveling abroad for conferences, ceased engaging in political protest and assembly in which they previously participated, ceased teaching a course they previously taught, and foregone opportunities to write and speak at public events, to continue planning a national organization addressing issues related to Palestine, and to take on leadership opportunities within their AAUP chapter.  Id. ¶¶ 51-66.  MESA Members A-B are lawful permanent resident professors

who have, variously, reduced their engagement on social media
and self-censored on issues related to Palestine, refrained from
traveling internationally for key research including on a new
book project that requires it, canceled travel plans for
conferences and thus foregone associating with colleagues
including other MESA members, ceased protesting activity in
which they formerly engaged, declined opportunities to chair
academic committees and publish work, and foregone research
grants and scholarship opportunities that would have required
travel -- all of which harms their scholarship, which depends on
travel for interviews and attendance at cultural events that
they study.  Id. ¶¶ 67-73.  Noncitizen Student A is a graduate
student and student visa holder who has worked closely with
local AAUP chapter members, and who recently deleted their
social media account, which they used for academic and
networking purposes, and removed information about their work
from university websites due to concern about material related
to Palestine, and who has been chilled from associating publicly
with colleagues, including AAUP members, and has declined to
give speeches at protests or to appear at rallies and a
previously planned film screening and panel discussion and a
conference at which they had planned to speak.  Id. ¶¶ 74-76.

    In addition to the harms to these anonymous noncitizen
teachers and students, the Plaintiffs allege direct harms to

their organizations, which all advocate for academic freedom and related causes, and to their citizen members: deterred noncitizen participation in AAUP events and leadership roles, and diverted resources to counsel noncitizen members on immigration issues, id. ¶¶ 78-81; similar harms, including reduced noncitizen membership joining, to Harvard-AAUP, id. ¶¶ 82-84; similar harms, including a member-prepared petition related to pro-Palestine protesting that the NYU administration discounted in part because members felt compelled to remove their names out of fear, to the NYU-AAUP, id. ¶¶ 85-87; similar harms to Rutgers AAUP-AFT, id. ¶¶ 88-90; and similar harms to MESA, including the reduced participation of noncitizen scholars whose expertise is uniquely vital to MESA due to their "personal connections, heritage, and language skills," significantly reduced anticipated participation in MESA's landmark annual meeting in Washington, DC in November 2025 due to fear, and leadership and staff's specifically spending "more time and energy responding to crises stemming from the policy than on scholarship," id. ¶¶ 91-94.

The Plaintiffs also recount the experiences of several citizen member professors, including the President of MESA Asli Bâli, a professor at Yale Law School, who have been contacted by noncitizen students who are scrubbing the internet of any evidence of Palestine-related speech or scholarship, avoiding

traveling abroad for critical research or speaking at academic events, or changing research topics and syllabi, and who themselves now hesitate to or are unable to coordinate or organize with, work with, or otherwise communicate with noncitizen members and other faculty and students as they once did, and who have canceled events, had online communities shut down, and witnessed noncitizens' ceasing participating in class, refraining from teaching or speaking on political topics, or even going into hiding, and who in some cases have significantly curtailed their own speech with noncitizens.  Id. ¶¶ 95-133. The citizen member professors argue that these fear-based restraints have significantly harmed their research and teaching and negatively impacted their rights to hear from and to associate with the threatened noncitizens.  Id.

## II.  ANALYSIS

### A. Standard of Review

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "that states a claim for relief must contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief."  To test the sufficiency of the pleading, a defendant can file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and to test the subject matter jurisdiction of the Court, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). "When faced with motions

to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." <u>Katz</u> v. <u>Pershing, LLC</u>, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.), <u>aff'd</u>, 672 F.3d 64 (1st Cir. 2012).  Whether a motion is brought under Rule 12(b)(1) or 12(b)(6), "the reviewing court must take all of plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff."  <u>Verlus</u> v. <u>Experian Info. Sols., Inc.</u>, No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (Casper, J.).  The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007).  Courts "draw every reasonable inference" in favor of the plaintiff, <u>Berezin</u> v. <u>Regency Sav. Bank</u>, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up). Accordingly, the Court addresses the jurisdictional issues first, and then proceeds to the merits arguments.

**B. This Court Has Subject Matter Jurisdiction**

"For much of U.S. history, the federal courts have not laid down clear principles governing the relationship between the

First Amendment's commitment to freedom of speech and the
immigration laws." Jennifer Lee Koh, <u>Executive Discretion and
First Amendment Constraints on the Deportation State</u>, 56 Ga. L.
Rev. 1473, 1482 (2022). Part of the reason may be
jurisdictional. Here, the Public Officials argue the Court has
no jurisdiction to test the merits for two reasons: first, 8
U.S.C. § 1252(f) ("Section 1252(f)") provides that no court
other than the Supreme Court has jurisdiction "to enjoin or
restrain the operation" of the federal laws governing
deportation except as pertains to an individual alien against
whom proceedings have been initiated, and the Supreme Court has
interpreted this to mean that courts such as this one may not
grant injunctive relief ordering federal officials "to take or
to refrain from taking actions to enforce, implement, or
otherwise carry out" the deportation provisions, whether or not
those officials have properly interpreted the laws, <u>Garland</u> v.
<u>Aleman Gonzalez</u>, 596 U.S. 543, 549-52 (2022); Defs.' Opp'n 4-6;
and, second, 8 U.S.C. § 1252(g) ("Section 1252(g)") provides
that no court has jurisdiction to hear a claim "by or on behalf
of any alien arising from" the Attorney General's decision to
commence proceedings, adjudicate cases, or execute removal
orders, except through a petition for review from a final order
of removal filed in a court of appeals, and the Supreme Court
has interpreted this to mean that selective prosecution claims

are jurisdictionally barred once an order of removal has been
issued, see Reno v. American-Arab Anti-Discrim. Comm., 525 U.S.
471 (1999) ("AADC")[6] -- which rule, the Public Officials argue,
applies a fortiori to third party claims, or else associates
could always make an end run around the jurisdictional bar,
Defs.' Opp'n 6-7.

### 1. Section 1252(f) Bars Only Injunctive Relief as to Certain Claims

The Public Officials first argue that to the extent that
the "Plaintiffs ask this Court to 'enjoin' [the] Defendants from
taking any action to 'arrest, detain, and deport' **any**
'noncitizen students and faculty' pursuant to the alleged
'ideological deportation policy,'" they ask for an injunction of
"certain [immigration] enforcement actions against a class of
people -- all noncitizen students and faculty across the
country." Defs.' Opp'n 4. Such injunctive relief, say the
Public Officials, has been jurisdictionally stripped by Congress
from imposition by lower federal courts (though not the Supreme
Court) by 8 U.S.C. § 1252(f)(1) ("Section 1252"), which
provides:

> Regardless of the nature of the action or claim or of
> the identity of the party or parties bringing the
> action, no court (other than the Supreme Court) shall
> have jurisdiction or authority to enjoin or restrain
> the operation of the provisions of part IV of this

---

[6] Most courts and commentators use AADC, or some acronym
variation, as a short form, so it is adopted here.

>subchapter, as amended by the Illegal Immigration
>Reform and Immigrant Responsibility Act of 1996, other
>than with respect to the application of such
>provisions to an individual alien against whom
>proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

The Supreme Court recently reviewed the contours of Section 1252(f) in Aleman Gonzalez, 596 U.S. at 543.  In that case, the lower courts certified and entered class-wide relief to provide aliens detained under 8 U.S.C. § 1231(a)(6) with bond hearings. Id. at 546.  The government appealed, and the Ninth Circuit affirmed.  Id.

The Supreme Court granted certiorari and ordered the parties to address whether Section 1252(f)(1) "deprived the District Courts of jurisdiction to entertain respondents' requests."  Id.  The Supreme Court held that Section 1252(f)(1) "deprived" the district court "of jurisdiction to entertain . . . requests for class-wide injunctive relief."  Id.

The Supreme Court explained that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."  Id. at 550 (quoting Section 1252(f)(1)).

[23]

As Justice Sotomayor observed in her partial concurrence, the Court's "holding risks depriving many vulnerable noncitizens of any meaningful opportunity to protect their rights."  Id. at 569 (Sotomayor, J., concurring in part).  That being said, Aleman Gonzalez "does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act, 5 U.S.C. § 706(2)," nor does it "bar[] even classwide declaratory relief."  Id. at 571; see National TPS All. v. Noem, No. 25-CV-01766-EMC, 2025 WL 957677, at *11 (N.D. Cal. Mar. 31, 2025) ("The Court also bears in mind that the Supreme Court has, to date, declined to address the issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA.").

The Supreme Court subsequently read the provision as not brushing up against subject matter jurisdiction over an action at all, but rather merely "depriv[ing] courts [other than the Supreme Court] of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute."  Biden v. Texas, 597 U.S. 785, 798 (2022) (citation omitted).  Indeed, the limitation is only on the authority of an inferior federal court to enter injunctive remedies.  Id. at 799.  Said differently, and more to the point, "the question whether a court has jurisdiction to

[24]

Add.132

grant a particular remedy is different from the question whether
it has subject matter jurisdiction over a particular class of
claims." Id. at 801.  While the dissenting Justices in Biden v.
Texas questioned the jurisdiction-versus-remedy holding with
respect to injunctive relief, the only present bar is on
injunctive relief.  Id. at 821, 838-839.  Indeed, Justice
Barrett questions:

> Does [Section 1252(f)(1)] mean that the restriction on
> remedial authority is subject to waiver or forfeiture,
> so that a lower court can sometimes properly enter
> non-individual injunctive relief that this Court can
> then review?  That a district court has the authority
> to enter some kinds of non-individual relief (for
> example, a classwide declaratory judgment) and that
> this Court can enter different relief (for example, a
> classwide injunction) on review of that judgment?  Or
> that this Court can enter an injunction on appeal if
> the district court could have entered at least one
> form of relief, even if it actually entered only
> relief that exceeded its authority?  Or perhaps the
> parenthetical serves the very different purpose of
> clarifying that § 1252(f)(1) does not disturb any pre-
> existing authority this Court has under the All Writs
> Act or other sources. These are difficult questions,
> yet the Court does not address any of them.

Id. at 838-39.  The First Circuit presciently concluded, pre-
Aleman Gonzalez, "that declaratory relief remains available
under section 1252(f)(1)" and "[i]n so holding . . . reach[ed]
the unremarkable conclusion that Congress meant only what it
said -- and not what it did not say." Brito v. Garland, 22 F.
4th 240, 252 (1st Cir. 2021).

[25]

The Public Officials argue that the requested relief falls squarely within the injunction-bar as interpreted by the Supreme Court in Aleman Gonzales. Defs.' Opp'n 5.  The Public Officials incorrectly assert, however, that Section 1252(f)(1) is a "jurisdictional" bar.  It is not.

The Plaintiffs argue that: (1) the provision does not bar injunctive relief vis-à-vis the ideological-deportation policy as opposed to specific immigration law provisions; (2) an injunction would only be barred as to "Part IV" of the Immigration and Nationality Act as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"); and (3) the remaining relief would not be injunctive relief (i.e. a stay under the APA or an injunction against threats).  Pls.' Reply 8-10.  All three of these arguments are problematic.

Nevertheless, at the motion to dismiss stage, this Court need not rule on this issue since the contours of the relief requested remain unclear.  See Immigrant Defs. L. Ctr. v. United States Dept. of Homeland Sec., No. CV 21-0395, 2021 WL 4295139, at *7 (C.D. Cal. July 27, 2021) ("Because the precise form of plaintiffs' requested injunctive relief is not clearly defined at this stage of the case, it is premature to rule on whether § 1252(f) applies at this time.").

Accordingly, the motion to dismiss based on this Court's subject matter jurisdiction is DENIED without prejudice, subject to renewal as to the issue of authorized remedies if -- and only if -- liability is first established.

**2. Section 1252(g) Does Not Divest This Court of Jurisdiction Over the Plaintiffs' Ideological-Deportation Policy Claims**

The Public Officials argue that even to entertain consideration of the alleged ideological-deportation policy is an end-around of Section 1252(g).  The Plaintiffs respond that their claims are brought neither by nor on behalf of an alien, nor do they arise from any deportation proceeding subject to the narrow jurisdictional bar; rather, the Plaintiffs attack an allegedly unconstitutional, overarching policy.  Pls.' Reply 4.

Section 1252(g) is a jurisdiction-stripping clause applicable to aliens or those bringing claims on their behalf in three distinct phases of the removal process:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim **by or on behalf of any alien** arising from the **decision or action** by the Attorney General **to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.**

8 U.S.C. § 1252(g) (emphasis added).

[27]

As an initial matter, the statutory bar applies to "any cause or claim **by or on behalf of any alien**." Id. (emphasis added). The parties agree that Section 1252(g) is not all-encompassing, but rather is "narrow[]" in scope; it does not "cover[] the universe of deportation claims." AADC, 525 U.S. at 482; see Defs.' Opp'n 6; Pls.' Reply 4. Rather, the Supreme Court is clear that Section 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '[(1)] commence proceedings, [(2)] adjudicate cases, or [(3)] execute removal orders.'" Id. (brackets added).

A quarter century ago, in AADC, eight members of the Popular Front for the Liberation of Palestine, "a group characterized by the government as an international and terrorist organization," were charged under the now-repealed (and repealed at the time of the AADC decision) McCarran-Walter Act, which permitted the deportation of aliens who 'advocat[ed] . . . world communism.'" AADC, 525 U.S. at 473. Six of the eight were also charged with overstaying their visas and failing to maintain their student status. Id.

The aliens filed suit against the government to prevent their deportation, "challenging the anticommunism provisions of the McCarran-Walter Act and seeking declaratory and injunctive relief against the Attorney General, the INS, and various

[28]

immigration officials in their personal and official
capacities." Id.

The advocacy-of-communism charges were dropped. Id. The
"technical violation charges against the six temporary residents
[were retained] and [] Hamide and Shehadeh, who were permanent
residents, [were charged] under a different section of the
McCarran-Walter Act, which authorized the deportation of aliens
who were members of an organization advocating 'the duty,
necessity, or propriety of the unlawful assaulting or killing of
any [government] officer or officers' and 'the unlawful damage,
injury, or destruction of property.'" Id. at 474 (quoting 8
U.S.C. §§ 1251(a)(6)(F)(ii)-(iii)). Furthermore, the "INS
regional counsel William Odencrantz said at a press conference
that the charges had been changed for tactical reasons but the
INS was still seeking respondents' deportation because of their
affiliation with the PFLP." Id. The aliens "amended their
complaint to include an allegation that the INS was selectively
enforcing immigration laws against them in violation of their
First and Fifth Amendment rights." Id.

The case wound its way through the courts, and eventually
the district court preliminarily enjoined the aliens'
deportation. Id. at 475. The district court held "that [the
six temporary aliens] were likely to prove that the INS did not
enforce routine status requirements against immigrants who were

not members of disfavored terrorist groups and that the possibility of deportation, combined with the chill to their First Amendment rights while the proceedings were pending, constituted irreparable injury." <u>Id.</u>  The two permanent residents lost at summary judgment.  The Ninth Circuit affirmed the injunction as to the six and reversed as to the two permanent residents.  <u>Id.</u>  The matter was remanded to the district court.  <u>Id.</u>

At that point, IIRIRA was passed by Congress, which enacted, among other things, Section 1252(g).  <u>Id.</u>  The Attorney General appealed, claiming this new section stripped the courts of jurisdiction.  <u>Id.</u>  The Ninth Circuit disagreed, the Attorney General appealed again, and the Supreme Court granted certiorari.  <u>Id.</u> at 476.

The Supreme Court rejected the parties' competing arguments, and held that Section 1252(g) "applies only to three discrete actions that the Attorney General may take:" her "decision or action" to "**commence** proceedings, **adjudicate** cases, or **execute** removal orders."  <u>Id.</u> at 482.  As the Supreme Court explained, Congress' precision decidedly omitted "many other decisions or actions that may be part of the deportation process -- such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the

product of the adjudication, and to refuse reconsideration of that order." Id.  As the Supreme Court reasoned, "it is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.  Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." Id. at 482.

To be sure, as argued by the Public Officials, "**many** provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts -- indeed, that can fairly be said to be the theme of the legislation," such as inspections of aliens, denials of discretionary relief, and limiting review of asylum determinations.  Id. at 486.  Section 1252(g) is limited, however, to the discrete "subset of deportation claims" of three specific claims outline above.  Id. at 487.  Turning to the aliens' challenge to the commencement of deportation proceedings, the Supreme Court held that Section 1252(g) squarely applied.  Id.

The aliens argued that the doctrine of constitutional doubt required the Supreme Court "to interpret § 1252(g) in such fashion as to permit immediate review of their selective-enforcement claims." Id. at 488.  The Supreme Court stated that it did "not believe that the doctrine of constitutional doubt

[31]

has any application here" and held that "[a]s a general matter -
- and assuredly in the context of claims such as those put
forward in the present case -- **an alien unlawfully in this
country has no constitutional right to assert selective
enforcement as a defense against his deportation**." Id. at 488
(emphasis added).

The Supreme Court was sensitive, in the context of
perceived selective enforcement, to the independence of the
Executive Branch:

> What will be involved in deportation cases is not
> merely the disclosure of normal domestic law
> enforcement priorities and techniques, but often the
> disclosure of foreign-policy objectives and (as in
> this case) foreign-intelligence products and
> techniques. The Executive should not have to disclose
> its "real" reasons for deeming nationals of a
> particular country a special threat -- or indeed for
> simply wishing to antagonize a particular foreign
> country by focusing on that country's nationals -- and
> even if it did disclose them a court would be ill
> equipped to determine their authenticity and utterly
> unable to assess their adequacy.

Id. at 490-91. The Supreme Court was clear that a continued
violation of the law need not be countenanced because an alien
is improperly selected for deportation:

> In many cases (for six of the eight aliens here)
> deportation is sought simply because the time of
> permitted residence in this country has expired, or
> the activity for which residence was permitted has
> been completed. Even when deportation is sought
> because of some act the alien has committed, in
> principle the alien is not being punished for that act
> (criminal charges may be available for that separate
> purpose) but is merely being held to the terms under

[32]

which he was admitted.  And in all cases, deportation
is necessary in order to bring to an end an ongoing
violation of United States law.  **The contention that a
violation must be allowed to continue because it has
been improperly selected is not powerfully appealing.**

To resolve the present controversy, **we need not
rule out the possibility of a rare case in which the
alleged basis of discrimination is so outrageous that
the foregoing considerations can be overcome.  Whether
or not there be such exceptions,** the general rule
certainly applies here.  **When an alien's continuing
presence in this country is in violation of the
immigration laws, the Government does not offend the
Constitution by deporting him for the additional
reason that it believes him to be a member of an
organization that supports terrorist activity.**

AADC, 525 U.S. at 491-92 (emphasis added).  In sum, it does not

violate the Constitution for the government to commence removal

proceedings against an alien that is in the United States in

violation of the law for the **additional** reason that the alien is

a member of an organization that supports terrorist activity.

Here the Plaintiffs challenge the applicability of the

statute to them inasmuch as they are not bringing their claims

on behalf of an alien or in relation to a deportation

proceeding, and argue that the narrow grounds of Section 1252(g)

are not applicable.  The Plaintiffs' reliance on NWDC Resistance

v. Immigration & Customs Enf't, 493 F. Supp. 3d 1003, 1006 (W.D.

Wash. 2020) is persuasive authority that the Plaintiffs can

pursue their own rights and do not fall within the narrow

jurisdictional bar of Section 1252(g).  Pls.' Reply 4.

[33]

In <u>NWDC Resources</u>, two immigration activist organizations sued ICE, its then-acting-director, and the then acting-Secretary of the Department of Homeland Security, claiming that "ICE ha[d] a policy and practice of targeting undocumented immigration activists in retaliation for their protected speech" but clarifying that they did "not seek to intervene in any particular removal proceeding, or to reverse any specific removal decision, but instead ask[ed] the Court to enjoin ICE's 'selective enforcement' policy as unconstitutional."  <u>Id.</u> at 1006.  Specifically, the plaintiffs plausibly pled the following facts that echo the allegations in the instant complaint:

> ICE has engaged in a policy and practice of targeting outspoken activists who publicly criticize U.S. immigration law, policy and enforcement.  [The plaintiffs'] operative First Amended Complaint includes numerous examples of such targeting.  Maru Mora-Villalpando is the president of La Resistencia.  The FAC and Mora-Villalpando's Declaration establish that she was issued a Notice to Appear because of her "anti-ICE protests."  La Resistencia and Maru Mora-Villalpando claim that such tactics are discriminatory and unconstitutional, and that they have had the perhaps intended effect of disrupting and discouraging member activists and their speech.  Plaintiffs plausibly claim that they rely on family members for information about detainees, and that as the result of ICE's practice, those family members are afraid to speak.  Plaintiffs argue that the fear caused by selective enforcement has forced them to cancel events, limit interactions with the media, and required them to divert resources from activism to defending members facing removal proceedings.

<u>Id.</u> at 1007.  ICE's primary argument was that Section 1252(g) barred the action because the claim was really a selective

enforcement claim against the immigrants, relying on the Supreme
court's decision in AADC.  Id. at 1008-09.  For their part, the
plaintiffs in that case argued that Section 1252(g) did not
apply to their claims, which did not "challenge any specific
removal decision, but rather the constitutionality of a policy
of selectively enforcing immigration laws against aliens who
speak about immigration issues."  Id. at 1010.

The district court agreed with the plaintiffs that Section
1252(g) did not bar the claim:

> The Plaintiff organizations challenge the
> constitutionality of ICE's "policy choice" to target
> outspoken aliens.  They do not seek to stop, delay,
> reverse or otherwise interfere with any of the three
> discrete actions described in Section 1252(g), as to
> any specific alien or any particular proceeding.  None
> of the authorities upon which ICE relies supports its
> claim that such actions are barred by that statute's
> "limited scope;" every case it cites involved a claim
> by an individual challenging the motives behind
> removal proceedings commenced against him or her.
>
> Unlike the plaintiffs in those cases, the
> organizational Plaintiffs here are not aliens seeking
> to undo or prevent removal proceedings commenced
> against them.  A narrow reading of Section 1252(g)
> does not apply to constitutional challenges brought by
> one who is not the alien subject to the three discrete
> decisions articulated in that statute, or one who is
> not bringing a challenge to such actions on the
> alien's behalf.

Id. at 1011.

So it is here.  The NWDC Resistance decision, while
somewhat a lone voice in the wilderness, is virtually
indistinguishable from the larger picture in this case: the

[35]

Plaintiffs plausibly allege harm from a policy driven purely by the Public Officials' displeasure with pro-Palestinian speech -- not even membership in an organization or espousing violence.

Whether the Plaintiffs will be successful on the merits is, of course, another matter entirely, but the Plaintiffs in the instant action are not barred by Section 1252(g), at least to the extent the relief is construed consistent with attacking the ideological-deportation policy.[7]  This Court agrees that the Plaintiffs' claims based upon the ideological-deportation policy are not brought "by or on behalf of any alien arising from" an enumerated deportation decision, and therefore this Court is not stripped of jurisdiction.  See Section 1252(g).

Though the Court rules that Section 1252(g) does not apply to the Plaintiffs' claims, it nevertheless addresses the applicability of the so-called "outrageousness" exception under AADC, being fully cognizant that "[t]his argument is based on dicta in [AADC] where the Supreme Court commented that a rare case might present a constitutional violation that is so outrageous that the doctrine of constitutional doubt might be employed to overcome the jurisdictional prohibitions of Section

---

[7] In fact, the plaintiffs in NWDC Resistance ultimately lost at summary judgment in January 2024.  See Jan. 4, 2024 Order Granting Summary Judgment and Vacating the Trial Date, ECF No. 191, NWDC Resistance v. Immigration & Customs Enforcement, Civ. No. 3:18-cv-05860-JLR.  There was no hearing, and the Order is unclear as to the reasoning; a written opinion is pending.  Id.

1252(g)." <u>Oldaker</u> v. <u>Giles</u>, 724 F. Supp. 3d 1315, 1338 (M.D. Ga. 2024).  While at least one court has viewed the exception as a possible avenue for relief in an appropriate case, <u>see</u> <u>Ragbir</u> v. <u>Homan</u>, 923 F.3d 53, 69–73 (2d Cir. 2019) (reversing jurisdiction-based dismissal of habeas claim, on basis that outrageousness exception to Section 1252(g) had been pleaded), **cert. granted, judgment vacated on other grounds sub nom**. <u>Pham</u> v. <u>Ragbir</u>, 141 S. Ct. 227 (2020), it is unclear whether it is applicable here.  The Plaintiffs seem to recognize the tenuous nature of its applicability, devoting only a single sentence in a footnote:

> Even if § 1252(g) applied, [the] Defendants' policy is so egregious a violation of the First Amendment that it would come within the exception recognized in <u>AADC</u> for outrageous government conduct.

Pls.' Reply 5 n. 3 (citations omitted).  As the Court views it, the Plaintiffs have successfully argued the inapplicability of Section 1252(g), and thus this Court has no basis for ruling on the applicability of the outrageousness exception.  Put another way, Section 1252(g)'s jurisdictional bar applies narrowly to claims by aliens or brought on their behalf in relation to the deportation decisions enumerated in the statute, but the Supreme Court has left the door ajar to an even narrower exception even as to **those** claims.

In any event, Section 1252(g) does not bar the Plaintiffs'
claims, and its claims as to the ideological-deportation policy
as pleaded plausibly will proceed as to most of the counts here.
The Public Officials' motion to dismiss on this ground is
DENIED.

### C. Standing

"As Justice Scalia memorably said, Article III requires a
plaintiff to first answer a basic question: '"What's it to
you?"'"  Food and Drug Admin. v. Alliance for Hippocratic Med.,
602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine
of Standing as an Essential Element of the Separation of Powers,
17 Suffolk U. L. Rev. 881, 882 (1983)).  As the Supreme Court
recently explained, "[f]or a plaintiff to get in the federal
courthouse door and obtain a judicial determination of what the
governing law is, the plaintiff cannot be a mere bystander, but
instead must have a 'personal stake' in the dispute," and
"courts do not opine on legal issues in response to citizens who
might 'roam the country in search of governmental wrongdoing.'"
Id. (first quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423
(2021); and then quoting Valley Forge Christian College v.
Americans United for Separation of Church and State, Inc., 454
U.S. 464, 487 (1982)).  "In particular, the standing requirement
means that the federal courts decide some contested legal
questions later rather than sooner, thereby allowing issues to

percolate and potentially be resolved by the political branches in the democratic process," and as to some "the standing requirement means that the federal courts may never need to decide some contested legal questions." Id. at 380.  Indeed, "'[o]ur system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed.'" Id. (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974)).

Here, the Public Officials argue that the Plaintiffs lack standing under both of the theories that they advance: associational and organizational standing.  Defs.' Opp'n 7-11.

In order to establish standing, plaintiffs must show that they have suffered an "injury in fact" that is "concrete and particularized," and, if based on future action, "actual or imminent" rather than "conjectural" or "hypothetical"; (2) "fairly traceable" to the alleged conduct of the defendant; and (3) "likely" redressable by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  "The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter," and "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 57 (2024)

(alterations in original) (first quoting Carney v. Adams, 592
U.S. 53, 59 (2020); and then quoting Lujan, 504 U.S. at 561).
"'[P]laintiffs must demonstrate standing for each claim that
they press' against each defendant, 'and for each form of relief
that they seek.'" Id. at 61 (quoting TransUnion LLC, 594 U.S.
at 431). "At the pleading stage, [the Court] 'appl[ies] [to
questions of standing] the same plausibility standard used to
evaluate a motion under Rule 12(b)(6)"; the Plaintiffs "'need
not definitively prove [their] injury or disprove . . .
defenses' but need only 'plausibly plead on the face of [their]
complaint' facts supporting standing." In re Fin. Oversight &
Mgmt. Bd. for Puerto Rico, 110 F.4th 295, 307 (1st Cir. 2024)
(first quoting Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7
(1st Cir. 2018); and then quoting Tyler v. Hennepin Cnty., 598
U.S. 631, 637 (2023)).

### 1. Associational Standing

Associational standing allows an organization to sue on
behalf of its members when "(a) its members would otherwise have
standing to sue in their own right; (b) the interests it seeks
to protect are germane to the organization's purpose; and (c)
neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit." Hunt v.
Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977);
see also In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F. 4th

[40]

at 308.  The first prong, which is the only one that has been
challenged here, requires only "that at least **one** of the group's
members have standing as an individual."  Draper v. Healey, 827
F.3d 1, 3 (1st Cir. 2016).

"Where a litigant seeks to challenge governmental action as
violative of the First Amendment, two types of injuries may
confer Article III standing without necessitating that the
challenger have been subjected to [penalty]."  Thayer v. City of
Worcester, 979 F. Supp. 2d 143, 151 (D. Mass. 2013) (Hillman,
J.).  The first, which the Plaintiffs have not alleged, arises
when "the plaintiff has alleged an intention to engage in a
course of conduct arguably affected with a constitutional
interest, but proscribed by statute, and there exists a credible
threat of prosecution."  Id. (quoting Babbitt v. United Farm
Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  The second
occurs when "the plaintiff is chilled from exercising her right
to free expression or forgoes expression in order to avoid
enforcement consequences.  In such situations the vice of the
statute is its pull toward self-censorship."  Id. (quoting New
Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 13-14 (1st
Cir. 1996)).[8]  Both injuries "depend on 'the existence of a

---

[8] Similarly, "[w]hen it comes to the freedom of association,
the protections of the First Amendment are triggered not only by
actual restrictions on an individual's ability to join with
others to further shared goals.  The risk of a chilling effect

credible threat that the challenged law will be enforced,'" or, put differently, require that "the fear of prosecution must be 'objectively reasonable.'"  Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (1st Cir. 2003) (first quoting N.H. Right to Life, 99 F.3d at 14; and then quoting Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir. 1999)).  At least in the criminal context, the evidentiary bar to show a credible threat of enforcement is "extremely low," and will be assumed "in the absence of compelling contrary evidence."  Id. (quoting N.H. Right to Life, 99 F.3d at 15).

The problem of evaluating allegedly objective chills on First Amendment rights has been analyzed recently in a number of campus speech code cases.  See Speech First, Inc. v. Cartwright, 32 F. 4th 1110, 1120 (11th Cir. 2022) (collecting cases).  In a recent dissent from a denial of certiorari in one such case, Justice Thomas described the state of the law on this issue:

> It is well settled that plaintiffs may establish standing based on "the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  And, in assessing whether an "objective chill" exists in a particular case, courts must "look through forms to the substance" of the government's "informal sanctions," . . . .

---

on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'"  Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 618-19 (2021) (quoting National Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 433 (1963)).

[42]

> Common features of [campus] bias response
> policies suggest that they may cause "'students [to]
> self-censor, fearing the consequences of a report to
> [the bias response team] and **thinking that speech is
> no longer worth the trouble**.'" . . . . [T]he
> challenged bias response program combines a definition
> of bias that "appears limitless in scope" with a
> "threshold for reporting [that] is intentionally low."
> . . . . And, the threat that the bias response team
> may refer a report to other university officers for
> further action is a **"weighty consequenc[e]" that
> "'lurks in the background.'"**

Speech First, Inc. v. Whitten, 145 S. Ct. 701, 703 (2025)

(Thomas, J., dissenting from denial of certiorari) (emphasis

added) (citations omitted).  As the Eleventh Circuit has framed

its version of the objective chill test, "to determine whether a

First Amendment plaintiff has standing, we simply ask whether

the 'operation or enforcement,' of the government policy would

cause a reasonable would-be speaker to 'self censor[],' -- even

where the policy 'fall[s] short of a direct prohibition against

the exercise of First Amendment rights.'"  Cartwright, 32 F. 4th

at 1120 (alterations in original) (citations omitted).

The Public Officials argue that the alleged policy has not

been enforced against any of the Plaintiffs' members or even

anyone their members know, so the Plaintiffs cannot show that

their members face an immediate threat of harm that a judicial

remedy could alleviate, or, put differently, that any particular

speech of a particular speaker will invite deportation.  Id. at

7-8.  Were the Plaintiffs' associational standing theory to pass

[43]

muster, the Public Officials warn, any group of professors could challenge any federal enforcement initiative that might impact students.  Id. at 9.  They also point to a more general bar against challenging the Executive Branch's exercise of enforcement discretion, premised on the principle that courts lack meaningful standards to assess enforcement choices, and argues that Plaintiffs cannot show causation because both the policy and the class of persons impacted are ambiguously defined.  Id. at 9-10.  Finally, the Public Officials argue that the Plaintiffs have not shown that any incidental injuries to the Plaintiffs and their members are redressable, because the alleged chill depends on the actions of others (that is, noncitizens) who feel threatened, and even the requested injunction would in no way reduce the authority of the government to exercise its immigration authority or prevent governmental authorities from commenting on issues related to Israel and Palestine.  Id.

On balance, drawing all factual inferences in their favor, at least the AAUP and MESA have associational standing to challenge the allegedly objective chill on their noncitizen members' speech.  Although they have downplayed this standing argument in their supporting briefs, the Plaintiffs have alleged facts supporting a plausible inference that reasonable noncitizen members of the Plaintiff organizations would self-

[44]

censor in response to the challenged policy based on a credible threat of enforcement, which amounts to an objective chill. Compl. ¶¶ 51-76; see Cartwright, 32 F. 4th at 1120; see Laird v. Tatum, 408 U.S. 1, 11 (distinguishing between cases where chill "arise[s] merely from the individual's knowledge that a governmental agency was engaged in certain activities," such as the army surveillance program challenged there, and, based on those activities, "might in the future take some other and additional action," and cases where the governmental power exercised "was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to" it); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 164-66 (2014) (finding risk of future enforcement sufficiently substantial where there was history of past enforcement, broad authority to file complaints triggering enforcement, enforcement proceedings were not rare, and proceedings could trigger criminal prosecution).

The experiences of five anonymous AAUP members and two anonymous MESA members, all lawful permanent residents and professors or lecturers, are described in the complaint, with particularized allegations that these members have stopped assigning materials or teaching formerly-offered classes touching on Israel and Palestine, turned down opportunities to write and speak on related matters, canceled conference and

[45]

other plans, removed related previously published writing and
scholarship from the internet, declined leadership and event
opportunities within their organizations, ceased traveling
abroad or departed the country, and stopped associating or
protesting, all out of fear of potential retaliatory deportation
if they engage in political speech.  Compl. ¶¶ 51-73.  The
complaint alleges, moreover, that "Plaintiffs all have
noncitizen faculty and student members who have been compelled
to curtail the exercise of expressive and associational rights,"
that only "some" of these members have described their
experiences in detail, and that they are "anonymized because
they fear that their connection to this lawsuit could lead to
them being targeted," and that some noncitizen members who were
interviewed by counsel "were too fearful even to have their
experiences described anonymously."  Compl. ¶ 50.  Contrary to
the Public Officials' assertions, this alleged chill bears a
close connection to the Plaintiffs' allegations that the Public
Officials have announced an intent to carry out large-scale
arrests and deportations of noncitizen students and faculty who
participate in pro-Palestinian protests and related speech, have
made good on this promise by initiating arrests and revoking
student visas, have supplied the names of other students to be
targeted to universities, and have launched a social media
surveillance program to identify more targets.  Compl. ¶ 30.

Although the Plaintiffs may be required to name at least one of these would-be speakers, see Summers v. Earth Island Inst., 555 U.S. 488, 498-99 (2009); Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016), these chilled noncitizen members of the Plaintiffs' organizations would have standing to assert their First Amendment rights on their own behalf, so the associations of which they are members also have standing to sue.

Instead of emphasizing the chill on their noncitizen members' speech, the Plaintiffs have stressed their citizen members' right to hear from and associate with noncitizens, citing Kleindenst v. Mandel, 408 U.S. 753, 762-65 (1972) for the proposition that the right to hear and to receive information and ideas is protected by the First Amendment. The Plaintiffs are not wrong to invoke their citizen members' right to hear and to receive information, particularly given that the First Amendment is "nowhere more vital than in our schools and universities," Mandel, 408 U.S. at 763, nor of course their right to associate, see Bonta, 594 U.S., but they point to no authority for the extension of what amounts to a kind of right-to-consortium claim to the right to hear from and associate with potential deportees. Mandel involved an individual would-be speaker who was invited to speak by particular would-be hearers and refused entry, 408 U.S. at 756-60, lending support to the Public Officials' argument that the harm to the citizen members'

[47]

rights is too attenuated because no specific member is alleged
to have been deprived by the government of the opportunity to
hear from or associate with a specific noncitizen, Defs.' Opp'n
9.  The Plaintiffs' "right to hear" argument, therefore, while
non-frivolous, asks this Court to take an apparently
unprecedented creative leap: to rule that one may sue for being
deprived of the right to hear from another, due to an objective
chill on another's speech.  Without ruling that such a theory,
or a similar theory based on freedom of association, could not
properly be advanced, this Court instead rests its ruling that
the AAUP and MESA have associational standing on the Plaintiffs'
own noncitizen members' objectively chilled speech.

The Public Officials' redressability argument likewise
fails at this stage.  Although "Article III requires some
minimum likelihood that the relief sought actually does or could
matter," at the same time, "declaratory relief alone may be
sought where it may have some meaningful effect." Neely v.
Benefits Review Bd., 139 F.3d 276, 279 (1st Cir. 1998).  This
Court may grant the Plaintiffs declaratory relief, or a stay
under the Administrative Procedure Act, even if injunctive
relief is barred.  See Brito, 22 F. 4th at 252.  The Supreme
Court has found the redressability requirement satisfied where,
for instance, "it would seem . . . 'substantially likely that
the President and other executive and congressional officials

[48]

would abide by an authoritative interpretation of the census statute and constitutional provision,'" even in circumstances where it was not entirely clear how an agency would or must respond to a court's determination on a given issue. Utah v. Evans, 536 U.S. 452, 463-64 (2002) (quoting Franklin v. Massachusetts, 505 U.S. 788, 803 (1992) (opinion of O'Connor, J.)); see also Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 318 (1st Cir. 2012) ("To carry its burden of establishing redressability, [plaintiff] need only show that a favorable ruling could potentially lessen its injury . . . ."). The Public Officials are incorrect, moreover, in asserting that the Plaintiffs' claims necessarily depend on the actions or inaction of others; rather, the Plaintiffs allege that their members' own speech is being chilled.

### 2. Organizational Standing

Because the Plaintiffs' standing theories may affect the relief this Court can offer, this Court proceeds to analyze organizational standing as well.

Organizational standing allows an organization to sue when, like an individual, it has "alleged . . . a personal stake in the outcome of the controversy," because the challenged actions have caused "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources" that is "more than simply a setback to

the organization's abstract social interests." Havens Realty
Corp. v. Coleman, 455 U.S. 363, 379 (1982) (quoting Arlington
Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261
(1977)). Although "only a perceptible impairment of an
organization's activities is necessary for there to be an injury
in fact," Louis v. Saferent Solutions, LLC, 685 F. Supp. 3d 19,
32 (D. Mass. 2023) (Kelley, J.), the Supreme Court has cautioned
that "an organization that has not suffered a concrete injury
caused by a defendant's action cannot spend its way into
standing simply by expending money to gather information and
advocate against the defendant's action," and thus "has been
careful not to extend the Havens [organizational standing]
holding beyond its context," Food & Drug Admin. v. Alliance for
Hippocratic Med., 602 U.S. 367, 370 (2024); see also Equal Means
Equal v. Ferriero, 3 F. 4th 24, 29-31 (1st Cir. 2021)
(collecting cases); African Cmtys. Together v. Trump, No. 19-
10432, 2019 WL 5537231, at *4 (D. Mass. Oct. 25, 2019) (Hillman,
J.) (injury-in-fact requirement satisfied where plaintiff
organization alleged it had diverted resources to protect
particular African immigrants facing imminent removal);
Massachusetts v. United States Dept. of Health & Hum. Servs.,
923 F.3d 209, 222 (1st Cir. 2019) (noting that, "[i]n this
circuit, '[i]t is a bedrock proposition that "a relatively small
economic loss -- even an identifiable trifle -- is enough to

confer standing"'" (quoting Katz v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012))).

The Public Officials argue that the Plaintiffs do not have organizational standing because they do not claim that they are being regulated directly, but rather focus on downstream harms from others' actions, such as noncitizens' declining to become members of their organizations. Defs.' Opp'n 11. It is entirely speculative, the Public Officials contend, whether associating with the Plaintiff organizations would lead to deportation, and the Plaintiffs have not alleged that it has; they have only alleged "ipse dixit anxiety." Id. Likewise, because organizations may not spend their way into standing, these organizations' decisions to divert resources toward addressing fears of deportation is not a cognizable Article III injury. Id.

The Plaintiffs argue that they have organizational standing because the policy has caused concrete injury to their activities, such as by deterring noncitizen faculty and students from joining their organizations and participating in their events, including members' stepping back from AAUP leadership positions and skipping AAUP and MESA events and projects, including MESA's flagship annual meeting, which has significantly lower-than-usual registration numbers at this time of year. Pls.' Mem. 9-10. The Plaintiffs also argue that they

[51]

have diverted resources from other projects, spending
significant portions of their time counseling noncitizen members
on deportation risks and connecting them with legal help.  Id.

This Court rules that at least MESA has organizational
standing to sue based on its own injuries.  The Middle East
Studies Association, after all, exists to "foster the study of
the Middle East," Compl. ¶ 91, and the Plaintiffs allege that
the Public Officials are intentionally targeting noncitizens who
speak about an important controversy affecting the Middle East
and chilling speech related to it, see Compl. ¶¶ 13, 91-94.
This is a far cry from Alliance for Hippocratic Med., where the
plaintiff medical associations alleged only that they were
incurring costs to oppose the FDA's actions with respect to
mifepristone, such as sponsoring studies to inform citizens of
the drug's risk.  602 U.S. at 394.  The case at bar seems closer
to Havens, where, as described in Alliance for Hippocratic Med.,
"[c]ritically, [the plaintiff] not only was an issue-advocacy
organization, but also  operated a . . . service [that was] . .
. 'perceptibly impaired'" by the defendant's actions, that is,
where the plaintiff's core service of providing accurate housing
information were harmed by the defendant's giving its employees
false information.  Id. at 395 (quoting Havens, 455 U.S. at
379).  With the caution that the Supreme Court has deemed Havens
to be "an unusual case," id. at 396, then, MESA at least

plausibly alleges that the Public Officials' "actions directly affect[] and interfere[]" with its "core . . . activities," id. at 395, such as by deterring noncitizen members -- whom MESA alleges are among its most valuable members due to their backgrounds and linguistic capacities, Compl. ¶ 92 -- from participating in core organization activities, and by perceptibly impairing its core mission of fostering the study of and dialogue about the Middle East.

Given the AAUP's core mission of advancing "academic freedom" in higher education, at least some of this reasoning applies to the AAUP and its chapters as well. Compl. ¶ 78. Considering the broader sweep of this mission, however, the AAUP's organizational standing argument is somewhat less particularized than MESA's. But see The Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 521-22 (9th Cir. 1989) (organizational standing to sue based on plaintiff church's allegation that Immigration and Naturalization Service surveillance caused members to "withdraw from active participation in the churches" and led to cancellation of a bible study group, to clergy time being diverted from regular duties, and to a general decline in support and congregant engagement and speech); NWDC Resistance, 493 F. Supp. 3d at 1015-16 (collecting First Amendment cases supporting capacious view of organizational standing).

[53]

"So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief." <u>Comfort</u> v. <u>Lynn Sch. Comm.</u>, 418 F.3d 1, 11 (1st Cir. 2005) (en banc).  This Court therefore declines to rule on whether the AAUP and its chapters have organizational standing to sue at this stage.  The motion to dismiss on standing is DENIED, and the Court proceeds to the merits.

**D. The First Amendment (Counts One and Two)**

As to the Plaintiffs' First Amendment claims, the Public Officials argue: (1) that a "policy" cobbled together from news articles and social media posts is not amenable to First Amendment challenge, but is protected by the Public Officials' own rights to speech and to coordinate political initiatives, Defs.' Opp'n 12; (2) a facial challenge to the Executive Orders themselves is foreclosed because they have a plainly legitimate sweep, and these orders address unlawful conduct such as supporting terrorist groups, not protected speech, <u>id.</u> at 12-13; (3) under the federal immigration laws and Supreme Court precedent, the President and the Secretary of State may take action against noncitizens based on expression, such as speech that would compromise a compelling United States foreign policy interest or that endorses or espouses terrorist activity or persuades others to do so, or Communist party membership,

[54]

because First Amendment protections are less robust for
noncitizens, id. at 13-14; (4) aliens unlawfully in the United
States cannot raise a selective enforcement defense against
their deportations, so their would-be hearers cannot raise what
is in essence one either and, to the extent that noncitizens can
bring such claims, they must do so individually, id. at 14-15;
and (5) the Plaintiffs cannot bring a claim based on National
Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191 (2024), because
they do not allege that the Public Officials are suppressing
their or their members' speech by coercing a third party to
censor them, but rather that the Public Officials are acting
directly against the would-be speakers, id. at 15.

Although this case raises novel First Amendment issues and
the precise scope of the ideological-deportation policy
challenged by the Plaintiffs is not yet clear, at the motion to
dismiss stage the Plaintiffs' First Amendment claims survive.
It is well established that noncitizens have at least some First
Amendment rights, see Bridges v. Wixon, 326 U.S. 135, 148
(1945), and political speech is "at the core of what the First
Amendment is designed to protect," Virginia v. Black, 538 U.S.
343, 365 (2003). Although case law defining the scope of
noncitizens' First Amendment rights is notably sparse, the
Plaintiffs have at least plausibly alleged that noncitizens,
including lawful permanent residents, are being targeted

[55]

specifically for exercising their right to political speech.
See American-Arab Anti-Discrim. Comm. v. Reno, 70 F.3d 1045,
1063-64 (9th Cir. 1995), rev'd on other grounds, 525 U.S. 471
("The Supreme Court . . . has accorded to aliens living in the
United States those protections of the Bill of Rights that are
not, by the text of the Constitution, restricted to citizens.");
OPAWL – Building AAPI Feminist Leadership v. Yost, 118 F. 4th
770, 776 (6th Cir. 2024) ("Lawful permanent residents have First
Amendment rights. . . . [T]hey have developed sufficient
connections with the United States to be considered part of the
national community: They live and work here lawfully, and they
can serve in the military."); United States v. Verdugo-Urquidez,
494 U.S. 259, 271 (1990) ("[A]liens receive constitutional
protections when they have come within the territory of the
United States and developed substantial connections with this
country."); but see Price v. United States Immigr. &
Naturalization Serv., 962 F.2d 836, 841-42 (9th Cir. 1991).  The
Plaintiffs have also clarified that they do not mean to bring a
selective prosecution challenge, but rather contend "that
Defendants are deporting people on the basis of their viewpoints
alone."  Pls.' Reply 6.

Contrary to what the Public Officials contend, this Court
cannot agree that this alleged conduct would be constitutional.
See Abourezk v. Reagan, 592 F. Supp. 880 (D.D.C. 1984) ("[Public

Officials] may not, consistent with the First Amendment, deny
[noncitizens] entry solely on account of the content of their
speech."), vacated on other grounds, 785 F.2d 1043 (D.C. Cir.
1986).  The Public Officials' reliance on case law from the
height of the second Red Scare era, such as Harisiades v.
Shaughnessy, 342 U.S. 580 (1952), is misplaced, and this Court
assumes instead that noncitizens lawfully present in the United
States have at least the core rights protected by the First
Amendment, chief among them the right to speak on political
subjects at least where such speech poses no immediate threat to
others.  See American Arab Anti-Discrim. Comm. v. Meese, 714 F.
Supp. 1060, 1074-82 (C.D. Cal. 1989) (collecting cases holding
that noncitizens have First Amendment rights, holding that
noncitizens retain these rights in the deportation setting, and
observing that in Harisiades, "the Supreme Court applied to
aliens the same First Amendment test then applicable to
citizens," which has since changed), aff'd in part, rev'd in
part sub nom. American-Arab Anti-Discrim. Comm. v. Thornburgh,
970 F.2d 501 (9th Cir. 1991); see also Erwin Chemerinsky, The
First Amendment 137-39 (3rd ed. 2024) (observing that, following
the era in which Harisiades was decided, "by the mid-1960s, the
Court appeared to be much more protective of speech," and
describing the since-developed "incitement test" requiring "a
likelihood of imminent harm"); Keyishian v. Board of Regents,

385 U.S. 589 (1967) (holding a state law denying employment to
members of subversive organizations, without requiring proof of
knowledge and intent respecting the organizations' illegal
objectives, unconstitutional); Holder v. Humanitarian L.
Project, 561 U.S. 1, 39 (2010) (upholding application of statute
criminalizing material support of terrorism to groups providing
any material support to designated terrorist groups, including
legal training and political advocacy done in coordination with
them, but noting that the Court "in no way suggest[s] that a
regulation of independent speech would pass constitutional
muster, even if the Government were to show that such speech
benefits foreign terrorist organizations").

Although there is some superficial appeal to the Public
Officials' argument that the Plaintiffs have raised no more than
"generalized complaints about agency behavior," Greater Boston
Legal Servs. v. United States Dept. of Homeland Sec., No. 21-cv-
10083, 2022 WL 138629, at *6 (D. Mass. Jan. 14, 2022) (Casper,
J.) (quoting Cobell v. Kempthorne, 455 F.3d 301, 307 (D.C. Cir.
2006)), First Amendment challenges may be brought against
unwritten policies, and at this stage the existence of the
policy the Plaintiffs allege is a factual issue on which this
Court must draw all reasonable inferences in their favor, see,
e.g., Hoye v. City of Oakland, 653 F.3d 835, 855 (9th Cir. 2011)
(noting that "[a]n unwritten policy . . . is usually harder to

establish," but less so when "the [Public Officials'] own
pronouncements definitively articulate a content-discriminatory
enforcement policy")[9]; see also Schmitt v. Murphy, No. 05-11348,
2010 WL 3813648, at *7 n.13 (D. Mass. 2010) (Gertner, J.) ("The
existence of an oral, rather than written, policy does not

---

[9] In Hoye, the Ninth Circuit describes the First Circuit's
identification of a "second kind of as-applied challenge," which
challenges a neutral law that is being "enforced selectively in
a viewpoint-discriminatory way," and which the Ninth Circuit
characterizes instead as a "selective enforcement equal
protection claim[]" rather than an as-applied challenge.  653
F.3d 835, 854-55 (9th Cir. 2011) (quoting McGuire v. Reilly, 386
F.3d 45, 62 (1st Cir. 2004)).  The Public Officials construe the
Plaintiffs' claims as a facial challenge to the relevant
Executive Orders, but the Plaintiffs consistently state that
they instead challenge a discriminatory policy implementing
these orders.  See Compl. ¶ 1.  To make a selective enforcement
claim of the kind described in McGuire, "some showing of intent
on the part of government officials probably is necessary."  386
F.3d 45, 63 (1st Cir. 2004).  Insofar as this can be construed
as a facial challenge, the Public Officials are wrong to suggest
that Plaintiffs must show that the challenged law or policy
lacks any "plainly legitimate sweep," Moody v. NetChoice, 603
U.S. 707, 744 (2024); Defs.' Opp'n 12.  Rather, "[t]o 'provide[]
breathing room for free expression,'" a facial challenge under
the First Amendment requires plaintiffs to show that "a
substantial number of [the law's] applications are
unconstitutional, judged in relation to the statute's plainly
legitimate sweep.'"  Moody, 603 U.S. at 723 (first quoting
United States v. Hansen, 599 U.S. 762, 769 (2023); and then
quoting Bonta, 594 U.S. at 615)).  Since the Plaintiffs allege
intent, this Court need not decide the exact scope of their
First Amendment challenge at this stage.  See also Tipton v.
University of Haw., 15 F.3d 922, 927 (9th Cir. 1994) (describing
attack on "unwritten policy as manifested in the [defendant's]
application of its written policy," which may be described as
either facial or as-applied, and which focuses on "the
**systematically unconstitutional operation** of a [written policy]"
(quoting Bowen v. Kendrick, 487 U.S. 589, 608 (1988) (Blackmun,
J., dissenting))).

appear to implicate the Constitution.  The Supreme Court discusses regulations or 'practice.'" (quoting <u>Procunier</u> v. <u>Martinez</u>, 416 U.S. 396, 413 (1974)).  This makes intuitive sense, because a speech code that is unwritten or vague but enforced with harsh penalties would seem more likely to chill broad swaths of speech than one that clearly defines what is forbidden.  <u>See</u> <u>Speech First, Inc.</u> v. <u>Sands</u>, 69 F. 4th 184, 207 (4th Cir. 2023) (Wilkinson, J., dissenting) ("With a definition this loose and rambling, almost anything could be framed as a [bias violation].").  This is what the Plaintiffs have alleged: a not-clearly-articulated policy against speech that could be construed as pro-Palestinian or anti-Israel, and that may be enforced by arrest, detainment, and deportation, including arrests at one's home or on the street by masked officers.  It is hard to imagine a policy more focused on intimidating its targets from practicing protected political speech.

Given the broadness of these allegations, this Court declines to analyze counts one and two separately at this stage. The law against speech-chilling governmental pressure, which more clearly applies to count two's alleged campaign of "threats to punish constitutionally protected speech," Compl. ¶ 136, is in some ways clearer than the law regarding rules or policies that work an objective chill, because there is on-point Supreme Court precedent establishing that the government may not exert

undue pressure against First Amendment rights through a regime of "thinly veiled threats" and "informal censorship," <u>Bantam Books, Inc.</u> v. <u>Sullivan</u>, 372 U.S. 58, 66-67 (1963), but the former may ultimately collapse into the latter, <u>see</u> <u>Whitten</u>, 145 S. Ct. at 703 (Thomas, J., dissenting), and the more recent case law regarding the former is more obviously applicable to the ideological-deportation policy that is challenged in count one, Compl. ¶¶ 134-35; <u>see</u> <u>Cartwright</u>, 32 F. 4th.[10]

This Court rules that the Plaintiffs have plausibly alleged the existence of both an ideological-deportation policy targeting protected political speech and a more informal campaign of censorship through threats.  The motion to dismiss counts one and two is therefore DENIED.

**E. The Fifth Amendment (Count Three)**

As to the Plaintiffs' Fifth Amendment claim, the Public Officials argue that the Plaintiffs cannot challenge a cobbled-together unwritten "policy" as unconstitutionally vague; that, even if the Plaintiffs challenge the relevant Executive Orders,

---

[10] Count two also faces unique challenges because it implicates government speech, <u>see</u> <u>Pleasant Grove City, Utah</u> v. <u>Summum</u>, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."), and must also reckon with the free speech rights of the individual government actors whose speech the Plaintiffs view as threatening, <u>see</u> <u>Goldstein</u> v. <u>Galvin</u>, 719 F.3d 16, 30 (1st Cir. 2016) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern.").

this challenge is foreclosed, because these Orders do not regulate private conduct; that there is no precedent for extending Fifth Amendment vagueness doctrine beyond the statutory context; and, in any case, the Orders track well-established concepts of unlawful conduct such as harassment and aiding terrorism, so they are not vague.  Defs.' Opp'n 15-16.

The Plaintiffs' counterargument is confined to a footnote, stating the general proposition that policies such as this one may be challenged on vagueness grounds, and that the Plaintiffs are not, as the Public Officials contend, challenging the Executive Orders themselves.  Pls.' Reply 7 n.5.  The cases cited for this proposition address written rules and regulations, not unwritten policies.  See, e.g., Wagner v. City of Holyoke, 100 F. Supp. 2d 78, 86 (D. Mass. 2000) (Ponsor, J.) ("Even if **the rule** might be vague as applied . . . , it belies common sense to suppose that this plaintiff was not aware that his conduct fell within the purview of **the regulation**." (emphasis added)).  The Plaintiffs draw this Court's attention to a Due Process challenge to the foreign policy provision of the INA that the government has invoked to argue that it may take adverse immigration action based on expression, see Massieu v. Reno, 915 F. Supp. 681, 698-703 (D.N.J. 1996) (Barry, J.) (holding INA foreign policy provision void for vagueness), rev'd

on other grounds, 91 F.3d 416 (3d Cir.); Defs.' Opp'n 13, but do
not challenge this provision themselves.

Because Due Process-based vagueness challenges have not
been extended beyond the statutory sphere or, at most, to
written rules and regulations, the motion to dismiss count three
is ALLOWED.

### F. The APA (Count Four)

As to the Plaintiffs' APA claim, the Public Officials argue
that the Plaintiffs have not challenged a final agency action or
one for which there is no other adequate remedy, because (1) the
alleged policy has not determined rights and obligations or
triggered legal consequences, but is instead at most a general
executive program not captured in any order or regulation,
Defs.' Opp'n 16-17, and (2) challenges to removal decisions must
be channeled through the exclusive administrative scheme
established for immigration review, so there is another adequate
remedy, id. at 17-18.  In addition, the Public Officials argue
that Executive Orders may not be challenged under the APA
because the President is not an agency, and that the Plaintiffs'
APA challenge would fail on the merits in any case because the
"substantive policy decisions captured in the EOs (and reflected
in practice)" are not arbitrary or capricious, but rather
represent a rational response to a surge of antisemitic
harassment after the October 7 attack that benefited terrorist

organizations such as Hamas to the detriment of the United States' national security.  Id. at 18.

In response, the Plaintiffs argue that there is a strong presumption in favor of judicial review of agency action, that agency action may be final even if it not reduced to writing, and that the Plaintiffs do lack any other adequate remedy because their claims are not reviewable through removal proceedings and their harms would not be relieved by future review of potential deportees' claims.  Pls.' Reply 7-8.

For an agency action to be reviewable under the APA, it must be "final" action, Lujan, 497 U.S. at 882, and there must be "no other adequate remedy" for the alleged harm, Bennett v. Spear, 520 U.S. 154, 157 (1997).  To be final, agency action must be "one by which rights and obligations have been determined" or from which "legal consequences will flow." Bennett, 520 U.S. at 177-78.

Particularly given that this Court must draw all reasonable inferences in the Plaintiffs' favor at this stage, including "inferences that support the existence of an official policy," Amadei v. Nielsen, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018), the Plaintiffs have plausibly alleged final agency action.  Agency action "need not be in writing to be judicially reviewable as a final action," as "[a] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to

[64]

put those decisions in writing.'" Aracely, R. v. Nielsen, 319
F. Supp. 3d 110, 139 (D.D.C. 2018) (quoting Grand Canyon Tr. v.
Public Serv. Co. of N.M., 283 F. Supp. 2d 1249, 1252 (D.N.M.
2003)). This rule has been applied, for instance, where
plaintiffs challenged an unwritten Department of Homeland
Security policy that "direct[ed] ICE officers to consider
deterrence of mass migration as a factor in their custody
determinations," leading to the increased detention of Central
American mothers and children. R.I.L-R. v. Johnson, 80 F. Supp.
3d 164, 174 (D.D.C. 2015). Where "Defendants have repeatedly
stated that there is a policy," moreover, they "cannot, now,
have their cake and eat it too," and the Plaintiffs have pointed
to several examples of high-level agency officials at least
arguably "saying that they were following a policy" of targeting
those who have engaged in pro-Palestinian advocacy for
deportation. Amadei, 348 F. Supp. 3d at 165; see, e.g., Compl.
¶ 29.

As the Plaintiffs argue, the Public Officials' analogy to
Lujan, where the plaintiffs challenged a constellation of Bureau
of Land Management actions announcing its intent to grant
permission to certain activities, to decline to interfere with
others, and to take other action if requested, is inapposite,
because the Plaintiffs allege a specific "policy of revoking the
visas and green cards of faculty and students engaged in pro-

Palestinian advocacy," not a constellation of independent decisions or a general drift in agency priorities. Pls.' Reply 7-8; Lujan, 497 U.S. at 892. This case is closer to Johnson than Lujan: here the Plaintiffs allege that the Public Officials are targeting noncitizens who engage in pro-Palestinian advocacy for visa revocation and deportation, not that they have become anti-Palestinian or suppressive of speech in some general way.

The Plaintiffs have also plausibly argued that their harms are not otherwise redressable than through the APA. If, as discussed supra, the Plaintiffs may be unable to obtain an injunction based on their freestanding First Amendment claims, then it is unclear how their harms may otherwise be redressed than by the stay they request under the APA. Likewise, "even if an individual noncitizen challenges the Agencies' [action], that review does not address the broader injury alleged by Plaintiffs here," Greater Boston Legal Servs. 2022 WL 138629, at *5 -- that is, the chill on noncitizen members' speech, the harm to citizen members' ability to hear from and associate with noncitizen colleagues and students, and the direct harm to the organizations' core missions of supporting academic freedom and to their core activities and spending. The Public Officials argue that the INA broadly precludes APA review of decisions affecting immigration, Defs.' Opp'n 17-18, but, as Justice Sotomayor noted in her Aleman Gonzalez concurrence, the Supreme

[66]

Court has not addressed whether the INA restrains courts from setting aside agency action under the APA, 596 U.S. at 571 (Sotomayor, J., concurring in part), and the Plaintiffs point to instances where courts have held or assumed that it does not, Pls.' Reply 10; see National TPS All. v. Noem, No. 25-cv-01766, 2025 WL 957677, at *11-14 (N.D. Cal. Mar. 31, 2025).

Therefore, this Court DENIES the motion to dismiss count four.[11]

---

[11] The Plaintiffs argued the prudential standing requirement that their claims must be within the "zone of interests" of the statute governing the challenged actions for them to bring a claim regarding implementations of the statute under the APA, pointing to cases where employers benefiting from visa programs and organizations inviting noncitizens to speak were held to fall within the zone of interests of the INA. Pls.' Mem. 17-18. The Public Officials do not challenge this characterization. This issue is underdeveloped now. "As long as the constitutional standing requirements are satisfied, the court may evaluate the case's merits before resolving thorny prudential standing questions," and so this Court does here. Labor Rels. Div. of Constr. Indus. of Mass. v. Healey, No. 15-10116, 2015 WL 4508646, at *5 (July 9, 2015) (Zobel, J.).

**III. CONCLUSION**

For the reasons stated above, the Motion to Dismiss is ALLOWED in part as to count three and DENIED in part as to counts one, two, and four.  A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[12]

---

[12] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:25-cv-10685-WGY

4

5    AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
              Plaintiffs

6

7    vs.

8

9    MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10             Defendants

11
                         * * * * * * * * *
12

13
                      For Hearing Before:
14               Judge William G. Young

15
                  Case Management Conference
16

17                  United States District Court
                    District of Massachusetts (Boston.)
18                  One Courthouse Way
                    Boston, Massachusetts 02210
19                  Tuesday, May 6, 2025

20
                         * * * * * * * *
21

22
                REPORTER: RICHARD H. ROMANOW, RPR
23                   Official Court Reporter
                  United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                      rhr3tubas@aol.com
25

```
 1                    A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     JAMEEL JAFFER, ESQ.
 4   SCOTT WILKENS, ESQ.
        Knight First Amendment Institute at Columbia University
 5      475 Riverside Drive, Suite 302
        New York, NY 10115
 6      (646) 745-8500
        E-mail: Ramya.krishnan@knightcolumbia.org
 7   and
     MICHAEL TREMONTE, ESQ.
 8   NOAM BIALE, ESQ.
        Sher Tremonte LLP
 9      90 Broad Street, 23rd Floor
        New York, NY 10004
10      (212) 202-2600
        Email: Mtremonte@shertremonte.com
11      For Plaintiffs

12

13   SHAWNA YEN, ESQ.
        United States Attorney's Office
14      1 Courthouse Way, Suite 9200
        Boston, MA 02210
15      Email: Shawna.yen@usdoj.gov
        For Defendants

16

17

18

19

20

21

22

23

24

25
```

```
1          P R O C E E D I N G S
2          (Begins, 10:00 a.m.)
3          THE CLERK:  The Court will hear Civil Case Number
4     25-10685, the American Association of University
5     Professors, et al vs. Marco Rubio, et al.
6          THE COURT:  Good morning.  I'm not going to go
7     through the routine of having everyone introduce
8     themselves every time we may get together, but as people
9     may change, um, today I'll ask you to do that again.
10          So would counsel for the plaintiffs introduce
11     themselves and then counsel for the defense.
12          MS. KRISHNAN:  Good morning, your Honor, Ramya
13     Krishnan for the plaintiff, and with me at the bar table
14     are Jameel Jaffer, Scott Wilkens, and we're from the
15     Knight First Amendment Institute.  We also have
16     co-counsel Noam Biale and Michael Tremonte of Sher
17     Tremonte.
18          THE COURT:  And good morning to you all.
19          And for the government?
20          MS. YEN:  Good morning, your Honor, Shawna Yen for
21     the United States.
22          THE COURT:  And good morning to you.
23          Again I have authorized internet access to this
24     hearing.  If anyone has availed themselves of the
25     internet access, I must remind you that the rules of
```

1   court remain in full force and effect, you must keep

2   your microphone muted, there is no taping, streaming,

3   rebroadcast, screen shots, or other transcription of

4   these proceedings.

5        This is a case-management scheduling conference.

6   As I have traditionally held these conferences, we could

7   go back into the lobby, sit around -- with so many of

8   you I would do it in a jury room, and we could sit

9   around the jury's table and have our coffee and, um,

10  talk.  Because that's what I want to do this morning, I

11  want to talk and flag, um, as best I can, the issues

12  that may arise.

13       But for some scheduling, orders, um, I'm going to

14  share my ruminations, as I am the factfinder here as

15  well as the case manager.  I invite you to interrupt me.

16  And you may be sure that when I'm done, I'm going to ask

17  for questions and comments.

18       I don't view this -- though in the interests of

19  transparency, I'm doing it out in open court, I have the

20  Court Reporter here, everything's being taken down, I

21  don't view myself -- except as scheduling, I don't view

22  myself as making any rulings today, substantive rulings

23  at all, and so it's not the time to argue.  Though I'm

24  not going anywhere and we may have -- we may have

25  further argument at appropriate times, and I'm going to

1    have to have a final pretrial conference.  So that's

2    the -- that's what I think this case-management

3    scheduling conference is, a conference among counsel

4    with the Court.

5          Now having collapsed the further hearing for a

6    preliminary injunction with trial on the merits and

7    asked when plaintiffs would be ready, you said 6 weeks.

8    That takes us to June.  I have a trial -- interestingly

9    a trial that involves MS-13, to commence on Monday the

10    2nd of June, it will go two weeks.  I'm looking for you

11    on Monday the 16th of June.

12          If that case should resolve prior to, um -- and

13    stay close with Ms. Belmont, prior to the 16th, we'll

14    come looking for you.  I'll take witnesses out of order.

15    It's jury-waived.  I'll try to accommodate you as to

16    timing.  But we're not going to look for trial time

17    prior to, um, June since plaintiffs said 6 weeks.

18          I'm going to try the case, um -- as I view it,

19    though the case is framed significantly by the

20    plaintiffs, but as I view it I'm going to try it in two

21    parts.  Liability, that is, have any of the President or

22    these high public officials violated your client's First

23    Amendment free speech rights?  That's the first part.

24          The second part is remedy.  And I'm not assuming

25    remedy, and I'm not -- other than in the most general

1  way I'm not going to talk about it today, because that's

2  the second phase.

3          First, plaintiffs bear the burden of proof.  It's

4  a civil case.  The burden of proof is proof by a fair

5  preponderance of the evidence.  If that's established,

6  then the Court must consider remedy, if any, because

7  redressability here is a very real issue and one we're

8  going to need to talk about, but not today because I

9  would be getting -- well my remarks are going to focus

10 really on liability here and what I think this case

11 involves and what I think the overarching law is.  Now I

12 stand to be corrected on all of this, um, I'm trying to

13 be both transparent and helpful.

14         First, I want to make some remarks about what you,

15 as attorneys, and I, as the judicial officer, are doing

16 here together.

17         Each one of you has filed an appearance in this

18 case, so you are subject to the ethical rules of this

19 court, and I have no question about it, I simply note

20 it.  This is a trial, I think it's a trial of some

21 public significance, so let me say a couple of things

22 about that.

23         One, if any -- any of you lawyers, or your clients

24 indeed, and I include the government defendants as well,

25 if there's any threats or, um, you are approached in any

1 | way, clients or lawyers, about your representation in
2 | this case, the issue of obstruction of justice is
3 | raised.  This is a trial.  Trials are meant to be
4 | resolved on evidence with the cool, reflective,
5 | impartial, um, adjudication of the facts.

6 | Also, I really respect -- and I hope the opinion
7 | I've issued on standing manifests that respect.  I
8 | respect vigorous advocacy, I welcome it, I'm -- I'm fine
9 | with it.  At the same time -- and you won't take this as
10 | criticism, and I don't mean it as criticism, I've
11 | praised you justly -- and Mr. Graver is not here, but I
12 | include him, for the advocacy so far, but ethically you
13 | owe the Court absolute candor in answering the Court's
14 | questions, and I'm sure I will get it.

15 | It's not inappropriate to mention that in another
16 | case, um, government counsel, um, suffered -- apparently
17 | from what I read in the press, from absolute candor to
18 | the tribunal.  I'm not going to go into that other than
19 | to say, I read the newspapers.  If there's any
20 | intimation of anything like that in this case -- and
21 | I -- I find it hard to believe there could be, um, you
22 | can be very very sure that I will draw an adverse
23 | inference against that party, a severe adverse
24 | inference.  I don't expect it and it's totally
25 | unacceptable.

1  So now, um, if you'll let me talk a bit about how

2  I think the constitutional right to free speech, um, the

3  framework applies in this case.  These are not rulings.

4  I'm being transparent, I'm telling you what I'm thinking

5  going in.  So it truly is a free-speech case.

6  Now some of the speech that will be analyzed is

7  the speech of the President and high, um, government

8  officials.  That speech may be brutal, coarse,

9  demeaning, um, that makes no difference, it seems to me,

10  these officials have the right to speak.  Teddy

11  Roosevelt had it right, "The Presidency is a bully

12  pulpit."  Our President is duly-elected in a full and

13  fair election.

14  And one can draw conclusions as to why people

15  speak.  Such political speech by the powerful, um, is

16  intended to persuade, but it may also include, um,

17  speech that quite candidly is intended to bully people,

18  to frighten the opposition, to chill the opposition into

19  silence.  The First Amendment protects all of that.

20  Justice Scalia remarked once that under the First

21  Amendment a certain amount of fortitude is required."

22  He was speaking of citizens.  And that's the case.  So

23  this Court, whatever the content of pure speech by the

24  government, by these defendants, I'm starting out

25  believing that's absolutely protected by the First

1    Amendment.

2        Now, at the same time the President, these high-

3    executive public officials, are routinely mocked,

4    maligned, condemned, in equally coarse language, and

5    that's all protected under the First Amendment.  We

6    remember that as magnificent a President as President

7    Abraham Lincoln, he was routinely called a "gorilla"

8    throughout his tenure.  That's the First Amendment at

9    work, it's boisterous, rambunctious.  It can be very

10   coarse, demeaning, vitriolic.  We've survived for, um,

11   now close on -- we're talking about 250 years, with

12   that, um, approach to speech under our First Amendment.

13       Retribution, government retribution for speech is

14   prohibited by the First Amendment.  In fact, in the

15   circumstances of this case, were there to be found

16   retribution, government retribution for speech, it would

17   go to the very center or core of the concerns of the

18   First Amendment, because it would, um, it appears to be,

19   um, dealing with political speech, what's most precious

20   and must be absolutely protected under the First

21   Amendment.  And if that -- if the Court were to find

22   that action by government officials in retribution for

23   free speech, without more, the government -- the Court

24   would be warranted -- and I'm not saying I would,

25   because it's open to proof, and I'm not saying it's

1　presumed, but my view is the Court would be warranted in

2　finding that such retribution chills the speech, the

3　constitutionally-protected speech of others similarly

4　situated.  And the Court's ruling on standing as to

5　who's similarly situated here gives some idea who, I

6　think anyway, I would be warranted were I to make that

7　finding, and that -- that's the key finding I think

8　here.

9　　　　　So let me come out -- let me come down out of

10　the -- these generalities and talk about what appears to

11　be at issue in this case, at least as framed by the

12　plaintiffs, and I don't adopt their framing, that's

13　the -- that's the framing we've got here.

14　　　　　The plaintiffs claim that this is pro-Palestinian

15　speech, certainly that's political speech, protected

16　under the First Amendment.  So also within that ambit,

17　um, it would seem -- it would seem, I think, that

18　speech, however coarse, hostile, um, to the State of

19　Israel and its policies, both civil and military, um,

20　that's political speech, that's firmly protected.

21　　　　　Now the Executive Orders here -- which are not

22　challenged, and we'll get to that in a moment, speak of

23　"violent antisemitism."  Now because the government uses

24　the word "violent," and the President uses that word, I

25　can follow that, that's not challenged.  Indeed violent

1    antisemitism, as I understand it, is not protected,

2    under the First Amendment, to citizens or noncitizens

3    alike.  But we don't have statutes against hate speech.

4    And while I personally find antisemitism repugnant, I

5    find Islamophobia to be repugnant.  I find the choice

6    whether to believe or not believe, if that is the basis

7    of animus toward an individual, I find that contrary to

8    the American character, as I conceive of it.  And

9    nothing that I just said has any bearing on this case.

10   You're entitled to know it, it's appropriate that I say

11   it, but that's not going to be the basis for any

12   finding.

13        I do think that under the First Amendment -- the

14   First Amendment, unlike some other countries who

15   prohibit hate speech, we don't under the First

16   Amendment, and so antisemitism, repugnant though it may

17   be, the speech itself is not prohibited.

18        Now I'm very much aware that, um, speech can

19   become threats, threats can become assault, without

20   more.  A -- a threat with the potential that it be

21   carried out, or inciting the carrying out of a threat,

22   is, I think, that's an assault at common law.  It's open

23   to state and federal authorities to criminalize that.

24   And it's certainly open to these public officials, who

25   have been sued here, to take action against it.  Even

1   though pure speech, certainly political speech hostile

2   to the state of Israel, antisemitism, the government --

3   our government has a justified interest in promoting

4   tolerance for all faiths, or no faith, um, that's an

5   appropriate government goal. And just as an aside, I

6   don't know how it's squared with this hostility to what

7   is called "DEI." Put that aside. So enough on that.

8        Two other things I want to say going in that my

9   research has surprised me -- and you're going to want to

10  be thinking about this and I, um, candidly, um, solicit

11  further analysis and briefing. And the first is this.

12        When first I drew this case and began to read

13  the -- to read the complaint and the associated

14  documents, I adopted a view that of course noncitizens

15  have full rights to freedom of speech under the First

16  Amendment. The First Amendment speaks of "persons." I

17  went to law school when the Warren court was sitting and

18  among its justices was Justice Black, who is probably

19  the most famous texualist, and I haven't got the case

20  here, but I thought it was Black as saying that

21  "'persons' means 'persons,' and that's all persons."

22  You didn't have to be a citizen. Now I'm not saying

23  I've changed that view, what I'm saying is I'm not at

24  all clear, under the jurisprudence of the Supreme Court

25  today, that that's correct.

1        I find that that's assumed by a number of my

2   colleagues in related cases that deal with free speech

3   in the lower courts.  But, um, I'm not clear that

4   noncitizens have, um, I will call them the "full rights"

5   to free speech that a citizen has.  I'm looking for

6   guidance.  I'm looking for help.

7        And the second thing is, but this goes more to,

8   um, remedy, but we live in the real world and if we ever

9   got there, maybe we'll have to deal with it.

10        I see that the hearing officer in Mahmoud Khalil's

11   case, again just reading the papers, says, "Well he's an

12   embarrassment to the foreign policy of the United

13   States," and when I first read that I thought, "Well

14   that's not a standard, that exception squanders the

15   rule," an "embarrassment to the foreign policy of the

16   United States"?  And then I look into it and of course

17   that is a ground.  And more than that, the Supreme Court

18   has spoken to that and says I'm not, um, permitted to

19   question that.  I work for the Supreme Court.  I'm sworn

20   to give full and complete adherence and implement its

21   rulings.  And candidly -- I'm hopeful we don't get to it

22   in this case, but I don't see how that will work if a

23   noncitizen has the same rights as a citizen to speak

24   about these matters.

25        That's really everything I have to say about the

1    law.  Let's turn from those general things to, um, how
2    I -- I've tried to, in sort of the law-exam
3    issue-spotting, um, here's some of the issues as we get
4    ready for trial.  I'm not hoping that these issues
5    arise, I'm actually hoping -- and I exhort you to,
6    consistent with your duty to your clients, to cooperate,
7    to make things simple and understandable, the public
8    interests will be served, your duties as attorneys to be
9    most easily accomplished.  But, um, here's what I think
10   are the elements of the plaintiffs' case in, um -- and
11   then I'll get into some specifics.
12        The plaintiffs say, "All right, here are these
13   Executive Orders, we don't challenge them."  Here's all
14   this rhetoric by the defendant President and the high
15   Executive Orders which, pretty clear, goes well beyond
16   what the Executive Orders themselves confine to, but as
17   I see it, they have every right to say what they want to
18   say.  And then -- and this of course is where the rub
19   comes.
20        Then the plaintiffs say, "Well there has been
21   retaliation against individuals, it's not just the
22   speech which chills those who are not in office and who
23   are not as powerfully situated with the media
24   organizations and the like, there is, um -- there is
25   retribution against these individuals for their speech."

```
 1    Denied.  I've entered an order that we're taking it that
 2    all substantive allegations are denied by the defense, I
 3    take that very seriously, that's a factual difference.
 4    So we're going to have to figure out what happened and
 5    what is it that the plaintiffs say is actual retribution
 6    against speakers.  And then -- I think of things
 7    chronologically, then the plaintiffs are going to have
 8    to prove the effects.
 9         My ruling on standing, um, is you're going to have
10    to have some evidence.  I pointed out that a single
11    person can be sufficient for standing for an
12    organization, but I've got to have some evidence of the
13    specific person.
14         Now that's the overview.  I think those are the
15    elements.  Prove those things by a fair preponderance,
16    then in my view there is liability.  I'm not at all sure
17    what that means, but I do think it means, um, it means a
18    declaration of rights.  Prove that, it would be my
19    obligation so to declare.
20         And I have no, um -- no inflated view of my role
21    in the firmament here, but I have every sensibility of
22    the responsibility that devolves on me and my obligation
23    to discharge that responsibility.  So at minimum there's
24    a declaration of rights.  Whether there's any more,
25    we'll see.
```

1    Now I'm not -- I'm anticipating an expedited

2    narrow-focused run-up to the trial in this case. Here's

3    what I mean. Again we're just talking. So these aren't

4    orders, but this is what I expect, um, I'm trying to

5    flag issues. I'm not saying this is how I'll rule, but

6    I'm simply trying to be helpful.

7    So I am not expecting full discovery. We don't

8    have much time, we only have less than a month, if the

9    case in front of you were to fold and, um, a little more

10   than a month if that goes to two weeks. So I don't

11   expect depositions of certain -- I'm not going to permit

12   any direct discovery of the President or the high

13   executive officials that you have named and sued in

14   their official capacity. I'm not going to require that

15   they answer interrogatories or, um, submit themselves to

16   discovery at all, um, they're busy and they have many

17   other things to do besides deal with this case. The, um

18   -- well having said that, I'm not preventing any of the

19   high executive officials from coming forward and

20   submitting testimony, they have every right to do all

21   that. But I'm not requiring any of it.

22   It seems to be proof would follow pretty much the

23   following form. The Executive Orders are there, I can

24   take judicial notice of them and I'm prepared to,

25   they're not challenged, but they set the framework.

1      On reflection I think -- I want to refine a little

2 bit what I said at the initial hearing.  I said to the

3 plaintiffs, "Well you haven't got the evidence here,

4 these -- these newspaper clippings are insufficient

5 because maybe they're not complete."  Actually I think

6 the default is the other way.  Prove -- and I'm talking

7 plaintiffs now.  Prove that these clippings are in fact

8 authentic, then they are admissions, under the Federal

9 Rules of Evidence, by the specific defendant.  If

10 they're not complete -- and of course the defense may

11 raise under Article I the fact of the Rules of Evidence,

12 that they're not complete, then it falls upon the

13 defendants, you've got to come up with the complete

14 interview, you've got to come up with the complete

15 outtakes, um, whatever qualifications are not in them,

16 the rhetoric.  And I -- I don't think that's going to

17 take as much time and, um, I don't think that's the

18 purpose.

19      Then we come to this whole issue of government

20 retribution, which is what I think the case turns on,

21 because I don't think it would be hard to prove a

22 chilling effect, at least as I've cast standing.  And as

23 to that, um, I really do expect the government --

24 plaintiffs may have to frame a request for production,

25 but I expect every contemporaneous document that exists

1   up and down the chain of command within the government

2   bureaucracy that bears on that evidences -- but don't

3   make a request that says, "I want all the documents

4   related to the" -- that's silly, all life is related to

5   other life, so I routinely deny those requests.  But

6   seriously now, because I'm hopeful for complete

7   cooperation by the government here, by these executive

8   officials, um, as to or --

9       And candidly I think this is your case to try, but

10  on the retribution issue I would expect the plaintiffs

11  to focus on the -- well I've identified three

12  individuals who are the ones that I read about most in

13  the papers, and that would be Mahmoud Khalil, this

14  Rumeysa Ozturk, and, um, Mohsen Madawi.  Because since

15  this is a case about chilling, if the government -- and

16  the government isn't acting secretly here, one thing

17  that can be said is the government's pretty forthright

18  about what it's doing, so in fact part of the

19  plaintiffs' case is that's all intended to chill,

20  that's -- and I won't get into specifics, but I could

21  imagine what evidence we will get to show how

22  frightening it is.

23      I want to -- so I'm asking the plaintiffs -- I'm

24  expecting a limited focus on retribution.  If the

25  plaintiffs make that limited focus on retribution, then

1    I expect the government to be absolutely fulsome in its

2    disclosure of contemporaneous documents.  And if I'm

3    going to hear from people, if I'm going to hear from --

4    hear from people, um, as witnesses, if subpoenas go out

5    here, the people I -- and I'm just thinking if those

6    were the three, I'd like to hear from the lower-level

7    person or persons who organized the actual apprehension

8    of these three and what instructions they had and why

9    and work back up from there.

10        Now understand I think the government has these

11    high public officials -- and certainly the President of

12    the United States, have, um, various grounds that they

13    may serve to withhold such documents, or some of them,

14    and I want to address those now just to try to head it

15    off.

16        The government has a deliberative privilege.  I

17    must honor it and I must honor it without any cost to

18    the defendants, that is drawing any adverse conclusions.

19    But a deliberative privilege just doesn't throw a

20    blanket over the lie.  Let me give an example.

21        At some level -- and I'm making all this up just

22    as I -- (Coughs.)  At some level, um, let's assume that

23    one or more of the defendants identified here, um, says,

24    within the government, "We should do something about the

25    protests at Columbia, all right, and, um, give me a memo

1    on that," to somebody else.  Well that's privileged, it

2    seems to me.  But now saying that there's a deliberative

3    privilege doesn't mean the government can't come forward

4    with that, maybe that helps them.  But again, it's not

5    for me to say.  And something happens within the

6    bureaucracy, someone responds, "Here's a plan, what do

7    you think of that?"  Well that's privileged under the

8    deliberative privilege.  Meetings at which things were

9    kicked around, um, privileged.  But the memo which says

10   "Approved," "Executed," or "Approved, except for

11   Paragraph 6," that's not, that's the directive.  The

12   decision's made then.  Government works as a

13   bureaucracy.  There's nothing wrong with a bureaucracy,

14   a bureaucracy works.

15        And here, when we get down to the level of ICE

16   enforcement agents, they work in -- and again I don't

17   mean this to be pejorative, but in a sort of quasi-

18   military style and they get instructions.  All those

19   instructions are not in any way privileged, and I want

20   to know about it.  What was going on?  Why were they

21   armed or masked or not or identified or not?  All of

22   that.  What was going on?  And why?  Who set that out?

23   Who set up this business with the Madawi in Vermont?

24        Now a caution here, and the caution is, um, by

25   identifying these three -- I'm trying to deal with my

1    case, which is a chilling case.  I imagine there are

2    documents and documents have been produced and the like.

3    This Court in no way is going to retry immigration

4    proceedings or judicial proceedings in another district,

5    I just want to know what happened.  It's the what

6    happened which I imagine the plaintiffs are going to say

7    is the retaliation.  And my identifying these three

8    doesn't cabin the plaintiffs in, there may be others,

9    there may be a better.  But, um, the fact I haven't

10   heard about them, well that's more evidence that, um, in

11   the community of people who have standing, if they've

12   heard about them, that that's what's going around.  We

13   need to know at some stage.  But I've heard about these

14   and I'm just the average newspaper-reader.  Um, that's

15   one thing, deliberative privilege.

16       It's possible that there's state secrets here, the

17   government has some sort of intelligence about terrorist

18   organizations or the like, and as to this my remarks are

19   directed to the government.  If that figures in -- in --

20   well you people are going to have to cooperate.

21       First of all, you're going to have to -- I'm

22   looking at the plaintiffs.  You're going to have to

23   limit what you think is the retribution and let the

24   government know, and then the government will be able to

25   answer the question that I now put to the government,

1  and it's an important one.

2      If there's any state secrets issue here, um, I

3  know how to handle those cases, I've handled genuine

4  terrorist cases.  I presided over the **Richard Reid** case,

5  the **David Daoud Wright** case.  I am aware that there is

6  a -- a rather complete protocol for protecting

7  governmental secrets in the course of litigation, and

8  the government's going to have to do something.

9      You're going to have to -- assuming that's going

10  to be a part of this case, you're going to have to get

11  the proper officer who understands that protocol to

12  advise this Court.  I'm going to need a secret clearance

13  for Ms. Belmont and one of my law clerks.  I've been

14  there, done that.  I don't mean in any way to be blase

15  about it, I take it very seriously.  But it doesn't

16  prevent me, as the judicial officer, from knowing what

17  they are.

18      As I understand the protocol, and I have followed

19  it before, is I'm entitled to see them.  And the

20  plaintiffs will understand they do not in any way get

21  disclosed in the course of these civil proceedings.  But

22  I need to know.  Because I very much want to go to

23  trial, as I've described.

24      Lastly is the attorney-client privilege.  We're

25  all familiar with that.  Understand that under Rule 502,

1  um -- 502 does take some of its coloration from where

2  you sit.  Here in Massachusetts, if you, um, claim

3  attorney-client privilege, um, in the state courts, I'm

4  entitled to draw an adverse inference from that, that

5  you're hiding someone.  Um, I've always thought that

6  worked in federal court too.  I'm not sure of it.  My

7  experience has been, over the years, that, um, by

8  telling lawyers that, they're skittish about claiming

9  the attorney-client privilege.  And usually what the

10 lawyers have to say -- and I mean no disrespect, I honor

11 lawyers, but it doesn't amount to much anyway.  But be

12 aware, coming into the case, with that in mind.

13       Okay, let's see.  I don't see -- oh, I want to --

14 I'm surfing back now though, it's basic to the

15 plaintiffs' case, um, to standing.  We're going to have

16 to have somebody to establish the standing of each of

17 the associations or entities, um, to the distance that I

18 was willing to accept standing, and nobody's going to

19 testify by pseudonym or anything, it's got to be an

20 actual person.  And the sooner they're disclosed, the

21 better off we are, because the defendants, they need to

22 know who that person or persons is.

23       I'm also open to -- I know I didn't go so far, but

24 I don't think the citizen professors have standing, I

25 think that's too far away, but that doesn't mean I

1    wouldn't accept one or two witnesses, um, brief, as to

2    effects on, um, their functioning, as I've seen in the

3    moving papers.  But absent standing, um, I'm not giving

4    advisory opinions.  So, yes, I think there should be a

5    trial, yes, I think -- and certain noncitizen professors

6    have standing, but it's got to be proved, plaintiffs

7    have to prove it and make disclosures so that the

8    defendants can meet it.

9         Now experts.  I don't see experts in this case.

10   I'm not foreclosing any, but I don't see experts in this

11   case.  But, you know, I'm -- I think that's for

12   argument.  But if someone wanted to propose an expert,

13   and you know what the rules are, and, um, I follow this

14   idiosyncratic rule, that you know you have to produce an

15   expert report.  I like to say, in the usual product

16   liability case, that the expert report has to be "to the

17   level of exquisite detail of a patent claim."  No

18   expert's going to testify to anything that's not in the

19   report.  But actually I just don't see it.

20        Summary judgment prior to trial.  It's open to the

21   parties.  I don't see it.  The -- I can't see how the

22   plaintiffs could get summary judgment, because they bear

23   the burden of proof, and even if things were, um --

24   unless things were actually stipulated, I would accept

25   them.  But anything that wasn't stipulated, as the

1    factfinder, I'm open to reject it.  So the fact that

2    they don't, um, line by line oppose it, doesn't, um -- I

3    just don't see how you can get there.

4         For any of the defendants to seek summary judgment

5    because the plaintiffs' proof, as you work it up for

6    trial, is inadequate, um, there's this real tension

7    between the right under the First Amendment and this

8    exception for the government to say, "Well they're not

9    citizens and it embarrasses our foreign policy."  I

10   don't think that's likely to happen because then these

11   defendants -- that's a really interesting constitutional

12   issue, but it's not my job -- constitutional avoidance

13   is my job.  The Supreme Court or any higher court is not

14   going to be happy if you just serve up an interesting

15   constitutional issue.  I'm not going to permit that.

16   And it would have to be absolutely stipulated that, um,

17   clearly, um, these high public officials, and the

18   President -- or the President, were, um, violating the

19   First Amendment rights of these people who have

20   standing.  I can't conceive that the defense defendants

21   would want to say that, and so I don't see that we're --

22   we're not going to get any, um, "We don't admit it, but

23   if it were true, it makes no difference, because we have

24   the right to say a person can be excluded because it

25   embarrasses our foreign policy."

1     You've all sat mute.  No one interrupted me.  I

2  really would rather sit around a table and, um, drink

3  coffee -- but I drink tea.  But in all honesty now, I

4  anticipate a final pretrial conference.  I'm looking

5  forward to a trial.  I didn't spot anything else.  You

6  see the tenor of my concerns.

7     Questions or comments from the -- and not just to

8  mechanical things.  (Laughs.)  And this always happens,

9  I start and then I think of something else.

10    (Laughter.)

11    I think that -- you're going to find trouble from

12  me if you're going to tell me this is going to take more

13  than two weeks, I think we can get this case tried in

14  two weeks -- and less maybe, hopefully less.  It doesn't

15  mean these are of any less importance, these are, um, of

16  extraordinary importance, but I've got to get some

17  focus.  And then I would be helped going in -- well the

18  first day of trial, if not even before, with requested

19  findings and rulings, even though we haven't had the

20  trial, um, because that gives me a basis to rule, to

21  find and rule as soon after the close of evidence as

22  it's possible.

23    This is, after all, the start of, um -- with the

24  plaintiffs' claim that they needed a preliminary

25  injunction for irreparable harm, I take that very very

 1    seriously.  But now I'll try to be quiet and answer

 2    questions and listen to comments.  I want your help.

 3        Yes?

 4        MS. KRISHNAN:  Thank you, your Honor.  And I

 5    appreciate everything that you've shared with us.

 6    You've given us a lot to digest.  I wonder if you'd give

 7    us a few minutes to --

 8        THE COURT:  I'll do better than that, I'll take a

 9    recess and we'll come back after a half an hour or maybe

10    20 minutes.

11        Does that make sense?

12        MS. KRISHNAN:  Yes.

13        THE COURT:  How about the defense, the same?

14        MS. YEN:  The same, your Honor.  Thank you.

15        THE COURT:  Yes, one last thing.  Come to the

16    sidebar, and this does not need to be on the record.

17        (Sidebar off the record.)

18        THE COURT:  We'll stand in recess for one half

19    hour.

20        (Recess, 11:00 a.m.)

21        (Resumed, 11:30 a.m.)

22        THE COURT:  Taking a half hour allowed me to think

23    of one thing I had not said, and I'll say it now.

24        I could also anticipate -- and I get this from

25    reading articles about new computer systems that allow

1    the government to search the social media visa holders.

2    I've had cases where the government, quite properly

3    says, "We're not going to disclose because it will

4    reveal law-enforcement techniques," and that's a

5    perfectly appropriate thing for the government to say.

6    And the way I have always dealt with it, and the way I

7    believe it should be dealt with, is the government, if

8    it says that, I still get to see the data -- and again

9    I'm making it up, say the adherence to a terrorist

10   organization or something, "But we're going to not tell

11   you how we know."  Well I'm not going to buy that.  But

12   I will allow an ex-parte filing, and I will review the

13   material myself in camera.  That's different from the

14   state secrets where I must, under law, absolutely

15   preserve the state secrets, in this case it's up to me.

16   And I'm not going to reveal anything that in fact is not

17   generally known -- well I might make use of the data to

18   ground a finding.  That's the one additional thing that

19   I had not said.

20          Yes, questions and comments?  Let's start with the

21   plaintiffs.

22          MS. KRISHNAN:  Thank you, your Honor.  I'd like to

23   address four things.

24          The first is that, you know, just to say that we

25   appreciate this Court's willingness to move quickly in

1    this case for the reasons your Honor described.

2         The second is we think this can be a short trial,

3    we're committed to pursuing it in a narrow and focused

4    way, as your Honor previewed.  We don't think it will

5    take longer than a week.

6         The third is just on timing.  In some respects

7    we'd like to move more quickly and in some respects we'd

8    like to build in a few more weeks at the back end.

9    There are some scheduling conflicts that a couple of our

10   key witnesses have, they are scholars and they have been

11   granted international travel in connection with their

12   academic work from mid June onwards.  They're the two

13   key representatives of MESA and the AUP.

14        THE COURT:  It's jury-waived.  Not a problem.

15        MS. KRISHNAN:  Okay.

16        THE COURT:  I have tailored my scheduling to your

17   requests.  Now you're not the only one who has an

18   interest, the President and the high public officials

19   have -- but if they agree, I will move it.

20        Again, um, I usually take vacation in August.  My

21   vacation is not as important as this trial and I've

22   drawn other cases of I think significance, so I want to

23   get this done.  A two-week continuance is fine, if

24   that's what you want.

25        Go ahead.

1        MS. KRISHNAN:  Thank you.

2        THE COURT:  And you were talking, the Clerk tells

3   me --

4        Does that make sense?

5        MS. YEN:  Well, yes, sure, your Honor.  Thank you

6   so much for the guidance that you provided earlier in

7   this hearing.

8        I think at this point we're waiting to hear from

9   the plaintiffs as to how they plan to put on their case.

10  It's really difficult for us to gauge timing until we

11  hear more.

12       THE COURT:  Understood.

13       So we interrupted you, and go ahead.

14       MS. KRISHNAN:  Thank you.

15       So for those two individuals we're wondering if,

16  um, this Court would take their testimony out of turn in

17  the first couple of weeks of June, but to have the

18  balance of the trial scheduled for the last couple of

19  weeks of July.

20       THE COURT:  The last couple of weeks of July?

21       MS. KRISHNAN:  Or earlier in July.

22       THE COURT:  Yeah, how about the first couple of

23  weeks, and here's why.

24       MS. KRISHNAN:  Yes, your Honor.

25       THE COURT:  Just talking back and forth is fine,

1    but this -- win lose or draw, this needs some written,

2    um, conclusions, even as to the first part, and I'm not

3    thinking about a second part.  But as to the first part.

4         So the first two weeks of July?  Yes.  Taking

5    witnesses out of order?  Yes.  Um, again, subject to the

6    defendants' proper concerns.

7         Go ahead.

8         MS. KRISHNAN:  Thank you.  I've just had a note

9    passed to me.

10        The week of July 7th, if that's convenient to the

11   Court, um, I think would work on our end.  One of our

12   co-counsel has a commitment earlier on in July.

13        THE COURT:  Well understand that this is a civil

14   case, I'm responsible for trying criminal cases as well.

15   But, yes, I'll work with you.  And it's jury-waived.  I

16   normally sit on trial from 9:00 in the morning until

17   1:00 in the afternoon and do everything else in the

18   afternoon.  If worst comes to worse, I can sit on trial

19   in the afternoon, though I would reserve Friday

20   afternoons to try to do everything else.  That's a hard

21   schedule.  I've been able to do that.  I'd rather not.

22   But to the extent I can accommodate you, I will do it.

23        So that's sufficient for you?

24        MS. KRISHNAN:  Yes, that is.

25        THE COURT:  All right.  Thank you.

1       MS. KRISHNAN:  If I could just mention one more

2  thing, your Honor?

3       THE COURT:  Yes.

4       MS. KRISHNAN:  Which is that we would like to come

5  back to this Court in two weeks to address any issues

6  that have surfaced in the course of discovery.  It may

7  be that the government, as you've previewed, raises

8  various privileges.  Given the schedule we welcome the

9  Court's close supervision in this case and we would

10  welcome a --

11       THE COURT:  Well the Clerk will suggest a date.

12  But let me turn to defense counsel.

13       All of this is agreeable to you?

14       MS. YEN:  Well, your Honor, we don't know what the

15  government's -- no, I'm sorry, what the plaintiffs' case

16  will be yet, and we certainly have not seen their

17  discovery request.  So realistically I guess what I

18  would ask the Court is if we can have a few days?  I

19  think when they are able to share with us their

20  discovery request, quite shortly, if we could have a few

21  days to digest those requests, then I can go back to my

22  clients and see when we can respond to all those

23  requests before --

24       THE COURT:  Well I'm not hearing -- I'm not

25  hearing anything, um, different than what they suggest.

1  Having heard from the plaintiffs, here's what I'm
2  thinking.
3       The Clerk will suggest a status conference two
4  weeks out.
5       MS. YEN:  Yes.
6       THE COURT:  The -- at that time I will be
7  interested to know who, um, because they know, they want
8  to take early on out of turn and about how long that's
9  going to take, just the logistics of it, and see when I
10 can schedule that in June or maybe towards the end of
11 May.  I'll further talk about trial, and you'll be in a
12 better position to talk about trial, early in July.
13      So does that make sense?
14      MS. YEN:  That does make sense, your Honor.
15      THE COURT:  And in that time, um, I'm so gratified
16 that you're talking, because I expect them to be fully
17 forthcoming with what they want, and I'll be interested
18 to know what your response is, so that I can be guided
19 in how to deal with it.
20      And back to the plaintiffs.  Have we taken care of
21 the issues?
22      MS. KRISHNAN:  I'm sorry, your Honor, I missed
23 that question?
24      THE COURT:  Are we done?
25      MS. KRISHNAN:  Oh, yes, we are.

1          THE COURT:  And the defense, are we done?

2          MS. YEN:  Just one housekeeping matter, your

3    Honor.

4          THE COURT:  Sure.

5          MS. YEN:  At the end of the last hearing you

6    mentioned that the government -- that you were taking

7    the government as having denied the substantive

8    allegations of the complaint, which is absolutely

9    correct, and that we did not need any more formal

10   briefing.  So we're taking up the Court's indication to

11   not file a formal answer in this case, if that's okay?

12         THE COURT:  It's perfectly okay.

13         MS. YEN:  Okay.

14         THE COURT:  I knew exactly what I was saying.

15   This isn't the first time I've combined a preliminary

16   injunction with trial on the merits.  It's meant to be a

17   fair but expeditious procedure.  But fair.

18         No, I want it to be expeditious.  You've denied

19   all the substantive allegations of the complaint, and

20   I'm very sensitive to that.  I've now placed it on the

21   record twice.

22         MS. YEN:  Yes, thank you, your Honor.

23         THE COURT:  All right.

24         The Clerk will suggest a time for a status

25   conference.  It will be in the afternoon.  And it may

1   not be long.

2           THE CLERK:  Tuesday, May 20th at 2:00 p.m.

3           THE COURT:  Is that satisfactory to the

4   plaintiffs?

5           (Pause.)

6           MS. KRISHNAN:  Would Thursday the 22nd work?

7           THE CLERK:  Yes.

8           MS. KRISHNAN:  Thank you.

9           THE COURT:  There's five of you now, um, sitting

10  here, so, um, I try to accommodate.

11          How does defense counsel feel about that, Thursday

12  the 22nd at 2:00 p.m.?

13          MS. YEN:  That's fine, your Honor.  Thank you.

14          THE COURT:  (To Clerk.)  Did you say 2:00?

15          THE CLERK:  Yes.

16          THE COURT:  Thursday the 22nd at 2:00 p.m. for a

17  status conference.

18          Thank you very much.  It's good to see you.

19          We'll stand in recess until that time.

20          (Ends, 11:45 a.m.)

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 4      hereby certify that the forgoing transcript of the

 5      record is a true and accurate transcription of my

 6      stenographic notes, before Judge William G. Young, on

 7      Tuesday, May 6, 2025, to the best of my skill and

 8      ability.

 9

10

11

12
       /s/ Richard H. Romanow 05-08-25
13     _____
       RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | ) ) ) | Civil Action No. 1:25-cv-10685-WGY |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | ) ) ) | |
|  | ) |  |
| Defendants. | ) ) |  |

# DEFENDANTS' MOTION FOR A PROTECTIVE ORDER AND MOTION TO DISPENSE WITH RULE 65(a) TRIAL ON THE MERITS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 4

     I.      DISCOVERY IS BARRED IN THIS APA CASE SO THE COURT IS
            LIMITED TO THE ADMINISTRATIVE RECORD ................................. 4

     II.     DISCOVERY IS ALSO PRECLUDED BECAUSE PLAINTIFFS' FIRST
            AMENDMENT CLAIMS ARE REVIEWED UNDER THE FACIALLY
            LEGITIMATE AND BONA FIDE STANDARD ....................................... 8

CONCLUSION................................................................................................. 12

Add.214

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Alabama-Tombigbee Rivers Coal. v. Norton,*
  2002 WL 227032 (N.D. Ala. Jan. 29, 2002). ............................................... 6

*American Ass'n of Univ. Professors, et at. v.Rubio, et al.,*
  2025 WL 1235084 ............................................................................................ 4

*Atieh v. Riordan,*
  727 F.3d 73 (1st Cir. 2013) ......................................................................... 4, 5, 7

*Bellion Spirits, LLC v. United States,*
  335 F. Supp. 3d 32 (D.D.C. 2018) .................................................................... 6

*Berman v. United States,*
  264 F.3d 16 (1st Cir. 2001) ............................................................................... 4

*Bowen v. City of New York,*
  476 U.S. 467 (1986) ........................................................................................ 12

*Camp v. Pitts,*
  411 U.S. 138 (1973) .......................................................................................... 4

*Carlson v. Landon,*
  342 U.S. 524 (1952) .......................................................................................... 8

*Chang v. USCIS,*
  254 F. Supp. 3d 160 (D.D.C. 2017) .................................................................. 6

*Charlton Mem'l Hosp. v. Sullivan,*
  816 F. Supp. 50 (D. Mass. 1993) ..................................................................... 6

*Cheney v. U.S. Dist. Court for the Dist. of Columbia,*
  542 U.S. 367 (2004) ........................................................................................ 12

*City of Taunton v. U.S. EPA,*
  895 F.3d 120 (1st Cir. 2018) ............................................................................. 7

*Department of State v. Muñoz,*
  602 U.S. 899 (2024) .......................................................................................... 8

*Dep't of Com. v. New York,*
  315 F.Supp.3d 766 (S.D.N.Y 2018) ............................................................... 11

ii

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ..................................................................... 5

*Deukmejian v. Nuclear Regul. Comm'n*,
  751 F.2d 1287 (D.C. Cir. 1984) .................................................. 5

*Doraiswamy v. Secretary of Labor*,
  555 F.2d 832 (D.C. Cir. 1976) .................................................... 5

*Ducoste v. Cherry*,
  647 F. Supp. 3d 52 (D. Mass. 2022) ........................................... 4

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ..................................................................... 4

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ..................................................................... 4

*Galvan v. Press*,
  347 U.S. 522 (1954) ..................................................................... 9

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ..................................................................... 8

*Harkness v. United States*,
  727 F.3d 465 (6th Cir. 2013) ...................................................... 6

*Harvard Pilgrim Health Care of New England v. Thompson*,
  318 F. Supp. 2d 1 (D.R.I. 2004) ......................................... 5, 6, 7

*Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*,
  75 F.4th 248 (1st Cir. 2023) ....................................................... 7

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
  58 F. Supp. 3d 1191 (D. N.M. 2014) .......................................... 6

*Kerry v. Din*,
  576 U.S. 86 (2015) ..................................................................... 10

*Ketcham v. U.S. Nat'l Park Serv.*,
  No. 16-CV-00017SWS, 2016 WL 4268346 (D. Wyo. Mar. 29, 2016) ......................... 6

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ........................................................ 1, *passim*

*Lardner v. U.S. Dep't of Justice*,
    No. 03-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) ............................................ 12

*Lujan v. Nat'l Wildlife Federation*,
    497 U.S. 871 (1990)...................................................................................... 2

*Moralez v. Perdue*,
    2017 WL 2264855 (E.D. Cal. May 24, 2017) .............................................. 6

*Murphy v. United States*,
    45 F.3d 520 (1st Cir. 1995) ........................................................................ 4

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)........................................................................................ 2

*Olsen v. U.S.*,
    414 F.3d 144 (1st Cir. 2005) ........................................................................ 7

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
    2017 WL 3189446 (D. Md. July 27, 2017)................................................... 6

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ..................................................................................... 9

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    789 F.2d 26 (D.C. Cir. 1986) ....................................................................... 5

*Sierra Club v. United States Army Corps of Eng'rs*,
    2023 WL 6260728 (D. Me. Sept. 26, 2023) ................................................. 7

*Skelly Oil Co. v. Phillips Petroleum Co.*,
    339 U.S. 667 (1950)....................................................................................... 4

*Tafas v. Dudas*,
    530 F. Supp. 2d 786 (E.D. Va. 2008) .......................................................... 6

*Trump v. Hawaii*,
    585 U.S. 667 (2018)........................................................................... 9, 10, 11

*United States v. JG-24, Inc.*,
    478 F.3d 28 (1st Cir. 2007).......................................................................... 7

*United States v. Mitchell*,
    445 U.S. 535 (1980)....................................................................................... 4

iv

## <u>STATUTES</u>

5 U.S.C. § 702 .......................................................................................... 4

5 U.S.C. § 706 .......................................................................................... 6

5 U.S.C. § 706(2)(B) ............................................................................. 1, 6

28 U.S.C. § 1331 ...................................................................................... 4

## <u>FEDERAL RULES OF APPELLATE PROCEDURE</u>

Fed. R. Civ. P. 26(f)(1) ........................................................................... 5

Fed. R. Civ. P. 26(a)(1)(B)(i) .................................................................. 5

Fed. R. Civ. P. 65(a) ............................................................................ 1, 3

# INTRODUCTION

Defendants respectfully request a protective order, to preclude discovery in this Federal Rule of Civil Procedure 65(a) proceeding for two reasons. First, discovery and evidentiary hearings generally are impermissible in Administrative Procedure Act ("APA") cases, even where the plaintiff includes an overlapping constitutional claim. Plaintiffs' complaint is premised on the APA's limited waiver of sovereign immunity under 5 U.S.C. § 706(2)(B), providing for judicial review of final agency action that is alleged to be contrary to law or "constitutional right." This waiver limits the review of all claims, statutory and constitutional, in accordance with the APA's "record rule," in which review is ordinarily restricted to an "administrative record" compiled by the agency; there is no discovery, and no trial. The exceptions to the rule come into play only after the record has been provided.

Second, even if review is not limited to an administrative record here, the broad discovery Plaintiffs seek into ongoing removal proceedings is not relevant or proportionate to the needs of the case and is unduly burdensome. More specifically, Plaintiffs' proposed discovery is incompatible with well-established limitations on reviewing First Amendment claims of citizens and aliens in the immigration context. Plaintiffs challenge the agencies' alleged unlawful policy of "revoking the visas of and arresting, detaining, and deporting, noncitizen students and faculty based on their [First Amendment-]protected pro-Palestinian advocacy." Transcript, April 23, 2025, at 8-9. When Executive Branch decisions to pursue immigration enforcement actions allegedly conflict with rights of aliens or citizens under the First Amendment, the Supreme Court limits review of those actions to whether they are "facially legitimate and bona fide." *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (courts may neither "look behind" the "facially legitimate and bona fide" denial of immigration waiver, nor weigh it against asserted

First Amendment interests). The Court has asked the parties for guidance on this very question. *See* Transcript, 5/6/25, at 13 ("I'm not clear that noncitizens have . . . I will call them the "full rights" to free speech that a citizen has. I'm looking for guidance.").[1] The facially legitimate and bona fide standard limits judicial review of the challenged agency actions, and it necessarily precludes, or at the very least, dramatically limits discovery into the matters that the Supreme Court admonishes courts not to "look behind." *Kleindienst*, 408 U.S. at 770. For these reasons, Defendants respectfully request a protective order barring discovery and a "trial on the merits."

## **BACKGROUND**

Plaintiffs are student and faculty associations who allege that federal agencies have implemented an "ideological deportation policy," which they describe as a "large-scale" policy of "arresting, detaining, and deporting" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." Complaint for Declaratory and Injunctive Relief, Dkt. 1 ("Compl.") ¶ 1. Plaintiffs raise four claims: (1) the "ideological deportation policy" violates the First Amendment; (2) Defendants' "threats to punish constitutionally protected speech" violate the First Amendment; (3) the "ideological deportation

---

[1] The Court also noted, during the same status conference, that "redressability here is a very real issue and one we're going to need to talk about." (Transcript, 5-6-25, at 6 ln.5-8). Indeed, a "large-scale" policy of discrete agency actions alleged by Plaintiffs is generally not subject to "broad programmatic attacks" and review is only of discrete agency actions. *See Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990); *accord Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (holding jurisdiction is limited to discrete agency actions). But whether Plaintiffs attack certain discrete agency actions (e.g., by stating the alleged unconstitutional policy motivates the revocation of visas, and the arrest, detention, and removal of certain aliens) on the one hand, while, on the other, alleging that the focus of their lawsuit is an unwritten "large-scale" policy or program, it is undisputed that they have never established why their lawsuit justifies discovery, despite the APA record rule, or the facially-legitimate-and-bona-fide standard of review.

policy" violates the Fifth Amendment; and (4) the "ideological deportation policy" violates the APA. Compl. ¶¶ 134-39.

On April 1, 2025, Plaintiffs filed a motion for a preliminary injunction, Dkt. 13, 14, which Defendants opposed on jurisdictional grounds and on the merits. Dkt. 65. On April 23, the Court held a hearing on the preliminary injunction motion and indicated it was inclined to consolidate the hearing with a trial on the merits. *See* Transcript, April 23, 2025, at 10. The court then addressed Defendants' opposition to the preliminary injunction motion and treated it as a motion to dismiss and heard argument. Dkt. 73 at 4 n.3; Transcript at 14-15. On April 29, the Court dismissed Plaintiffs' Fifth Amendment claim but otherwise denied the motion to dismiss. Dkt. 73. The Court concluded that Plaintiffs "plausibly alleged final agency action" in the form of an ideological deportation policy. *Id.* at 66. At the same time, the Court invoked Fed. R. Civ. P. 65(a) to consolidate the preliminary injunction hearing with a trial on the merits. *See* Dkt. 73 at 4 n.3. On May 6, the Court held a case management conference and encouraged the parties to discuss a discovery plan that would enable them to try the case on the merits during the week of July 7, 2025. On May 13, Plaintiffs served their First Set of Requests for Production and their First Set of Interrogatories. *See* Exhibit A (requests for production) and Exhibit B (interrogatories). On May 19, 2025, Plaintiffs sent Defendants a second, revised set of the foregoing discovery requests. *See* Exhibit C (revised requests for production), Exhibit D (revised interrogatories). Among other things, Plaintiffs broadly request all documents concerning (1) any adverse action taken or even considered against nine particular individuals, (2) the surveillance of noncitizen social media accounts generally, and (3) proposed or actual actions taken against any non-citizen engaged in any pro-Palestinian, pro-Hamas, or pro-Jihadist speech. Exs. A-D.

## ARGUMENT

## I.   DISCOVERY IS BARRED IN THIS APA CASE SO THE COURT IS LIMITED TO THE ADMINISTRATIVE RECORD

The United States, as sovereign, is immune from suit unless it consents to be sued.  *See United States v. Mitchell*, 445 U.S. 535, 538 (1980); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit").  Further, "statutes waiving sovereign immunity should be strictly construed in favor of the United States." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995).  Thus, the party seeking to invoke the court's jurisdiction has the burden to show the application of a waiver of sovereign immunity.  *See Ducoste v. Cherry*, 647 F. Supp. 3d 52, 55 (D. Mass. 2022).  Here, the waiver of sovereign immunity that Plaintiffs have identified in their Complaint is the APA.  Compl. ¶ 6 (citing 5 U.S.C. § 702); *see also American Ass'n of Univ. Professors, et at. v.Rubio, et al.*, 2025 WL 1235084 at *21 (holding for an agency action to be reviewable there must be no other adequate remedy).[2]

Under the APA, judicial review of agency action is confined to the administrative record compiled by the agency.  *See Camp v. Pitts*, 411 U.S. 138, 141-42 (1973); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 742-745 (1985); *Atieh v. Riordan*, 727 F.3d 73, 75 (1st Cir. 2013).  "APA review . . . involves neither discovery nor trial." *Atieh*, 727 F.3d at 76.  The relevant inquiry is — and must remain — not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's

---

[2] While Plaintiffs' Complaint cites 28 U.S.C. § 1331 as a basis for the Court's subject matter jurisdiction, Compl. ¶ 6, that statute does not waive sovereign immunity and provides no jurisdictional basis for a claim against the federal government. *See, e.g., Berman v. United States*, 264 F.3d 16, 20 (1st Cir. 2001).  Similarly, the Declaratory Judgment Act creates no independent jurisdictional basis for suits in federal court. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-74 (1950)).

decision.  *Id*.  This principle of limited review "reflects the recognition that further judicial

inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of

another branch of Government and should normally be avoided."  *Dep't of Com. v. New York*,

588 U.S. 752, 780-781 (2019) (citations omitted).

Because the APA is the waiver of sovereign immunity, judicial review depends solely on

a review of an administrative record documenting the policy that the Plaintiffs allege implements

Executive Orders 14161 and 14188, which Plaintiffs describe as the "ideological deportation

policy."  This action is therefore exempt from the discovery requirements of Rule 26.  *See* Fed.

R. Civ. P. 26(a)(1)(B)(i) (exempting from initial disclosure "an action for review on an

administrative record"); Fed. R. Civ. P. 26(f)(1) (exempting for a conference of the parties and

planning for discovery "a proceeding exempted from initial disclosure under Rule

26(a)(1)(B)(i)").  This exemption exists because discovery is very rarely allowed in an APA

action to challenge the lawfulness of an agency action or decision and even then, only on a

motion to supplement the record after it has been produced.  *See Deukmejian v. Nuclear Regul.

Comm'n*, 751 F.2d 1287 (D.C. Cir. 1984), reh'g granted in part as to § III.B and vacated sub

nom. *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 760 F.2d 1320 (D.C.

Cir. 1985), and on reh'g sub nom. *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul.

Comm'n*, 789 F.2d 26 (D.C. Cir. 1986); *Doraiswamy v. Secretary of Labor*, 555 F.2d 832, 839-

42 (D.C. Cir. 1976).  Moreover, APA cases are not decided based on an evidentiary hearing or a

trial.  *Atieh*, 727 F.3d at 76 ("APA review . . . involves neither discovery nor trial."); *Harvard

Pilgrim Health Care of New England v. Thompson*, 318 F. Supp. 2d 1, 8 (D.R.I. 2004)

(observing, in the context of an APA challenge that also raised constitutional claims, that "the

focal point of judicial review under the APA is the administrative record already in existence and not a new record made by the reviewing court").

That Plaintiffs also raise constitutional claims makes no difference. *See, e.g.*, *Charlton Mem'l Hosp. v. Sullivan*, 816 F. Supp. 50, 51 (D. Mass. 1993) (plaintiff's equal protection claim "cannot so transform the case that it ceases to be primarily a case involving judicial review of agency action"); *cf. Harkness v. United States*, 727 F.3d 465, 471 (6th Cir. 2013) ("the review scheme does not carve out an exception for constitutional claims"). Judicial review under the APA, after all, expressly includes claims that agency action is "contrary to constitutional right[.]" 5 U.S.C. § 706(2)(B). And the APA is explicit that when reviewing such claims, as with any APA claim, "the court shall review the whole record or those parts of it cited by a party[.]" 5 U.S.C. § 706. For decades, courts across the country have therefore recognized that Section 706, by its plain language, limits the review of constitutional claims challenging agency action to the administrative record. *See Chang v. USCIS*, 254 F. Supp. 3d 160, 161 (D.D.C. 2017) (denying motion for discovery into past agency practices meant to support plaintiffs' retroactivity and equal protection claims).[3] That is especially true when, as here, the alleged constitutional violation is also the basis for plaintiffs' APA claim. Indeed, the "APA's restriction of judicial review to the administrative record would be meaningless if any party seeking review based on statutory or constitutional deficiencies was entitled to broad-ranging discovery." *Harvard*

---

[3] *See also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1232 (D. N.M. 2014); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 44 (D.D.C. 2018); *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, No. ELH-16-1015, 2017 WL 3189446, at *21 (D. Md. July 27, 2017); *Moralez v. Perdue*, 2017 WL 2264855, at *3 (E.D. Cal. May 24, 2017); *Ketcham v. U.S. Nat'l Park Serv.*, No. 16-CV-00017SWS, 2016 WL 4268346, at *1-2 (D. Wyo. Mar. 29, 2016); *Tafas v. Dudas*, 530 F. Supp. 2d 786, 803 (E.D. Va. 2008); *Harvard Pilgrim Health Care of New England v. Thompson*, 318 F. Supp. 2d 1, 10 (D. R.I. 2004); *Alabama-Tombigbee Rivers Coal. v. Norton*, No. CIV.A.CV-01-S-0194S, 2002 WL 227032, at *5-6 (N.D. Ala. Jan. 29, 2002).

*Pilgrim Health Care of New England v. Thompso*n, 318 F. Supp. 2d 1, 10 (D. R.I. 2004).  Thus, Plaintiffs' First Amendment claims must also be reviewed based on the administrative record prepared by Defendants.  *Id.*

While there are exceptions to the record rule, they only come into play *after* the record is produced.  *See Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*, 75 F.4th 248, 279 (1st Cir. 2023) ("supplementation of the administrative record is the exception, not the rule") (internal citations omitted); *City of Taunton v. U.S. EPA*, 895 F.3d 120, 127 (1st Cir. 2018) (granting government's motion to strike plaintiff's proffered supplement to the administrative record because no exception applied); *Atieh*, 727 F.3d at 77 ("when parties ignore" the "customary practice" of waiting until the government has certified that the administrative record is complete before asking a district court to reach a determination, "they undermine a court's ability to perform meaningful review of agency action").  And even then, discovery is carefully delimited.  *See, e.g., United States v. JG-24, Inc.*, 478 F.3d 28, 34 (1st Cir. 2007) ("we do not allow supplementation of the administrative record unless the proponent points to specific evidence that the agency acted in bad faith"); *see also Sierra Club v. United States Army Corps of Eng'rs*, 2023 WL 6260728, at *7 (D. Me. Sept. 26, 2023) (recognizing the "presumption of regularity" that applies to administrative records compiled by agencies). Following the record's production in this case, if Plaintiffs believe that the record is insufficient, they can raise the prospect of limited extra-record discovery with Defendants or the Court.  The general rule and the starting point in this litigation, however, is that "APA review . . . involves neither discovery nor trial."  *Atieh*, 727 F.3d at 76; *Olsen v. U.S.*, 414 F.3d 144, 155-56 (1st Cir. 2005) (rejecting plaintiff's motion to conduct discovery rather than limit review to an

administrative record).  The Court should, therefore, enter a protective order against discovery in this case.

## II.    DISCOVERY IS ALSO PRECLUDED BECAUSE PLAINTIFFS' FIRST AMENDMENT CLAIMS ARE REVIEWED UNDER THE FACIALLY LEGITIMATE AND BONA FIDE STANDARD

Even assuming the Court were to disagree that its review is limited to an administrative record, the Court's review—and the scope of discovery—would be separately, and independently, limited by the well-established doctrine, applicable in the immigration context, requiring that First Amendment claims, such as the Plaintiffs' core attack on the alleged "ideological deportation policy," be assessed only for whether the challenged immigration enforcement policy is facially legitimate and bona fide.  Under this standard, the Court looks to the legal justification proffered by the agency and, if facially valid, "the inquiry is at an end." *Department of State v. Muñoz*, 602 U.S. 899, 908 (2024) (reviewing a U.S. citizen's constitutional challenge to visa denial for whether the agency provided a "facially legitimate and bona fide reason").  Congress has plenary authority over immigration matters, which are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952); *see also Carlson v. Landon*, 342 U.S. 524, 534 (1952) (as long as a noncitizen "fail[s] to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders").

Courts have made clear the executive and legislature's broad authority over enforcement decisions on whom to admit or remove.  *See Kleindienst*, 408 U.S. at 766 ("[o]ver no conceivable subject is the legislative power of Congress more complete than it is over the

Add.226

admission of aliens"); *see also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487-91 (1999) (finding no jurisdiction to enjoin deportation proceeding based on noncitizen's claim that they were selectively targeted for deportation proceedings, which they asserted had a "chilling effect" on their exercise of First Amendment rights); *Galvan v. Press*, 347 U.S. 522, 530-33 (1954) (upholding constitutionality of deportation ground over dissent's First Amendment concerns). Where First Amendment interests are asserted to block the Executive Branch's actions in immigration matters, an unbroken line of Supreme Court cases since *Kleindienst* in 1972, establishes that the deferential facially legitimate and bona fide standard of review applies. *See Kleindienst*, 408 U.S. at 754, 769-70 (considering whether the Attorney General's refusal to admit an alien scholar to enter the country to attend academic meetings violated the First Amendment rights of the U.S. citizens who had invited him). Specifically, courts must defer to the agency's facially legitimate and bona fide reasons for decisions and actions on whether to enforce the immigration laws pertaining to the admission, exclusion, and deportation of aliens, while emphasizing that courts should neither "look behind" those reasons, nor "test" them against countervailing First Amendment concerns. *Id.* at 770. So, any discovery, even assuming the record rule did not apply to preclude it, would be limited to the documents showing those reasons.

In *Trump v. Hawaii*, 585 U.S. 667 (2018), Plaintiffs challenged an Executive Order (turned Proclamation) that they claimed, "was motivated not by concerns pertaining to national security but by animus toward Islam," in violation of the First Amendment. 585 U.S. at 681. The Supreme Court examined a series of media "statements by the President and his advisors casting doubt on the official objective of the Proclamation," which the plaintiffs submitted to claim "the primary purpose of the Proclamation was religious animus." 585 U.S. at 699. It then

explained that, because the Proclamation was "neutral on its face" and concerned "a matter within the core of executive responsibility," i.e., national security and regulating the entry of aliens, it would not "probe the sincerity of the [Executive Branch's] stated justification for the policy by reference to extrinsic statements," and instead "ask[ed] only whether the policy is facially legitimate and bona fide."[4]  *Id.* at 702-04.  And a facially legitimate and bona fide explanation need only be a statutory citation.  *Id.* at 703; *see also Kerry v. Din*, 576 U.S. 86, 104-05 (2015) (Kennedy, J., concurring) (relying on *Kleindienst* to conclude that the government satisfies due process when it provides a visa applicant a facially legitimate and bona fide reason for a visa denial, which, in that case, consisted of only a citation to a subsection of the immigration code governing admissibility).

*Trump v. Hawaii*, although different in some respects, has striking similarities to some of the Plaintiffs' allegations in this case.  Here, Plaintiffs challenge an alleged policy of targeting pro-Palestinian activists that they say was created to implement Executive Orders 14161 and 14188.  Compl. ¶¶ 21-30.  They claim that this "ideological deportation policy" amounts to animus (although not necessarily the religious animus examined in *Hawaii*) directed against aliens expressing pro-Palestinian views, in violation of the First Amendment.  *Id.*  In support of their theory, Plaintiffs similarly cite media statements by President Trump and his advisors, and they rely on immigration enforcement actions against five individual aliens, which they assert were ideologically based.  Compl. ¶¶ 24, 30-34, 36-40; PI Exs. A, E, G, V, Y, Z, AA-FF.  But as the Supreme Court has made clear in *Hawaii* and its prior holdings, such First Amendment claims are, at most, subject to facially legitimate and bona fide review.  The analysis does not

---

[4] The Court nonetheless also applied rational basis review, given the government had suggested it may be appropriate, and held that the Proclamation was not inexplicable but for discriminatory animus and was instead legitimately premised on national security.  585 U.S. at 706.

change because this case concerns a First Amendment speech claim rather than a First Amendment religion claim, or because the alleged policy involves not just denial of entry, but also removal. *Hawaii*, 585 U.S. at 703-04 (the facially legitimate and bona fide standard applies "across different contexts and constitutional claims"). And here the facially legitimate and bona fide standard applies with "particular force in admission and immigration cases that overlap with the area of national security." *See Hawaii*, 585 U.S. at 703-04 (cleaned up); *cf. Dep't of Com. v. New York*, 315 F.Supp.3d 766, 810 (S.D.N.Y 2018) ("every case cited by the [Supreme] Court in which [the facially legitimate and bona fide standard of] review was applied involved either immigration or the admission of noncitizens").

Neither the Government's denial of the existence of the alleged policy, nor the Plaintiffs' allegation that it may be unwritten, vitiates the application of the foregoing review standard. Dkt. 69 at 7. And given the Plaintiffs' APA-based jurisdictional pleading, it is incumbent on the Government to compile the administrative record, reflecting *its* reasoning for the initiation of the immigration enforcement actions challenged by the Plaintiffs. Indeed, the Supreme Court has emphasized that the standard of review only requires the government to disclose the statutory or constitutional basis for its actions. *Kleindienst*, 408 U.S. at 770. Once provided, the Court should not look behind that statutory or constitutional basis for pretext or "test it by balancing its justification against the First Amendment interests of" Plaintiffs. *Id.* Accordingly, if the Court finds that review solely on an administrative record is not appropriate, discovery is still strictly limited to the reasons provided by the government, and whether those reasons are facially legitimate and bona fide. The wide-ranging discovery proposed by Plaintiffs, *see* Exhibits A and B, is incompatible with the framework established by *Kleindienst* and its progeny. Furthermore, any discovery into discrete immigration enforcement actions against individual non-parties is

11

both inappropriate under the facially legitimate and bona fide standard and unnecessary given that Plaintiffs' claims do not rely on a discrete agency action. *See Bowen v. City of New York*, 476 U.S. 467, 485 (1986) (stating that a class of Social Security applicants challenging a "systemwide, unrevealed policy" did not need to individually exhaust their administrative remedies before ALJs because the challenged policy did not "depend on the particular facts of" each applicant's case, and "there was nothing to be gained from permitting the compilation of a detailed factual record" about each individual case).

## **CONCLUSION**

In sum, even assuming the APA record rule were *not* applicable in this case, the undisputedly applicable standard for reviewing the merits of Plaintiffs' constitutional claims would nevertheless bar discovery and a trial on the merits in this case. Accordingly, the Court should grant the Government's motion for a protective order and dispense with a trial on the merits in deciding this action.[5]

---

[5] In discussions with Plaintiffs over the last two weeks, Defendants have questioned the propriety of discovery, but—having asserted that objection along with noting the possibility of seeking relief—have nevertheless collaborated with the Plaintiffs in an effort to limit discovery in the event the Court were to deny the instant motion. To that end, Defendants note that while Plaintiffs' discovery requests are directed to *all* of the Defendants, and the President is among them, it appears that Plaintiffs are seeking discovery directed to the White House, which implicates the limitations outlined by the Supreme Court in *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 388 (2004). *See also Lardner v. U.S. Dep't of Justice*, No. 03-0180, 2005 WL 758267, at *9 (D.D.C. Mar. 31, 2005) ("[A] court must screen a request for presidential documents to ensure that the discovery is essential to the proceedings"). Finally, the overbreadth of Plaintiffs' requests in general, and the likely application of certain Government privileges over the requested material, likely pose considerable obstacles for beginning a trial in six weeks, even in the absence of Defendants' instant motion. Thus, should the Court deny the motion, Defendants respectfully request that the Court set a status conference to address these obstacles.

Respectfully Submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*


*Dated: May 21, 2025*

ANTHONY NICASTRO
*Acting Director*
*Office of Immigration Litigation*

*/s/ Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

*Counsel for Defendants*

13

## MEET AND CONFER CERTIFICATION

In accordance with Local Rule 7.1(2), on May 21, 2025, Defendants' counsel met and conferred with counsel for the Plaintiffs with regard to this motion and were unable to resolve or narrow the issue.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*Date: May 21, 2025*

By: */s/ Ethan Kanter*
ETHAN B. KANTER
U.S. Department of Justice

14

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                    Plaintiffs,

      v.

MARCO RUBIO, ET AL.

                  Defendants.

Case No. 1:25-cv-10685 (WGY)

## PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION
## DIRECTED TO DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure and Local Civil Rules for the District of Massachusetts 26.1, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") produce the following documents and things identified and listed below for inspection.

## DEFINITIONS AND INSTRUCTIONS

1.  The definitions and instructions provided in Federal Rule of Civil Procedure 34(a) and Local Rules 26.5 and 34.1 are incorporated by reference.

2.  Whenever reference is made to a person or legal entity, it includes any and all of such person's or entity's past and present affiliates, components, subdivisions, offices, directors, officers, agents, partners, employees, contractors, consultants, attorneys, representatives,

investigators, predecessors, successors, assigns and/or any other person or entity acting on, or purporting to act on, its behalf.

3. "Adverse action" means investigating, monitoring, surveilling, revoking the visa of, terminating the status of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to detention facilities in Louisiana.

4. "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

5. "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

6. "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

7. "Concerning" means, as defined in Local Rule 26.5(c), referring to, describing, evidencing or constituting.

8. The terms "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of

interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

9. "Each" shall be construed to include the word "every" and "every" shall be construed to include the word "each."

10. "Including" shall be construed to include the phrase "without limitation."

11. The terms "you" and "your" refer to each of the defendants individually responding to these requests.

12. The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

     a.  Mahmoud Khalil;

     b.  Mohsen Mahdawi;

     c.  Rümeysa Öztürk;

     d.  Yunseo Chung;

     e.  Efe Ercelik;

     f.  Mohammed Hoque;

     g.  Ranjani Srinivasan;

     h.  Badar Khan Suri; and

     i.  Momodou Taal.

13. To the extent a request calls for the production of documents or things you contend are subject to a privilege or immunity from discovery, your written request should so indicate, but you are requested to produce the balance of the documents or things not subject to a claim of privilege which fall within the scope of the request. Additionally, to the extent information subject to a

privilege or immunity from discovery is contained within responsive documents or things, you are requested to produce a redacted version of the document or thing containing the non-privileged information with a notation on the produced document or thing indicating that it is being produced in redacted form.

14. If you are unable to produce any file or document sought in these requests, you shall identify the file or document; state the reasons why you are unable to produce it, describe in detail the efforts you have made to obtain it, and identify its location and/or custodian.

15. Documents responsive to these requests should be produced in the order in which they are ordinarily kept and in a format sufficient to identify the files from which they have been taken. Documents from different files should not be intermingled.

16. Except as otherwise specified, these requests cover the time period January 20, 2025 to the present.

17. These discovery requests are continuing in that they may require supplemental responses. If you obtain further information or documents with respect to any request to which you have already responded, you have a continuing duty to supplement your answer pursuant to Federal Rule of Civil Procedure 26(e) at any time prior to the entry of judgment.

18. For each document or thing requested that you object to producing on the basis of any privilege or immunity from discovery, please provide the following information:

    a.   The basis for the privilege being invoked;

    b.   The date of the document;

    c.   The title of the document (if any);

    d.   The name of the person(s) authoring the document;

4

e. The name of the person(s) to whom the document and/or copies thereof were given or transmitted;

f. The name of the person(s) from whom the document and/or copies thereof were given or transmitted:

g. The present location and custodian of the document, or any copies thereof; and

h. The general subject matter dealt with in the document with reasonable specificity to allow Plaintiffs to determine whether to challenge the privilege designation.

## **DOCUMENT REQUESTS**

1. Documents and communications concerning any adverse action you have taken or considered taking against any of the Targeted Noncitizen Students or Faculty Members, including but not limited to:

a. Any document in which the Department of Homeland Security ("DHS") and/or U.S. Immigration and Customs Enforcement ("ICE") requested or recommended that the U.S. Department of State revoke the visas of or determine the removability of a Targeted Noncitizen Student or Faculty Member. *See Ozturk v. Trump*, No. 25-CV-374, 2025 WL 1145250, at *3 (D. Vt. Apr. 18, 2025) (describing request from DHS and ICE for revocation of Rümeysa Öztürk's F-1 visa);

b. Any document in which the State Department approved the revocation of a Targeted Noncitizen Student's or Faculty Members's visa. *See id.*;

*c.* Any document in which Secretary of State Marco Rubio determined that a Targeted Noncitizen Student or Faculty Member is removable under 8

U.S.C. 1227(a)(4)(C). *See Khalil v. Joyce*, No. 25-CV-01963, 2025 WL 1232369, at *2 (D.N.J. Apr. 29, 2025);

d. Any document in which the State Department informed DHS and/or ICE that it had approved the revocation of a Targeted Noncitizen Student or Faculty Member's visa or determined the removability of a Targeted Noncitizen Student or Faculty Member;

e. A memorandum from Secretary Rubio accusing Mohsen Mahdawi of engaging in "threatening rhetoric and intimidation of pro-Israeli bystanders." *Mahdawi v. Trump*, No. 25-CV-389, 2025 WL 1243135, at *10 (D. Vt. Apr. 30, 2025);

f. A memorandum from Andre Watson (Senior Official, Homeland Security Investigations) to John Armstrong (Senior Bureau Official, Department of State) stating that Rümeysa Öztürk had engaged in "anti-Israel activism." John Hudson, *No Evidence Linking Tufts Student to Antisemitism or Terrorism, State Dept. Office Found*, Wash. Po. (Apr. 13, 2025) https://perma.cc/KRB2-AVXF;

g. A March 2025 State Department memorandum finding that neither DHS nor ICE nor Homeland Security Investigations had produced any evidence showing that Rümeysa Öztürk had engaged in antisemitic activity or made public statements indicating support for a terrorist organization. *See id.*;

h. A document dated March 21, 2025 in which the State Department informed DHS that the revocation of Öztürk's visa had been "approved." *See id.*;

i. An April 9, 2025 memorandum from the Deputy Assistant Secretary of State for Visa Services to ICE regarding the revocation of Efe Ercelik's visa. *Ercelik v. Hyde*, No. 25-CV-11007, slip op. at 17 (D. Mass. May 8, 2025);

j.  A March 22, 2025 communication from DHS/ICE to the State Department
seeking the Department's determination as to whether Mohammed Hoque's visa
should be revoked. *Hoque v. Trump*, No. 25-cv-01576, slip op. at 4 (D. Conn.
May 5, 2025);

k.  A May 23, 2025 memorandum from the State Department informing DHS/ICE
that Mohammed Hoque's visa had been revoked. *See id.*; and

l.  Any Notice to Appear (Form I-862), administrative arrest warrant (Form I-200),
or Record of Deportable/Inadmissible Alien (Form I-213) that has been issued or
drafted as to any of the Targeted Noncitizen Students or Faculty Members.

2.  Documents, including memoranda, policies, procedures, and directives concerning the
inspection, review, monitoring, or surveillance of noncitizens' social media accounts or activity,
including but not limited to:

a.  The Secretary of State's communication to State Department employees on March
25, 2025, titled "Enhanced Screening and Social Media Vetting for Visa
Applicants." Ken Klippenstein, *Trump Admin Spies on Social Media of Student
Visa Holders*, Substack (Mar. 28, 2025), https://perma.cc/FV5L-MUNA;

b.  The State Department's new guidance to consular officers on reviewing visa
applicants' social media, referred to in paragraph 16 of the declaration from John
Armstrong submitted in support of the government's opposition to Plaintiffs'
preliminary injunction motion.

3.  Documents and communications created, referenced, or relied on by you to take any
adverse action against any of the Targeted Noncitizen Students or Faculty Members.

4.   Documents and communications concerning the "open-source information" collected and reviewed by the Homeland Security Investigations Office of Intelligence relating to the Targeted Noncitizen Students or Faculty Members. *See* Declaration of Andre Watson, ¶ 7 (April 14, 2025), ECF 65-2; Declaration of Unit Chief Roy M. Stanley ¶¶ 5-10, ECF 30-2 (March 22, 2025), *Taal v. Trump*, 3:25-cv-00335, (N.D.N.Y.).

5.   Documents and communications concerning the identification of Targeted Noncitizen Students or Faculty Members for potential adverse actions, including identifications made by you or any third party, such as Betar US and Canary Mission.

6.   Documents and communications concerning the implementation or enforcement of Executive Orders 14,161 and 14,188, with respect to taking any adverse action against non-citizens, including but not limited to any reports issued by the Attorney General, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security pursuant to Section 3(a) of Executive Order 14,188.

7.   Documents and communications concerning any proposed or actual adverse action taken against any non-citizen engaged in any speech or activities deemed, determined to be, or suspected of being pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

8.   Documents and communications referencing any of the Targeted Noncitizen Students or Faculty Members by name or A-number and concerning your decision to invoke the Foreign Policy Ground (8 U.S.C. § 1227(a)(4)(C)) as to any of them.

9.   Documents sufficient to show all information that you contend provided reasonable grounds for Secretary Rubio to believe that the continued presence or activities in the United

States of any of the Targeted Noncitizen Students or Faculty Members would have potentially serious adverse foreign policy consequences for the United States.

10. Documents sufficient to show all information considered by Secretary Rubio in determining that the continued presence or activities in the United States of any of the Targeted Noncitizen Students or Faculty Members would compromise a compelling United States foreign policy interest.

11. Documents and communications concerning any request or demand, by the Department of Education or any other official or agency, requesting, demanding or requiring that any university or college provide the names, nationalities or any other identifying information of students who have been accused of or suspected of engaging in speech or activities deemed, determined to be, or suspected of being pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, or anti-Israel.

12. Documents and communications concerning your identification to colleges and universities of non-citizen students or faculty members against whom you considered taking (or are considering taking) adverse action, including but not limited to the list of students provided by DHS to Columbia University that was referenced by White House Press Secretary Karoline Leavitt on March 11, 2025.

Dated:      May 13, 2025
            New York, NY

                              SHER TREMONTE LLP

                                    By:    /s/ Noam Biale
                                    Michael Tremonte
                                    Noam Biale
                                    Alexandra Conlon
                                    Courtney Gans
                                    90 Broad Street, 23rd Floor

9

New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
David Zimmer
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

*Attorneys for Plaintiffs*

To:      Ethan B. Kanter, Esq. (via email)
          Harry Graver, Esq. (via email)
          Lindsay M. Murphy, Esq. (via email)
          Shawna Yen, Esq. (via email)
          Sarmad Khojateh, Esq. (via email)

          *Attorneys for Defendants*

10

# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                    Plaintiffs,

      v.

MARCO RUBIO, ET AL.

                 Defendants.

Case No. 1:25-cv-10685 (WGY)

### PLAINTIFFS' FIRST SET OF
### INTERROGATORIES DIRECTED AT DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure and Local Civil Rules for the District of Massachusetts 26.1 and 33.1, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") answer the following interrogatories (the "Interrogatories" and each individually an "Interrogatory") under oath and serve the answers within fourteen (14) days of service of this request.

### INSTRUCTIONS

1. The instructions provided in Local Rule 33.1 are incorporated by reference.

2. Whenever an Interrogatory asks for the identity of an individual, please set forth the following information:

a.  The individual's name;

b.  The individual's title or occupation;

c.  The individual's present or last known residential address; and

d.  The individual's present or last known business address.

3.  In answering these Interrogatories, Defendants are required to furnish all information known or available to them, regardless of whether this information is possessed by Defendants or by their agents, employees, representatives, investigators, or by their attorneys or other persons who have acted on their behalf, or by any corporation, partnership, or other legal entity.

4.  If any of these Interrogatories cannot be answered in full, after exercising due diligence to secure the information to do so, answer to the extent possible, specifying the reasons for Defendants' inability to answer the remainder and stating whatever information, knowledge, or belief Defendants have concerning the unanswered portion. In addition, specify the person or persons Defendants have reason to believe may have the information and/or knowledge to answer such interrogatory or any part thereof.

5.  The Interrogatories are continuing in nature. If, after answering these interrogatories, Defendants obtain or become aware of further information responsive to these Interrogatories, Defendants are required to provide a supplemental interrogatory answer.

6.  State whether the information furnished is within the personal knowledge of Defendants and, if not, the name of each person to whom the information is a matter of personal knowledge.

7.  If Defendants believe that an Interrogatory seeks privileged information, state the grounds for the privilege assertion in sufficient detail to enable Plaintiffs to challenge your claim.

8.  If Defendants object to any portion of any Interrogatory herein, identify the portion of the Interrogatory to which Defendants object and respond to the remainder of the Interrogatory.

## DEFINITIONS

1.  The definitions provided in Federal Rule of Civil Procedure Rule 34(a) and Local Rule 26.5(c) are incorporated by reference.

2.  "Adverse action" means investigating, monitoring, surveilling, revoking the visa of, terminating the status of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to a detention facility in Louisiana.

3.  "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

4.  "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

5.  "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

6.  The term "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of