interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

7.  "Identify," when referring to a person, means to give the names, titles, organizational roles, and job descriptions of all U.S. Government officials, officers, agents, employees or contractors.

8.  "Including" shall be construed to include the phrase "without limitation."

9.  The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

> a.  Mahmoud Khalil;
>
> b.  Mohsen Mahdawi;
>
> c.  Rümeysa Öztürk;
>
> d.  Yunseo Chung;
>
> e.  Efe Ercelik;
>
> f.  Mohammed Hoque;
>
> g.  Ranjani Srinivasan;
>
> h.  Badar Khan Suri; and
>
> i.  Momodou Taal.

10.  The terms "you" and "your" refer to each of the defendants individually responding to these requests.

## INTERROGATORIES

1.  Identify the persons who are or were involved in proposing or taking adverse action against any of the Targeted Noncitizen Students or Faculty Members, including everyone from the most senior agency officials (*e.g.*, Secretary Rubio and Secretary Noem) down the chain to the most junior agency officials, officers, employees, agents, contractors, or consultants.

2.   Identify the persons who are or were involved in the inspection, review, monitoring, or surveillance of non-citizens' social media accounts or activity.

3.   Identify the persons who are or were involved in the implementation or enforcement of Executive Orders 14,161 and 14,188, as they relate to taking any adverse action against non-citizens.

4.   Identify the persons who are or were involved in proposing or taking adverse action against any non-citizen student or faculty member on the basis of, or partly on the basis of, speech or activities determined or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

5.   Identify the persons who are or were involved in any request or demand, by the Department of Education or any other official or agency, requesting, demanding or requiring that any university or college provide the names, nationalities or any other information of non-citizen students or faculty members believed or suspected to have engaged in speech or activities deemed to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

6.   Identify the persons who are or were involved in the identification of non-citizen students or faculty members targeted for any adverse action on the basis of, or partly on the basis of, speech or activities deemed to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including but not limited to the persons who were involved in compiling and sharing the list of students provided by the Department of Homeland Security to Columbia University referenced by White House Press Secretary Karoline Leavitt on March 11, 2025.

7.   State the basis of or for your claim, assertion, allegation, or contention that your taking adverse action against any of the Targeted Noncitizen Students or Faculty Members was lawful.

8.  State the basis of or for your claim, assertion, allegation, or contention that any of the Targeted Noncitizen Students or Faculty Members engaged in pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activities.

9.  State the basis of Secretary of State Rubio's determination that any of the Targeted Noncitizen Students or Faculty Members is removable under 8 U.S.C. § 1227(a)(4)(C).

10. Identify all documents you created, consulted, referenced, or relied on in determining whether to take any adverse action against any of the Targeted Noncitizen Students or Faculty Members.

11. Describe in detail the reasons why the agents who arrested Rümeysa Öztürk and Badar Khan Suri were wearing civilian clothes, hoods, and masks, without their official badges visible.

12. Describe in detail your transfer of Mahmoud Khalil and Rümeysa Öztürk from the location of their arrest to a detention facility in Louisiana, including your decision to transfer them, your reasons for transferring them, and your planning, coordination, and execution of the transfers.

13. Describe in detail your arrest and detention of Mohsen Mahdawi and your attempt to transfer him to a detention facility in Louisiana, including your planning and coordination of his arrest in connection with his U.S. Citizenship and Immigration Services interview in Colchester, Vermont on April 14, 2025.


Dated:        May13, 2025
              New York, NY

                         SHER TREMONTE LLP

                         By: _____/s/ Noam Biale_____
                         Michael Tremonte
                         Noam Biale
                         Courtney Gans
                         Alexandra Conlon
                         90 Broad Street, 23rd Floor

New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
*edwina@zimmercitronclarke.com*

*Attorneys for Plaintiffs*

To:        Ethan B. Kanter, Esq. (via email)
           Harry Graver, Esq. (via email)
           Lindsay M. Murphy, Esq. (via email)
           Sarmad Khojateh, Esq. (via email)
           Shawna Yen, Esq. (via email)

           *Attorneys for Defendants*

# Exhibit C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                           Plaintiffs,

      v.

MARCO RUBIO, ET AL.

                     Defendants.

Case No. 1:25-cv-10685 (WGY)

## PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION
## DIRECTED TO DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure and Local Civil Rules for the District of Massachusetts 26.1, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") produce the following documents and things identified and listed below for inspection.

## DEFINITIONS AND INSTRUCTIONS

1.  The definitions and instructions provided in Federal Rule of Civil Procedure 34(a) and Local Rules 26.5 and 34.1 are incorporated by reference.

2.  Whenever reference is made to a person or legal entity, it includes any and all of such person's or entity's past and present affiliates, components, subdivisions, offices, directors, officers, agents, partners, employees, contractors, consultants, attorneys, representatives,

1

investigators, predecessors, successors, assigns and/or any other person or entity acting on, or purporting to act on, its behalf.

3. "Adverse action" means investigating, monitoring, surveilling, revoking the visa or lawful permanent residency of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to detention facilities in Louisiana.

4. "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

5. "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

6. "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

7. "Concerning" means, as defined in Local Rule 26.5(c), referring to, describing, evidencing or constituting.

8. "Covered Institution" means the following colleges and universities: Arizona State University, Columbia University, Cornell University, Georgetown University, Harvard University, Minnesota State University System, Tufts University, University of California System, University of Massachusetts System, and University of Texas System.

9. The terms "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text

Add.254

message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

10. "Each" shall be construed to include the word "every" and "every" shall be construed to include the word "each."

11. "Including" shall be construed to include the phrase "without limitation."

12. The terms "you" and "your" refer to each of the defendants individually responding to these requests.

13. The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

    a. Mahmoud Khalil;

    b. Mohsen Mahdawi;

    c. Rümeysa Öztürk;

    d. Yunseo Chung;

    e. Efe Ercelik;

    f. Mohammed Hoque;

    g. Ranjani Srinivasan;

    h. Badar Khan Suri; and

    i. Momodou Taal.

Add.255

14. To the extent a request calls for the production of documents or things you contend are subject to a privilege or immunity from discovery, your written request should so indicate, but you are requested to produce the balance of the documents or things not subject to a claim of privilege which fall within the scope of the request. Additionally, to the extent information subject to a privilege or immunity from discovery is contained within responsive documents or things, you are requested to produce a redacted version of the document or thing containing the non-privileged information with a notation on the produced document or thing indicating that it is being produced in redacted form.

15. If you are unable to produce any file or document sought in these requests, you shall identify the file or document; state the reasons why you are unable to produce it, describe in detail the efforts you have made to obtain it, and identify its location and/or custodian.

16. Documents responsive to these requests should be produced in the order in which they are ordinarily kept and in a format sufficient to identify the files from which they have been taken. Documents from different files should not be intermingled.

17. Except as otherwise specified, these requests cover the time period January 20, 2025 to the present.

18. These discovery requests are continuing in that they may require supplemental responses. If you obtain further information or documents with respect to any request to which you have already responded, you have a continuing duty to supplement your answer pursuant to Federal Rule of Civil Procedure 26(e) at any time prior to the entry of judgment.

19. For each document or thing requested that you object to producing on the basis of any privilege or immunity from discovery, please provide the following information:

   a.  The basis for the privilege being invoked;

   b.  The date of the document;

   c.  The title of the document (if any);

   d.  The name of the person(s) authoring the document;

   e.  The name of the person(s) to whom the document and/or copies thereof were given or transmitted;

   f.  The name of the person(s) from whom the document and/or copies thereof were given or transmitted:

   g.  The present location and custodian of the document, or any copies thereof; and

   h.  The general subject matter dealt with in the document with reasonable specificity to allow Plaintiffs to determine whether to challenge the privilege designation.

## **DOCUMENT REQUESTS**

1.  Documents and communications showing the planning, execution and implementation of your decision to take any adverse action against a Targeted Noncitizen Student or Faculty Member, including:

   a.  Documents and communications relating to the planning and execution of the arrest and detention of Mahmoud Khalil;

   b.  Documents and communications relating to the planning and execution of the arrest and detention of Mohsen Mahdawi.

   c.  Documents and communications relating to the planning and execution of the arrest and detention of Rümeysa Öztürk.

    d.  Documents and communications relating to the planning and execution of the arrest and detention of Yunseo Chung.

    e.  Documents and communications relating to the planning and execution of the arrest and detention of Efe Ercelik;

    f.  Documents and communications relating to the planning and execution of the arrest and detention to Mohammed Hoque;

    g.  Documents and communications relating to the planning and execution of the arrest and detention of Ranjana Srinivasan;

    h.  Documents and communications relating to the planning and execution of the arrest and detention of Badar Khan Suri; and

    i.  Documents and communications relating to the planning and execution of the arrest and detention of Momodou Taal.

2.  Documents and communications requesting or recommending the taking of, and memorializing, explaining, or justifying the decision to take any adverse action against a Targeted Noncitizen Student or Faculty Member, including:

    a.  A document or documents in which the Department of Homeland Security ("DHS") and/or U.S. Immigration and Customs Enforcement ("ICE") requested or recommended that the U.S. Department of State revoke the visas of or determine the removability of a Targeted Noncitizen Student or Faculty Member. *See Ozturk v. Trump*, No. 25-CV-374, 2025 WL 1145250, at *3 (D. Vt. Apr. 18, 2025) (describing request from DHS and ICE for revocation of Rümeysa Öztürk's F-1 visa);

Add.258

b.  A document or documents in which the State Department approved, explained, or justified the revocation of a Targeted Noncitizen Student's or Faculty Members's visa. *See id.*;

c.  A document or documents in which Secretary of State Marco Rubio determined that a Targeted Noncitizen Student or Faculty Member is removable under 8 U.S.C. § 1227(a)(4)(C), and the attachments to any such determination. *See, e.g.*, *Khalil v. Joyce*, No. 25-CV-01963, 2025 WL 1232369, at *2 (D.N.J. Apr. 29, 2025);

d.  A document or documents in which the State Department informed DHS and/or ICE that it had approved the revocation of a Targeted Noncitizen Student or Faculty Member's visa or determined the removability of a Targeted Noncitizen Student or Faculty Member; and

e.  Any Notice to Appear (Form I-862), administrative arrest warrant (Form I-200), or Record of Deportable/Inadmissible Alien (Form I-213) that has been issued or drafted as to any of the Targeted Noncitizen Students or Faculty Members.

3.  The following documents and memoranda that Plaintiffs have reason to believe are in Defendants' possession based on the public record and that are relevant to the adverse actions taken against the Targeted Noncitizen Students or Faculty:

a.  A memorandum from Secretary Rubio accusing Mohsen Mahdawi of engaging in "threatening rhetoric and intimidation of pro-Israeli bystanders." *Mahdawi v. Trump*, No. 25-CV-389, 2025 WL 1243135, at *10 (D. Vt. Apr. 30, 2025);

b.  A memorandum from Andre Watson (Senior Official, Homeland Security Investigations) to John Armstrong (Senior Bureau Official, Department of State)

7

stating that Rümeysa Öztürk had engaged in "anti-Israel activism." John Hudson, *No Evidence Linking Tufts Student to Antisemitism or Terrorism, State Dept. Office Found*, Wash. Po. (Apr. 13, 2025) https://perma.cc/KRB2-AVXF;

c.   A March 2025 State Department memorandum finding that neither DHS nor ICE nor Homeland Security Investigations had produced any evidence showing that Rümeysa Öztürk had engaged in antisemitic activity or made public statements indicating support for a terrorist organization. *See id.*;

d.   A document dated March 21, 2025 in which the State Department informed DHS that the revocation of Öztürk's visa had been "approved." *See id.*;

e.   An April 9, 2025 memorandum from the Deputy Assistant Secretary of State for Visa Services to ICE regarding the revocation of Efe Ercelik's visa. *Ercelik v. Hyde*, No. 25-CV-11007, slip op. at 17 (D. Mass. May 8, 2025);

f.   A March 22, 2025 communication from DHS/ICE to the State Department seeking the Department's determination as to whether Mohammed Hoque's visa should be revoked. *Hoque v. Trump*, No. 25-cv-01576, slip op. at 4 (D. Conn. May 5, 2025); and

g.   A May 23, 2025 memorandum from the State Department informing DHS/ICE that Mohammed Hoque's visa had been revoked. *See id.*

4.   Documents and communications with Betar US, Canary Mission, and the Heritage Foundation concerning the Targeted Noncitizen Students or Faculty Members.

5.   Communications, memoranda, policies, procedures, and directives concerning the inspection, review, monitoring, or surveillance of noncitizens' social media accounts or activity

for pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activity, including:

    a.   The State Department's new guidance to consular officers on reviewing visa applicants' social media, referred to in paragraph 16 of the declaration from John Armstrong submitted in support of the government's opposition to Plaintiffs' preliminary injunction motion; and

    b.   The Secretary of State's communication to State Department employees on March 25, 2025, titled "Enhanced Screening and Social Media Vetting for Visa Applicants." Ken Klippenstein, *Trump Admin Spies on Social Media of Student Visa Holders*, Substack (Mar. 28, 2025), https://perma.cc/FV5L-MUNA; and

6.   Memoranda, policies, procedures, directives or guidance concerning the implementation or enforcement of Executive Orders 14,161 and 14,188 related to the revocation of visas or green cards, or the surveillance, arrest, detention, or deportation of noncitizen students or faculty members for pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activity, including:

    a.   Any reports issued by the Attorney General, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security pursuant to Section 3(a) of Executive Order 14,188; and

    b.   Communications from the State Department to Covered Institutions directing them to report international students for participating in "proscribed antisemitic actions," "terrorist activity," or "endorsing or espousing terrorism." Prem Thaker, *SCOOP: Trump Admin Forcing Schools to Report International Students for*

9

Add.261

*Protest Activity or 'Antisemitic Actions,'* Zeteo (May 16, 2025),

https://perma.cc/XD4N-BSZC.

7. Communications with Covered Institutions concerning non-citizen students or faculty members who have been accused or suspected of engaging in speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including the list of students provided by DHS to Columbia University that was referenced by White House Press Secretary Karoline Leavitt in her press briefing on March 11, 2025.

Dated:     May 19, 2025
           New York, NY

SHER TREMONTE LLP

By:    */s/ Noam Biale*
Michael Tremonte
Noam Biale
Alexandra Conlon
Courtney Gans
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

10

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Attorneys for Plaintiffs*

To:     Ethan B. Kanter (via email)
        Harry Graver (via email)
        Lindsay M. Murphy (via email)
        Shawna Yen (via email)
        Sarmad Khojatesh (via email)

        *Attorneys for Defendants*

11

# Exhibit D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                Plaintiffs,

      v.

MARCO RUBIO, ET AL.

                Defendants.

Case No. 1:25-cv-10685 (WGY)

**PLAINTIFFS' FIRST SET OF**
**INTERROGATORIES DIRECTED AT DEFENDANTS**

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure

and Local Civil Rules for the District of Massachusetts 26.1 and 33.1, Plaintiffs American

Association of University Professors, American Association of University Professors-Harvard

Faculty Chapter, American Association of University Professors at New York University, Rutgers

American Association of University Professors-American Federation of Teachers, and Middle

East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request

that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants")

answer the following interrogatories (the "Interrogatories" and each individually an

"Interrogatory") under oath and serve the answers within fourteen (14) days of service of this

request.

**INSTRUCTIONS**

1.  The instructions provided in Local Rule 33.1 are incorporated by reference.

2.  Whenever an Interrogatory asks for the identity of an individual, please set forth the

following information:

    a.  The individual's name;

    b.  The individual's title or occupation;

    c.  The individual's present or last known residential address; and

    d.  The individual's present or last known business address.

3.  In answering these Interrogatories, Defendants are required to furnish all information known or available to them, regardless of whether this information is possessed by Defendants or by their agents, employees, representatives, investigators, or by their attorneys or other persons who have acted on their behalf, or by any corporation, partnership, or other legal entity.

4.  If any of these Interrogatories cannot be answered in full, after exercising due diligence to secure the information to do so, answer to the extent possible, specifying the reasons for Defendants' inability to answer the remainder and stating whatever information, knowledge, or belief Defendants have concerning the unanswered portion. In addition, specify the person or persons Defendants have reason to believe may have the information and/or knowledge to answer such interrogatory or any part thereof.

5.  The Interrogatories are continuing in nature. If, after answering these interrogatories, Defendants obtain or become aware of further information responsive to these Interrogatories, Defendants are required to provide a supplemental interrogatory answer.

6.  State whether the information furnished is within the personal knowledge of Defendants and, if not, the name of each person to whom the information is a matter of personal knowledge.

7.  If Defendants believe that an Interrogatory seeks privileged information, state the grounds for the privilege assertion in sufficient detail to enable Plaintiffs to challenge your claim.

8.   If Defendants object to any portion of any Interrogatory herein, identify the portion of the Interrogatory to which Defendants object and respond to the remainder of the Interrogatory.

## DEFINITIONS

1.   The definitions provided in Federal Rule of Civil Procedure Rule 34(a) and Local Rule 26.5(c) are incorporated by reference.

2.   "Adverse action" means investigating, monitoring, surveilling, revoking the visa or lawful permanent residency of, terminating the status of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to a detention facility in Louisiana.

3.   "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

4.   "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

5.   "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

6.   "Covered Institution" means the following colleges and universities: Arizona State University, Columbia University, Cornell University, Georgetown University, Harvard University, Minnesota State University System, Tufts University, University of California System, University of Massachusetts System, and University of Texas System

7.   The term "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text

message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

8. "Identify," when referring to a person, means to give the names, titles, organizational roles, and job descriptions of all U.S. Government officials, officers, agents, employees or contractors.

9. "Including" shall be construed to include the phrase "without limitation."

10. The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

    a.  Mahmoud Khalil;

    b.  Mohsen Mahdawi;

    c.  Rümeysa Öztürk;

    d.  Yunseo Chung;

    e.  Efe Ercelik;

    f.  Mohammed Hoque;

    g.  Ranjani Srinivasan;

    h.  Badar Khan Suri; and

    i.  Momodou Taal.

11. The terms "you" and "your" refer to each of the defendants individually responding to these requests.

## **INTERROGATORIES**

1.   Identify the persons who are or were involved in proposing or taking adverse action against any of the Targeted Noncitizen Students or Faculty Members, including everyone from the most senior agency officials (*e.g.*, Secretary Rubio and Secretary Noem) down the chain to the most junior agency officials, officers, employees, agents, contractors, or consultants.

2.   Identify the persons who are or were involved in the inspection, review, monitoring, or surveillance of the Targeted Noncitizen Students or Faculty Members' social media accounts or activity.

3.   Identify the persons who are or were involved in taking adverse action against any non-citizen student or faculty member at a Covered Institution based in whole or in part on speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

4.   Identify the persons who are or were involved in communications between you and any Covered Institution concerning non-citizen students or faculty members believed or suspected to have engaged in speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including the persons at the Department of Homeland Security who communicated with Columbia University, as referenced by White House Press Secretary Karoline Leavitt in her press briefing on March 11, 2025.

5.   Identify the persons who are or were involved in the identification of non-citizen students or faculty members at Covered Institutions who were targeted for any adverse action based in whole or in part on speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including the persons who were involved in creating, compiling and sharing the list of students provided by the Department of

Homeland Security to Columbia University, as referenced by White House Press Secretary Karoline Leavitt in her press briefing on March 11, 2025.

6.  State the basis of or for your claim, assertion, allegation, or contention that your taking adverse action against any of the Targeted Noncitizen Students or Faculty Members was lawful.

7.  State the basis of or for your claim, assertion, allegation, or contention that any of the Targeted Noncitizen Students or Faculty Members engaged in pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activities.

8.  State the basis of the State Department's decision to revoke the visas of any of the Targeted Noncitizen Students or Faculty Members under 8 U.S.C. § 1201(i).

9.  State the basis of Secretary of State Rubio's determination that any of the Targeted Noncitizen Students or Faculty Members is removable under 8 U.S.C. § 1227(a)(4)(C).

10. Identify all documents you created, consulted, referenced, or relied on in determining whether to take adverse action against any of the Targeted Noncitizen Students or Faculty Members.

11. State the basis of the State Department's decision to make "silent" the revocation of any of the Targeted Noncitizen Students' or Faculty Members' visas or green cards, *i.e.*, not to notify the Targeted Noncitizen Student or Faculty Member of the revocation..

12. Describe in detail the reasons why the agents who arrested Rümeysa Öztürk and Badar Khan Suri were wearing civilian clothes, hoods, and masks, without their official badges visible.

13. Describe in detail your transfer of Mahmoud Khalil and Rümeysa Öztürk from the location of their arrest to a detention facility in Louisiana, including your decision to transfer them and your reasons for transferring them.

14. Describe in detail your decision to and reasons for arresting Mohsen Mahdawi at the time and location of his U.S. Citizenship and Immigration Services interview in Colchester, Vermont on April 14, 2025.

Dated:        May19, 2025
               New York, NY

SHER TREMONTE LLP

By: ____/s/ Noam Biale_____
Michael Tremonte
Noam Biale
Courtney Gans
Alexandra Conlon
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
Zimmer, Citron & Clarke, LLP

130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
*edwina@zimmercitronclarke.com*

*Attorneys for Plaintiffs*

To:    Ethan B. Kanter, Esq. (via email)
Harry Graver, Esq. (via email)
Lindsay M. Murphy, Esq. (via email)
Sarmad Khojateh, Esq. (via email)
Shawna Yen, Esq. (via email)

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

|  |  |  |
|---|---|---|
| | ) | |
| AMERICAN ASSOCIATION OF | ) | |
| UNIVERSITY PROFESSORS, ET AL., | ) | Civil Action No. 1:25-cv-10685-WGY |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARCO RUBIO, in his official capacity | ) | |
| as Secretary of State, and the | ) | |
| DEPARTMENT OF STATE, ET AL., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' ASSENTED-TO MOTION TO PROVISIONALLY FILE
PORTIONS OF CERTIFIED ADMINISTRATIVE RECORD UNDER SEAL**

Defendants respectfully move the Court for leave to provisionally file portions of the Certified Administrative Record ("record") under seal. Plaintiffs' complaint seeks judicial review under the Administrative Procedure Act, which authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In applying that standard, the focal point for judicial review should be the administrative record." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). Defendants have therefore been compiling the relevant administrative record for submission to the Court.

1

Although Defendants would normally file the record on the Court's public docket, the record in this case will contain both confidential information that should not be filed publicly and non-confidential information.  Defendants will publicly file the non-confidential portions of the record by 12:00 p.m. EST on Thursday, May 29, 2025, in accordance with the Court's May 22, 2025, directive.  *See* ECF 98.  With respect to material in the record that Defendants deem confidential, however, Defendants hereby move to file such portions of the record under seal, on a provisional basis, because the parties are currently negotiating the terms of a stipulated protective order concerning the designation, production, filing, and use of confidential information.  Plaintiffs have indicated that they assent to this request to provisionally seal portions of the record that Defendants deem confidential while the parties work toward agreement on a stipulated protective order.  The parties agree that provisionally sealed portions of the record will not be used or disseminated outside of this litigation, nor outside of their intended purpose.

Upon the parties' filing of a stipulated protective order, which the parties anticipate will occur in short order, and the Court's approval of it, Defendants will reassess whether and what record content should be deemed confidential pursuant to that protective order and will make an appropriate motion regarding the extent of public access to such documents, if necessary.  In this regard, Defendants note that the record in this case will likely contain documents concerning immigration enforcement actions against specific, non-party individuals.  Such documents contain personally identifying information protected under the Privacy Act.  Furthermore, the Federal Rules of Civil Procedure restrict public access to electronic filings in cases involving "action[s] or proceeding[s] relating to . . . order[s] of removal, to relief from removal, or to immigration benefits or detention."  Fed. R. Civ. P. 5.2(c); *see also* D. Mass. General Order 19-

Add.274

02, "Standing Procedural Order Re: Public Access to Immigration Cases Restricted By Federal Rules of Civil Procedure 5.2(C)" (June 1, 2019).  Plaintiffs have declined to take a position in this regard without seeing the documents in question.

Accordingly, due to the confidential nature of certain documents in the record, and the momentary lack of a stipulated protective order between the parties, Defendants respectfully request to provisionally file certain portions of the record under seal to guard against unwarranted disclosure.  *See*, *e.g.*, *Moncada v. Mayorkas*, No. 20-cv-11561-MPK (D. Mass. Sept. 7, 2022) (ECF 14) (granting motion to file administrative record under seal); *Patel v. Johnson*, No. 12-cv-12317-WGY (D. Mass. Aug. 5, 2013) (ECF 27) (same).

Respectfully Submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*

ANTHONY NICASTRO
*Acting Director*
*Office of Immigration Litigation*


*/s/ Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

*Counsel for Defendants*

*Dated: May 28, 2025*

4

## CERTIFICATE OF SERVICE

I certify that on May 29, 2025, I served a copy of the foregoing document on all parties by causing this document and its attachments to be filed with the Clerk of the Court through the CM/ECF system, which will provide electronic notice of this document to all attorneys of record.

/s/ Ethan B. Kanter
ETHAN B. KANTER
Chief
National Security Unit
Civil Division
Office of Immigration Litigation
General Litigation & Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-9123 | Fax: (202) 305-7000

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| AMERICAN ASSOCIATION OF ) | |
| UNIVERSITY PROFESSORS, ET AL., ) | Civil Action No. 1:25-cv-10685-WGY |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| MARCO RUBIO, in his official capacity ) | |
| as Secretary of State, and the ) | |
| DEPARTMENT OF STATE, ET AL., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

## [PROPOSED] ORDER

Having considered Defendants' MOTION TO PROVISIONALLY FILE PORTIONS OF

CERTIFIED ADMINISTRATIVE RECORD UNDER SEAL, the Court hereby ORDERS that:

Defendants shall publicly file non-confidential portions of the Administrative Record by

12:00 p.m. on Thursday, May 29, 2025;

Defendants shall file portions of the Administrative Record that Defendants deem

confidential under seal by 12:00 p.m. on Thursday, May 29, 2025; and

The portions of the Administrative Record Defendants file under seal on Thursday, May

29, 2025, are provisionally sealed until further order of this Court.

SO ORDERED.


Dated: May __, 2025                            s/_____
                                              William G. Young
                                              United States District Judge

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

)
AMERICAN ASSOCIATION OF )
UNIVERSITY PROFESSORS, ET AL., )          Civil Action No. 1:25-cv-10685-WGY
)
       Plaintiffs, )
)
    v. )          **CERTIFIED**
)          **ADMINISTRATIVE RECORD**
)
MARCO RUBIO, in his official capacity )
as Secretary of State, and the )
DEPARTMENT OF STATE, ET AL., )
)
)
       Defendants. )
)

**INDEX**

Declaration of John Armstrong .................................................................................. 1

Declaration of Andre Watson ................................................................................... 7

Department of State Cable 26168 ............................................................................ 12

███████ Notification of Removability Determination under INA 237(a)(4)(C) ............................ 18

███████ Notice to Appear ....................................................................................... 20

███████ Form I-261 .............................................................................................. 23

███████ Warrant for Arrest of Alien .......................................................................... 25

████████ Notification of Deportability Determination under INA 237(a)(4)(C) ......................... 26

████████ Notice to Appear ...................................................................................... 28

████████ Warrant for Arrest of Alien ......................................................................... 32

████████ Notice of Custody Determination .................................................................... 33

███████ Visa Revocation – Memo for ICE ...................................................................... 34

███████ Notice to Appear ....................................................................................... 36

███████ Warrant for Arrest of Alien .......................................................................... 40

███████ Notification of Removability Determination under INA 237(a)(4)(C) ............................ 41

███████ Unserved Warrant for Arrest of Alien ................................................................ 43

█████ Notification of Deportability Determination under INA 237(a)(4)(C) ............................. 44

█████ Notice to Appear ......................................................................................... 46

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| AMERICAN ASSOCIATION OF | ) | |
| UNIVERSITY PROFESSORS, ET AL., | ) | Civil Action No. 1:25-cv-10685-WGY |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CERTIFICATION OF** |
| | ) | **ADMINISTRATIVE RECORD** |
| | ) | |
| MARCO RUBIO, in his official capacity | ) | |
| as Secretary of State, and the | ) | |
| DEPARTMENT OF STATE, ET AL., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Larry W. Talbott, hereby declare under penalty of perjury:

1. I am employed by the United States Department of State, Bureau of Consular Affairs, Visa Office, Office of Information Management and Liaison. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

2. Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the following documents annexed hereto constitute the Department of State's administrative record in this matter, which consists of the declaration of John Armstrong, dated April 11, 2025, previously submitted to this Court (Dkt.# 65-1), describing the Department of State's requirements and polies relating to visa revocation and affirming that it is not true that the

1

SBU – LEGAL

Department is approving visa revocations for "ideological deportation" reasons, a true and correct version of the Department of State Cable 26168, redacted for Law Enforcement Privilege, and the following documents related to five individuals, filed in separate litigation:

a. ███ Notification of Removability Determination under INA 237(a)(4)(C)

b. ████ Notification of Removability Determination under INA 237(a)(4)(C)

c. ███ Visa Revocation – Memo for ICE

d. ███ Notification of Removability Determination under INA 237(a)(4)(C)

e. ██ Notification of Removability Determination under INA 237(a)(4)(C)

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

*Larry W. Talbott*
_____
Larry W. Talbott
Deputy Director
Office of Information Management and Liaison
Visa Office, Bureau of Consular Affairs
U.S. Department of State

2

SBU – LEGAL

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

—————————————————————

AMERICAN ASSOCIATION OF )
UNIVERSITY PROFESSORS, ET AL., )        Civil Action No. 1:25-cv-10685-WGY
                                )
         Plaintiffs,            )
                                )
         v.                     )        **CERTIFICATION OF**
                                )        **ADMINISTRATIVE RECORD**
                                )
MARCO RUBIO, in his official capacity )
as Secretary of State, and the  )
DEPARTMENT OF STATE, ET AL.,    )
                                )
                                )
         Defendants.            )
                                )

I, Akil Baldwin, hereby declare under penalty of perjury:

1. I am the Deputy Assistant Director for the National Security Division of Homeland Security Investigations (HSI). Prior to becoming the Deputy Assistant Director, I served as the Division Chief for the HSI Office of International Operations. I have additionally served as the HSI Attache in Hong Kong; Assistant Special Agent in Charge in New York, N.Y., and Assistant Attache in Brussels, Belgium. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

2. Noting that this is not a traditional Administrative Record, because it is addressing the *absence* of a policy alleged to exist in litigation, and is further compiled for purposes of non-traditional review in a Rule 65(a) expedited proceeding, I certify that the declaration of HSI National Security Division Assistant Director Andre Watson, dated April 11,

1

2025, previously submitted to this Court (Dkt.# 65-2), describing the Department of

Homeland Security's processes for identifying, disrupting and dismantling transnational

criminal enterprises and terrorist organizations that threaten the security, and confirming

that the Department has no official or unofficial "ideological deportation policy," is part

of the U.S. Immigration and Customs Enforcement's administrative record in this matter.

3. In good faith, I certify the document that was put before me. There's a separate

certification pertaining to other U.S. Immigration and Customs Enforcement documents

and a separate certification pertaining to U.S. Department of State's documents reflected

in the index and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and

correct to the best of my knowledge.

AKIL R
BALDWIN
Digitally signed by AKIL R
BALDWIN
Date: 2025.05.29 12:11:47
-04'00'

_____

Akil Baldwin
Deputy Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

)
AMERICAN ASSOCIATION OF )
UNIVERSITY PROFESSORS, ET AL., )        Civil Action No. 1:25-cv-10685-WGY
)
Plaintiffs, )
)
v. )        **CERTIFICATION OF**
)        **ADMINISTRATIVE RECORD**
)
MARCO RUBIO, in his official capacity )
as Secretary of State, and the )
DEPARTMENT OF STATE, ET AL., )
)
)
Defendants. )
)

I, William S. Walker, hereby declare under penalty of perjury:

1. I am the Acting Assistant Director for Domestic Operations at Homeland Security
   Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the
   U.S. Department of Homeland Security ("DHS"). As the Acting Assistant Director, I am
   responsible for oversight of 30 HSI Special Agents in Charge, ensuring all field
   operations are working to efficiently execute the agency mission.

2. I began my career with the U.S. Government as an Inspector with the former U.S.
   Customs Service at the Port of Philadelphia. Over 26 years, I have served as Deputy
   Special Agent in Charge, Assistant Special Agent in Charge, and Supervisory Special
   Agent with HSI. Most recently, I served as the Special Agent in Charge of HSI's New
   York Field Office where I oversaw over 700 investigators whose mission was
   investigating, disrupting, and dismantling transnational criminal organizations and

1

terrorist networks. In my capacity as Acting Assistant Director, I now oversee 237

Domestic Field Offices and more than 7,100 Special Agents.

3. In good faith, I certify the documents that were put before me.  There's a separate

certification pertaining to the U.S. Department of State's documents reflected in the index

and record.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and

correct to the best of my knowledge.

WILLIAM S WALKER

Digitally signed by
WILLIAM S WALKER
Date: 2025.05.29
12:24:12 -04'00'

William S. Walker
HSI Acting Assistant Director for Domestic Operations
U.S. Immigration and Customs Enforcement

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., ) | Civil Action No. 1:25-cv-10685-WGY |
| Plaintiffs, ) | |
| v. ) | |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., ) | |
| Defendants. ) | |

## DECLARATION OF JOHN ARMSTRONG IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

I, John Armstrong, hereby declare under penalty of perjury:

1.     I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru, as Economic Counselor in Warsaw, Poland, as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas, Deputy Consul General in Kyiv, Ukraine, and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russia Desk, and Belarus Desk Officer.

2.     As the Senior Bureau Official, I oversee the functions and responsibilities of the Bureau of Consular Affairs, including the Office of Overseas Citizen Services, the Office of Passport Services, and the Office of Visa Services ("Visa Office"), which encompasses all aspects of visa policy, procedures, and information related to U.S. visa issuance to foreign citizens who apply at more than 230 visa-issuing U.S. embassies and consulates.

3.     I am familiar with the Department's requirements and policies relating to visa revocation. I base this declaration on my review of Department of State records and discussion with other Department of State employees.

4.     The Visa Office's functions and responsibilities encompass all aspects of visa policy, procedures and information related to U.S. visa issuance to foreign citizens, who are applying at U.S. Embassies and Consulates worldwide, seeking to come to the United States. The responsibilities of the Visa Office include coordinating with other agencies to perform national security screening of foreign travelers, and providing guidance and recommendations on visa policy related to national security exclusions. Among its many functions, the Visa Office also revokes thousands of visas annually and provides guidance to the field on visa issuance, revocation and denial.

1

5.      On January 20, 2025, President Trump issued Executive Order 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats ("E.O. 14161"). Consistent with E.O. 14161, the Visa Office has undertaken numerous efforts to "identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible."

6.      On January 29, 2025, President Trump issued Executive Order 14188, Additional Measures to Combat Anti-Semitism ("E.O. 14188"). Pursuant to E.O. 14188, the Visa Office and other relevant offices at State are working with the Department of Education and the Department of Homeland Security ("DHS") on appropriate ways to "familiariz[e] institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens."

7.      One of the tools in place to ensure maximum vetting of visa applicants and visa-holders, including students, is the Department's long-standing continuous vetting program. All visa-holders are continuously vetted by law enforcement and intelligence agencies for information that surfaces after visa issuance. Processes for coordinated security-related continuous vetting have been used by the State Department and partner agencies for over 10 years.

8.      The Department of State has the authority to revoke visas under Section 221(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(i), which states, in pertinent part: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." For example, the Department may revoke a visa if information arises that indicates an alien is potentially ineligible for that visa or that revocation is otherwise warranted, including, for example, if the alien poses a threat to U.S. public safety. The Visa

2

Office provides notice to DHS when a visa is revoked.

9.      A visa is revoked only after the Department of State reviews available information to ascertain whether the visa revocation is supported by the facts and law.

10.     Given the Department's commitment to, and responsibility for, national security, the Visa Office uses all available resources in its visa screening and vetting both when making the initial visa adjudication and during recurrent vetting.

11.     Information on visa-holders can come directly from interagency partners, from offices within the Department of State, or from public sources. The Visa Office has long-standing relationships with U.S. law enforcement agencies who regularly send the Visa Office information when they believe derogatory information merits a revocation. This includes information from DHS and the Federal Bureau of Investigation.

12.     A visa can be revoked for any potential ineligibility under U.S. law, including but not limited to potential ineligibility for a visa under one of the "Security and related grounds" of inadmissibility at section 212(a)(3) of the INA. The "Security and related grounds" include terrorism related inadmissibility grounds, such as endorsing or espousing terrorist activity or persuading others to endorse or espouse terrorist activity or support a terrorist organization, as well as engaging in terrorist activity by providing material support to a designated or undesignated terrorist organization. That section also includes an inadmissibility ground for foreign policy reasons, when the Secretary of State has reasonable ground to believe an alien's entry or proposed activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

13.     The Bureau of Consular Affairs, including the Office of Visa Services, does not carry out deportations. DHS's Immigration and Customs Enforcement ("ICE") is responsible for immigration enforcement in the United States, including initiating proceedings against aliens charged as removable.

14.     As deportations are carried out by DHS, deportation policy is outside the purview of the Bureau of Consular Affairs. No ideological deportation policy has been developed or

3

implemented by the Bureau of Consular Affairs or the Visa Office.

15.     I am aware of Secretary Rubio's public remarks indicating the U.S. government will revoke visas of and deport Hamas supporters. These statements are consistent with the State Department's long-standing implementation of visa and immigration laws, across administrations. Hamas has been a designated foreign terrorist organization under section 219 of the INA since it was designated by former Secretary Madeleine Albright in 1997. Support for a designated terrorist organization by statute is a basis for visa refusal and other immigration consequences: the INA provides that an alien who persuades others to support a terrorist organization, or who has afforded material support to a designated terrorist organization, is inadmissible and deportable. INA §§ 212(a)(3)(B), 237(a)(4)(B).

16.     I am aware of plaintiffs' contention that the State Department and ICE have launched new social media surveillance programs aimed at identifying noncitizen students and faculty with alleged terrorist sympathies. It is true that the State Department has authored new guidance to consular officers on reviewing visa applicants' social media. However, it is misleading and false to refer to the Department's review of publicly available social media as a form of "surveillance" to root out "terrorist sympathies" among students and faculty. Rather, review of publicly available social media is a component of the extensive information-collection and vetting process foreign visitors undergo when they apply for and use U.S. visas.

17.     I am aware of plaintiffs' contentions regarding Secretary Rubio's March 16, 2025, interview on the television news show *Face the Nation*. I understand Secretary Rubio's comments to refer to the ongoing work of the Visa Office to revoke visas, revocations which occur for a wide variety of reasons. Secretary Rubio did not state, and it is not true, that the Visa Office is approving visa revocations every day for "ideological deportation" reasons. This assertion is simply false.

4

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of April, 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State

5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS.*, et al.*,

Plaintiffs,

v.

MARCO RUBIO, *et al.*,

Defendants.

No. 1:25-CV-10685

## DECLARATION OF ANDRE WATSON

I, Andre Watson pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

      1.      I am the Senior Official within the National Security Division (NSD) for Homeland Security Investigations (HSI).  I am a career member of the Senior Executive Service with the rank of Assistant Director. Prior to becoming the Assistant Director of NSD, I served on a detail assignment to the U.S. Department of Homeland Security in the capacity of Principal Deputy Assistant Secretary for the Countering Weapons of Mass Destruction Office.  I served as the HSI Special Agent in Charge in Baltimore, M.D., Deputy Special Agent in Charge in Washington, D.C., Assistant Special Agent in Charge in Houston, T.X., and Supervisory Special Agent in Blaine, W.A.  I have also previously served in Headquarters assignments as Chief of Staff to the Deputy Director of U.S.  Immigration and Customs Enforcement (ICE), Chief of Intelligence for the U.S. Department of Justice, International Organized Crime and Intelligence Operations Center, and various supervisory positions within NSD.

2.      As the Senior Official within NSD, I oversee the National Security as well as Student and Exchange Visitor Programs functions in support of ICE efforts to identify, disrupt and dismantle transnational criminal enterprises and terrorist organizations that threaten the security of the United States.  These efforts encompass all investigations and aspects of terrorism, special interests involving state and non-state actors, human rights violators and war criminals as well as compliance and oversight functions for over 6,900 academic institutions, 45,000 designated school officials, and over 1.2 million foreign students studying in the United States.

3.      HSI is a component of ICE that conducts significant and complex criminal investigations into individuals and international criminal networks that violate U.S. laws. HSI focuses its efforts on combating the transnational criminal networks that pose the greatest threats to the security of the United States. HSI has more than 10,000 employees stationed in more than 235 U.S. cities and more than 50 countries worldwide. The HSI workforce is made up of special agents, criminal analysts, intelligence analysts, and support personnel who live and work in the communities they are sworn to protect and serve.

4.      The Student and Exchange Visitor Program (SEVP), a component of HSI's National Security Division, was created in the wake of 9/11 to provide integrity to the immigration system by collecting, maintaining and analyzing information so only legitimate nonimmigrant students or exchange visitors can gain entry in the U.S. Through a database housing information pertaining to schools and students, the Student and Exchange Visitor Information System (SEVIS), SEVP manages and tracks nonimmigrants in the F, M, and J categories. To eliminate vulnerabilities related to the nonimmigrant visa program, Congress first introduced statutory language mandating the development of a program to collect data and improve tracking of foreign students in the Illegal Immigration Reform and Immigrant Responsibility Act of (IIRIRA) of 1996. In 2001, Congress

expanded the foreign student tracking system when it enacted PATRIOT ACT, and in 2002 Congress strengthened the tracking system yet again, through the Enhanced Border Security and Visa Entry Reform Act, noting concerns with national security and emphasizing the need to carefully track student status and information. Accordingly, these laws and regulations demonstrate a clear congressional directive that ICE closely monitor foreign students and the schools in which they enroll by vigorously enforcing statutory and regulatory requirements.

5.      I am aware of the above-captioned lawsuit. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other Department of Homeland Security (DHS) employees, and information portals maintained and relied upon by DHS in the regular course of business.

6.      On January 29, 2025, President Trump issued Executive Order 14188, *Additional Measures to Combat Anti-Semitism* (E.O. 14188). ICE remains steadfast in its commitment to enforcing E.O. 14188 prohibiting anti-Semitism and safeguarding national security by applying existing authorities consistent with the priorities set forth in the E.O. 14188.

7.      In applying existing authorities,, HSI Office of Intelligence proactively reviews open-source information to identify individuals within the parameters of E.O. 14188. Open-source information is defined as unclassified information that has been published or broadcast in some manner to the general public, could be lawfully seen or observed by a casual observer, is made available at a meeting open to the public, or is obtained by visiting any place or attending any event that is open to the public.

8.      The U.S. Department of State (DOS) has broad discretion under 8 U.S.C. § 1201(i) to revoke visas and make determinations of whether an alien's present or activities in the United States would have potentially serious adverse foreign policy consequences. ICE does not make

those determinations. Upon notification of DOS determination, ICE may take subsequent enforcement actions such as placing the alien in removal proceedings under the Immigration and Nationality Act (INA). HSI's Counter Threat Lead Development Unit (CTLD) is specifically responsible for analyzing alien nonimmigrant status violators, lawfully admitted to the United States, who violate the terms of their admission and pose a threat to national security, public safety and/or are involved in criminal activity for field referral and further investigation. Since 2003, the National Security Division has overseen this mission. Currently, CTLD receives over one million alien violator records each year, primarily from U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS), as well as from SEVIS. CTLD generates viable, investigative leads on nonimmigrant overstays with national security and public safety concerns and/or criminal activity to HSI field offices for further action. CTLD may also provide information to DOS for possible visa revocation if appropriate. .

9.     Procedurally, once DOS notifies ICE of its decisions concerning whether to revoke a visa or make certain determinations that would render a alien removable, the determination is then disseminated to the local field office for additional enforcement actions against the student (e.g., issuing a Notice to Appear in removal proceedings) if appropriate.

10.     Enforcement actions carried out against aliens within the purview of E.O.14188 occur pursuant to ICE's existing civil immigration authorities under the INA. There is no official or unofficial "ideological deportation policy."  Aliens may be charged with any deportation ground under the INA supported by fact and law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April 2025.

ANDRE R WATSON

Digitally signed by
ANDRE R WATSON
Date: 2025.04.11
18:22:22 -04'00'

Andre Watson, Assistant Director
National Security Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 26168 |
| **Date/DTG:** | Mar 25, 2025 / 251914Z MAR 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O.:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Action Request: Enhanced Screening and Social Media Vetting for Visa Applicants |

1. (U) This is an action request. **See paragraph 7**.

2. **(SBU) SUMMARY:** The protection of our nation and its citizens is a consular officer's first consideration. Pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*, effective immediately, consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below. As the Secretary stated on March 16, "We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple. Especially people that are here as guests. That is what a visa is…It is a visitor into our country. And if you violate the terms of your visitation, you are going to leave." The Visa Office will host webinars for consular officers to discuss this guidance on April 3 and April 4, 2025. **END SUMMARY.**

3. **(SBU) Consular Officers Play a Critical Role in Protecting National Security:** As part of screening every case for potential ineligibilities, consular officers MUST ADDRESS any derogatory information indicating that a visa

applicant may be subject to the terrorism-related ineligibility grounds of the Immigration and Nationality Act (INA).  This includes advocating for, sympathizing with, or persuading others to endorse or espouse terrorist activities or support a DESIGNATED FOREIGN TERRORIST ORGANIZATION (FTO).

4. **(SBU) Every Visa Decision is a National Security Decision:**  In Ref A, the Visa Office directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that visa classification should be refused under 214(b), as appropriate.  This includes establishing that the applicant does not intend to engage in activities inconsistent with the requested visa status.  If 214(b) does not apply to the visa classification, consular officers should refuse any nonimmigrant or immigrant visa case presenting such concerns under section 221(g) of the INA for further review of additional ineligibility grounds, **LE**
**LE**     as appropriate.

5. (U) This was reflected well by the Secretary's statement on March 16, that "when you apply to enter the United States and you get a visa, you are a guest…if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States…if you had told us you were going to do that, we never would have given you the visa."

6. **(SBU) Situations that Cast Doubt on Students' Intent or Credibility:**  As described in 9 FAM 402.5-5(C), an applicant applying for an F-1 or M-1 student visa must demonstrate intent to enter the United States solely to pursue a full course of study at an approved institution.  In addition, J-1 visa applicants who are college, university, and other post-secondary students are required to pursue a full course of study as described in 9 FAM 402.5-6(E)(11).  Evidence suggesting a student visa applicant intends to travel to

the United States to engage in unlawful activities clearly calls into question whether the applicant possesses intent and/or the ability to solely pursue a full course of study.  While many activities may not fall under the INA's definitions of "terrorist activity," you should otherwise consider that information in assessing the credibility of a visa applicant's claimed purpose of travel.  INA section 214(b) requires the applicant to show credibly that all activities in which he or she is expected to engage in while in the United States are consistent with the specific requirements of their visa classification.

7. **(SBU) ACTION REQUEST:  Mandatory Social Media Reviews for Students and Student Exchange Visitors.**  Effective immediately, consular officers must refer all new or returning F-1, M-1, or student J-1 visa applications meeting one or more of the following criteria, that the consular officer has determined is otherwise eligible for the requested nonimmigrant status, to the FPU via ECAS as described in 7 FAH-1 H-945.4,  using the SOCIAL MEDIA REVIEW category.

**LE**

**LE**

**LE**

**LE**

8. **(SBU) Documenting the Results of the Social Media Review:**  If the social media review uncovers potentially derogatory information indicating that the applicant may not be eligible for a visa, Fraud Prevention Units are required to take screenshots of social media findings to the extent it is relevant to a visa ineligibility, to preserve the record against the applicant's later alteration of the information.  Limit screenshots to information relevant to connecting the applicant, the applicant's actions, and a visa ineligibility.

**LE**

**LE**

9. **(SBU) Support for Terrorist Organizations - Grounds and Definitions for INA 212(a)(3)(B):** All consular officers should carefully review 9 FAM 302.6 to understand the grounds under which an applicant may be ineligible under 3B, including that an applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is ineligible. Consular officers should consider these grounds and definitions when conducting interviews and pursuing lines of inquiry. Because terms in INA 212(a)(3)(B) are broadly defined, consular officers should elicit as much pertinent information as possible from visa applicants with suspected ties to terrorist organizations or terrorist activity. This includes the names of all relevant organizations potentially involved in terrorist activity and the applicant's relationship with them (for example, by current membership or past financial contributions or other support). Evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization, may be indicative of ineligibility under INA 212(a)(3)(B). This may be evident in conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles). Or it may be evident in advocacy or sympathy for foreign terrorist organizations. All of these matters may open lines of inquiry regarding the applicant's credibility and purpose of travel. Consular officers should inquire into the nature and activities of those organizations.

**LE**

**LE**

10. **(SBU) Intention to Engage in Unlawful Activity:**  Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity.  Consular officers should take care to enter detailed case notes regarding the specific activities expected in the United States and request an advisory opinion per 9 FAM 302.5-4(C).

11. **(SBU) Revocations of Valid Visas:**  If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b), post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas.  The Visa Office reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding - other than a revocation based on driving under the influence (DUI) - and that such cases should be referred **LE** in accordance with 9 FAM 403.11-5(B) for further review.  A consular officer's revocation must be based on an actual finding that the individual is ineligible for the visa.

12. **(U) Additional Guidance:**  The Visa Office will host webinars for consular officers to discuss this guidance on Thursday, April 3 and Friday, April 4, 2025.  Invitations with links to these webinars will be sent separately.  The FAM will be updated to reflect this guidance.

13. **(U) Inquiries:**  Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov.  Posts may respond to requests from

international media regarding E.O.s using CA's cleared press guidance located on CA Web, copying CA-PRESS@STATE.GOV.

14. (U) Minimize considered.

| MINIMIZE CONSIDERED | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**<u>UNCLASSIFIED</u>**
SBU

███ **Notification of Removability Determination under INA 237(a)(4)(C)**

# Filed Under Seal

██ **Notice to Appear**

# Filed Under Seal

█████ **Form I-261**

# Filed Under Seal

 **Warrant for Arrest of Alien**

# Filed Under Seal

███████ **Notification of Deportability Determination under INA 237(a)(4)(C)**

# Filed Under Seal

 **Notice to Appear**

# Filed Under Seal

 **Warrant for Arrest of Alien**

# Filed Under Seal

███████ **Notice of Custody Determination**

# Filed Under Seal

███ **Visa Revocation – Memo for ICE**

# Filed Under Seal

 **Notice to Appear**

# Filed Under Seal

 **Warrant for Arrest of Alien**

# Filed Under Seal

███ **Notification of Removability Determination under INA 237(a)(4)(C)**

# Filed Under Seal

 **Unserved Warrant for Arrest of Alien**

# Filed Under Seal

██ **Notification of Deportability Determination under INA 237(a)(4)(C)**

# Filed Under Seal

 **Notice to Appear**

# Filed Under Seal

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS (Boston)

3                      No. 1:25-cv-10685-WGY

4

5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
              Plaintiffs

6

7   vs.

8

9   MARCO RUBIO, in his official capacity as
    Secretary of State, et al,
10            Defendants

11

                        *********

12

13

                   For Hearing Before:
14                 Judge William G. Young

15

                     Motion Hearing
16

17                 United States District Court
                   District of Massachusetts (Boston.)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Monday, June 2, 2025

20

                        ********
21

22

             REPORTER: RICHARD H. ROMANOW, RPR
23                 Official Court Reporter
                 United States District Court
24      One Courthouse Way, Room 5510, Boston, MA 02210
                    rhr3tubas@aol.com
25

```
 1                    A P P E A R A N C E S

 2

 3    CAROLINE DeCELL, ESQ.
      ALEXANDER ABDO, ESQ.
 4       Knight First Amendment Institute at Columbia
         University
 5       475 Riverside Drive, Suite 302
         New York, NY 10115
 6       (646) 745-8500
         E-mail: Carrie.decell@knightcolumbia.org
 7    and
      COURTNEY GANS, ESQ.
 8       Sher Tremonte LLP
         90 Broad Street, 23rd Floor
 9       New York, NY 10004
         (212) 540-0675
10       Email: Cgans@shertremonte.com
         For Plaintiffs
11

12    ETHAN B. KANTER, ESQ.
      WILLIAM KANELLIS, ESQ.
13       DOJ-Civ
         P.O. 878
14       Ben Franklin Station
         Washington, DC 20044
15       (202) 616-9123
         Email: Ethan.kanter@usdoj.gov
16    and
      SHAWNA YEN, ESQ.
17       United States Attorney's Office
         1 Courthouse Way, Suite 9200
18       Boston, MA 02210
         Email: Shawna.yen@usdoj.gov
19       For Defendants

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (Begins, 12:00 p.m.)

3          THE CLERK:  Civil Action 25-10685, the American

4     Association of University Professors, et al versus Marco

5     Rubio, et al.

6          THE COURT:  Good morning.  The Court has permitted

7     internet access to this hearing.  That being so, I

8     remind you that if you are attending the hearing

9     remotely, that the rules of court remain in full force

10    and effect, that is to say you must keep your microphone

11    muted.  There's no taping, streaming, screen shots,

12    rebroadcast, or transcription of these proceedings.

13         With that stated, there are two preliminary

14    matters.  We -- well excuse me.

15         (Pause.)

16         THE COURT:  The motion dealing with the timing of

17    the filing of the administrative record, I've allowed

18    that motion.  Then there is the assented-to motion

19    provisionally to file portions of the administrative

20    record as sealed, and in fact it has been so filed.

21         I haven't yet looked at anything in the redacted

22    portion of the record, but the motion seems to me to

23    make sense.

24         Have you agreed upon a protective order here?  And

25    since we may have different people arguing, perhaps you

 1   could introduce yourself when first you speak.

 2        MS. GANS:  This is Courtney Gans for the

 3   plaintiffs.

 4        We have not yet reached an agreement on the

 5   protective order, but we're expecting to meet and confer

 6   this week and we'll hopefully have an agreement in short

 7   order.

 8        THE COURT:  All right.

 9        MS. GANS:  And we do agree that they could

10   provisionally file under seal.

11        THE COURT:  I have no doubt about the accuracy of

12   the representation.  It would be helpful to know what

13   the administrative record is.  So we'll leave things in

14   that lie.

15        This is the motion filed by the defendants.  I

16   said I would hear it.  I've read all the papers.  I

17   think that about 10 minutes a side will be sufficient.

18   And it's the government's motion, and I'll hear the

19   government.

20        MR. KANTER:  Thank you, your Honor.  May it please

21   the Court.  My name is Ethan Kanter and I'm representing

22   the government defendants in this case.

23        THE COURT:  Mr. Kanter, welcome back.

24        MR. KANTER:  Thank you very much.  I was here

25   virtually on the last round and you suggested I show up

1     in person, and I think that was a good -- a good

2     judgment.

3         (Laughs.)

4         So this is how I'd like to begin.  You have our

5     motion raising two objections.  One, the record rule

6     that, um, the case should proceed based on an

7     administrative record.  But this is an APA case --

8         THE COURT:  Not entirely.

9         MR. KANTER:  Well that's a very good point, your

10    Honor, the plaintiffs have asserted constitutional

11    claims as well, um, under the First Amendment.  And as

12    you -- you would know, and I'll sort of fast-forward

13    here, the APA expressly provides for asserting claims of

14    constitutional right, power, privilege, immunity.  I

15    mean Congress really is trying to make that point, that,

16    yes, okay, through the APA framework, nevertheless --

17    and plaintiffs have cited this in their letter brief to

18    the Court, there are some exceptions which have been

19    noted, generally speaking.  And then the First Circuit,

20    in ***The Commonwealth of Puerto Rico vs. FBI*** case, has

21    drilled down on exactly what the exceptions are.  And so

22    I want to talk about that, um, and get into those

23    exceptions.

24        I also want to reach our second objection, which

25    relates to the application in this context of the

1  facially-legitimate and bonified review standard, which

2  was announced first and applied in the immigration

3  context really by the **_Kleindienst vs. Mandel_** case, and I

4  refer to that as **_"Mandel."_**  Plaintiffs have rejected

5  both objections and this is where I'd like to begin,

6  because the rejection of both is pretty unequivocal.

7       With regard to the record rule, the plaintiffs

8  say, on the first page of their brief, that it is

9  entirely without merit.  Entirely.

10      With regard to the facially-legitimate and

11 bonified review standards application here, they are

12 equally unequivocal.  It has no application.

13      Your Honor, the purity of extremes, it is

14 something that I think can be questioned on its face,

15 especially in our profession.  There are exceptions.

16 There are general propositions and then how it's

17 applied.

18      With regard to, um, the First Amendment.  To say,

19 I believe, that this case is only about the First

20 Amendment in a vacuum, divorced from the immigration

21 context, which is so apparent on every single page of

22 the plaintiffs' complaint and every single page of their

23 PI motion, they use the word "targeted" more than 30

24 times in those papers.  Targeted by whom?  By the

25 immigration agencies.

 1          To say that this case can be viewed about the
 2     First Amendment in a vacuum is too simple, and it's
 3     simply -- it's incompatible with a number of things,
 4     because it's obvious that this case involves both the
 5     First Amendment and noncitizens.  It's obvious that this
 6     case involves, um, as has been pled, um, reticent
 7     enforcement or the targeting for enforcement.
 8          The primary distinction of my friends, um, of the
 9     *Kleindienst's* line of cases and the facially-legitimate
10     and bonified standard, is this outside/inside, right?
11     Um, *Kleindienst* --
12          THE COURT:  I'm trying to follow you here.
13          MR. KANTER:  Okay.
14          THE COURT:  And, you see, I have been following
15     you and I have looked at the redacted administrative
16     record and, um, I've looked at the proper rationale for,
17     um, the government action by immigration authorities.
18     Now, um, on that record, standing alone, um, the Court
19     would be warranted -- though I've been very careful to
20     say I've meant to draw no conclusions in anybody's -- in
21     any other case, because the people who have standing
22     here are not parties to those cases and have brought
23     their independent case, but I do say this.  I would be
24     warranted in thinking that, um, the reason for those
25     actions by immigration authorities is simply the speech

1  of the individuals against whom those actions were

2  taken.  And if I understand their complaint, they're

3  saying that's retribution for that speech.  And the

4  analysis would proceed, um, thereby.

5       Really I -- I am curious to find out -- and I

6  still am, whether there's something more, something that

7  I don't know about?  And so that's how I approach this.

8       Go ahead.

9       MR. KANTER:  And I, um -- your Honor said

10 something similar in the first, um, status conference,

11 that the case boils down to retaliation that, um,

12 plaintiffs have pled that --

13      THE COURT:  Not just that.

14      MR. KANTER:  Okay.

15      THE COURT:  You see retaliation as to various

16 people with one of the reasons to chill the speech of

17 the group that this Court has afforded standing.  I

18 still think that's what this case is about.

19      Go ahead.

20      MR. KANTER:  Okay, well they're -- so it's in the

21 mix.  Whether it's the one reason or they're being

22 targeted for, um, immigration enforcement, because of

23 immigration violations, but I want to take both head on.

24 Because, um -- and this is where I believe my friends

25 have misread *Kleindienst* and that line of cases, and

1     ***Kerry vs. Dinn, Munoz, Trump vs. Hawaii***, which

2     construed, um, an executive order very similar to the

3     one in our case, because it's about vetting, screening.

4     Plaintiffs have cited one sentence in that executive

5     order to support their view that they're being targeted

6     improperly.

7         But at its core, ***Kleindienst*** is about executive

8     discretion. It was a discretionary waiver. The

9     resolution of the case and the analysis therein followed

10    a discourse in which, um, the Court -- I believe it was

11    Justice Blackmon, talked about the prior cases about

12    Congressional plenary authority in immigration,

13    familiar, um, holdings that I think may, you know, sort

14    of echo in our minds. Like over no conceivable subject

15    is the legislative power of Congress over immigration

16    more complete. And that the plenary Congressional power

17    is not only respecting the entry of aliens to the United

18    States, but the terms and conditions of their stay and

19    their right to remain. ***Kleindienst*** is not simply about

20    denying the admission into the United States of aliens

21    outside. And so the primary distinction of my friends,

22    I think, doesn't apply. What ***Kleindienst*** focuses on is

23    executive discretion.

24        Interestingly, that in ***Kleindienst*** the plaintiffs

25    brought a nondelegation claim. They argued that, "Wait,

1   the power that Congress, according to the government,

2   has delegated to the executive, it can't be that broad,

3   it must violate the nondelegation principle."  That was

4   rejected.  It was underscored that, no, here you have

5   coordinated branches of government, legislative and

6   executive --

7         THE COURT:  But you're arguing propositions with

8   which I agree.

9         MR. KANTER:  Okay.

10         THE COURT:  I agree to those propositions.  And

11   indeed my agreement, as Judge Selya would say, is

12   superogatory, you're quoting from decisions from the

13   Supreme Court of the United States.  I am sworn to agree

14   with them.  Of course I do.  And I'm familiar with them

15   and I agree.

16         MR. KANTER:  Then let me connect the dots as it

17   were, because the plaintiffs are the masters of their

18   complaint, and as I noted, the word "targeting" appears

19   again and again and again.  They are attacking this

20   alleged retaliation, this alleged improper selection of

21   these individuals because they engaged in

22   pro-Palestinian advocacy.  That the executive branch,

23   these agencies are somehow abusing their enforcement

24   discretion, or more to the point, they're attacking the

25   prosecutorial discretion of the agency.

1      In this way it is very much squarely what

2 *Kleindienst* is about because that case said when --

3 virtually the government's argument was that it can deny

4 for any reason and no reason at all.

5      THE COURT:  You have another 5 minutes.

6      MR. KANTER:  Okay.

7      And the Court didn't reach that and said, "No, we

8 don't have to reach that argument because the executive

9 has provided a facially-legitimate and bonified" --

10 (Zoom interruption.)  It's about -- their case is about

11 targeting that is fundamentally discretionary, um,

12 *Kleindienst*, and their other distinction.  It's about

13 aliens outside the United States attempting to enter,

14 not those like their membership, um, noncitizen members

15 who are in the United States.

16      THE COURT:  I'm not sure they go this far.

17      MR. KANTER:  Yes.

18      THE COURT:  Let me put this to you.

19      Suppose that within these public officials, senior

20 public officials, they are concerned about

21 pro-Palestinian speech and they flat-out say -- and I'm

22 not sure they have to prove this, they flat-out say,

23 "You know the way to cut down on this protest, the way

24 to cut down on this speech is simply to" -- "we'll use

25 the regulations we have now and we'll start, um,

1    revoking visas, deporting for green cards, and, um,

2    excluding people under our admitted powers to do that,

3    and with the goal of they'll quiet down then."  Now

4    suppose that.  I do not suggest that.  I haven't seen

5    evidence of -- direct evidence of that.  But suppose

6    that.

7         If that were so, doesn't that violate the First

8    Amendment rights of the group to which I've afforded

9    standing here?

10        MR. KANTER:  Well that is a very direct and

11   challenging question for which my answer -- it's a

12   perfect pivot to the record rule argument and process.

13   And let me explain.

14        In the Department of Commerce --

15        THE COURT:  You've got 3 minutes.  Go ahead.

16        MR. KANTER:  I think I can do it in 2 1/2.

17        The Department of Commerce case, which the Supreme

18   Court -- the census case, which enforced the APA-record

19   rule requirement, which held that the District Court's

20   authorization of discovery was premature and erroneous,

21   even though it ended up reviewing that information on

22   appeal, um, contains information about what your Honor

23   is asking me.  Because they talk about how the executive

24   may have both stated and unstated reasons.  In commerce,

25   they had to show the only reason was pretext, and that

1  was the basis upon which the decision turned.

2      As to the stated/unstated, the Court wrote,

3  "Agency policymaking is not a rarified technocratic

4  process unaffected by political considerations or the

5  presence of Presidential power."

6      THE COURT:  Mr. Kanter, I -- again I interrupt you

7  only because if you -- and you're not expected to read

8  everything that this lowly-court writes --

9      MR. KANTER:  (Laughs.)  I found that especially

10  compelling that I wanted to quote it.

11      THE COURT:  Oh, you have every right to, as I

12  quoted it most recently in one of these NIH cases also

13  before this Court.  I'm well-aware of that language.

14  I -- I want to ask them about it being the only reason.

15  I understand your argument and respect it.

16      All right.  Who argues for the plaintiffs here?

17      MR. KANTER:  Thank you, your Honor.

18      THE COURT:  Thank you.

19      MS. DECELL:  Good afternoon, your Honor, may it

20  please the Court, my name is Caroline DeCell on behalf

21  of the plaintiffs.

22      THE COURT:  Yes, Ms. DeCell.

23      MS. DECELL:  Thank you.

24      So I will address both points that the government

25  makes with respect to the record rule and the ***Mandel***

1    standard, but I think one overarching concern applies to

2    both, and that is that the government disputes the

3    existence of the policy that we challenge in this case,

4    and they have not explained how an administrative record

5    compiled for the purpose of demonstrating that the

6    challenged policy does not exist would facilitate

7    judicial review or how the **Mandel** standard would apply

8    to a lack of justifications or a lack of coherent policy

9    with respect to the challenged actions.

10            THE COURT:  How do you deal -- how do you deal

11   with the commerce case?  He quoted that language, um,

12   which I most recently quoted.  What -- when he says to

13   me, "It has to be the only reason that the government

14   officials have taken this action," that seems to be a,

15   um, a row so long that I find it difficult to think you

16   could ever hoe it.  I push back on his argument saying,

17   "Well suppose this" and "Wouldn't I be warranted with

18   that?"  And now he cites me the Supreme Court case and

19   from that he derives the only reason for pardoning these

20   other people who are -- about whom I have nothing to

21   say, except what I can infer from what happened to them,

22   to the group that you represent, that's what this case

23   is about.  And he says, "The only reason has got to be

24   the chilling of protected speech."

25            What about that?

 1          MS. DECELL:  And so, your Honor, that is quite the

 2     whittling down of the claims in this case, but remember

 3     -- so first I'd just like to quote the full language

 4     from the **Department of Commerce** case, which is that the

 5     Supreme Court concluded that, um, in invoking the

 6     bad-faith exception to the record rule and ordering

 7     extra-record discovery, um, the District Court's order

 8     was premature, but I quote, "We think it was ultimately

 9     justified in light of the expanded administrative

10     record."  So they're certainly not beyond considering

11     the extra-record discovery there.

12          THE COURT:  All right.  And I've read the case

13     carefully, having just cited it.

14          Go ahead.

15          MS. DECELL:  And that speaks to a case in which

16     the record -- the administrative record was the basis

17     for the proceedings there, and the question was whether

18     or not there was discovery allowed outside the record to

19     kind of supplement the record?  There's a body of

20     case law in this circuit and elsewhere, um, that

21     determines the ability of plaintiffs to seek discovery

22     to supplement the record, um, or to complete the record.

23          And in the former case, the bad faith requirement

24     applies, although the District Court may also allow

25     discovery to supplement the record for purposes of

1     facilitating judicial review, if in the absence of that

2     discovery, um, judicial review would be frustrated. And

3     that's with respect to supplementing the administrative

4     record.

5         And then in order to complete the record, um, no

6     such bad faith showing is required. And we pointed to a

7     few cases in the District of Massachusetts that lay out

8     this delineation quite clearly.

9         But as an initial matter, as your Honor noted at

10     the beginning, we raise not only APA claims in this

11     case, but also constitutional claims. And there are

12     other courts in this District that have concluded that

13     independent constitutional claims merit independent

14     discovery outside of the administrative record. And

15     that's particularly important here with respect to one

16     set of claims that, um, upon which we raise no APA

17     claims whatsoever.

18         So we have challenged, and the Court agreed that

19     we have plausibly alleged, um, a campaign of censorship

20     through coercive threats, and we raise no APA claims

21     against that campaign of censorship, and it's not clear

22     to what extent an administrative record could be

23     compiled, um, on the basis of which we could litigate

24     those claims. And so for that reason alone, this extra-

25     record discovery will be required in this case.

1      Even with respect to the APA claims, um, the cases

2    that the government relies on involve situations in

3    which the constitutional claims overlap almost entirely

4    with the APA claims at issue, and the courts in those

5    cases have analyzed the APA claims and the

6    constitutional claims to determine the extent of that

7    overlap, and ultimately concluded that it would be the

8    most effective way to proceed on the basis of an

9    administrative record in those cases.  So not offering a

10    bright-line rule saying that whenever the APA comes into

11    play, there is no discovery allowed outside of the

12    administrative record, but really just accessing the

13    value of proceeding, um, with discovery outside of the

14    administrative record in those cases.

15      But here, as I mentioned at the outset, the

16    government disputes the existence of the policy that we

17    challenge, again putting aside the challenges to the

18    campaign of threats, um, and --

19      THE COURT:  Well the policy -- let me interrupt

20    you, because I have the responsibility of administering

21    the case.  So I posited to him what in my mind

22    conceptually is the smoking gun here.

23      You agree with that, don't you?

24      MS. DECELL:  That certainly would be --

25      THE COURT:  That's what they were thinking, you

1    agree with that, that's the essence of your case?  I

2    mean -- look, I won't say anything, go ahead, but I've

3    got that right?

4         MS. DECELL:  Well I would just say that, yes, that

5    is certainly a core component of our case.  We also

6    think that the policy, as we've alleged it, is facially

7    unconstitutional because it's, um -- to arrest, detain,

8    and deport people on the basis of their political

9    speech.  But, um, it's particularly with our allegations

10   with respect to the --

11        THE COURT:  Well you say "facially," they

12   certainly don't say that?

13        MS. DECELL:  And that's in part because they

14   dispute, um, coming back to my previous point, the

15   existence of this policy -- to be clear, they dispute it

16   in this courtroom, but not in public, um, they proclaim

17   this policy left and right.  But here they dispute that

18   --

19        THE COURT:  Language like "We don't want people

20   creating a ruckus"?

21        MS. DECELL:  Yes, that would go -- certainly that

22   would go to our claims, your Honor.

23        But here there are courts that have concluded that

24   where defendants deny the existence of the policy in

25   question, um, the plaintiffs cannot be constrained by

1    administrative record as to that policy.  It simply

2    makes no sense.  And here the declarations that

3    defendants submitted in connection with the

4    administrative record in this case, um, speaks to the

5    purpose of the record as demonstrating the absence of

6    the policy.  So there's just a fundamental disconnect

7    between the administrative record they have compiled and

8    the policy that we're challenging.

9         There are analogous circumstances in APA cases in

10    which the Court proceeds with ordinary discovery outside

11    of an administrative record.  For example, when

12    plaintiffs challenge agency inaction and delay, there

13    may be a number of relevant materials, but that don't

14    coalesce into some administrative record.

15         But more importantly, in other cases challenging

16    policies that the defendants dispute the existence of,

17    the courts have permitted discovery.  One case that we

18    point to is the *Allotoyloto v. Mayorkas* case in the

19    Southern District of California, um, where no

20    administrative record was filed, it proceeded on the

21    basis of discovery.  And the *Greater Boston Legal*

22    *Services* case in this District where, um, discovery was

23    permitted to complete the administrative record.

24         THE COURT:  I recognize that.  Most recently

25    within the past 6 months, over the objection of the

1    Coast Guard, I allowed testimony about the rebuilding of
2    a fish boat in an Administrative Procedure Act case.
3    He's citing to me decisions by the Supreme Court of the
4    United States.  You've answered as to those.  While I
5    certainly respect all my District Court colleagues, um,
6    I am bound, and happily bound -- I'm not construing any
7    decision of the Supreme Court of the United States
8    narrowly, or skeptically, that's not given to me.  I'm a
9    United States District Judge, I'll exercise all the
10   authority of a United States District Judge.
11        Go ahead.
12        MS. DECELL:  Thank you, your Honor.
13        Well speaking of the Supreme Court, I would just
14   point to, um, one other piece of evidence that the Court
15   does not consider discovery with respect to
16   constitutional claims, even in cases that also raise APA
17   challenges, um, as inappropriate, and this would be
18   Justice Sotomayor's concurrence in the Department of
19   *Homeland Security vs. Regents* case, where she agreed
20   with the majority that DHS had violated the APA in
21   rescinding the DACA program, but explained that she
22   would have permitted respondents to pursue factual
23   development on their equal protection claims on remand.
24   So a clear indication, we think, that the Supreme Court
25   itself, or at least certain justices, consider discovery

1   on constitutional claims appropriate even when APA

2   claims are raised alongside them.

3        And there are other cases of course that we have

4   pointed to in our opposition in which the, um, District

5   Court here has concluded that, um -- and now I quote,

6   "Limiting the scope of review to the administrative

7   record makes little sense in the context of an inquiry

8   into illicit animus in the context of an equal

9   protection claim," but here too, as your Honor has

10  recognized, intent is a core component of some of our

11  claims.  That's the **Boston Alliance of Gay Lesbian**

12  **Bisexual and Transgender Youth** case that we cite in our

13  opposition.  And there are more.

14       But I will turn to the **Mandel** point, unless your

15  Honor has further questions?

16       THE COURT:  Please.  You have 5 minutes left.  Go

17  ahead.

18       MS. DECELL:  Thank you, your Honor.

19       So with respect to **Kleindienst vs. Mandel** and, um,

20  the progeny of that case, those cases simply do not

21  apply outside the context of final inadmissibility

22  decisions.  And I will -- if you'll indulge me, quote

23  from recent Supreme Court decisions, um, applying that

24  standard and from **Mandel** itself.

25       In the **Munoz** case, that defendants point to, the

1  Supreme Court said that, quote, "The Immigration and

2  Nationality Act does not authorize judicial review of a

3  consular officer's denial of a visa.  Thus, as a rule,

4  the federal courts cannot review those decisions."  And

5  that's referred to as the "Consular Nonreviewability

6  doctrine."

7      Then the Court proceeds to say "That we have

8  assumed that a narrow exception to this bar exists,"

9  quote, "when the denial of a visa allegedly burdens the

10 constitutional rights of a U.S. citizen, and in that

11 event the Court has considered whether the executive

12 gave a," quote, "facially legitimate and bonified

13 reason."  And so in the Supreme Court's own articulation

14 of the *Mandel* standard, it is tied very closely with

15 denials of a visa.

16     And the *Hawaii* -- the *Trump v. Hawaii* case is in

17 line with the Doctrine of Consular Nonreviewability and

18 the application of *Mandel* as an exception to that

19 doctrine.  And in fact in *Mandel* itself, in putting

20 forth the standard that defendants rely on here, um, if

21 you read the beginning of the quoted -- the quoted

22 standard, the Court says, um, that when an alien is

23 excludable under the relevant statutory provision, um,

24 excludable in the first instance, and that person is

25 denied a visa, Congress has delegated to conditional

1    exercise of the exclusion power to the executive, and

2    then we hold that when the executive exercises this

3    power negatively on the basis of a facially-legitimate

4    and bonified reason, the courts will neither look behind

5    the exercise of that discretion, nor testify balancing

6    its justifications against the First Amendment.  And so

7    again, any articulation of the standard is connected to

8    the visa denial context.

9        Moreover, as I mentioned earlier, the government

10   offers no clear explanation of how the **Mandel** standard

11   would even apply in this case given that they have

12   offered no coherent set of justifications for the

13   actions that, um, we have identified in support of the

14   policy.

15       THE COURT:  Well wait a minute.  Yes, they have.

16       MS. DECELL:  They have offered different

17   justifications in different cases.

18       THE COURT:  Yes.

19       MS. DECELL:  Um, but to date we have not seen a

20   coherent explanation from the government across the

21   board --

22       THE COURT:  Well when you say "coherent" and

23   "across the board," um, I have looked at the

24   administrative record that's been prepared and, um, it's

25   the basis for my question to Mr. Kanter, when I said,

1    "Well I would be warranted in thinking they have nothing

2    beyond what is in the administrative record."  But

3    what's in the administrative record is reference to

4    regulations which say that conduct -- unspecified, but

5    conduct, embarrasses the foreign policy of the United

6    States.  That's there.  And again, that's in the

7    administrative -- that's in the immigration context.

8    And this Court is not going to say, "Well you know the

9    judge in this case -- in that case should do this or

10   that or was right to do this or that."  That's not this

11   Court's business.  All I'm going to do is -- if it went

12   your way, was to say, um, on the totality of the record,

13   whatever we figure it out to be, what was going on here

14   was to chill the free speech of your clients.

15        Do you understand procedurally what I am trying to

16   do?

17        MS. DECELL:  I believe so, your Honor, yes.  So

18   taking the government's statement --

19        THE COURT:  Okay, well then let's -- I'll ask you,

20   and I'm asking sincerely, have I got the procedure right

21   in your view?

22        MS. DECELL:  Um, so just to confirm that I

23   understand this.

24        So what the government has put forward in the

25   administrative record, um, is a -- I think an assertion

1     that, um -- they, um -- they claim the authority to

2     deport people from this country, including legal

3     permanent residents, um, and other visa holders, based

4     on speech that they identify as perhaps related to some

5     of the statutory provisions that they have identified in

6     the administrative record.  And so typically there's one

7     statutory provision that the Court can look to and

8     determine whether or not it's a facially-legitimate

9     basis for the challenged action.  Here, um, as put forth

10    in the administrative record, there are a handful of

11    provisions.  So that complicates things a little bit.

12         But to the extent the government, um, kind of

13    induces from those provisions a broader authority to

14    exclude people on, um, the basis of speech, which I

15    understand they're contesting -- I guess my difficulty

16    here is that it's not clear to me what their overarching

17    justification is.  But even if --

18         THE COURT:  Thank you.  No, no, I'm understanding

19    what you're saying, and I'll say it back, because it's

20    important that I do understand.

21         You're saying, "Well here are these various

22    justifications from their regulations and the like which

23    touch on speech, but coupled with their, um, bellicose

24    public pronouncements about the policies that they are

25    following generally," you're now going to say to me,

1  "the Court must infer they're trying to chill the speech

2  of your clients."

3       Have I got it right?

4       MS. DECELL:  Yes, that's the policy from our

5  perspective, your Honor, and that is what we were

6  challenging.  We're not challenging the --

7       THE COURT:  I understand that.

8       MS. DECELL:  We're not challenging the individual

9  actions against particular people.

10      THE COURT:  But when we were having that

11  case-management conference -- you know the government

12  has the power, and indeed it has the First Amendment

13  right to speak in a bellicose fashion, to chill the

14  weaker, um, less-heard parts of society, more vulnerable

15  parts of society, because they may not be United States

16  citizens.  The government has every power to -- First

17  Amendment power to scare those people, at least I think

18  they do.  But what they cannot do is visit retribution

19  on those people for speaking -- and then you say, they

20  have, in order to chill the others.  That's how I frame

21  it.  And you say that's part of it.

22       But you would, in fairness -- and I -- well you

23  tell me, but in fairness you're saying more, that I

24  should go further than that.  That's where you say it's

25  facially incompatible with the First Amendment and this

1  Court should so declare, and that's my responsibility so

2  to declare.

3      MS. DECELL:  That's right, your Honor.  And that

4  goes to, um, your Honor's recognition that there are

5  First Amendment rights in play here, that the lawful

6  permanent residents and other noncitizens who are in

7  this country do have First Amendment rights.  And for

8  that reason other courts have concluded that the **Mandel**

9  standard does not apply in the deportation context, and

10 certainly with respect to a broad policy of deportation,

11 um, we believe that standard is inappropriate.  And here

12 in particular, if First Amendment rights mean anything,

13 they mean that you cannot be arrested and thrown in jail

14 and then deported on the basis of your political speech.

15     THE COURT:  And I'm sensitive to it.

16     All right, thank you for the argument.  The

17 argument was helpful.

18     MS. DECELL:  Thank you.

19     THE COURT:  As a case-management matter, well I

20 must make rulings and I will make them.

21     Looking at the entirety of the complaint here and

22 looking and giving full effects to the controlling

23 cases, I do agree that there is no bright-line rule and

24 this Court has the authority to supplement the record,

25 and need not make some determination that the

1    government's proffered views are pretextual, and I

2    certainly make no such determination.  And that being

3    so, the government's motion -- the motion of public

4    officials is denied, and the case will proceed to trial

5    allowing the discovery, which I have allowed, and

6    maintaining the trial date that we have.

7         Which is the 6th of July, is that correct?

8         MS. DECELL:  I believe it's July 7th, your Honor.

9         THE COURT:  The 7th of July.

10        Now things -- we go by day by day and things

11   happen.  The Court takes judicial notice of the public

12   announcements by certain of the public officials.  As to

13   a pause in, um, granting visas to other noncitizens who

14   seek admission to the United States and, um, the

15   explanation for the pause being a careful scrutiny of

16   the social media records of such applicants, the Court

17   has no discord, expresses no challenge whatsoever to the

18   power of the Secretary of State and his agents to engage

19   in, one, such a cause, and, two, such an examination, an

20   examination, which if visited upon citizens of the

21   United States, would no doubt cause some outcry that

22   privacy rights were being violated.  But I -- I will say

23   I would like to see the protocol that has been issued to

24   these consular officers as to what they are looking for.

25        Now I would treat that as a law enforcement

```
 1    document, it may be submitted to the Court in camera,
 2    not for any public docketing, but I'd like to see what
 3    instructions are today being given, um, in order to
 4    enforce the law, because it's relevant to the issues --
 5    the issues of intent, among other things, that are
 6    germane in this case.
 7          Now having said that, I'll ask only if there
 8    are -- I think we've done what I came to the hearing to
 9    do.  Are there questions?  And we'll start with the
10    plaintiff.
11          Any questions relevant at this time?  This is not
12    argument.  Questions.
13          MS. GANS:  No questions, your Honor.  Thank you.
14          THE COURT:  Questions?  Not argument.
15          MR. KANTER:  Yes, um, we do have a question, and
16    I'd like to have my colleague, Mr. Kanellis, raise that
17    question to your Honor.
18          THE COURT:  And he may.
19          Mr. Kanellis?
20          MR. KANELLIS:  Thank you, your Honor.  May it
21    please the Court.
22          The Court has set a trial date for -- pardon me,
23    for July 7th, and let me say that in conjunction with
24    this, um, motion for a protective order, we have, in
25    good faith, engaged with the plaintiffs in responding to
```

1  discovery --

2      THE COURT:  I have no suggestion to the contrary.

3  I always like to congratulate you when you're agreeing,

4  and I speak to all of you.

5      Go ahead.

6      MR. KANELLIS:  Of course, but unfortunately I

7  regret that this is the first time that I've appeared

8  before your Honor because I have, um, somewhat bad --

9  bad news to share regarding our ability to comply with

10  the discovery requests as had been propounded by the

11  plaintiffs in this case.

12      THE COURT:  Make motions.

13      MR. KANELLIS:  Well we may, your Honor, but I've

14  been -- and we of course seek to contour any discovery

15  to the limited -- as your Honor has acknowledged in the

16  prior hearings, the very limited scope of this.  We will

17  make those motions.  However, I just wanted to advise

18  the Court that at least one of our clients finds it very

19  challenging to -- even if we limit it to the 5

20  noncitizens, even if we contour discovery in that

21  respect, to comply with the discovery schedule that

22  would allow us to go to trial on July 7th.

23      We of course will file, um --

24      THE COURT:  Well I've already said, though these

25  top public officials have every right to dissipate,

1    testify, I'm not requiring it, and I'm not requiring

2    depositions of any of them.  So they will have agents,

3    employees.  I think there's plenty of people to comply

4    with the discovery as I understand it, and I expect it

5    to be complied with.  And the last time we met I said,

6    um, any motion would be dealt with as on an emergency

7    basis, 3 business days and I decide it, once the

8    opposition came in, um, within that time.

9            What more guidance can I give?

10           MR. KANELLIS:  Well the guidance that would help

11   contour what discovery is proper is what is the factum

12   probandum at trial?

13           THE COURT:  I, um --

14           MR. KANELLIS:  Is it --

15           THE COURT:  I took Latin, but, um, my Latin

16   teacher told me -- she was elderly, but she told me that

17   my mother was much better than I.

18           (Laughter.)

19           THE COURT:  So what are you talking about?

20           MR. KANELLIS:  What is the "fact to be proved."

21   As I understand your Honor, I --

22           THE COURT:  Well that is the question, and I'm

23   happy to engage in that.

24           I see their case as a circumstantial evidence

25   case.  I've thrown out what, um, from their point of

1  view, I would think would be a smoking gun.  I have said

2  in my case-management conference that I recognize a

3  government privilege.  And so you can -- you need not

4  discover discussions among government officials at any

5  level, the highest down to the lowest -- like let's

6  take, for example, Rumeysa Ozturk, just because she's

7  been in the news a lot, and that's all I'm going on.

8  And so if discovery was sought about her, um, the form

9  of her apprehension and detention.

10       So usually when there's that many people involved,

11  the law enforcement agents get together and they work

12  out a plan.  I think that's privileged under the

13  governmental privilege.  But when the plan's over, the

14  agent in charge says, "This is what we're going to do,"

15  and they explain, and "This is why we're going to do

16  it."  Well that's not privileged.  And indeed I said

17  from the beginning, I'm interested in those things, as I

18  think anyone would be.

19       Why so many officers?  Why masked?  Why, um --

20  just a -- is it protocol to handcuff people with their

21  hands behind their backs?  Maybe.  Why is that?  Is

22  there a manual that says to do that?  Is there a manual

23  that says something about these people wearing these

24  masks that cover their faces?  I'm not accustomed to, um

25  -- and I'm talking as a citizen now, I'm not accustomed

1   to law enforcement officers without identification, um,

2   approaching individuals masked and, um, you know not

3   having a warrant or being able to display a warrant,

4   having only an administrative warrant.

5        Let me -- so there's an example.  And then go to

6   the highest, go to the identified Cabinet Secretary.

7   The Cabinet Secretary meets with people, um, which is

8   privileged.  Somebody make minutes of that and something

9   comes out of that.  Does the -- I'm not interested at

10   all in the grant or denial of any particular visa, but

11   I've already expressed my interest in what's the

12   protocol that was sent to these consular officers?

13   "When you're looking at social media, look for this,

14   look for that."  I'd be interested to see that.  I don't

15   think that's privileged.  But using that example, that

16   is law enforcement, so I'll get to see that.  But nobody

17   else gets to see that.  Because I'm certainly not going

18   to compromise in any way the law enforcement, internally

19   in the United States or externally.  Absolutely not.

20        Is that helpful?

21        MR. KANELLIS:  Yes, your Honor, it is.  And if

22   you'll indulge me one follow-up question?

23        THE COURT:  Yes.

24        MR. KANELLIS:  From my read of the transcript and

25   the Court's order on what you fashioned a "motion to

1  dismiss," there is an open question as to whether -- I
2  believe it's the AAUP plaintiffs have standing, and I
3  think you left that --
4      THE COURT:  No, I -- I, um -- well to be clear, I
5  think the noncitizen AAUP plaintiffs have standing.  I
6  think the citizen AAUP plaintiffs do not have standing.
7      Does that answer your question?
8      MR. KANELLIS:  Um, that is very helpful.  So the
9  question that follows from that, the last one, is
10  whether --
11      THE COURT:  Well I'm not -- your questions are
12  fine.  We're going to try this case, unless you settle
13  it.
14      MR. KANELLIS:  We have refrained from engaging in
15  discovery for reasons Mr. Kanter has articulated, and
16  that is because we believe there should be a record
17  review.  Your Honor has ruled on it.  So would that
18  allow the government to propound its own discovery?
19      THE COURT:  Now that -- that phrase is in the
20  subjunctive form.  I don't give advisory opinions.  It's
21  a case or controversy.  I don't have a case or
22  controversy yet.  I've answered your question.  Thank
23  you.
24      MR. KANELLIS:  Thank you, sir.
25      THE COURT:  And again, to the extent you can work

1    things out -- at some stage they're talking about, or

2    they did, um, say, "Well you can take witnesses out of

3    order?" I said, "Yes." "Well we may have some expert

4    who can't be there at this date, but could come in late

5    June." And then I said, "Well not a problem, I'm

6    around, we can take witnesses out of order." And I'm

7    thinking to myself, "An expert? An expert who? What's

8    an expert going to tell me? Who is this expert?" You

9    people ought to be talking about this.

10        Now the ball is back to Mr. Kanter, who argued

11    very well, um, I said that -- I suggest no pretext, but

12    I think, given the nature of the case, there must be

13    extra-record discovery and I authorized it. Limited.

14    And I -- and I took my limitations to be vague. But

15    within the limitations, and I'm repeating myself, I

16    expect fulsome discovery and cooperation.

17        Do my answers to their questions raise questions

18    on the plaintiffs' side?

19        MS. DECELL: No, thank you, your Honor.

20        THE COURT: Hearing no further questions, it's

21    always good to see you. We'll recess.

22        We'll probably meet -- I'm not saying that now

23    they're going to start filing motions and you'll file

24    motions. I don't give oral hearings on discovery

25    motions and we know a fair amount about this case. But

```
 1    we ought be thinking of a time late June to have a

 2    pretrial conference and at that time, um, again, because

 3    I've collapsed this with a preliminary injunction, so

 4    this is all expedited.

 5          But again, I'm going to want to know what -- why

 6    -- we'll have the record, and I imagine you're able to

 7    agree on that, I want to know what live testimony you

 8    want?  And the same on the part of the public officials.

 9    If any.

10          And I should also say, because your questions are

11    very good, that should you seek discovery, should you

12    proffer live testimony, your rights are saved as to the

13    argument that I should not allow any -- and I say to the

14    public officials, so the record is clear, you're not

15    waiving anything should you now put on live testimony.

16    Of course not.

17          All right, thank you all.

18          We'll recess.

19          (Ends, 1:00 p.m.)

20

21

22

23

24

25
```

1          C E R T I F I C A T E

2

3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

4     hereby certify that the forgoing transcript of the

5     record is a true and accurate transcription of my

6     stenographic notes, before Judge William G. Young, on

7     Monday, June 2, 2025, to the best of my skill and

8     ability.

9

10

11

12
      /s/ Richard H. Romanow 06-05-25
13    _____
      RICHARD H. ROMANOW  Date
14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL.,<br><br>*Plaintiffs,*<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,<br><br>*Defendants.* | No. 1:25-cv-10685-WGY<br><br>**NOTICE OF SEALED SUBMISSION OF DOCUMENTS FOR *IN CAMERA, EX PARTE* REVIEW** |

## INDEX RELATING TO THE SEALED, *IN CAMERA, EX PARTE* SUBMISSION OF DOCUMENTS

Pursuant to the Court's invitation to submit documents for *in camera* inspection, the Government respectfully submits the following:

**Exhibit A.**     Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Inadmissibility. This document is subject to the deliberative process privilege and the presidential communications privilege and therefore has been withheld from Plaintiffs in full.

Exhibits B-K are Department of Homeland Security documents that relate to specific individuals. These documents are law enforcement sensitive and have not been filed in any other proceedings or otherwise shared with the individuals discussed therein. They have therefore been withheld from Plaintiffs in full.

**Exhibit B.**     Letter to Andrea Toll Whiting, Director of Field Operations, U.S. State Department on ███████████;

1

**Exhibit C.**    HSI Report of Analysis on ███████████;

**Exhibit D.**    Letter to Andrea Toll Whiting, Director of Field Operations, U.S. State Department on ████████████;

**Exhibit E.**    HSI Report of Analysis on ███████████;

**Exhibit F.**    Letter to John L. Armstrong, Senior Bureau Official Bureau of Consular Affairs, U.S. State Department on ████████████;

**Exhibit G.**    HSI Report of Analysis on ████████████;

**Exhibit H.**    Letter to John L. Armstrong, Senior Bureau Official Bureau of Consular Affairs, U.S. State Department on ███████████;

**Exhibit I.**    HSI Report of Analysis on ████████████;

**Exhibit J.**    Letter to John L. Armstrong, Senior Bureau Official Bureau of Consular Affairs, U.S. State Department on ████████████;

**Exhibit K.**    HSI Report of Analysis on ████████████.

The following are Department of State documents that relate to specific individuals. These documents are subject to the deliberative process privilege and have not been filed in any other proceedings or otherwise shared with the individuals discussed therein. They have therefore been withheld from Plaintiffs in full.

**Exhibit L.**    Action Memo for the Secretary -- Removal of ████████ and ████████████ under INA 237(a)(4)(C);

**Exhibit M.**    Action Memo for the Secretary -- Determination of Deportability of ████████████ under INA 237(a)(4)(C);

**Exhibit N.**    Action Memo for the Secretary -- Determination of Deportability of ████████████ under INA 237(a)(4)(C);

**Exhibit O.**    Action Memo for Senior Bureau Official John Armstrong -- ███

Visa Revocation.

Respectfully Submitted,

BRETT A. SCHUMATE                           WILLIAM KANELLIS
*Assistant Attorney General*

                                            *Ethan B. Kanter*
YAAKOV M. ROTH                              ETHAN B. KANTER
*Principal Deputy Assistant Attorney General*   *Chief, National Security Unit*
                                            *Office of Immigration Litigation*
DREW C. ENSIGN                              *P.O. Box 878, Ben Franklin Station*
*Deputy Assistant Attorney General*         *Washington, D.C. 20001*

LEAH B. FOLEY
*United States Attorney*

SHAWNA YEN                                  *Counsel for Defendants*
*Assistant United States Attorney*
*District of Massachusetts*


*Dated: June 11, 2025*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., <br><br>            Plaintiffs, <br><br>    v. <br><br> MARCO RUBIO, ET AL. <br><br>            Defendants. | Case No. 1:25-cv-10685 (WGY) |

**[PROPOSED] PROTECTIVE ORDER FOR THE PRODUCTION OF DOCUMENTS AND EXCHANGE OF CONFIDENTIAL INFORMATION**

The Court, having found that good cause exists for issuance of an appropriately tailored confidentiality order governing the pre-trial phase of the above-captioned action *American Association of University Professors ("AAUP"), et al. v. Marco Rubio, et al.,* Case No. 25-cv-10685-WGY ("Litigation" or "Action"), which may involve discovery of documents, information and tangible things, that Plaintiffs or Defendants (collectively, the "Parties") may reasonably believe in good faith to be protected from disclosure to the public or to one or more of the Parties under Rule 26(c) of the Federal Rules of Civil Procedure, sets forth the following Order to facilitate the discovery process by protecting against the unauthorized disclosure of confidential information and the potential injury caused by such disclosure.

The Parties, by and among their respective counsel, having stipulated and agreed to the terms set forth herein, and good cause having been shown, it is hereby **ORDERED** that any person subject to this Order—including without limitation the Parties to this action, their attorneys, representatives, agents, experts and consultants, acting as such, all non-parties ("Third Parties" or "Third Party" singular), providing discovery in this action, and all other interested persons with

1

actual or constructive notice of this Order—shall adhere to the following terms, upon pain of contempt:

**ORDER**

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, all discovery and other materials exchanged by the Parties or Third Parties, or filed with the Court in this Action shall be provided subject to the conditions set forth in this Order.

1. **Scope of Order.**[1] The following terms, conditions, procedures, and restrictions govern with respect to documents, electronic data, and any other information of any kind produced or voluntarily exchanged in this Action by any Party or Third Party; all discovery contemplated by Rules 26 through 36 of the Federal Rules of Civil Procedure, including responses to all written discovery requests and demands, and deposition testimony and exhibits, however recorded, and any other written, recorded, or graphic matters (collectively "Discovery Material"). The protections conferred by this Order cover not only those portions of any documents containing Confidential Information (as defined below), but also (a) any information copied or extracted from those portions of any documents containing Confidential Information; (b) all copies, excerpts, summaries, or compilations of Confidential Information; and (c) any testimony, conversations, or presentations by the parties or their counsel that might reveal Confidential Information. However, the protections conferred by this Order do not cover information that is properly in the public domain or becomes part of the public domain through trial or otherwise, except as limited by other agreement of the parties or order of the Court in this action.

---

[1] The headings herein are provided only for convenience and are not intended to define or limit the scope of the express terms of this Stipulation.

Add.361

2. **Designation of Discovery Material as Confidential Material.** The party producing Discovery Material (the "Producing Party") may designate as Confidential Material any portion thereof that contains any information that the Producing Party, in good faith, believes should be protected from disclosure by the receiving party (the "Receiving Party"), including but not limited to the following categories of information:

a. An individual's social security number, personal identification numbers, tax identification number, alien registration number ("A number"), passport numbers, driver license numbers, and any similar identifiers assigned to the individual by the federal government, a state or local government of the United States, or the government of any other country;

b. Birth dates;

c. Any information, document, or tangible thing that is or reveals (i) a trade secret or other confidential research, development, or commercial information, as such terms are used in Federal Rule of Civil Procedure 26(c)(1)(G), or (ii) non-public proprietary information purchased or obtained from a private entity;

d. Photographs of any person;

e. Names of any individuals known to be under 18 years of age;

f. Addresses and telephone numbers;

g. Information, documents or tangible things that the Court may order produced, but which are protected by federal privacy laws and regulations, including, but not limited to, the Privacy Act, 5 U.S.C. § 552a, *et seq.* and other laws or regulations that may prevent disclosure of specific information related to noncitizens, including but not limited to: 8 U.S.C. §§ 1160(b)(5), (6); 1186A(c)(4), 1202(f), 1254a(c)(6),

1255a(c)(4), (5); 1304(b), and 1367(a)(2), (b), (c), (d); 22 U.S.C. §7105(c)(1)(C); 8 C.F.R. §§ 208.6, 210.2(e), 214.11(e), 214.14(e), 216.5(e)(3)(viii), 236.6, 244.16, 245a.2(t), 245a.3(n), 245a.21, 1003.27(b)-(d), 1003.46, and 1208.6, which otherwise could subject either party to civil or criminal penalties or sanctions in the event of unauthorized disclosure;

h.  Any sensitive, but unclassified, information or documents, to include "Limited Official Use" or "For Official Use Only" information;

i.  Information, documents or tangible things, which may include, among other things, records regarding federal law enforcement activities and operations, guidelines for law enforcement operations, law enforcement training materials, and internal law enforcement investigations.

j.  Any information compiled for law enforcement purposes, including but not limited to, investigative files and techniques related to the integrity of the legal immigration system, suspected or known fraud, criminal activity, public safety, or national security.

k.  Any information, documents, or tangible things filed under seal or otherwise protected from public docketing (such as under Fed. R. Civ. P. 5.2(c) and D. Mass. General Order 19 02, "Standing Procedural Order Re: Public Access to Immigration Cases Restricted By Federal Rules of Civil Procedure 5.2(C)" (June 1, 2019)) in other litigation;

l.  Bank account numbers, credit card numbers, and other financial information that can be specifically linked to an individual's or entity's financial account;

m.  Medical information, such as medical records, and information, documents, or tangible things revealing medical treatment and diagnoses;

**n.** Any other personally identifiable information protected under Federal Rule of Civil Procedure 5.2 and Local Civil Rule 83.6.11;

**o.** Information, documents or tangible things, which may include, among other things, Department of State and Department of Homeland Security documents regarding national security vetting which may include sensitive information related to national security and law enforcement investigations and practices; and information or records pertaining to the issuance, refusal, or revocation of visas protected under 8 U.S.C. § 1202(f).

**p.** All other documents, information or tangible things not identified above that any Party to this action contends in good faith contain confidential information, as well as copies or summaries of such information or materials that otherwise reveal the contents of such information, that the Party would not ordinarily disclose and which should be protected from disclosure under Federal Rule of Civil Procedure 26(c).

The Producing Party must give notice of material that is Confidential in the manner set forth in paragraph 5 below. Further, a Party may designate material obtained from a Third Party pursuant to this Order (the "Designating Party"), if it believes in good faith that it qualifies as Confidential under this Order.

**3. Access to and Use of Confidential Information.** The duty of the Party or Parties receiving the Confidential Material) and of all other persons bound by this Order to maintain the confidentiality of the Protected Material so designated shall commence upon receipt of the Protected Material. No person subject to this Protective Order may disclose, in public or private, any Protected Material so-designated by a Party as Confidential, except as provided for in this Order or as further provided by the Court. Use of any information or documents subject to this

5

Protective Order, including all information derived therefrom, shall be restricted to use in this litigation and shall not be used by anyone subject to the terms of this agreement, for any purpose outside of this litigation or in any other proceeding between the parties or involving either of the parties. Nothing in this Protective Order shall limit or in any way restrict the use of information obtained outside of this litigation, so long as such information was not derived from, obtained based on, or obtained in reliance on information disclosed in this case.

4.  **Method of Designation:** Protected Material shall be so designated, whenever possible, either by stamping or otherwise clearly marking as "CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER." In the case of material contained in or on media other than paper, the Producing Party shall affix a label to the material or use its best efforts to identify the material as Confidential Material. For interrogatory answers and responses to requests for admissions, designation of Confidential Information shall be made by placing within each interrogatory answer or response to requests for admission asserted to contain Confidential Information, "CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER." With respect to testamentary evidence, whether testimonial or in the form of an Exhibit used in a testamentary proceeding, such evidence may be designated as Confidential either by a statement on the record of the deposition or in writing within ten (10) business days of receipt of the transcript. Transcripts of testamentary evidence and exhibits attached thereto shall be treated as Confidential Information in their entirety until the expiration of the above-referenced 30-day period for designation, except that, during the 10-day period, the individual offering testamentary evidence (and his or her counsel, if any) may review the transcript of such proceeding and exhibits attached thereto, provided the individual signs the "Acknowledgement and Agreement to be Bound" (Exhibit A).

Add.365

**5. Treatment of Notes on Designated Material:**  To the extent notes are made that memorialize, in whole or in part, the Protected Material, or to the extent copies are made for any use authorized under this Order, such notes, copies, or reproductions shall become Protected Information subject to the Protective Order and must be handled in accordance with the terms of the Protective Order.

**6. Access to Confidential Material.**  Only the following persons shall have access to or retain material designated as Confidential pursuant to this Order:

    **a.**  the Court and its staff;

    **b.**  Defendants, Defendants' employees to whom disclosure is reasonably necessary for this litigation, Defendants' counsel in this action and any support staff and other employees of such counsel assisting in this action with an appropriate need to know.

    **c.**  Plaintiffs, Plaintiffs' employees to whom disclosure is reasonably necessary for this litigation, Plaintiffs' counsel of record in this action and any support staff and other employees of such counsel assisting in this action with an appropriate need to know.

    **d.**  counsel retained specifically for this Action, and their associated attorneys, paralegals and other professional personnel (including support staff) who are directly assisting such counsel in the preparation of this Action and are under the supervision or control of such counsel, and who have been advised by such counsel of their obligations hereunder;

    **e.**  experts and consultants retained by the Parties or their counsel to furnish technical or expert services in connection with this Action or to give testimony with respect to the subject matter of this Action at the trial of this Action or other proceeding herein (and the experts' or consultants' staff whose duties and responsibilities require access to

7

Add.366

such materials), and who have been advised by counsel of their obligations hereunder and have first executed the "Acknowledgement and Agreement to be Bound (Exhibit A);

f.  a witness who counsel for a Party in good faith believes may be called to testify at a deposition or trial in this Action, provided such person has first executed the "Acknowledgement and Agreement to be Bound" (Exhibit A);

g.  stenographers, videographers, and translators engaged to transcribe, record and translate depositions conducted in this Action who have been advised by counsel of their obligations hereunder and have first executed the "Acknowledgment and Agreement to be Bound" (Exhibit A);

h.  individuals (and their counsel) whose personally identifying information is contained within materials that the Parties have filed or intend to file in this action, limited to confidential information regarding their own personally identifying information, and excluding access to other confidential information unrelated to their personally identifying information since they are not parties to this suit, unless agreed upon by both parties to access such additional information; and,

i.  any other person agreed to in writing by the Parties.

7.  **Recordkeeping for Individuals Who Have Been Granted Access to Confidential Information:** Counsel for each party shall record in a log the name and title of each person, other than counsel of record and their support staff, who is given access to any Confidential Information produced by the other party, as well as the date that access is granted. Counsel shall preserve these logs indefinitely.

**8. Procedure for Challenging Designations.** The Parties shall meet and confer regarding any dispute over designations, after which the objecting party may seek de-designation by the Court. The designated material shall continue to be treated in accordance with the original designation until the issue is resolved by an order of this Court or by agreement of the Parties. The Producing Party may authorize, in writing, disclosure of Protected Material produced by the Producing Party beyond that is otherwise permitted by this Order without further Order of this Court.

**9. Filing Protected Materials in this Action.** Before filing Confidential Information with the Court, or discussing or referencing such material in court filings, the filing party shall confer with the designating party (where practical, at least seven days prior to the intended filing date ) to determine whether the designating party will remove the confidential designation, whether the document can be redacted, or whether a motion to seal or stipulation and proposed order is warranted. Local Civil Rule 83.6.11(b) sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the Court to file material under seal.

**10. Inadvertent Disclosure of Protected Materials.** If, upon promptly discovering that Confidential Information was inadvertently produced prior to the trial of this Action, a Producing Party realizes that some portion of Discovery Material that was previously produced without limitation should be designated as Confidential the Producing Party may so designate that portion promptly by notifying all parties in writing. Such designated portion of the Discovery Material will thereafter be treated as Confidential under the terms of this Order. In addition, the Producing Party shall provide each Party with replacement versions of such Discovery Material that bears the Confidential designation within five (5) business days of providing such notice.

9

**11. Limitations on the Use of Protected Materials.** A receiving party may use Confidential Information that is disclosed or produced by another party or by a non-party in connection with this case only for pursuing, defending, or attempting to settle this litigation. It shall not be disseminated outside the confines of this case, nor shall it be included in any pleading, record, or document that is not filed under seal with the Court or redacted in accordance with applicable law. Confidential Information may be disclosed only to the categories of persons and under the conditions described in this Order. Confidential Information must be stored and maintained by a receiving party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order. The Parties shall access the Protected Material for the sole purpose of preparing for trial and any appellate proceedings in this Action and for no other purpose. However, nothing in this Order shall be construed as limiting a producing party's right to use and share information that the producing party has designated as confidential for any lawful purpose.

**12. Subpoenas in Other Actions.** In the event a Receiving Party having possession, custody, or control of any Protected Material produced in this Action and designated as confidential under this protective order receives a subpoena or other process or order to produce such information, such subpoenaed person or entity shall promptly notify by e-mail the attorneys of record of the Producing Party and shall furnish those attorneys with a copy of said subpoena or other process or order. Unless the Producing Party consents, the subpoenaed person or entity shall not produce the requested Confidential Material, and will instead take the following steps: The subpoenaed person or entity shall promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order and provide a copy of this Order with that notification. The

Add.369

subpoenaed person or entity shall cooperate with respect to all reasonable procedures sought to be pursued by the designating party or parties whose Confidential Information may be affected, including objecting and seeking a protective order in the litigation in which the subpoena or order was issued.

**13. Return or Destruction of Confidential Material.** Upon the final disposition of this Action, any Protected Material shall not be used, in any way, absent a court order. All materials designated subject to this Order maintained in either Party's files shall remain subject to this Order unless and until such order is modified by court order. Within thirty days of the conclusion of all appeals of this Action, each Party shall return Protected Material to the Producing Party, certify that all such material has been destroyed, or certify that the materials will be securely preserved in such a way as to ensure the confidentiality of those materials until they may be destroyed. In the event that there is a substitution of counsel prior to when such documents must be returned, new counsel must join this Protective Order before any Confidential Material may be transferred to the new counsel, who will be bound by the terms of this Order.

**14. Modification.** This Order may be changed by further order of the Court, and is without prejudice to the rights of a Party to move, on notice to the other Party, for relief from, or modification of, any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

**15. Retention of Jurisdiction.** The provisions of this order shall not terminate at the conclusion of this Action and the Court will retain jurisdiction to enforce this Order following termination of the Action.

AGREED AND CONSENTED TO:

Attorneys for *Plaintiffs*

KNIGHT FIRST AMENDMENT
INSTITUTE

SHER TREMONTE LLP

_____

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

_____

Michael Tremonte
Noam Biale
Alexandra Conlon
Courtney Gans
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

ZIMMER, CITRON & CLARKE, LLP

_____

Edwina Clarke, BBO 699702
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

_____

Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Attorneys for *Defendants*

_____

Ethan B. Kanter
Lindsay M. Murphy
Assistant United States Attorneys
Office of Immigration Litigation
Civil Division, Department of Justice

_____

Shawna Yen
Rayford A. Farquhar
Assistant United States Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200

Add.371

P.O. 878, Ben Franklin Station
Washington, DC. 20044
(202) 616-9123
ethan.kanter@usdoj.gov
lindsay.m.murphy@usdoj.gov

Boston, MA 02210
(617) 748-3100
shawna.yen@usdoj.gov
rayford.farquhar@usdoj.gov

_____
Harry Graver
United States Department of Justice
Counsel to the Assistant Attorney General
Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2000
harry.graver@usdoj.gov

SO ORDERED

Dated:    *June 23, 2025*
          Boston, Massachusetts

*William A Young*
THE HONORABLE WILLIAM J. YOUNG
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                          Plaintiffs,

        v.

MARCO RUBIO, ET AL.,

                        Defendants.

Case No. 1:25-cv-10685 (WGY)

**PLAINTIFFS' MOTION TO COMPEL COMPLETE ANSWERS TO PLAINTIFFS'
INTERROGATORIES, PRODUCTION OF DOCUMENTS, AND DISCLOSURE
OF INFORMATION IMPROPERLY WITHHELD AS PRIVILEGED**

With only two weeks left before trial, Defendants have produced a total of 25 documents to Plaintiffs, some heavily redacted; they have omitted many documents from their productions that should have been included; they have provided grossly inadequate answers to Plaintiffs' interrogatories more than ten days past the deadline provided in the Federal Rules; and they have improperly withheld highly relevant documents and answers to interrogatories and have instructed their witnesses not to answer crucial questions at depositions based on overbroad and improper assertions of privilege. In short, Defendants are blocking discovery at every turn, despite this Court's expectation that Defendants produce "every contemporaneous document that exists up and down the chain of command" bearing on retribution. May 6, 2025 Tr. 17:19–18:2.

Accordingly, pursuant to Rules 30, 33, 34, and 37 of the Federal Rules of Civil Procedure and Rules 33.1, 34.1, and 37.1 of the Local Rules, Plaintiffs move to compel (1) the production of documents that Plaintiffs have identified as missing from Defendants' productions, (2) complete answers to Plaintiffs' interrogatories, with all objections deemed waived due to Defendants'

untimely and deficient responses, which have caused substantial prejudice to Plaintiffs, (3) the production of documents improperly withheld as privileged, and (4) the reappearance of John Armstrong, a State Department official who was previously deposed, for a continued deposition on questions that he was instructed not to answer based on improper assertions of privilege. The Court's guidance is urgently needed in advance of additional depositions of government witnesses this week and the week before trial.

## I.    Defendants should be compelled to produce highly relevant documents that are missing from their productions.

From the outset of this case, the Court has made clear that it expects Plaintiffs to "focus [discovery] on retribution," and that it expects "the government to be absolutely fulsome in its disclosure of contemporaneous documents." May 6, 2025 Tr. 18:23–19:2. Plaintiffs heeded this guidance and served narrow discovery requests on May 13, 2025. *See* Declaration of Scott Wilkens ("Wilkens Decl."), attached hereto as **Exhibit A**, Exs. 1 & 2. The Court deemed these requests "in order" after limiting the number of targeted noncitizens from nine to five. May 22, 2025 Tr. at 7:15–8:8; *see also id.* (describing the Court's review of Plaintiffs' discovery requests and determining that they were "not inappropriate").

Contrary to the Court's guidance, however, Defendants have not made genuine efforts to provide fulsome discovery. They assert that they have "operated with deliberate speed" in responding to Plaintiffs' document requests, which "has required a review across Federal agencies of thousands of records to find responsive materials, then filtering those materials through multiple levels of agency review to redact for multiple privileges." ECF No. 136, at 2. Plaintiffs do not doubt the diligent efforts of Defendants' counsel. Yet to date, Defendants have produced a meager *25 documents*, many of which are heavily redacted based on assertions of the law enforcement privilege. Wilkens Decl. ¶¶ 4, 6, 9. Defendants have submitted only *15 additional documents* to

the Court for *in camera* review based on assertions of the deliberative process privilege, presidential communications privilege, and law enforcement privilege. *Id.* ¶ 5; ECF No. 131.[1]

Defendants produced documents on May 29, 2025 as part of the certified administrative record (CAR). Wilkens Decl. ¶ 4. Defendants produced additional documents on June 13 in response to Plaintiffs' document requests. *Id.* ¶ 6. Two days later, Plaintiffs wrote to Defendants and identified numerous documents missing from Defendants' productions, some of which are referenced in the documents Defendants already produced (and should have been turned over with those documents) and some of which Plaintiffs only learned of during the depositions of Andre Watson, a Department of Homeland Security official, and Mr. Armstrong on June 11 and 12, respectively. *Id.* ¶ 7 & Ex. 3. Plaintiffs requested that Defendants produce the missing documents by June 17, but Defendants failed to do so. *Id.* Ex. 3. After Plaintiffs followed up on this request, Defendants' counsel stated on June 18 that they were "still running down most of the documents on [Plaintiffs'] list," but did not give an indication of how long it would take them. *Id.* Ex. 4, at 1. Plaintiffs are forced to move to compel the production of the missing documents given the upcoming depositions, the shortness of time until trial, and Defendants' prior discovery delays.

The Court should order Defendants to produce the missing documents identified in **Exhibit B**, which is the same as the list Plaintiffs sent to Defendants on June 16, except that several documents have been removed from the list.[2] The documents identified in Exhibit B are responsive

---

[1] Notably, Defendants have not produced a single email to Plaintiffs, and it does not appear that any of the documents submitted to the Court for *in camera* review are emails. That alone raises serious concerns about the adequacy of Defendants' document productions.

[2] Defendants informed Plaintiffs that two documents on the June 16 list were among those submitted to the Court for *in camera* review, and that one document on the list was produced to Plaintiffs on June 13, 2025. Wilkens Decl. Ex. 4, at 1. Accordingly, those documents are not listed as missing in Exhibit B.

to Plaintiffs' document requests and are highly relevant to Plaintiffs' claims. *See, e.g., Close v. Account Resolution Servs.*, 557 F. Supp. 3d 247, 250 (D. Mass. 2021) (the party moving to compel discovery responses "bears the initial burden of showing that the discovery requested is relevant," and once the moving party does so, the opposing party "bears the burden of showing that a discovery request is improper" (cleaned up)). Exhibit B identifies several categories of missing documents that are responsive to RFPs 1-2, which seek records relating to the "planning, execution and implementation" of the government's decisions to target five noncitizens, and records "requesting or recommending the taking of, and memorializing, explaining, or justifying" these decisions. Exhibit B; Wilkens Decl. Ex. 1, at 6. These categories of missing documents include:



---

[3] "A Security Advisory Opinion (commonly referred to as an 'SAO') is a U.S. Government mechanism to coordinate third-agency checks on visa applicants about whom the State Department have security-related concerns. Applicants identified for an SAO require in-depth review by multiple federal agencies." DHS, *Privacy Impact Assessment for the Visa Security Program Tracking System* (Aug. 27, 2009), https://perma.cc/6MVB-VBJV.

Exhibit B. Each of these categories of documents is directly relevant the ideological-deportation policy's existence and implementation, the government's retributive motive, and its intent to chill the speech of other noncitizen students and faculty.

Exhibit B also identifies numerous missing documents that are responsive to RFP 5, which seeks communications, memoranda, and other documents concerning the government's social media surveillance of noncitizens for "pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech." Exhibit B; Wilkens Decl. Ex. 1, at 8–9. Defendants object that these terms are "vague and ambiguous," Wilkens Decl. Ex. 2, at 20, but Defendants use those terms in documents they have produced, and the objection only underscores the First Amendment violations at issue.[4] The missing documents Plaintiffs have specifically identified include State Department cables, nonpublic Foreign Affairs Manual and Foreign Affairs Handbook provisions, and State Department policy materials, guidance, or instructions related to this social media surveilance. *See* Exhibit B.

Finally, Exhibit B identifies a category of documents that Plaintiffs expressly asked for in RFP 6(b): communications from the State Department to specific colleges and universities "directing them to report international students for participating in 'proscribed antisemitic actions,' 'terrorist activity,' or 'endorsing or espousing terrorism,'" as reported in news media. Exhibit B; Wilkens Decl. Ex. 1, at 9. These communications are highly relevant because they, too, would provide evidence of the ideological deportation policy and the government's intent.

---

[4] Defendants object to the request on the grounds that it "does not identify the persons/parties who allegedly directed" the surveillance, Wilkens Decl. Ex. 2, at 20, but that is Defendants' obligation, not Plaintiffs', and underscores Defendants' failure to identify relevant individuals in response to Plaintiffs' interrogatories in a timely manner. *See infra* Part II.

II.    **Defendants Should Be Compelled to Provide Complete Answers to Plaintiffs'
Interrogatories, With All Objections Deemed Waived.**

Plaintiffs served Defendants with their First Set of Interrogatories on May 13, 2025, and,
as noted above, the Court deemed them "in order." *See supra* Part I. Given the short discovery
period and Plaintiffs' need to identify relevant government officials in order to notice depositions,
Plaintiffs repeatedly urged Defendants to respond in advance of the 30-day deadline set forth in
Fed. R. Civ. P. 30(b)(2). Wilkens Decl. ¶ 11. Rather than provide that information on an expedited
basis, however, Defendants did not answer Plaintiffs' interrogatories until June 22, 2025, *40 days*
after the interrogatories were served, and did not ask Plaintiffs or the Court for an extension. *Id.* ¶
12 & Ex. 10. And even then, Defendants provided deficient responses.

With respect to Interrogatories 1–3, which seek the identification of relevant government
officials, Defendants failed to identify *any State Department officials,* not even Secretary Rubio,
and also failed to identify numerous DHS officials Plaintiffs asked Andre Watson to identify in
his deposition, but whose names he could not recall. *Id* ¶ 14. Defendants refused to answer
Interrogatories 4–5, which ask them to identify persons involved in communications between
Defendants and specified colleges and universities concerning non-citizen students or faculty who
engaged in pro-Palestinian or anti-Semitic speech, and persons involved in identifying non-citizen
students or faculty members at the same colleges and universities who were targeted for visa
revocation or other adverse actions based on their pro-Palestinian or anti-Semitic speech. Wilkens
Decl. ¶ 15 & Ex. 10 at 10–12. And Defendants provided very limited information in response to
Interrogatories 6–10 and 12–14 based on assertions of the deliberative process and law
enforcement privileges. Wilkens Decl. ¶ 15 & Ex. 10 at 12–23.

Defendants' failure to provide any information in response to Plaintiffs' interrogatories
until two weeks before trial has prejudiced Plaintiffs' ability to prepare their case. Plaintiffs noticed

the depositions of Mr. Watson and Mr. Armstrong—the only relevant officials Plaintiffs knew about because they filed declarations in support of Defendants earlier in the case—and had to spend substantial portions of those depositions attempting to obtain the information sought by the interrogatories. And because the witnesses were relying on memory, they were unable to identify many officials about whom Plaintiffs asked.[5] Defendants' interrogatory responses do not rectify the situation, because they do not identify a single State Department official with relevant knowledge—not even Secretary Rubio—and fail to identify many Department of Homeland Security officials with relevant knowledge. They do not even include some of the individuls that Defendants' own declarants testified at their depositions have relevant knowledge. It is difficult to view these omissions as anything other than bad faith.

The Court should accordingly order Defendants to answer the interrogatories in full, deeming as waived Defendants' objections. Their failure to timely object to Plaintiffs' interrogatories is itself grounds to deem the objections waived. *See, e.g.,* Fed. R. Civ. P. 33(b)(4); L. R. 33.1(c)(1); *Katz v. Liberty Power Corp.*, Case No. 1:18-cv-10506, 2021 WL 3616073, at *1 (D. Mass. Mar. 29, 2021) (finding that objections to interrogatories based on attorney-client privilege and work product privilege were waived because "the objections were provided more than 30 days after service"). And although "a court can decline to deem late objections waived when '[the discovery] request far exceeds the bounds of fair discovery,'" *Katz*, 2021 WL 3616073, at *1 (quoting *Krewson v. City of Quincy*, 120 F.R.D. 6, 7 (D. Mass. 1988)), that is decidedly not the case here, as the Court noted at the May 22 and June 2, 2025 hearings. May 22, 2025 Tr. 7:15–

---

[5] Defendants tout the fact that they made these "two high-level witnesses who plaintiffs noticed" available for depositions, ECF No. 136, at 2, but, as noted, Plaintiffs knew about the officials' relevance to this case only because they submitted declarations in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction. *See* ECF Nos. 65-1 & 65-2.

8:8; June 2, 2025 Tr. 28:3–6. Furthermore, although a showing of prejudice is not required, Plaintiffs have suffered prejudice as a result of Defendants' dilatory response, and accordingly are now two weeks out from trial with virtually none of the information the Court directed Defendants to produce.

**III.    Defendants Should Be Compelled to Disclose Information Improperly Withheld as Privileged.**

As noted above, Defendants have have withheld 15 documents in full and have heavily redacted several additional documents based on assertions of the deliberative process privilege, presidential communications privilege, and law enforcement privilege. And at the depositions of Mr. Watson and Mr. Armstrong on June 11 and 12, respectively, Defendants' counsel instructed the witnesses not to answer numerous questions based on assertions of these privileges. Wilkens Decl. ¶ 14 & Exs. 8, 9. And in their belated and deficient answers to Plaintiffs' interrogatories, Defendants asserted these privileges numerous times. Wilkens Decl. ¶ 15 & Ex. 10.

The withheld information is highly relevant to Plaintiffs' First Amendment claims. The 15 documents withheld in full and submitted to the Court for *in camera* review can be described as follows:

- One document, titled "Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Inadmissibility," is being withheld under the deliberative process and presidential communications privileges.[6] ECF No. 131.

- Ten documents—"Department of Homeland Security documents that relate to specific individuals"—are being withheld as "law enforcement sensitive." *Id.* ███████

---

[6] Defendants describe this document elsewhere as ███████



- Four documents—"Department of State documents that relate to specific individuals" —are being withheld under the deliberative process privilege. ECF No. 131. Three are "Action Memos for the Secretary" concerning "Removal" or "Determinations of Deportability" of specific individuals, and one is an "Action Memo for Senior Bureau Official John Armstrong" concerning a visa revocation. *Id.*

The four documents with heavy redactions, which apparently have not been submitted to the Court

for *in camera* review, *see* ECF No. 131, can be described as follows:



At the deposition of John Armstrong on June 12, 2025, Defendants' counsel instructed the

witness not to answer questions about the following topics, among others.



9

- 

Similarly, in answering Plaintiffs' interrogatories, Defendants objected on grounds of the deliberative process privilege or law enforcement privilege to almost every interrogatory other than those asking Defendants to identify relevant government officials.[8] Wilkens Decl. Ex. 10 at 12–23 (responses to Interrogatories 6–10, 12–14). In answering four of these interrogatories, Defendants stated that they "will not provide . . . details about the" the documents they have withheld in their entirety that concern the Five Targeted Noncitizens: ▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[7] At the deposition of Andre Watson, Defendants' counsel similarly instructed the witness not to answer questions ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Plaintiffs do not seek to redepose Mr. Watson at this time, because it appears that other Department of Homeland Security officials who have been noticed for depositions are likely to have more information on this topic than he does.

[8] The only exception is Interrogatory 11, which asks Defendants to state the basis for making a "silent" visa or green card revocation—i.e. failing to provide notice of the revocation—with respect to any of the Five Targeted Noncitizens. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉

Even if Defendants can show that the information described above qualifies for the asserted privilege, all three privileges at issue—the deliberative process privilege, the presidential communications privilege, and the law enforcement privilege—are qualified rather than absolute and thus are subject to the Court's balancing of interests to determine whether material should be disclosed. *See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 884–85 (1st Cir. 1995) (deliberative process privilege); *Gulluni v. Levy*, 85 F.4th 76, 85 (1st Cir. 2023) (law enforcement privilege); *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885–86 (D.C. Cir. 2021) (presidential communications privilege). The balancing of interests clearly favors disclosure given the constitutional violations at issue, the central relevance of the withheld information, and the unavailability of the information from other sources.

**Deliberative process privilege.** The deliberative process privilege does not apply to the documents, deposition testimony, and interrogatory responses at issue for two reasons. First, the privilege does not apply where, as here, the government's decision-making process is the very subject matter of the suit. Second, even if it did apply, it is a qualified privilege, and the balance of interests here tips in favor of production.

The deliberative process privilege shields from disclosure information "'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 50 (1975)). As this Court has explained, the privilege is "grounded on the proposition 'that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl.'" *Gen. Elec. Co. v. E.P.A.*, 18 F. Supp. 2d 138, 140 (D. Mass. 1998) (quoting *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc)).

Add.383

The deliberative process privilege thus "distinguishes between predecisional, deliberative [material], which [is] exempt from disclosure, and [material] reflecting a final agency decision and the reasons supporting it, which [is] not." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). The privilege does not shield "post-decisional documents explaining or justifying a decision already made," *Texaco*, 60 F.3d at 884–85, or "material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).

Defendants bear the burden of showing that the withheld material is predecisional and deliberative. As an initial matter, it seems doubtful that the four documents being withheld in full—State Department "Action Memos" regarding the removal or deportability of five individuals—do not contain relevant, purely factual information that is segregable. *See* ECF No. 131, Exhibits L–O; Wilkens Decl. ¶ 5. For example, these documents presumably contain summaries of factual information regarding these individuals' participation in campus protests and engagement in pro-Palestinian, anti-Semitic, or pro-Hamas speech, if any. Such factual information is not protected by the deliberative process privilege and should be disclosed. The same is true with respect to Defendants' refusal to include in their answers to interrogatories any of the information contained in these Action Memos. Wilkens Decl. Ex.10 at 13, 15, 17, 18 (responses to Interrogatories 6, 7, 9, 10).

Even if Defendants meet their burden of showing that the withheld material is predecisional and deliberative, the deliberative process privilege does not bar the material's disclosure. First, the deliberative process privilege does not apply where, as here, the agencies' decision-making process is the very subject matter of the suit. *See, e.g., In re Subpoena Duces Tecum Served on*

*Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998); *Williams v. City of Boston*, 213 F.R.D. 99, 102 (D. Mass. 2003); *Velazquez v. City of Chicopee*, 226 F.R.D. 31, 34 (D. Mass. 2004). As the D.C. Circuit explained:

> The privilege was fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit. If the plaintiff's cause of action is directed at the government's intent, however, it makes no sense to permit the government to use the privilege as a shield. For instance, it seems rather obvious to us that the privilege has no place in a Title VII action or in a constitutional claim for discrimination. . . . [I]f either the Constitution or a statute makes the nature of governmental officials' deliberations *the* issue, the privilege is a nonsequitur.

*In re Subpoena Duces Tecum*, 145 F.3d at 1424 (internal citations omitted) (emphasis in original).[9]

Particularly noteworthy here is *Montrevil v. Decker*, a case in which a habeas petitioner sued ICE officials for allegedly arresting and deporting him in retaliation for his First Amendment protected activities—speaking at protests against U.S. immigration policy. No. 20-264, 2021 WL 11690690, at *1–2 (E.D.N.Y. July 19, 2021). The court held that "[t]o the extent petitioner seeks information that speaks to the government's reasons for and actions taken in connection with his removal from the United States, respondents may not shield this information from disclosure by the deliberative process privilege." *Id.* at *5. The government's "decision-making process about petitioner's case and his removal," the court reasoned, "are central to petitioner's claims." *Id.*; *see also id.* ("respondents' motivation to remove petitioner . . . is the crux of petitioner's claim"). As a result, the court ordered the government to produce unredacted versions of emails between ICE officials regarding petitioner's removal. *Id.*

---

[9] *See also Dorce v. City of New York*, No. 19-cv-2216, 2023 WL 7545345, at *4 (S.D.N.Y. Nov. 14, 2023) (collecting cases); *Est. of LeRoux v. Montgomery Cnty., Md.*, No. 8:22-cv-00856, 2024 WL 1703939, at *4 (D. Md. Apr. 19, 2024) (collecting cases); *Gudkovich v. City of Chicago*, No. 17-cv-8714, 2022 WL 252716, at *9 (N.D. Ill. Jan. 27, 2022) (collecting cases).

Add.385

Similarly here, Defendants' intent and decision-making process in revoking the visas and green cards of non-citizen students and faculty members, and in arresting, detaining, and deporting them, are clearly relevant to Plaintiffs' claims. *See Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019) (discussing centrality of "retaliatory motive" to establishing First Amendment retaliation); *NRA v. Vullo*, 602 U.S. 175, 180 (2024) ("[A] government entity's 'threat of invoking legal sanctions and other means of coercion' against a party 'to achieve the suppression' of disfavored speech violates the First Amendment." (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *see also* ECF No. 73 at 59 n.9 (noting that "some showing of intent on the part of government officials" may be relevant to Plaintiffs' challenge to Defendants' policy or practice of ideological deportation (quoting *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004)). Indeed, this Court observed as much at the May 6 case management conference, noting that "government retribution for speech" is what this case "turns on." May 6 Tr. 9:13–16, 17:19–20. Moreover, Defendants have put these issues squarely in play: in a sworn declaration submitted to this Court, John Armstrong made clear the importance of the agencies' deliberations. He stated that "[n]o ideological deportation policy *has been developed* or implemented by the Bureau of Consular Affairs or the Visa Office." ECF No. 65-1 at 3–4 (emphasis added). Yet during his deposition, Defendants' counsel instructed Mr. Armstrong not to answer any questions about the development of such a policy based on the deliberative process privilege.

Second, even if the privilege is not categorially inapplicable in this case and instead requires a balancing of interests, that makes no difference to the outcome, because "[w]here the deliberative or decisionmaking process is the 'central issue' in the case, the need for the deliberative documents will outweigh the possibility that disclosure will inhibit future candid debate among agency decision-makers." *In re Delphi Corp.*, 276 F.R.D. 81, 85 (S.D.N.Y. 2011)

(cleaned up); *see also Burbar v. Inc. Vill. of Garden City*, 303 F.R.D. 9, 14 (E.D.N.Y. 2013) ("Both approaches tend to yield the same result."); *Montrevil*, 2021 WL 11690690, at *5. The Court should order the material to be disclosed based on a balancing of "the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *Texaco*, 60 F.3d at 885. Preventing the disclosure of agency deliberations concerning the arrest, detention, and removal of noncitizen students and faculty members based on their speech would not serve the purpose of the deliberative process privilege. To the contrary, given the First Amendment rights at stake, disclosure would serve the "public's interest in honest, effective government." *Id*. Indeed, it is difficult to imagine a case in which the balancing of interests would weigh more decisively in favor of disclosure.

   ***Presidential communications privilege.*** Defendants' assertions of the presidential communications privilege are also unavailing. The privilege is "limited to communications 'in performance of (a President's) responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (quoting *United States v. Nixon*, 418 U.S. 683, 711 (1974)). "At core, the presidential communications privilege is rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (cleaned up). Thus, the privilege "extends beyond communications made directly to the President to include communications solicited and received by the President's 'immediate White House advisers' or even certain members of their staffs, but 'should not extend to staff outside the White House in executive branch agencies." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1111 (D.C. Cir. 2004) (quoting *In re Sealed Case,* 121 F.3d at 744). The

presidential communications privilege should be construed as "narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case,* 121 F.3d at 752.[10]

Here, the presidential communications privilege does not apply for two reasons. First, Defendants have not followed the proper procedure for invoking it, which requires that the privilege "be claimed by the president or an official authorized to speak for the president." *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977); *Dairyland Power Co-op v. United States*, 79 Fed. Cl. 659, 669 (2007) (requiring White House to submit an affidavit formally invoking the privilege). Defendants have not done so here. Second, even if Defendants had properly invoked the privilege, it would be overcome because Plaintiffs have a substantial need for the information at issue, which is directly relevant to "the substantial violations of constitutional rights sought to be vindicated," and is not available elsewhere. *Dellums*, 561 F.2d at 249; *see also Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (the privilege "may give way in the face of other strong constitutional values" (cleaned up)). Testimony from Mr. Armstrong about ██████████████ ████████████████████████ is "directly relevant to issues that are expected to be central to the trial." *In re Sealed Case*, 121 F.3d at 754.

***Law enforcement privilege.*** Defendants' assertions of the law enforcement privilege are also ineffective, for two independent reasons. First, much of the information Defendants seek to shield from disclosure does not fall within the scope of the privilege. Second, even as to information covered by the privilege, the balance of interests favors disclosure—even more so

---

[10] Unlike the deliberative process privilege, which covers "only pre-decisional and deliberative material, the presidential privilege covers documents in their entirety, including post-decisional and factual material within a record." *Protect Democracy*, 10 F.4th at 885–6 (cleaned up).

given that, as many courts recognize, the potential harms of disclosure of law enforcement sensitive information can be mitigated by a protective order.

The purpose of the law enforcement privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 63 (1st Cir. 2007). "An investigation need not be ongoing for the law enforcement privilege to apply as the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed." *Walsh v. Tara Constr., Inc.*, No. 19-10369-LTS, 2021 WL 12094216, at *2 (Apr. 18, 2021) (cleaned up). If the government shows that the privilege applies by, for example, demonstrating that the information at issue constitutes "law enforcement techniques and procedures," the disclosure of which would "jeopardize future criminal investigations," then the court must "balance[e] the government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure. *Commonwealth of Puerto Rico*, 490 F.3d at 64. In balancing these interests, the court "must consider the effect of a protective order restricting disclosure to the plaintiff and the plaintiff's attorney, or to the plaintiff's attorney alone," which "can mitigate many if not all of the oft-alleged injuries to . . . law enforcement." *Floyd v. City of N.Y.*, 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010).

Defendants have asserted the law enforcement privilege to shield information about their reasons for arresting, detaining, and deporting the Five Targeted Noncitizens—but that information is not covered by the privilege. It would not, if disclosed, reveal law enforcement techniques or procedures or impair the ability of the Department of Homeland Security to conduct

future investigations. As noted above, in Mr. Armstrong's deposition, Defendants' counsel instructed him not to answer any questions about the basis for the State Department's determinations that the Five Targeted Noncitizens were deportable. The "ICE referral memos" and "HSI Profiles" regarding the Five Targeted Noncitizens, which Defendants have withheld in full, *see* ECF No. 131, Exs. B–K, also address the reasons why Defendants decided to arrest, detain, and deport the Five Targeted Noncitizens. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The reasons why Defendants decided to arrest, detain, and deport the Five Targeted Noncitizens are not law enforcement sensitive—they would not reveal any law enforcement techniques or compromise future investigations. They accordingly should be released. Defendants also must answer the interrogatories that call for this information.

*Montrevil*, the case discussed above involving a noncitizen's First Amendment challenge to his deportation, again is instructive. In that case, the court distinguished between materials that "relate to law enforcement techniques and procedures, namely the logistics of a removal operation," which qualify for the law enforcement privilege, and materials that "relate to [ICE's] rationale for petitioner's removal," which do not. 2021 WL 11690690, at *8. The court also

concluded that "case summary information about petitioner's criminal and immigration history" did not qualify for the law enforcement privilege. *Id.* at *6–7. The same is true here.

Even if the information being withheld is covered by the law enforcement privilege, the balancing of interests strongly favors disclosure. As noted, information about Defendants' reasons for arresting, detaining, and deporting the Five Targeted Noncitizens is highly relevant to Plaintiffs' First Amendment claims. It is also unavailable from other sources. *See, e.g., Lunn v. Smith*, No. 17-10938, 2019 WL 569828, at *5 (D. Mass. Feb. 12, 2019) (holding that the plaintiff's need for information relevant to his constitutional claims outweighed ICE's interest in keeping confidential information used in executing orders of removal). And any potential harm to law enforcement interests can be mitigated by a protective order. *See Floyd*, 739 F. Supp. 2d at 381.

A balancing of interests should also result in the disclosure of the information Defendants have redacted from the State Department cables and webinar slides referenced above. One of these cables was leaked to the public, and a review of the redacted material from the leaked version shows that the State Department mandated the review of the social media accounts of student-visa applicants who were present in the U.S. on a student visa from October 7, 2023 to August 31, 2024. *Compare* Wilkens Decl. Ex. 6, *with id.* Ex. 7. That the State Department specifically identified this category of student visa applicants for social media vetting is relevant to Plaintiffs' claims and should be released, as should any other relevant information.

## CONCLUSION

For the foregoing resons, Plaintiffs respectfully request that the Court order Defendants to produce the identified documents it has failed to produce; to provide complete answers to Plaintiffs' interrogatories, with all objections deemed waived; and to produce in full the 19 documents identified above that are being withheld in whole or in part as privileged. Plaintiffs

further request that the Court order Defendants to make Mr. Armstrong available for a 4-hour deposition to answer questions on the topics identified above, including the discussions and deliberations of the interagency task force on the revocation of student visas. This Court should also instruct Defendants' counsel to refrain from similar invocations of privilege in upcoming depositions of Defendants' witnesses.

June 23, 2025

Edwina Clarke (BBO 699702)
David Zimmer (BBO 692715)
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

Noam Biale
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

Respectfully submitted,

 /s/ *Scott Wilkens*
Scott Wilkens
Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
scott.wilkens@knightcolumbia.org

Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs*

Add.392

## MEET AND CONFER CERTIFICATION

In accordance with Local Rule 7.1(a)(2), Plaintiffs' counsel have met and conferred with counsel for Defendants with regard to the areas of dispute raised in this motion, and notwithstanding the various communications identified in the motion and accompanying declaration, were unable to resolve or narrow the issues.

June 23, 2025                              /s/ *Scott Wilkens*
                                          Scott Wilkens

                                          *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2025, I filed Plaintiffs' Motion to Compel Complete Answers to Plaintiffs' Interrogatories, Production of Documents, and Disclosure of Information Improperly Withheld as Privileged, and that service will be accomplished by the CM/ECF system.

June 23, 2025                              /s/ *Scott Wilkens*
                                          Scott Wilkens

                                          *Counsel for Plaintiffs*

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS (Boston)

 3                        No. 1:25-cv-10685-WGY

 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                Plaintiffs

 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10                Defendants

11                       * * * * * * * * *

12

13

                       For Hearing Before:
14               Judge William G. Young

15

                        Final Pretrial
16

17                   United States District Court
                     District of Massachusetts (Boston.)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   Thursday, June 26, 2025

20

                         * * * * * * * *
21

22

             REPORTER: RICHARD H. ROMANOW, RPR
23                 Official Court Reporter
               United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                     rhr3tubas@aol.com
25
```

```
1              A P P E A R A N C E S

2

3   CAROLINE DeCELL, ESQ.
    ALEXANDER ABDO, ESQ.
4   SCOTT B. WILKENS, ESQ.
        Knight First Amendment Institute at Columbia
5       University
        475 Riverside Drive, Suite 302
6       New York, NY 10115
        (646) 745-8500
7       E-mail: Carrie.decell@knightcolumbia.org
    and
8   COURTNEY GANS, ESQ.
    NOAM BIALE, ESQ.
9       Sher Tremonte LLP
        90 Broad Street, 23rd Floor
10      New York, NY 10004
        (212) 540-0675
11      Email: Cgans@shertremonte.com
        For Plaintiffs

12

13  ETHAN B. KANTER, ESQ.
    WILLIAM KANELLIS, ESQ.
14  VICTORIA M. SANTORA, ESQ.
    JESSICA An. STROKUS, ESQ.
15      DOJ-Civ
        P.O. 878
16      Ben Franklin Station
        Washington, DC 20044
17      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
18  and
    SHAWNA YEN, ESQ.
19      United States Attorney's Office
        1 Courthouse Way, Suite 9200
20      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
21      For Defendants

22

23

24

25
```

1    P R O C E E D I N G S

2    (Begins, 11:30 a.m.)

3    THE CLERK:  The Court will hear Civil Action

4    Number 25-10685, the American Association of University

5    Professors, et al versus Marco Rubio, et al.

6    THE COURT:  Good morning.  Again I've allowed

7    internet access to this proceeding.  That being so, it's

8    appropriate that I say that if you are viewing the

9    proceeding via the internet, you must keep your

10   microphone muted, the rules of court remain in full

11   force and effect, and that means there's no taping,

12   streaming, rebroadcast, screen shots, or other

13   transcription of these proceedings.

14   Rather than have everyone introduce themselves, so

15   that we may have a accurate record, when you speak for

16   the first time, would you again introduce yourself.  But

17   otherwise it's not necessary to introduce yourself.

18   This is a final pretrial conference under Federal

19   Rule of Civil Procedure 16.  Normally I conduct these

20   conferences in the lobby, um, but in the interests of

21   complete transparency, I believe that this conference

22   ought be conducted on the record.  But I would hope that

23   we can have a relaxed interchange such that, if I say

24   something that's problematic, don't hesitate to, um,

25   point it to my attention and we'll try to work through

1 it.

2  Let me start by saying I welcome your efforts to

3 submit the joint pretrial memorandum, it's in the form

4 with which the Court is familiar, and addresses those

5 issues that are of most concern to the Court.  It's, I

6 think, easiest to work from the back forward, and that's

7 how I'm going to proceed.

8  So, um, I don't have an exhibit list, I understand

9 that, and that's not a problem.  Before we start, I want

10 one.  And absent some surprise to the litigants that I

11 -- with which I concur, um, nothing more is going to be

12 proffered but what is proffered in that exhibit list.

13 Now sit down together and work it out.  The exhibit list

14 should consist of the certified administrative record

15 and the other materials that either side wishes to place

16 before the Court.

17  The, um, -- those things that are not disputed,

18 and I would urge you not to -- well you're zealous

19 advocates, go ahead and dispute.  But to the extent you

20 reasonably can agree that a document ought be in the

21 record, give it a number -- not a plaintiff's number or

22 a defendant's number, just give it a number.  Numbers go

23 on to infinity.

24  Where there's any objection, give it a letter.

25 And once you've run out of letters, there's only 26,

1   start again AA, AB, AC, not AA, BB, CC.  I once got up

2   to 8Qs, the Court Reporter couldn't follow it, it makes

3   for a lousy record.

4       When you object to the other side's proposed

5   exhibit, it is not necessary -- I really am trying to

6   keep the costs down here, to tell me, um, the grounds of

7   the objection, unless it's authenticity.  If you think

8   the document is not an authentic document, or a

9   photograph or news report or whatever you think it may

10  be, it's not authentic, it's not what it purports to be,

11  call that out, because then I'll want the foundation

12  turned very square.  But otherwise I'm going in assuming

13  that what's before me are authentic documents.

14      I've read this, and I hope with some care, I

15  understand the government's -- well the government has

16  reasons, for instance, um, to object to videos of the

17  taking into custody of Ms. Ozturk.  I would hope that

18  that could be worked out, because it seems to me the

19  fact, whatever it is, is a fact.

20      And let me say as to things such as videos, um,

21  they -- they will be received in evidence, but I'm not

22  taking Court time to view them.  Before I enter findings

23  and rulings, you will understand that I have viewed

24  them.  Likewise depositions, I see you're taking

25  depositions, and that's fine, and maybe you want to

```
 1    designate portions of those depositions.  Just do so.
 2    Again, see if you can't agree as to whether I may
 3    receive the depositions in the record or not, and, um, I
 4    will -- I will rule on those.  And my practice is to
 5    take the deposition -- this is jury-waived, and rule
 6    right on the deposition with an "O" or an "S,"
 7    "Overruled" or "Sustained," so the record, for any
 8    appellate court, is clear what I have received at least
 9    in evidence, or refused to receive.  The, um -- but
10    we're not taking any time in open court to read
11    deposition testimony.  I can read.  And it's my duty to
12    have read these things.
13         Um, now let's work -- so that's what I expect on
14    exhibits, a single exhibit list marked as I've
15    designated.
16         MR. BIALE:  Your Honor?
17         THE COURT:  Yes?
18         MR. BIALE:  Two quick questions.
19         THE COURT:  That's why I'm doing this.
20         MR. BIALE:  Okay, great.  I'm Noam Biale for the
21    plaintiffs.
22         THE COURT:  Yes.
23         MR. BIALE:  The first question is about the
24    videos.
25         THE COURT:  Yes.
```

1    MR. BIALE:  So I anticipate we will seek to

2    introduce the video of Ms. Ozturk's arrest and

3    potentially the video of Mr. Khalil's arrest.  I totally

4    understand that we don't need to play that in open

5    court.  However, to the extent we want to ask our

6    witnesses whether they saw the video around the time

7    that it was released and what they thought about it,

8    would you like us to -- should we play it for them or

9    should we --

10    THE COURT:  It depends upon their recollection.

11    MR. BIALE:  Okay.  Um --

12    THE COURT:  This is a very well-equipped courtroom

13    and working with Ms. Belmont, if you have an AV person,

14    or persons, she can teach how the audio/visual in this

15    courtroom works.  So again it's your case to try, but my

16    expectation is I would have made the ruling that a video

17    is admissible.  Then if you think you need to refresh

18    your witness or point out some specific thing to a

19    witness, we can go right to that point in the video.

20    Does that answer your question?

21    MR. BIALE:  It does.  I mean I think there may be

22    witnesses who we want to say, you know, "Is Exhibit X

23    the video that you saw at the time?"

24    THE COURT:  Right.

25    MR. BIALE:  I think it's a fairly short video, so

1  we won't belabor the point.  But understood.

2       THE COURT:  It isn't a show, it's a trial, it's a

3  jury-waived trial, I take my duty very seriously, and I

4  want to be very clear as to what the record is.

5       So one other thing on exhibits.  The government

6  has proffered, or I have in my hand some documents that

7  I understand the government takes the position that

8  these are, um, privileged under the law enforcement

9  privilege.

10      Right?

11      MR. KANELLIS:  Yes, sir.

12      THE COURT:  And I want to put on the record how

13 I'm going to deal with them and how I'm going to deal

14 with them at trial, while we're talking about exhibits.

15 I said I would honor that privilege, and I do, and I

16 would examine those materials in camera.

17      Now "in camera," in the operations of this Court,

18 means I'm the only one who's going to look at them, not

19 law clerks, no one else.  And at least by the time we

20 get into this trial, I will have looked at them all, and

21 we've got them secure and will keep them secure.

22      If you refer to them, um, let's say in a 30,000

23 foot view, and say, there is no evidence of some

24 specific conduct, let's say, and you have every -- in

25 other words you're in control here, you can not refer to

1  them at all and, um, I anticipate that if I have to

2  then, I would give notice if it makes some difference to

3  the Court's determination.  But if you say, in argument

4  or otherwise, there's no evidence of X, and within these

5  materials there is evidence of X, I feel it's perfectly

6  okay for me, at the same level of generality, either in

7  the written decision or in open court, to say, "Well,

8  yes, there is," but I won't go any further.

9       Does that -- is that helpful, is that -- I want to

10  give you that guidance.

11       MR. KANELLIS:  That is somewhat helpful, your

12  Honor.  I think the problem is --

13       THE COURT:  Introduce yourself.  I'm sorry.

14       MR. KANELLIS:  Oh, my apologies.  William Kanellis

15  for the United States -- well for the government

16  defendants.

17       THE COURT:  Yes, Mr. Kanellis.

18       MR. KANELLIS:  I think that is somewhat helpful,

19  but obviously the devil's in the details --

20       THE COURT:  They always are in a trial.

21       MR. KANELLIS:  -- um, and I think it would depend

22  upon not only the witness's answer given, but I would be

23  interested in understanding perhaps the reason why the

24  Court would disagree with the witness.  But I don't

25  think that's going to be an issue.

1          THE COURT:  I'm not saying -- the Court, at least

2    sitting here in open court, is not going to disagree

3    with the witness, it may be, upon reflection, I would

4    find the witness not credible, but I understand how to

5    do that.

6          MR. KANELLIS:  Of course.

7          THE COURT:  I'm just not going to have, um, people

8    who refer conclusory to things -- privileges can't be

9    used as a sword and a shield, that's the general

10   proposition I'm following.

11         MR. KANELLIS:  Yes, your Honor.

12         THE COURT:  If you're going to use it as a sword,

13   you're waiving the privilege, because you're saying,

14   "We've got evidence of this," and if we've got the

15   specific evidence, well you've waived it, and now we've

16   got the evidence, it is what it is, and we'll deal with

17   it.  I've been in that -- I can't tell you any more than

18   that.

19         But that leads me -- I was working from the back,

20   but it leads me to -- in your witness list, which is

21   fine, you call certain people "summary witnesses."  Let

22   me tell you what I think that means.  That means that

23   where there are voluminous materials, a witness who has

24   gone over those materials summarizes them.  The

25   underlying materials have to be made available to the

1   other side.  But you're in agreement, so I don't have a

2   problem.

3           MR. KANELLIS:  Yes, sir, we merely do what I've

4   done in other District Courts, 1006(6)(11)(a), we will

5   make available the underlying, um -- the underlying data

6   to the other side, they're welcome to question the

7   witness --

8           THE COURT:  And that's satisfactory to the Court.

9           MR. KANELLIS:  Thank you, your Honor.

10          THE COURT:  Perfectly satisfactory.  And that's

11  what I thought you meant when you said a "summary list."

12          MR. KANELLIS:  Your Honor, while I'm standing, I

13  do have a follow-up question.

14          THE COURT:  Go ahead.

15          MR. KANELLIS:  So in other trials we usually --

16  obviously we want to inform the Court with respect to

17  exhibits that everybody can agree on.  Oftentimes though

18  we can't anticipate, Number 1, documents we will need to

19  refresh a witness's recollection or, Number 2, documents

20  needed to impeach a particular witness, if something

21  goes in a way we don't expect.

22          THE COURT:  That's what I meant by "surprise."

23          MR. KANELLIS:  I'm anticipating, your Honor, that

24  you don't expect us to name every potential document

25  that we -- that's fair game, but we can't introduce them

1  --

2      THE COURT:  It's fair game but they better fit

3  into one of those boxes.

4      MR. KANELLIS:  Um, just -- which boxes?

5      THE COURT:  Refreshing the witness or impeaching

6  him.

7      MR. KANELLIS:  Of course.  Of course.  I just

8  wanted to make sure that we don't have to present 1,000

9  exhibits --

10      THE COURT:  You don't have to present impeaching

11  evidence, though -- you've tried cases.  I don't want,

12  and will not accept, end runs around my orders.  I want

13  to have an exhibit list and have it work.

14      MR. KANELLIS:  Yes.

15      THE COURT:  I understand what impeachment is.

16      All right.  Now let's talk timing now.

17      MR. BIALE:  Sorry, your Honor, and I apologize for

18  --

19      THE COURT:  No apology is necessary.

20      MR. BIALE:  Okay, I withdraw the apology.

21      (Laughter.)

22      MR. BIALE:  When would you like the exhibit list,

23  your Honor, the joint exhibit list?

24      THE COURT:  The morning of trial.

25      MR. BIALE:  Okay, perfect.

1        And then the second question I have is, um, you

2   know I'd like to -- and we may get into this later, as

3   we reference in our motion to compel, but we've received

4   a very small number of documents from the government and

5   your Honor has received some additional documents.

6   They're not -- they're certainly not so voluminous that

7   --

8        THE COURT:  Let's --

9        MR. BIALE:  Well I just want to ask with respect

10  to if they're calling summary witnesses to summarize the

11  data that Mr. Kanellis was just talking about, it would

12  be helpful to when we are going to receive that data so

13  we can prepare to cross-examine those witnesses?

14       MR. KANELLIS:  The rule states, your Honor, within

15  a reasonable time.

16       THE COURT:  What do you think is a reasonable

17  time?

18       MR. KANELLIS:  I think sometime next week.

19       THE COURT:  I think that's true.  Before the

20  holiday.

21       MR. BIALE:  Thank you, Judge.

22       THE COURT:  All right.

23       The time for the trial.  The defense has estimated

24  it's going to take 2 weeks.  I'm prepared to give 9

25  days.  I have a doctor's appointment on the 16th.  I sit

1   from 9:00 in the morning till 1:00 in the afternoon.

2   Yes, there will be opening -- or maybe opening

3   statements no longer than 15 minutes a side.  There may

4   be closing arguments, no longer than 1 half hour per

5   side.  I would appreciate, at least by the close of the

6   trial, proposed findings and rulings.

7       I understand that the plaintiffs are --

8   Ms. Belmont said you've got some problem with the second

9   week of trial?

10       MR. BIALE:  Yes, your Honor, so there's a couple

11   of issues.

12       One is, um, so I have a conflict the 14th, 15th,

13   and 16th that will require me to be in New York.

14       THE COURT:  Well I'm looking at this battalion of

15   lawyers here.

16       MR. BIALE:  I thought that you might say that,

17   your Honor, so let me quickly get to the other issue,

18   which is, um, we do have now, that the government has

19   identified for us, um, 12 witnesses, only two of which

20   we've had an opportunity to depose, and time is short

21   between now and the trial.  We have 6 depositions, um,

22   both offensive and defensive, scheduled in the six

23   business days remaining before the trial.  It would be

24   helpful to us certainly to have a brief pause where we

25   could depose these additional witnesses that the

1   government has noticed.

2        THE COURT:  Look -- look, when I collapsed your

3   motion for a preliminary injunction with trial on the

4   merits, the urgency with which you supported a

5   preliminary injunction was not lost on the Court and I

6   have followed the schedule that you people have adopted.

7   You asked that the trial start on the 7th.  I'm ready to

8   have the trial start on the 7th.

9        Now this case is going to require a written

10  opinion.  I take some time in August.  The truth is,

11  because I'll move other things, I have for trial between

12  the 7th of July and the 31st of July.  So I know I'm not

13  going to be here on the 30th of July.  If you're content

14  to wait until sometime in September for an order --

15  remember we're only talking liability in this phase, so

16  maybe the full opinion need not come out.  But as I

17  looked at this case, I thought that if we could get it

18  done in the first two weeks -- 9 days, not 10 -- but if

19  you're all here at 9:00, then we will certainly start on

20  the dot of 9:00, and then there might well be at least

21  an order, conclusory perhaps, in July.  One would think

22  you'd want that.

23       But if you don't, and you want to say, "Well let's

24  go to the next week, the 21st, we'll take a pause," then

25  you can take depositions.  I've had people call my

1    bluff, when I collapsed it with trial on the merits, and

2    the other side said, "Well we need depositions," and I

3    say "There isn't a constitutional right to depositions."

4    Put out subpoenas.  Trial's work.  People focus.

5        You tell me.  What do you want to do?

6        MR. BIALE:  I think I'm going to listen to what

7    the Court said and I'm going to sit down.

8        THE COURT:  All right.

9        Counsel?

10        MR. KANELLIS:  Just a couple of comments, your

11    Honor.

12        We have endeavored to bring witnesses who have,

13    um, they have national security concerns they're dealing

14    with on a daily basis, and they've set aside this time,

15    and we've made them at great cost, um, okay --

16        THE COURT:  Respectfully I'm under the gun too.  I

17    accept that absolutely as you state it, and we'll hear

18    it.

19        MR. KANELLIS:  And let me add this.  Look,

20    depositions, that's a nice thing to have.  We don't need

21    them.  You Honor tries cases every day where there are

22    no depositions.  We understand we may have to go to

23    trial where witnesses have not been deposed.  Those are

24    the breaks.

25        THE COURT:  I'm sure you do.  All right, now let's

1  see.

2       So it's 9 days of trial.  I'm keeping time.  It

3  includes the openings and closings.  And working back,

4  um, well some of these objections we can deal with.  I

5  guess now is the time to work through these issues, some

6  I can handle, some I can't.

7       MR. KANWIT:  Your Honor, I apologize, one final

8  question?

9       THE COURT:  Yes.

10      MR. KANELLIS:  Closing arguments.  Do you expect

11  closing arguments at the very close -- which is fine, as

12  soon as the last witness has taken the stand, we have a

13  30-minute closing?

14      THE COURT:  Well usually I take a recess, but,

15  yes.

16      MR. KANELLIS:  Thank you, your Honor.

17      THE COURT:  I mean the truth is that I expect this

18  to go faster than we've estimated.  I would have given

19  you the 10 days, but I have to take the 16th.

20      It's always, um, an appropriate correction for

21  judges, who can set their own schedules, to be at the

22  mercy of doctors who set theirs.  (Laughter.)  So I have

23  to do it, um, not sit on the 16th.  9 days will do it.

24  But it may well go faster than that, um, and the like.

25      So let me deal with the outstanding matters to the

1    extent that I can, and I'll try to refer, because your

2    joint memorandum has been very helpful.  All right,

3    questions really raised by pending motions.

4         The plaintiffs have filed motions pending with the

5    Court, motions to compel.  The first one is under

6    advisement.  I'll rule on it.

7         Remote testimony?  Now, look, since we're going

8    two weeks, they'll even put them in on the second week,

9    can't you?

10        MR. BIALE:  So, yes, your Honor.  As to two of

11   them there's one that we would not be able to put on --

12        THE COURT:  Where's he or she?

13        MR. BIALE:  She is the one who is in Beirut, so

14   it's most difficult for her to travel.  So we'd ask just

15   to have that one --

16        THE COURT:  Who is she?  Just so I know.

17        MR. BIALE:  Sure.  So her name is Nadia Abu

18   El-Haj, she's a professor at Barnard College, Columbia

19   University.  She's an AAUP member.

20        THE COURT:  You may call her remote.

21        MR. BIALE:  Thank you, Judge.

22        THE COURT:  And all the arrangements are on you,

23   there's time-zone differences and the like.

24        MR. BIALE:  Okay.

25        And just to preview for the Court the two other

1    witnesses who we mentioned in the, um, motion for remote

2    testimony, they will certainly be able to testify by

3    Friday the 18th.  It may be difficult to get them to do

4    it earlier, but that is within the two weeks that --

5         THE COURT:  Well it's not like you get one week

6    and they get another week, it's -- the cross-examination

7    comes out of your time.  I mean you're not taking up

8    five full days.

9         MR. BIALE:  Understood, your Honor.

10        THE COURT:  All right.  Okay.

11        MR. KANELLIS:  Your Honor, before you move on to

12   the next, if you're going to allow remote testimony,

13   we'd ask that all our witnesses be available.  We have

14   one witness who is moving to pursue an attache position

15   in London.  If you're going to allow remote testimony,

16   we would ask that that witness be allowed to testify

17   from London on, um --

18        THE COURT:  Well work it out with them when, but

19   fair is fair and you may.

20        MR. KANELLIS:  It's the second Tuesday, the

21   Tuesday of the second week.

22        MR. BIALE:  We have no objection to that, your

23   Honor.

24        THE COURT:  Fine.  That's done.

25        All right.  "Preclude the defendants

1    from questions as to the identities of" -- um, these

2    issues come up during the course of the trial.  I -- I

3    don't decide that in limine, I'm not going to preclude

4    anything.  We'll see.

5        "Permit witnesses to testify about" -- that's an

6    evidentiary ruling, I'll make evidentiary rulings when I

7    have to.

8        "Draw certain adverse inferences" -- well at the

9    trial, we'll see how the trial goes.

10        The defense.  "Reconsideration of the Court's

11    order entering a protective order."  In one respect, um,

12    the motion is allowed, the, um -- the, um -- I've

13    allowed this, um, a record to be made of the people that

14    look at the information.  It's without limit of time.

15    It's with a limit of 5 years following the close of the

16    trial.  In all other respects, the protective order

17    remains as the Court has, um, ruled on it.

18        "Exclude evidence based on" --

19        MS. SANTORA:  Your Honor?

20        THE COURT:  Yes?

21        MS. SANTORA:  This is Victoria Santora for the

22    government, may it please the Court.

23        THE COURT:  Yes.

24        MS. SANTORA:  I do have a question about, um, the

25    ruling that you just issued on the protective order.

1          THE COURT:  Yes.

2          MS. SANTORA:  Plaintiffs gave their response to

3     our motion for reconsideration and suggested amendments

4     to the paragraph you were just referring to.

5          THE COURT:  If you work it out, you work it out.

6     Give them to me.  But those are the Court's orders.

7          MS. SANTORA:  Yes, okay, thank you, your Honor.

8          THE COURT:  "Exclude evidence based upon, um, not

9     retrying other immigration or judicial proceedings."

10    The breathe here -- and I'm on Page 9, Subparagraph ii,

11    is to more.  I'm not going to make any findings of fact

12    in anybody else's case, whether the case is wholly

13    administrative or whether it's pending in some other

14    court.  But we're certainly going to take evidence with

15    respect to what was known about what's going on in those

16    cases.  So I'm going to allow that.

17         This business about Veena Dubal, waiving the

18    attorney-client privilege.  I'm sensitive to that.  If

19    she's going to testify about communications -- and maybe

20    the government, um -- the defendants will allow that and

21    then turn around in cross-examination and say, "Well

22    you've waived it," there might be something to that.

23         The last point is about, um, additional documents.

24         MR. KANELLIS:  Your Honor, I'm sorry -- I'm sorry

25    to keep interrupting, but on the, um --

1          THE COURT:  It's not interrupting, I'm just

2     precluding argument, but not interrupting.

3          Go ahead.

4          MR. KANELLIS:  This issue cannot wait until trial

5     and here's why.

6          Ms. Dubal is testifying strictly in the capacity

7     as General Counsel for AAUP, yet, she is testifying as a

8     fact witness.  That's unusual, yes.  But we need a

9     ruling from the Court prior to trial because they've

10    been withholding documents on the basis of a privilege

11    that we need to see in advance of trial.  It's not

12    something that we can wait until she testifies and I

13    make an objection.  We need to see those records.

14         THE COURT:  I've made my ruling.  We'll start the

15    trial.  You won't be disadvantaged insofar as the, um,

16    exercise of the attorney-client privilege.  We'll have

17    to see how it works out.

18         You should understand that I come from a state

19    court system where, um, it, um, allows the drawing of a

20    -- the state court system, that's where I learned how to

21    be a judge, which allows the drawing of an adverse

22    inference from the assertion of an attorney-client

23    privilege.  Just have that in mind.  I've made my

24    ruling.

25         MR. BIALE:  Your Honor, can I just briefly, for

1   the record --

2          THE COURT:  You know --

3          MR. BIALE:  Okay.

4          THE COURT:  And I don't mean to be brusque, but

5   you know when you tell me "for the record," you're

6   trying to convince me.  There are higher courts.  You

7   may get to them.

8          All right, let's see here.  I'll see that everyone

9   has an adequate record.

10          All right, discovery.

11          Now that, um, that takes care of what I, um,

12   wanted to do in this Rule 16 conference.  I have some,

13   um, comments that I think are appropriate as we go into

14   this case, and then I'll stop and take questions briefly

15   because I do want to call you to the sidebar before we

16   conclude.  So let me make these comments.

17          Much has been made of the term "antisemitism" in

18   government-issued documents.  A concern to minimize,

19   ameliorate antisemitism is -- antisemitism now, standing

20   alone, without the adjective "violent" antisemitism or

21   the like, but the government has a legitimate concern

22   trying to ameliorate antisemitism as it has an equally-

23   legitimate concern to ameliorate islamophobia, or any

24   other sectarian, um, expression of hate.

25          I take antisemitism to be the expression of hate

1   or dislike to a person or a group of people based upon

2   their faith, their Jewish faith, or -- or and, perhaps

3   an ethnicity based upon national origin or some

4   geographic position.  And it is the legitimate purpose

5   of government to seek to minimize that -- and again I'll

6   say islamophobia or any sectarian disapproval, um, based

7   upon race or faith or lack of faith.

8        But none of that, as I understand the law, and as

9   I understand the First Amendment, none of that is

10  illegal.  A simple expression, however -- however

11  uncomfortable, however repugnant, that's not against the

12  law, nor can it be in, um, a society dedicated, as our

13  society is, to the First Amendment.  And having said

14  that, um, statements concerning the policies of the

15  State of Israel are political expression and are among

16  the most protected statements under the First Amendment.

17       Now I fully recognize, going in, that these are

18  not, um -- there's not a firm line here, expression can

19  turn into, um, threats, which at a certain level of

20  extremity are properly, um -- and going back to Holmes,

21  that you cannot "cry fire in a crowded theater."  I

22  understand the lines are blurred.  But it's appropriate

23  to say that.

24       Political expression is, um, it seems to this

25  Court, truly protected under the First Amendment, no

matter how uncomfortable, no matter how disfavored by

the government.  Whereas pure speech, hostile to one's

faith or the lack of faith, is I think inconsistent with

American values, but it is not the subject of our

criminal laws.

Now I've talked enough.  A few moments for your

questions and then I do want to see you at the sidebar.

And we'll start with the plaintiffs.

Any questions about what I've said or taken under

advisement?

MR. BIALE:  No, your Honor, thank you.

THE COURT:  All right.

And, sir?

MR. KANELLIS:  I do have a question to an issue

that relates to -- actually partly to the plaintiffs'

earlier motion.

We have, um, an ample audience here and in high-

profile trials I've been involved with in the past,

there have been concerns, as there are in this case,

regarding the, um, I guess prophylactic measures taken

to protect the identify of witnesses.  We've explained

that some of our agents have been, um, in other

litigation have been the subject of doxxing, agents have

been attacked.  Likewise your Honor has -- and we agree,

we think it's appropriate to protect the identify of

1    witnesses so that their identities don't prevent fulsome

2    and honest testimony.

3        My question, or actually my recommendation to the

4    Court, is in other trials that I've been in, that

5    sometimes we allow the anonymization of witnesses by

6    using pseudonyms, like "Agent A" or "Ms.", and using

7    somebody's initials, in lieu of their real names, so

8    that, um -- to protect the witnesses from both parties

9    from being doxxed and that sort of thing.

10       THE COURT:  See if you can work it out.  And to

11    the extent you can work it out, the Court, um, will be

12    supportive of it, pretty clearly.  But I need to be

13    clear on who is who, in other words tying it, the record

14    all together, because I have a separate duty.  But so

15    long as I know what we're doing, that should not be a

16    problem.  But no one is going to be in this courtroom

17    masked or otherwise concealed from a public courtroom.

18    The law is pretty clear on that.  But your suggestion is

19    not a bad suggestion.  See if you can work it out.

20       MR. KANELLIS:  Fair enough, your Honor.  And one

21    last concern.

22       Your Honor last week, last Wednesday, I believe,

23    issued an order regarding the identify of the opposing

24    party's witnesses.  We still do not have discovery from

25    the plaintiffs that we've requested even though they

1   have this order in their possession, and the clock's

2   ticking.

3          THE COURT:  I understand.

4          MR. KANELLIS:  So I would ask that --

5          THE COURT:  I'm only going to rule on motions, and

6   the motions I have, I've ruled on them.

7          All right, let's go off the record.  Come up to

8   the sidebar.

9          (Sidebar, off the record.)

10         THE COURT:  And we'll recess.

11         THE CLERK:  All rise.

12         (Ends, 12:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Thursday, June 26, 2025, to the best of my skill and

9    ability.

10

11

12

13
     /s/ Richard H. Romanow 06-27-25
14   _____
     RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., <br><br> *Defendants.* | No. 1:25-cv-10685-WGY <br><br> RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY |

## INTRODUCTION

The Court should deny the motion to compel.  Plaintiffs are proceeding as though this were a standard civil case, rather than the expedited preliminary injunction proceeding—consolidated with a trial on the merits within eight weeks—for which they committed to being ready. The Court was clear: full discovery is neither feasible nor permitted in this compressed timeframe. *See* May 6, 2025, Tr. at 16:7-15:8 ("I am not expecting full discovery. We don't have much time)

Despite that, Plaintiffs seek to compel responses that have largely been (or are currently being) satisfied, overstating purportedly "dilatory" conduct that amounts to mere days—which, in any case, are "delays" only in the sense they arise from deadlines they unilaterally imposed. They also seek information which Defendants have properly withheld as privileged, in accordance with this Court's own instructions and guidance. Defendants have produced responsive information across all categories while shouldering the burden of protecting sensitive data and national security information, expediting the multi-step protocols and requirements for shielding privileged information, and devising work-arounds that enabled the more expeditious review by Plaintiffs' counsel of non-public information, whenever feasible. Defendants are continuing to meet the substance of most requests. In short, the motion disregards the Court's clear limitations and practical realities of the accelerated schedule Plaintiffs requested, and it should be denied.

## BACKGROUND

Plaintiffs served their initial discovery requests on Defendants on May 13, 2025. Declaration of Ethan Kanter (Kanter Decl.) ¶2; Exh. A (Plfs' Requests for Production (RFPs)); Exh. B (Plfs' Interrogatories). They amended their requests on May 19, 2025.  Kanter Decl. ¶3; Exh. C (Plfs' Amended RFPs); Exh. D (Plfs' Amended Interrogatories). During a May 22, 2025, status conference the Court reduced the number of "targeted noncitizens" about whom Plaintiffs could seek discovery from nine down to five.  Dkt. # 102 at 7, 9-10.

1

On May 21, 2025, Defendants moved for a protective order to limit the Court's review to an administrative record, Dkt. # 94. The Court heard argument on the motion on June 2, 2025, and denied it that day. Dkt. # 112. In authorizing Plaintiffs to seek discovery, Dkt. # 115 at 28, the Court set forth some important parameters: (1) it recognized that information subject to the law enforcement or deliberative process privilege could be withheld from disclosure, Dkt. 115 at 27-28, 32; and (2) it admonished against discovery into high-ranking agency officials, Dkt. # 115 at 30-31.

The government subsequently filed both sealed and public versions of the certified administrative record with the Court on May 29, 2025. Dkt. #105 & 106. On June 11, 2025, it also lodged an in camera, ex parte submission of privileged and law enforcement sensitive documents. Dkt. # 131. On June 13, 2025, Defendants served on Plaintiffs responses and objections to Plaintiffs' amended RFPs, along with their first production volume of responsive documents. Kanter Decl. ¶4; Wilkens Decl. Exh. 2 (sealed) (Defs' RFP Responses); Exh. E (June 13, 2025, Transmittal Email). On June 21, 2025 (not June 22, 2025, as Plaintiffs claim, Mot. at 6), Defendants served responses and objections to Plaintiffs' interrogatories. Kanter Decl. ¶5; Exh. G (June 21, 2025, Transmittal Email); Wilkens Decl. Exh. 10 (sealed) (Defs' ROG Responses).

Meanwhile, Defendants have made, or intend to make, the following officials available to Plaintiffs for depositions: Andre Watson, Assistant Director, National Security Division, Homeland Security Investigations (HSI), deposed on June 11, 2025; John Armstrong, Senior Bureau Official, Bureau of Consular Affairs, U. S. Department of State, deposed on June 12, 2025; Stuart Wilson, Deputy Assistant Secretary for Visa Services, Bureau of Consular Affairs, U.S. Department of State, deposed on June 24, 2025; Peter Hatch, Assistant Director, Office of Intelligence, Homeland Security Investigations, Department of Homeland Security, deposed on June 25, 2025; Andrew Veprek, Senior Advisor, Office of the Counselor, U.S. Department of State, to be deposed on June 20, 2025; and Jessica Norris, Managing Director for Visa Services, Bureau

2

of Consular Affairs, U.S. Department of State, to be deposed on July 1 & 3, 2025. Kanter Decl. ¶¶

6-11. Defendants also have identified various Immigration and Customs Enforcement agents and

will make them available for depositions to the extent that schedules allow. *Id.* Kanter Decl. ¶ 12.

Plaintiffs ask the Court to compel "(1) the production of documents that Plaintiffs have

identified as missing from Defendants' productions, (2) complete answers to Plaintiffs'

interrogatories, with all objections deemed waived due to Defendants' untimely and deficient

responses, which have caused substantial prejudice to Plaintiffs, (3) the production of documents

improperly withheld as privileged, and (4) the reappearance of John Armstrong, a State Department

official who was previously deposed, for a continued deposition on questions that he was instructed

not to answer based on improper assertions of privilege." Mot. (Dkt. # 153, filed under seal) at 1-2.

For the reasons set forth below, the Court should deny Plaintiffs' motion.

## ARGUMENT

### I.    The Information Plaintiffs Seek To Compel Are Unresponsive Or Do Not Exist

Plaintiffs allege that Defendants improperly omitted the documents listed below from their

production, claiming they are responsive to Plaintiffs' RFPs 1 & 2. Mot. at 2-5.  These requests

seek information "showing the planning, execution and implementation of your decision to take

any adverse action against a Targeted Noncitizen Student or Faculty Member," and "requesting or

recommending the taking of, and memorializing, explaining, or justifying the decision to take any

adverse action against a Targeted Noncitizen Student or Faculty Member." Exh. C at 5-6.

- Documents and communications concerning the DHS/DOS Student Visa Working Group. *See* DEF-077.
- Documents and communications concerning the interagency working group that focused on the revocation of student visas and that included White House Deputy Chief of Staff Stephen Miller and officials from several agencies, including the Department of State, Department of Homeland Security, and Department of Defense. *See* Wilkens Decl. Ex. 8 (Armstrong Tr. at 203–210).
- Security advisory opinions sought with respect to any of the five Targeted Noncitizens.

3

Mot., Exh. B. Plaintiffs have not shown – and make no effort to explain, *see* Mot. at 4 – how broad communications or documents from interagency working groups are responsive to RFPs 1 & 2, which concern nine specific individuals, which the Court limited to five. Dkt. # 125. Of those five, only one, Ms. Ozturk, had a visa revoked.  Defendants have not identified any documents or communications concerning the DHS/DOS Student Visa Working Group referencing Ms. Ozturk.

Additionally, the cited portions of Armstrong's deposition transcript do not reflect any "interagency working group." *See* Wilkens Decl. Exh**.** 8 at 203-209 (describing phone calls involving the White House and representatives from multiple executive departments discussing the revocation of non-immigrant visas, including student visas). Nor have Defendants been able to verify that one exists. Thus, Defendants have identified nothing responsive to these requests. Finally, Defendants have not identified no security advisory opinion for any of the five specific individuals into whom the Court has permitted discovery. Dkt. # 102 at 7, 9-10.

Plaintiffs, next, demanded production of various State Department cables as being responsive to their **RFP 5**, which sought information "concerning the inspection, review, monitoring, or surveillance of noncitizens' social media accounts or activity for pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activity." Exh. C at 8-9. In response to this request, Defendants will produce two State Department cables with law enforcement redactions: 25 STATE 52014, "ACTION REQUEST - Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University," and 25 STATE 50220, "Action Request: Expanding Screening and Social Media Vetting for Visa Applicants - Part 1."

The remaining cables that Plaintiffs demand are not responsive to RFP 5 because they do not concern social media review and do not address the speech or activity referenced in that RFP. Should the Court disagree, Defendants will produce them with appropriate redactions for privilege.

4

Plaintiffs also demand production of nonpublic provisions of the State Department's Foreign Affairs Manual and Foreign Affairs Handbook. *See* Mot., Exh. B at 1. Defendants have reviewed these provisions and determined that only 9 FAM 402.5-5(C) contains responsive material. Defendants will produce the provision, with appropriate redactions for privilege.

Additionally, Plaintiffs have requested Department of State policy materials, guidance, or instructions, which they claim are also responsive to RFP 5. *See* Mot., Exh. B at 1-2. Defendants have no record of the documents below, however, and therefore cannot produce them.

- Any finalized "3(C) policy" developed in response to E.O. 14,161 and/or E.O. 14188 or that otherwise addresses antisemitic or terrorist activity.
- Any "action memo" presented to the Secretary of State seeking the approval of such a policy.

To the extent that Plaintiffs also seek a "3(C) policy" being developed in response to E.O. 14,161, *see* Sealed Exh. G (Armstrong Tr. at 33-47), Defendants will endeavor to identify whether such a policy is being developed and, if so, will produce it with appropriate redactions for privilege.

Plaintiffs also request "Any additional documents embodying the guidance given to consular officers regarding social media vetting protocols." Mot., Exh. B at 2. Defendants have already provided 25 STATE 26168, "Enhanced Screening and Social Media Vetting for Visa Applicants" (*see* CAR-012-017), as well as a PowerPoint presentation on social media vetting (*see* DEF-064-083). They will also provide, as reflected above, 25 STATE 52014, "Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University," and 25 STATE 50220, "Expanding Screening and Social Media Vetting for Visa Applicants - Part 1and are not aware of any further guidance. Defendants continue to investigate whether there is anything further and will produce any other responsive documents, subject to appropriate privileges, as they are identified.

Regarding Plaintiffs' request for guidance related to EOs 14,161 and 14, 188 "found on CAWeb," *see* Mot., Exh. B at 2, Defendants have reviewed CAWeb for any responsive guidance

that has not already been produced and found none. Defendants have already produced 25 STATE 26168 (*see* CAR-012-017), which pertains to social media vetting and is located on CAWeb.

Plaintiffs also request the "guidance [for] what to consider when submitting revocation requests and tips" that is referenced on DEF-086. Mot., Exh. B at 2. The guidance references State Department Cable 5914, "THE IMPORTANCE OF SECURITY AND VIGILANCE IN VISA ADJUDICATIONS," which is not responsive to RFP 5. Should the Court disagree, Defendants will provide that to Plaintiffs subject to privilege review.

Through their **RFP 6(b)**, Plaintiffs request "Communications from the State Department to Covered Institutions directing them to report international students for participating in "proscribed antisemitic actions," "terrorist activity," or "endorsing or espousing terrorism," Mot., Exh. B at 2. The State Department has not found any such communications so cannot produce them.

Plaintiffs request documents based on their reading of Stuart Wilson's deposition rough transcript on June 24, 2025, which references "3(C) Policies." Add. at 1-2 (Dkt. #162). It is unclear what documents are being referenced, as Defendants have not identified any such "3(C) Policies." As Mr. Wilson's deposition remains open, his continued testimony may clarify his remarks.

## II.    Defendants' Responses And Objections To Plaintiffs' Interrogatories Were Proper

While Defendants' substantial compliance by itself warrants denial of Plaintiffs' motion, Plaintiffs' effort to impose routine discovery standards in this expedited proceeding is misplaced. The Court should decline to find that Defendants have waived their objections. Plaintiffs' waiver argument underscores this fundamental mismatch. Defendants' objections to Plaintiffs' interrogatories were served while responding to discovery requests on multiple fronts in the abbreviated timeframe necessary to enable the expedited trial date. With Plaintiffs' consent and representation that they would be prepared for trial within six weeks, the Court consolidated a hearing on Plaintiffs' preliminary injunction motion with a trial on the merits. April 23, 2025, Tr. at

10:19-10:21, 11:23-12:6.  This consolidated proceeding has required the government to simultaneously negotiate agreements with Plaintiffs' counsel to ensure the protection of sensitive information, *see, e.g.,* Dkt. ## 133, 135, 137, 143; negotiate stipulations of fact, Dkt. ## 126, 130; respond to their RFPs and interrogatories; search for, collect and review documents for responsiveness and privilege and produce them to Plaintiffs with privilege logs; identify documents appropriate for inclusion in the certified administrative record, Dkt. ## 98, 106; identify yet other documents appropriate only for in camera, ex part consideration; defend depositions of multiple government witnesses; propound their own discovery requests; and depose Plaintiffs' reluctantly proffered witnesses. All within the span of eight weeks.  Meanwhile, Plaintiffs largely have yet to respond to Defendants' RFPs and have provided no responses to Defendants' interrogatories.

No discovery schedule has been set by the Court. And, shortly after receiving Plaintiffs' amended interrogatories on May 19, 2025, the government moved for a protective order on May 21, 2025, which the Court agreed to hear on June 2, 2025. Dkt # 112. While the Court denied the government's request, it clarified the scope of discovery. Dkt. # 115 at 28. Defendants served their responses on June 21, 2025, within three weeks of the Court's ruling. Plaintiffs point to no authority requiring that objections be deemed waived when provided 39 days after being served in the context of a Rule 65(a)(2) expedited proceeding and only 19 days after the Court detailed discovery scope. The 30-day deadline should not apply in the context of a Rule 65(a)(2) proceeding, given its summary nature. *See Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 15 (1st Cir. 2009) (observing that Rule 65(a)(2) proceedings implicate "real hazards inherent in fully disposing of cases in such an expedited fashion-among them incomplete coverage of relevant issues and failure to present all relevant evidence.") (quotations marks omitted).

Even assuming a standard civil proceeding where the thirty-day deadline applied; Plaintiffs cite no case establishing objections are waived when they are filed nine days late. *See* Mot. at 7.

7

Add.430

Instead, courts in this circuit have found objections to interrogatories waived when they are significantly untimely. *See, e.g., NLRB v. Pan Am. Grain*, 2022 WL 17494323, *7 (D. P.R. Dec. 7, 2022) (six months late); *Krewson v. City of Quincy*, 120 F.R.D. 6, 7 (D. Mass. 1988) (45 days late); *Katz v. Liberty Power Corp., LLC*, 2021 WL 3616073 (D. Mass. Mar. 29, 2021) (53 days late).

This minimal delay is excusable because promptly responding to Plaintiffs' interrogatories was neigh impossible when viewed in concert with other discovery demands – all of which Defendants accomplished in an unusually compressed time frame and notwithstanding the myriad layers of approvals and privilege reviews needed from two different executive agencies. Despite these obstacles, Defendants filed a 48-page certified administrative record, Dkt. # 106, produced 98 pages of document discovery to Plaintiffs, and submitted 99 pages of documents in camera. Defendants have also facilitated the depositions of two State Department officials and two DHS ICE officials, and have arranged for additionally depositions next week. Given the expansive discovery that has already taken place in a tight six-week period, Plaintiffs' claim that they have been prejudiced by Defendants' 39-day response is unpersuasive and it ignores the potential for serious harm arising from the inadvertent release of privileged information. *See* Section 3.

As for the merits of the government's objections, they are grounded in this Court's rulings and guidance on discovery parameters. The Court limited Plaintiffs' discovery into immigration enforcement actions against specific noncitizens to five individuals. Dkt. # 125. It also stated that Plaintiffs are not entitled to deliberative process or law enforcement privileged information. *See* June 2, 2025, Hearing Tr. at 27-28; May 6, 2025, Hearing Tr. at 19-20. And, the Court admonished that discovery into high-ranking officials was off limits. May 6, 2025, Tr. at 16:11-16:17 ("I'm not going to permit any direct discovery of the President or the high executive officials that you have named and sued in their official capacity. I'm not going to require that they answer interrogatories or, um, submit themselves to discovery at all . . . ."); *see also* April 23, 2025, Hearing Tr. at 12.

8

As to the individual Interrogatories, Defendants' responses were sufficiently complete, reasonable, and in line with the Court's guidance. For **Interrogatories 1-3**, Defendants provided the names of multiple agency officials with the requested relevant knowledge. *See* Wilkens Decl. Ex. 10  at 6-9. Plaintiffs have already deposed State Department official John Armstrong and were permitted to question him about specific enforcement actions. *See* Sealed Exh. G (Armstrong Deposition Tr. at 211-15, 217-35). Plaintiffs' expectation that Secretary of State Marco Rubio be listed among Defendants' responses directly contradicts this Court's guidance against discovery into high-level officials. May 6, 2025, Tr. at 16:11-16:17; *see also* April 23, 2025, Tr. at 12.

**Interrogatories 4-5**, asked for the identities of individuals involved in communications with universities concerning noncitizen believed to have engaged in antisemitic speech or activities and who were targeted as a result. Defendants have identified nothing responsive.[1]

Plaintiffs also fault Defendants for providing "limited responses" to **Interrogatories 6-10** and **12-14**, but they provide no argument for why Defendants' responses are insufficient. Defendants provided Plaintiffs the details that could be shared without risking the disclosure of sensitive information, and submitted additional information to the Court to review in camera. Sharing the full information contained in the documents submitted in camera would impermissibly information that has not even been shared in the litigation involving the identified noncitizens. In response to Interrogatory 13, Defendants provided government declarations describing the details of the transfers, as requested. In response to Interrogatories 12 and 14, Defendants provided documents setting forth the procedures and policies for orchestrating immigration-related arrests.

Plaintiffs' complaint of prejudice is unavailing. In agreeing to Rule 65(a)(2) proceedings, Plaintiffs should largely be deemed ready to present their case without the need for extensive

---

[1]  While Defendants initially declined to answer Interrogatories 4 & 5 and instead stood on their objections, they will update their responses to reflect that they have identified nothing responsive.

discovery.  *See* May 6, 2025, Tr. at 16:7-15:8 ("I am not expecting full discovery. We don't have much time); Fed. R. Civ. P. 65(a)(2) (advisory committee's note to 1966 amendment noting that the court's authority under this provision  "can be exercised with particular profit when it appears that a substantial part of the evidence offered on the application will be relevant to the merits and will be presented in such form as to qualify for admission on the trial proper."); *see also Doe v. Prosecutor, Marion Cnty., Indiana*, 705 F.3d 694, 696 (7th Cir. 2013) (In assenting to a Rule 65(a)(2) hearing, "the parties further agreed no additional discovery was required and there would be no live evidence at trial," and bench trial consisted of just four affidavits and counsel' arguments).

Plaintiffs' complaint that they "had to spend substantial portions" of the Armstrong and Watson depositions "attempting to obtain information sought by the interrogatories" is unpersuasive. Mot. at 7. While the lead-up to a standard civil trial enables traditional sequencing, so that interrogatory responses are received before depositions begin, this is not possible to do in eight weeks. Indeed, the parties have jointly submitted their *final* pretrial memo, though depositions continue, and production of new information will continue up to the date of trial. That is not standard sequencing, and Plaintiffs' selective effort to impose it here is wholly inappropriate.

Plaintiffs also assert that the government has failed to produce the names of individuals identified by Messrs. Watson and Armstrong during their depositions. Yet, they fail to cite those names in their motion or explain their relevance to this case. While Plaintiffs are apparently dissatisfied with Defendants' responses, more than mere dissatisfaction is necessary for them to show that a grant of their motion to compel is warranted. *See Gravley v. Tretnik*, 2011 WL 13578683, *1 (W.D. Pa. Dec. 28, 2011) ("Plaintiff's general dissatisfaction" insufficient "to compel general redrafts of Defendants' responses to his discovery requests").

### III.    The Court Should Uphold Defendants' Privilege Assertions

      A.    In Camera Documents

Defendants have provided the Court, for in camera ex parte review, ten law enforcement sensitive documents relating to the five identified noncitizens who are in active litigation in other courts because those documents had not been produced there. *See* June 11, 2025, Notice of Sealed Sub. of Docs. for In Camera, Ex Parte Review ("Notice of Sealed Docs."), Dkt. 131, Exh. B-K; *see also* May 6, 2025, Hearing Tr. at 21:3-5 (cautioning that the Court "in no way is going to retry immigration proceedings or judicial proceedings in another district"). By connection, interrogatory numbers 6, 7, & 10, may require reference to those documents so Defendants limited their answers accordingly. As the Court reiterated at Thursday's pretrial conference it would review those documents and give notice if it makes some difference to the Court's determination. *See* June 6, 2025, Tr. at 8:5-10:9. So, Plaintiffs do not have a great need for the documents.[2]

      B.    Unchallenged Redactions

Plaintiffs do not challenge the redactions to the Arrest Procedures Handbook, DEF 36-63, or the Memorandum of Agreement Between USCIS and ICE, DEF 95-98, so Defendants do not address them here. Defendants request an opportunity to respond to an untimely challenge.

      C.    The Defendants' Assertion of Privileges

Except for the Presidential Communications Privilege, *see infra*, the government bears the initial burden of showing a privilege applies. *See Stamps v. Framingham*, 38 F. Supp. 3d 134, 140

---

[2] In re-reviewing these documents to respond to Plaintiffs' motion, Defendants learned shortly before filing that at least one contains information owned by a third-party agency that implicates law enforcement privilege and four others contain third-party information that may implicate the privilege. *See* Notice of Sealed Docs., Exh. G. Although the Government views asserting the privilege is unnecessary while the documents are in camera, it will prepare to invoke the privilege over at least one document, and possibly all five, but given the late discovery, it will require more time. Should the Court deem formal invocation necessary, Defendants respectfully request permission to supplement their opposition.

(D. Mass. 2014). Accordingly, Defendants provided agency declarations. *See Huntleigh USA Corp. v. United States*, 71 Fed. Cl. 726, 727 (2006); *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1306 (Fed. Cir. 2006) (following majority in holding that the head of the agency need not invoke the privilege). Those declarations are from William H. Walker, Acting Deputy Executive Assistant Director for HSI who has been delegated authority by the Acting Director of ICE to assert the privileges. *See* Exh. I at ¶ 1. Gary Lawkowski Deputy Assistant and Deputy Counsel to the President is responsible for matters involving the invocation of the presidential communications privilege. *See* Exh. J at ¶ 1. John Armstrong, Senior Bureau Official within the U.S. Department of State's Bureau of Consular affairs, who is authorized to assert the deliberative process and law enforcement privileges, Exhs. H at ¶ 6 & K at ¶ 6.

1.    The Deliberative Process Privilege

Plaintiffs challenge almost every assertion of the deliberative process privilege and audaciously claim that the privilege should not apply at all. *See* Mot. at 11-19. The Court, however, in denying Defendants' protective order did so based on its understanding that Plaintiffs were *not* seeking deliberative documents. *See* Electronic Order, Dkt. 125 ("The plaintiffs nowhere seek governmental deliberations"). And Defendants have proceeded in a good faith understanding of this Court's directives concerning the deliberative process privilege. *See* May 6, 2025, Tr. at 19:16-19:20, 28:2-28:18. Plaintiffs, nevertheless, insist on the production of deliberative information.

The deliberative process privilege protects "agencies from being 'forced to operate in a fishbowl,'" and "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated[.]'" *U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (internal citations omitted). To qualify for the privilege, documents must be both *predecisional* and *deliberative*. *See Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 557 (1st

Cir. 1992). They "are 'predecisional' if they were generated before the agency's final decision" and "they are 'deliberative' if they were prepared to help the agency formulate its position." *U.S. Fish & Wildlife Svc. v. Sierra Club. Inc.*, 592 U.S. 261, 268 (2021). Advice and recommendations can still be privileged even if no decision results. *See Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 13 (D. D.C. 1995) (citing *Access Reports v. USDOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991)).

The Documents Plaintiffs specifically challenge are four State Department action memos concerning the deportability of the five identified noncitizens. *See* Notice of Sealed Submission, Exh. L-O. Plaintiffs suggest that any facts would be segregable and should be disclosed. *See* Mot. at 12. However, not only are the documents pre-decisional containing *recommendations* of visa revocations but also disclosing their contents would expose facts the Secretary finds significant and provide a roadmap of decision making to potential targets of investigation. *See* Exh. H at ¶ 11. In any event, Defendants provided those action memos to the Court for in camera ex parte review because those documents, too, have not yet been produced in the litigation where those noncitizens are bringing their claims. So, the Court will be able to consider the documents, after notice, as described at the final pretrial conference. *See* June 26, 2025, Tr. at 8:5-10:9.

HSI has asserted the deliberative process privilege (and the law enforcement privilege) over select deposition testimony of its deponent Assistant Director Andre R. Watson for National Security. *See* Exh. I at ¶ 7(c). Mr. Walker explained the reasons for both the assertion of law enforcement and deliberative process privileges at ¶ 8, 12-13. Of particular note, the deposition questions sought information on type and content of recommendations ICE might send to the State Department. These proposals are predecisional as the State Department would be the one to act and deliberative as they are part of the decision-making process, not the final decision.

The Department of State has also asserted the deliberative process privilege over questions Mr. Armstrong was asked in his deposition concerning interagency and Presidential

communications. *See* Exh. H at ¶ 7(ii). The types of questions are more fully discussed under the presidential communications privilege section, but the Department lays out its reasons for asserting the deliberative process privilege. *See* Exh. H. at ¶¶ 8-12. The Department also invokes the privilege over questions concerning the "catch and revoke" policy. *See* id. at ¶ 7(iii) And sets out its reasons for doing so. *See id.* at ¶¶ 8-12. And asserts it over questions concerning the discussions leading up to the decisions involving the five identified noncitizens and provides its reasons, which are plainly predecisional as they do not embody the decision itself. *See id.* at ¶¶ 7(iv), 8-12.

Additionally, the Department asserts the privilege over predecisional documents—action memoranda providing recommendations to the Secretary of State. *See id.* ¶ 7(v). The documents only recommend decisions but do not embody the final decision. Finally, the Department asserted the privilege over the eport on Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Admissibility ("State Authorities Report"). *See* Exh. H at ¶ 7(i). The White House has also asserted the Presidential Communications privilege over it, so this document is discussed more fully below.

Once the government carries its initial burden, the issue is whether the privilege should be overcome by Plaintiffs' need. The deliberative process privilege is qualified so in deciding whether it should be overcome, a court "should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *In re Pharm. Industry Average Wholesale Price Litig.*, 254 F.R.D. 35, 40 (D. Mass. 2008) (quoting *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 885 (1st Cir. 1995)). "The Court must balance the public interest in the protection of the deliberative process against the movant's particularized need for the information." *Id.* (citations omitted).

Plaintiffs seek to side-step this analysis entirely by claiming that because the Defendant agencies' decision making is at issue, the privilege categorically does not apply. *See* Mot. at 12.

They cite *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) in support. That court's decision, however, is not the majority view. The Court of Federal Claims said it will continue to use a "case-by-case analysis to determine whether or not a plaintiff's need for particular evidence can overcome the government's interest in maintaining" confidentiality. *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 321-22 (2000) (declining to follow *In re Subpoena Duces Tecum*), clarified by 46 Fed. Cl. 827 (2000).

Indeed, in this circuit, the discretionary balancing test applies. In *Texaco*, the court noted that where documents sought may shed light on malfeasance the privilege is routinely denied. *See Texaco*, 60 F.3d at 885. But denial is not automatic as the court affirmed the district court as there was a "'strong showing' of arbitrariness and discriminatory motives" and the trial court concluded the agency "acted in bad faith over a lengthy period of time." *Id.* Plaintffs have not made a strong showing here. Ultimately, the court upheld the decision based on the trial court's *weighing* the interests; it did not rule the privilege categorically inapplicable. *See id.* at 885. Also, the cases from this District Plaintiffs cite, both used discretionary balancing. *See Velazquez v. City of Chicopee*, 226 F.R.D. 31, 33-34 (D. Mass. 2004); *Williams v. City of Bos.*, 213 F.R.D. 99, 100 (D. Mass. 2003) ("courts are obliged to balance conflicting interests on a case-by-case basis") (cleaned up).

Plaintiffs appear to challenge the assertions of privilege en mass and are dismissive of the government's interests in the privilege. But the declarations set out the government's strong equities. *See* Exh. H at ¶¶ 8-13; Exh. I ¶¶ 8, 12 & 13. But, aside from the interests typical with the deliberative process privilege, they are are stronger here as the deliberations being protected concern policies toward noncitizens, which "is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" and "such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (quotations and citations

15

omitted). Additionally, the ICE and State Department information Plaintiffs seek involves the collaborative relationship between ICE and the State Department and exposing predecisional correspondence undermines that collaboration. *See United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (holding referral memorandum from FTC to DOJ was predecisional and deliberative).

In addition to their misplaced reliance on *In re Subpoena Duces Tecum*, Plaintiffs also cite *Montrevil v. Decker*, No. 20 CV 264(WFK)(LB), 2021 WL 11690690 (E.D.N.Y. July 19, 2021). In that case the Judge pierced the deliberative process and law enforcement privileges because the movant was challenging the government's actions against him in deporting him. *See id.* at 5. Meaning, the critical evidence to his claim was the privileged information targeting *him*. The Plaintiffs here are in a inapposite position where there are other sources of evidence they could rely on. Additionally, unlike in *Montrevil*, none of Plaintiffs are the noncitizens claiming to have been "targeted." Those "targeted" persons are pursuing their own claims in other courts. So, the actual "targeted" noncitizen would have a greater interest in the documents. Additionally, there is an outlet in this case which reduces Plaintiffs' need; rather than resisting the production of documents in camera, given the exigencies of a Rule 65(a)(2) case, the government provided several documents for the Court, which also made clear at the pretrial conference that it would review such documents and how it would use them at trial. *See June 26, 2025, Tr. at 8:5-10:9.

2. Presidential Communications Privilege

The presidential communications privilege works differently from the others. Before the White House needs to formally invoke the PCP, the party making the discovery request must show "a heightened need for the information sought." *See Dairyland Power Co-op. v. United States*, 79 Fed. Cl. 659, 662 (2007) (citing *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004) and *In re Sealed Case*, 121 F.3d 729 (D.C. Cir.1997)). Although Plaintiffs have not made the required showing of a heightened need, given the pace of this litigation the White

House has preemptively asserted the privilege. *See* Exh. J; *In re United States*, 678 F. App'x 981, 992 (Fed. Cir. 2017) (holding the President himself need not invoke the privilege especially in a civil case where the materials were not necessarily viewed by him).

> The presidential communications privilege, a "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974), preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially, *see Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004). As such, the privilege protects "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the President or his "immediate White House advisers [with] ... broad and significant responsibility for investigating and formulating the advice to be given the President." *Id.* at 1114. The privilege covers documents reflecting "presidential decision making and deliberations," regardless of whether the documents are predecisional or not, and it covers the documents in their entirety.

*Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (quoting *Loving v. Dep't of Defense*, 550 F.3d 32, 37-38 (D.C. Cir. 2019)). Unlike the deliberative process privilege, there is no exception allowing for segregation and partial disclosure of documents. *See id.* (citing *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993)).

First, While Plaintiffs do not challenge the assertion of the presidential communications privilege over the State Authorities Report, *see* Mot. to Compel at 15-16, they mention it summarily in their recitation of the documents. *See id.* at 8. So, in an abundance of caution, the White House has formally asserted the presidential communications privilege over it. *See* Exh. J ¶¶ 4, 6. This is core presidential communications as it was solicited by the president, received by his advisors, and used for decision making. *See id.* at 6, 11; *Karnoski*, 926 F.3d at 1203.

Second, Plaintiffs challenge the lack of produced documents relating to a purported interagency working group dealing with the revocation of student visas. *See* Mot. to Compel at 16. But as discussed above, Defendants have identified no responsive information and Plaintiffs misrepresent deposition testimony. *See, supra*, § I. Plaintiffs do seek to reopen Mr. Armstrong's

deposition to inquire further about the phone call communications among representatives of the White House, State Department, Defense Department, and DHS. The White House has formally invoked the presidential communications privilege over such information. *See* Exh. J at ¶ 7-11. Again, these are core presidential communications. Mr. Armstrong's testimony could include interagency telephonic meeting regarding creating immigration policy involving White House and cabinet-level officials. *See id.* at ¶ 9. The communications were both solicited and received by senior presidential advisors or their staff. *See id.* at ¶ 10. And the communications were use in formulating advice to the President to inform decision making on immigration policy. ¶ 11.

Mr. Lawkowski assessed that without the protection of the presidential communications privilege, "Presidential advisors and their staffs would be chilled from having candid conversations with senior officials in cabinet agencies, gathering relevant information, exploring alternatives, and providing fully informed recommendations regarding the performance of the President's duties.

    3.      Law Enforcement Privilege

The purpose of the law enforcement privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Puerto Rico v. United States*, 490 F.3d 50, 63 (1st Cir. 2007) (citation omitted); *accord Gulluni v. Levy*, 85 F.4th 78, 85 (1st Cir. 2023). "[A]n investigation need not be ongoing for the law enforcement privilege to apply as 'the ability of a law enforcement agency to conduct *future investigations* may be seriously impaired if certain information is revealed.'" *MacNamara v. New York*, 249 F.R.D. 70, 79 (S.D.N.Y. 2008) (citations omitted). The privilege applies where the government demonstrates that the disclosure of information would "jeopardize future criminal investigations." *Puerto Rico*, 490 F.3d at 64. Like the deliberative process privilege, the law enforcement privilege is a qualified privilege subject to

balancing the federal government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure. *See id.*

Defendants' DHS ICE and the State Department provided agency declarations asserting the privilege and explaining its basis. *See* Exh. I & K. HSI identified areas of questioning at Assistant Director Watson's depositions that would elicit law enforcement privileged information. *See* ¶ 7(a)-(c). This includes information transmitted as part of recommendations made to the Department of State concerning the five identified noncitizens, internal analyses and internal deliberative communications about decisions to take actions against noncitizens. *See id.* That information includes collaborations between ICE and DHS critical to law enforcement efforts and would be hampered by breeching confidentiality. *See* ¶ 8. The questions also seek information on what evidence is relevant in taking enforcement action and revealing it could undermine enforcement efforts, confidential investigative techniques, methods, and procedures not widely known. *See* ¶ 9-10. And if the subjects of investigations obtain LEP, they could identify behaviors, information, and methods relevant to enforcement and alter their conduct to avoid detection. *See* ¶ 11.

The State Department asserted the law enforcement privilege over redacted portions of Department guidance to field posts, including the webinar presentation, social media vetting, security in visa adjudications, visa ineligibilities, and visa qualifications. *See* Exh. K at ¶ 7(i). The Department also invoked the privilege over deposition questions about the process to reach final decisions concerning the five identified noncitizens. *See id.* ¶ 7(ii). Finally, it invoked the privilege over the nonpublic versions of the Foreign Affairs Manual and Foreign Affairs Handbook involving visa ineligibilities. *See id.* at ¶ 7(iii). And the interrogatories relating to the above information. *See id.* at ¶ 7(iv). The Department laid out the law enforcement reasons for withholding the documents. *See id.* at ¶ 8-12. And concluded that there are not precautions that would allow the department to safely release the information. *See id.* at 13.

19

Given the application of the privilege, the question for decision is whether the government's interest in preserving the confidentiality of the law enforcement information outweighs Defendants' interest in disclosure. *See Puerto Rico*, 490 F.3d at 64. The declarants set out the government's interests. *See* Exh. I at ¶ 8-11; Exh. K at ¶ 8-11.

Plaintiffs argue the DHS ICE documents including HSI reports of analysis and DHS ICE action summaries should be disclosed. Defendants discuss those items, which have been produced to the court in camera, above in section III.A. Plaintiffs reference a webinar slide deck and State Department cables that have been redacted. Presumably they mean those produced directly to Plaintiffs (DEF 64-84, DEF 88-94, DEF 84-87) and the cable included in the administrative record at CAR12-17. *See* Mot at 9, 19. Plaintiffs do not make an argument as to why, in the law enforcement privilege context, the government's interest in preserving the confidentiality of the redacted portions is less than their interest in their disclosure. So, Defendants rest on the declaration, Exh. K showing the need for redacting those cables.

Plaintiffs also argue that the government should produce an unredacted version of one of the cables because a leaked version showed that the Department mandated the review of social media accounts of student-visa applicants who were present in the United States from October 7, 2023 to August 31, 2024, and that fact is directly relevant to Plaintiffs' claims. *See* CAR 12-17 and Mot. at 19. But the analysis does not end at a showing of relevance to the Plaintiffs claims. The government has a strong interest in maintaining the law enforcement privilege of these redactions. Disclosure of the information would reveal highly sensitive screening and vetting techniques that could allow visa applicants to avoid fraud detection or national security review. *See* Exh. K at ¶ 9-11. Disclosing such information "could ultimately provide bad actors with the information they need to evade" or thwart U.S. law enforcement or national security efforts. *Cf. Mathews*, 426 U.S. at 81 n.17. So the Court should not compel disclosure of the law enforcement privileged material.

Add.443

Respectfully Submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*

*Dated: June 27, 2025*

WILLIAM KANELLIS

*Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

*Counsel for Defendants*

21

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: June 27, 2025                                    By: _Ethan B. Kanter_
                                                       ETHAN B. KANTER
                                                       *Chief, National Security Unit*
                                                       *Office of Immigration Litigation*
                                                       *P.O. Box 878, Ben Franklin Station*
                                                       *Washington, D.C. 20001*

22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETS**

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSITY PROFESSORS, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE *et al.*,<br><br>    Defendants. | **No. 1:25-cv-10685-WGY**<br><br>**DECLARATION OF ETHAN KANTER IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL** |

I, Ethan Kanter, hereby declare:

1.    I am one of the attorneys representing Defendants in the above-captioned matter, *AAUP v. Rubio*, No. 1:25-cv-10685-WGY.  I have personal knowledge of the facts stated below and am competent to testify regarding the same.

2.    On May 13, 2025, Plaintiffs served their initial discovery requests on Defendants; *see* **Exhibit A** (Plaintiffs' Requests for Production); **Exhibit B** (Plaintiffs' Interrogatories);

3.    On May 19, 2025, Plaintiffs served their amended discovery requests on Defendants; *see* **Exhibit C** (Plaintiffs' Amended Requests for Production); **Exhibit D** (Plaintiffs' Amended Interrogatories);

4.    On June 13, 2025, Defendants served on Plaintiffs' their responses and objections to Plaintiffs amended Requests for Production, along with Defendants' first production volume of responsive documents; *see* **Wilkens Decl. Ex. 2** (submitted under seal) (Government's Responses and Objections to RFPs); **Exhibit E** (June 13, 2025, Transmittal Email);

Add.446

5.    On June 21, 2025, Defendants served on Plaintiffs their responses and objections to Plaintiffs' amended interrogatories; *see* **Wilkens Decl. Ex. 10** (submitted under seal) (Governments Responses and Objections to Interrogatories); **Exhibit F** (Interrogatory Response Transmittal Email);

6.    On June 11, 2025, Plaintiffs conducted the deposition of Andre Watson, Assistant Director, National Security Division, Homeland Security Investigations;

7.    On June 12, 2025, Plaintiffs conducted the deposition of John Armstrong, Senior Bureau Official, Bureau of Consular Affairs, U.S. Department of State; **Sealed Exhibit G** (Armstrong Deposition Transcript).

8.    On June 24, 2025, Plaintiffs conducted the deposition of Stuart Wilson, Deputy Assistant Secretary for Visa Services, Bureau of Consular Affairs, U.S. Department of State;

9.    On June 25, 2025, Plaintiffs conducted the deposition of Peter Hatch, Assistant Director, Office of Intelligence, Homeland Security Investigations, Department of Homeland Security;

10.    On June 30, 2025, Plaintiffs are scheduled to depose Andrew Veprek, Senior Advisor, Office of the Counselor, U.S. Department of State;

11.    On July 1 and July 3, 2025, Plaintiffs are scheduled to depose Jessica Norris, Managing Director for Visa Services, Bureau of Consular Affairs, U.S. Department of State;

12.    Defendants have also identified various DHS, Immigration and Customs Enforcement agents for Plaintiffs and will make them available for depositions to the extent that schedules allow.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 27th day of June 2025 in Washington, DC.

*/s/ Ethan Kanter*
Ethan Kanter

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                    Plaintiffs,                        Case No. 1:25-cv-10685 (WGY)

        v.

MARCO RUBIO, ET AL.

                    Defendants.

## PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION DIRECTED TO DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure and Local Civil Rules for the District of Massachusetts 26.1, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") produce the following documents and things identified and listed below for inspection.

## DEFINITIONS AND INSTRUCTIONS

1.  The definitions and instructions provided in Federal Rule of Civil Procedure 34(a) and Local Rules 26.5 and 34.1 are incorporated by reference.

2.  Whenever reference is made to a person or legal entity, it includes any and all of such person's or entity's past and present affiliates, components, subdivisions, offices, directors, officers, agents, partners, employees, contractors, consultants, attorneys, representatives,

1

investigators, predecessors, successors, assigns and/or any other person or entity acting on, or purporting to act on, its behalf.

3.    "Adverse action" means investigating, monitoring, surveilling, revoking the visa of, terminating the status of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to detention facilities in Louisiana.

4.    "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

5.    "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

6.    "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

7.    "Concerning" means, as defined in Local Rule 26.5(c), referring to, describing, evidencing or constituting.

8.    The terms "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of

interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

9. "Each" shall be construed to include the word "every" and "every" shall be construed to include the word "each."

10. "Including" shall be construed to include the phrase "without limitation."

11. The terms "you" and "your" refer to each of the defendants individually responding to these requests.

12. The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

      a.  Mahmoud Khalil;

      b.  Mohsen Mahdawi;

      c.  Rümeysa Öztürk;

      d.  Yunseo Chung;

      e.  Efe Ercelik;

      f.  Mohammed Hoque;

      g.  Ranjani Srinivasan;

      h.  Badar Khan Suri; and

      i.  Momodou Taal.

13. To the extent a request calls for the production of documents or things you contend are subject to a privilege or immunity from discovery, your written request should so indicate, but you are requested to produce the balance of the documents or things not subject to a claim of privilege which fall within the scope of the request. Additionally, to the extent information subject to a

privilege or immunity from discovery is contained within responsive documents or things, you are requested to produce a redacted version of the document or thing containing the non-privileged information with a notation on the produced document or thing indicating that it is being produced in redacted form.

14. If you are unable to produce any file or document sought in these requests, you shall identify the file or document; state the reasons why you are unable to produce it, describe in detail the efforts you have made to obtain it, and identify its location and/or custodian.

15. Documents responsive to these requests should be produced in the order in which they are ordinarily kept and in a format sufficient to identify the files from which they have been taken. Documents from different files should not be intermingled.

16. Except as otherwise specified, these requests cover the time period January 20, 2025 to the present.

17. These discovery requests are continuing in that they may require supplemental responses. If you obtain further information or documents with respect to any request to which you have already responded, you have a continuing duty to supplement your answer pursuant to Federal Rule of Civil Procedure 26(e) at any time prior to the entry of judgment.

18. For each document or thing requested that you object to producing on the basis of any privilege or immunity from discovery, please provide the following information:

    a. The basis for the privilege being invoked;

    b. The date of the document;

    c. The title of the document (if any);

    d. The name of the person(s) authoring the document;

e.  The name of the person(s) to whom the document and/or copies thereof were given or transmitted;

f.  The name of the person(s) from whom the document and/or copies thereof were given or transmitted:

g.  The present location and custodian of the document, or any copies thereof; and

h.  The general subject matter dealt with in the document with reasonable specificity to allow Plaintiffs to determine whether to challenge the privilege designation.

## **DOCUMENT REQUESTS**

1.  Documents and communications concerning any adverse action you have taken or considered taking against any of the Targeted Noncitizen Students or Faculty Members, including but not limited to:

a.  Any document in which the Department of Homeland Security ("DHS") and/or U.S. Immigration and Customs Enforcement ("ICE") requested or recommended that the U.S. Department of State revoke the visas of or determine the removability of a Targeted Noncitizen Student or Faculty Member. *See Ozturk v. Trump*, No. 25-CV-374, 2025 WL 1145250, at *3 (D. Vt. Apr. 18, 2025) (describing request from DHS and ICE for revocation of Rümeysa Öztürk's F-1 visa);

b.  Any document in which the State Department approved the revocation of a Targeted Noncitizen Student's or Faculty Members's visa. *See id.*;

c.  Any document in which Secretary of State Marco Rubio determined that a Targeted Noncitizen Student or Faculty Member is removable under 8

5

U.S.C. 1227(a)(4)(C). *See Khalil v. Joyce*, No. 25-CV-01963, 2025 WL 1232369, at *2 (D.N.J. Apr. 29, 2025);

d.  Any document in which the State Department informed DHS and/or ICE that it had approved the revocation of a Targeted Noncitizen Student or Faculty Member's visa or determined the removability of a Targeted Noncitizen Student or Faculty Member;

e.  A memorandum from Secretary Rubio accusing Mohsen Mahdawi of engaging in "threatening rhetoric and intimidation of pro-Israeli bystanders." *Mahdawi v. Trump*, No. 25-CV-389, 2025 WL 1243135, at *10 (D. Vt. Apr. 30, 2025);

f.  A memorandum from Andre Watson (Senior Official, Homeland Security Investigations) to John Armstrong (Senior Bureau Official, Department of State) stating that Rümeysa Öztürk had engaged in "anti-Israel activism." John Hudson, *No Evidence Linking Tufts Student to Antisemitism or Terrorism, State Dept. Office Found*, Wash. Po. (Apr. 13, 2025) https://perma.cc/KRB2-AVXF;

g.  A March 2025 State Department memorandum finding that neither DHS nor ICE nor Homeland Security Investigations had produced any evidence showing that Rümeysa Öztürk had engaged in antisemitic activity or made public statements indicating support for a terrorist organization. *See id.*;

h.  A document dated March 21, 2025 in which the State Department informed DHS that the revocation of Öztürk's visa had been "approved." *See id.*;

i.  An April 9, 2025 memorandum from the Deputy Assistant Secretary of State for Visa Services to ICE regarding the revocation of Efe Ercelik's visa. *Ercelik v. Hyde*, No. 25-CV-11007, slip op. at 17 (D. Mass. May 8, 2025);

j.  A March 22, 2025 communication from DHS/ICE to the State Department seeking the Department's determination as to whether Mohammed Hoque's visa should be revoked. *Hoque v. Trump*, No. 25-cv-01576, slip op. at 4 (D. Conn. May 5, 2025);

k.  A May 23, 2025 memorandum from the State Department informing DHS/ICE that Mohammed Hoque's visa had been revoked. *See id.*; and

l.  Any Notice to Appear (Form I-862), administrative arrest warrant (Form I-200), or Record of Deportable/Inadmissible Alien (Form I-213) that has been issued or drafted as to any of the Targeted Noncitizen Students or Faculty Members.

2.  Documents, including memoranda, policies, procedures, and directives concerning the inspection, review, monitoring, or surveillance of noncitizens' social media accounts or activity, including but not limited to:

a.  The Secretary of State's communication to State Department employees on March 25, 2025, titled "Enhanced Screening and Social Media Vetting for Visa Applicants." Ken Klippenstein, *Trump Admin Spies on Social Media of Student Visa Holders*, Substack (Mar. 28, 2025), https://perma.cc/FV5L-MUNA;

b.  The State Department's new guidance to consular officers on reviewing visa applicants' social media, referred to in paragraph 16 of the declaration from John Armstrong submitted in support of the government's opposition to Plaintiffs' preliminary injunction motion.

3.  Documents and communications created, referenced, or relied on by you to take any adverse action against any of the Targeted Noncitizen Students or Faculty Members.

4.   Documents and communications concerning the "open-source information" collected and reviewed by the Homeland Security Investigations Office of Intelligence relating to the Targeted Noncitizen Students or Faculty Members. *See* Declaration of Andre Watson, ¶ 7 (April 14, 2025), ECF 65-2; Declaration of Unit Chief Roy M. Stanley ¶¶ 5-10, ECF 30-2 (March 22, 2025), *Taal v. Trump*, 3:25-cv-00335, (N.D.N.Y.).

5.   Documents and communications concerning the identification of Targeted Noncitizen Students or Faculty Members for potential adverse actions, including identifications made by you or any third party, such as Betar US and Canary Mission.

6.   Documents and communications concerning the implementation or enforcement of Executive Orders 14,161 and 14,188, with respect to taking any adverse action against non-citizens, including but not limited to any reports issued by the Attorney General, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security pursuant to Section 3(a) of Executive Order 14,188.

7.   Documents and communications concerning any proposed or actual adverse action taken against any non-citizen engaged in any speech or activities deemed, determined to be, or suspected of being pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

8.   Documents and communications referencing any of the Targeted Noncitizen Students or Faculty Members by name or A-number and concerning your decision to invoke the Foreign Policy Ground (8 U.S.C. § 1227(a)(4)(C)) as to any of them.

9.   Documents sufficient to show all information that you contend provided reasonable grounds for Secretary Rubio to believe that the continued presence or activities in the United

States of any of the Targeted Noncitizen Students or Faculty Members would have potentially serious adverse foreign policy consequences for the United States.

10. Documents sufficient to show all information considered by Secretary Rubio in determining that the continued presence or activities in the United States of any of the Targeted Noncitizen Students or Faculty Members would compromise a compelling United States foreign policy interest.

11. Documents and communications concerning any request or demand, by the Department of Education or any other official or agency, requesting, demanding or requiring that any university or college provide the names, nationalities or any other identifying information of students who have been accused of or suspected of engaging in speech or activities deemed, determined to be, or suspected of being pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, or anti-Israel.

12. Documents and communications concerning your identification to colleges and universities of non-citizen students or faculty members against whom you considered taking (or are considering taking) adverse action, including but not limited to the list of students provided by DHS to Columbia University that was referenced by White House Press Secretary Karoline Leavitt on March 11, 2025.

Dated:      May 13, 2025
            New York, NY

SHER TREMONTE LLP

By:    _/s/ Noam Biale_____
Michael Tremonte
Noam Biale
Alexandra Conlon
Courtney Gans
90 Broad Street, 23rd Floor

9

Add.458

New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
David Zimmer
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

*Attorneys for Plaintiffs*

To:        Ethan B. Kanter, Esq. (via email)
           Harry Graver, Esq. (via email)
           Lindsay M. Murphy, Esq. (via email)
           Shawna Yen, Esq. (via email)
           Sarmad Khojateh, Esq. (via email)

           *Attorneys for Defendants*

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,<br><br>                  Plaintiffs,<br><br>     v.<br><br>MARCO RUBIO, ET AL.<br><br>                 Defendants. | Case No. 1:25-cv-10685 (WGY) |

## PLAINTIFFS' FIRST SET OF
## INTERROGATORIES DIRECTED AT DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure and Local Civil Rules for the District of Massachusetts 26.1 and 33.1, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") answer the following interrogatories (the "Interrogatories" and each individually an "Interrogatory") under oath and serve the answers within fourteen (14) days of service of this request.

### INSTRUCTIONS

1. The instructions provided in Local Rule 33.1 are incorporated by reference.

2. Whenever an Interrogatory asks for the identity of an individual, please set forth the following information:

a.  The individual's name;

b.  The individual's title or occupation;

c.  The individual's present or last known residential address; and

d.  The individual's present or last known business address.

3.  In answering these Interrogatories, Defendants are required to furnish all information known or available to them, regardless of whether this information is possessed by Defendants or by their agents, employees, representatives, investigators, or by their attorneys or other persons who have acted on their behalf, or by any corporation, partnership, or other legal entity.

4.  If any of these Interrogatories cannot be answered in full, after exercising due diligence to secure the information to do so, answer to the extent possible, specifying the reasons for Defendants' inability to answer the remainder and stating whatever information, knowledge, or belief Defendants have concerning the unanswered portion. In addition, specify the person or persons Defendants have reason to believe may have the information and/or knowledge to answer such interrogatory or any part thereof.

5.  The Interrogatories are continuing in nature. If, after answering these interrogatories, Defendants obtain or become aware of further information responsive to these Interrogatories, Defendants are required to provide a supplemental interrogatory answer.

6.  State whether the information furnished is within the personal knowledge of Defendants and, if not, the name of each person to whom the information is a matter of personal knowledge.

7.  If Defendants believe that an Interrogatory seeks privileged information, state the grounds for the privilege assertion in sufficient detail to enable Plaintiffs to challenge your claim.

8.  If Defendants object to any portion of any Interrogatory herein, identify the portion of the Interrogatory to which Defendants object and respond to the remainder of the Interrogatory.

## DEFINITIONS

1.  The definitions provided in Federal Rule of Civil Procedure Rule 34(a) and Local Rule 26.5(c) are incorporated by reference.

2.  "Adverse action" means investigating, monitoring, surveilling, revoking the visa of, terminating the status of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to a detention facility in Louisiana.

3.  "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

4.  "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

5.  "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

6.  The term "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of

interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

7. "Identify," when referring to a person, means to give the names, titles, organizational roles, and job descriptions of all U.S. Government officials, officers, agents, employees or contractors.

8. "Including" shall be construed to include the phrase "without limitation."

9. The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

  a. Mahmoud Khalil;

  b. Mohsen Mahdawi;

  c. Rümeysa Öztürk;

  d. Yunseo Chung;

  e. Efe Ercelik;

  f. Mohammed Hoque;

  g. Ranjani Srinivasan;

  h. Badar Khan Suri; and

  i. Momodou Taal.

10. The terms "you" and "your" refer to each of the defendants individually responding to these requests.

## INTERROGATORIES

1. Identify the persons who are or were involved in proposing or taking adverse action against any of the Targeted Noncitizen Students or Faculty Members, including everyone from the most senior agency officials (*e.g.*, Secretary Rubio and Secretary Noem) down the chain to the most junior agency officials, officers, employees, agents, contractors, or consultants.

2.  Identify the persons who are or were involved in the inspection, review, monitoring, or surveillance of non-citizens' social media accounts or activity.

3.  Identify the persons who are or were involved in the implementation or enforcement of Executive Orders 14,161 and 14,188, as they relate to taking any adverse action against non-citizens.

4.  Identify the persons who are or were involved in proposing or taking adverse action against any non-citizen student or faculty member on the basis of, or partly on the basis of, speech or activities determined or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

5.  Identify the persons who are or were involved in any request or demand, by the Department of Education or any other official or agency, requesting, demanding or requiring that any university or college provide the names, nationalities or any other information of non-citizen students or faculty members believed or suspected to have engaged in speech or activities deemed to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

6.  Identify the persons who are or were involved in the identification of non-citizen students or faculty members targeted for any adverse action on the basis of, or partly on the basis of, speech or activities deemed to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including but not limited to the persons who were involved in compiling and sharing the list of students provided by the Department of Homeland Security to Columbia University referenced by White House Press Secretary Karoline Leavitt on March 11, 2025.

7.  State the basis of or for your claim, assertion, allegation, or contention that your taking adverse action against any of the Targeted Noncitizen Students or Faculty Members was lawful.

8.  State the basis of or for your claim, assertion, allegation, or contention that any of the Targeted Noncitizen Students or Faculty Members engaged in pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activities.

9.  State the basis of Secretary of State Rubio's determination that any of the Targeted Noncitizen Students or Faculty Members is removable under 8 U.S.C. § 1227(a)(4)(C).

10. Identify all documents you created, consulted, referenced, or relied on in determining whether to take any adverse action against any of the Targeted Noncitizen Students or Faculty Members.

11. Describe in detail the reasons why the agents who arrested Rümeysa Öztürk and Badar Khan Suri were wearing civilian clothes, hoods, and masks, without their official badges visible.

12. Describe in detail your transfer of Mahmoud Khalil and Rümeysa Öztürk from the location of their arrest to a detention facility in Louisiana, including your decision to transfer them, your reasons for transferring them, and your planning, coordination, and execution of the transfers.

13. Describe in detail your arrest and detention of Mohsen Mahdawi and your attempt to transfer him to a detention facility in Louisiana, including your planning and coordination of his arrest in connection with his U.S. Citizenship and Immigration Services interview in Colchester, Vermont on April 14, 2025.


Dated:        May 13, 2025
              New York, NY

                            SHER TREMONTE LLP

                            By:    _/s/ Noam Biale_____
                            Michael Tremonte
                            Noam Biale
                            Courtney Gans
                            Alexandra Conlon
                            90 Broad Street, 23rd Floor

New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
*edwina@zimmercitronclarke.com*

*Attorneys for Plaintiffs*

To:     Ethan B. Kanter, Esq. (via email)
        Harry Graver, Esq. (via email)
        Lindsay M. Murphy, Esq. (via email)
        Sarmad Khojateh, Esq. (via email)
        Shawna Yen, Esq. (via email)

        *Attorneys for Defendants*

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                         Plaintiffs,                         Case No. 1:25-cv-10685 (WGY)

         v.

MARCO RUBIO, ET AL.

                         Defendants.

## PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION
## DIRECTED TO DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure

and Local Civil Rules for the District of Massachusetts 26.1, Plaintiffs American Association of

University Professors, American Association of University Professors-Harvard Faculty Chapter,

American Association of University Professors at New York University, Rutgers American

Association of University Professors-American Federation of Teachers, and Middle East Studies

Association ("Plaintiffs"), by and through their undersigned counsel hereby request that

Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants")

produce the following documents and things identified and listed below for inspection.

## DEFINITIONS AND INSTRUCTIONS

1.  The definitions and instructions provided in Federal Rule of Civil Procedure 34(a) and

Local Rules 26.5 and 34.1 are incorporated by reference.

2.  Whenever reference is made to a person or legal entity, it includes any and all of such

person's or entity's past and present affiliates, components, subdivisions, offices, directors,

officers, agents, partners, employees, contractors, consultants, attorneys, representatives,

1

investigators, predecessors, successors, assigns and/or any other person or entity acting on, or purporting to act on, its behalf.

3. "Adverse action" means investigating, monitoring, surveilling, revoking the visa or lawful permanent residency of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to detention facilities in Louisiana.

4. "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

5. "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

6. "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

7. "Concerning" means, as defined in Local Rule 26.5(c), referring to, describing, evidencing or constituting.

8. "Covered Institution" means the following colleges and universities: Arizona State University, Columbia University, Cornell University, Georgetown University, Harvard University, Minnesota State University System, Tufts University, University of California System, University of Massachusetts System, and University of Texas System.

9. The terms "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text

message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

10. "Each" shall be construed to include the word "every" and "every" shall be construed to include the word "each."

11. "Including" shall be construed to include the phrase "without limitation."

12. The terms "you" and "your" refer to each of the defendants individually responding to these requests.

13. The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

    a. Mahmoud Khalil;

    b. Mohsen Mahdawi;

    c. Rümeysa Öztürk;

    d. Yunseo Chung;

    e. Efe Ercelik;

    f. Mohammed Hoque;

    g. Ranjani Srinivasan;

    h. Badar Khan Suri; and

    i. Momodou Taal.

14. To the extent a request calls for the production of documents or things you contend are subject to a privilege or immunity from discovery, your written request should so indicate, but you are requested to produce the balance of the documents or things not subject to a claim of privilege which fall within the scope of the request. Additionally, to the extent information subject to a privilege or immunity from discovery is contained within responsive documents or things, you are requested to produce a redacted version of the document or thing containing the non-privileged information with a notation on the produced document or thing indicating that it is being produced in redacted form.

15. If you are unable to produce any file or document sought in these requests, you shall identify the file or document; state the reasons why you are unable to produce it, describe in detail the efforts you have made to obtain it, and identify its location and/or custodian.

16. Documents responsive to these requests should be produced in the order in which they are ordinarily kept and in a format sufficient to identify the files from which they have been taken. Documents from different files should not be intermingled.

17. Except as otherwise specified, these requests cover the time period January 20, 2025 to the present.

18. These discovery requests are continuing in that they may require supplemental responses. If you obtain further information or documents with respect to any request to which you have already responded, you have a continuing duty to supplement your answer pursuant to Federal Rule of Civil Procedure 26(e) at any time prior to the entry of judgment.

19. For each document or thing requested that you object to producing on the basis of any privilege or immunity from discovery, please provide the following information:

4

    a.   The basis for the privilege being invoked;

    b.   The date of the document;

    c.   The title of the document (if any);

    d.   The name of the person(s) authoring the document;

    e.   The name of the person(s) to whom the document and/or copies thereof were given or transmitted;

    f.   The name of the person(s) from whom the document and/or copies thereof were given or transmitted:

    g.   The present location and custodian of the document, or any copies thereof; and

    h.   The general subject matter dealt with in the document with reasonable specificity to allow Plaintiffs to determine whether to challenge the privilege designation.

## DOCUMENT REQUESTS

1.   Documents and communications showing the planning, execution and implementation of your decision to take any adverse action against a Targeted Noncitizen Student or Faculty Member, including:

    a.   Documents and communications relating to the planning and execution of the arrest and detention of Mahmoud Khalil;

    b.   Documents and communications relating to the planning and execution of the arrest and detention of Mohsen Mahdawi.

    c.   Documents and communications relating to the planning and execution of the arrest and detention of Rümeysa Öztürk.

5

    d.   Documents and communications relating to the planning and execution of the arrest and detention of Yunseo Chung.

    e.   Documents and communications relating to the planning and execution of the arrest and detention of Efe Ercelik;

    f.   Documents and communications relating to the planning and execution of the arrest and detention to Mohammed Hoque;

    g.   Documents and communications relating to the planning and execution of the arrest and detention of Ranjana Srinivasan;

    h.   Documents and communications relating to the planning and execution of the arrest and detention of Badar Khan Suri; and

    i.   Documents and communications relating to the planning and execution of the arrest and detention of Momodou Taal.

2.   Documents and communications requesting or recommending the taking of, and memorializing, explaining, or justifying the decision to take any adverse action against a Targeted Noncitizen Student or Faculty Member, including:

    a.   A document or documents in which the Department of Homeland Security ("DHS") and/or U.S. Immigration and Customs Enforcement ("ICE") requested or recommended that the U.S. Department of State revoke the visas of or determine the removability of a Targeted Noncitizen Student or Faculty Member. *See Ozturk v. Trump*, No. 25-CV-374, 2025 WL 1145250, at *3 (D. Vt. Apr. 18, 2025) (describing request from DHS and ICE for revocation of Rümeysa Öztürk's F-1 visa);

    b.   A document or documents in which the State Department approved, explained, or justified the revocation of a Targeted Noncitizen Student's or Faculty Members's visa. *See id.*;

    c.   A document or documents in which Secretary of State Marco Rubio determined that a Targeted Noncitizen Student or Faculty Member is removable under 8 U.S.C. § 1227(a)(4)(C), and the attachments to any such determination. *See, e.g.*, *Khalil v. Joyce*, No. 25-CV-01963, 2025 WL 1232369, at *2 (D.N.J. Apr. 29, 2025);

    d.   A document or documents in which the State Department informed DHS and/or ICE that it had approved the revocation of a Targeted Noncitizen Student or Faculty Member's visa or determined the removability of a Targeted Noncitizen Student or Faculty Member; and

    e.   Any Notice to Appear (Form I-862), administrative arrest warrant (Form I-200), or Record of Deportable/Inadmissible Alien (Form I-213) that has been issued or drafted as to any of the Targeted Noncitizen Students or Faculty Members.

3.   The following documents and memoranda that Plaintiffs have reason to believe are in Defendants' possession based on the public record and that are relevant to the adverse actions taken against the Targeted Noncitizen Students or Faculty:

    a.   A memorandum from Secretary Rubio accusing Mohsen Mahdawi of engaging in "threatening rhetoric and intimidation of pro-Israeli bystanders." *Mahdawi v. Trump*, No. 25-CV-389, 2025 WL 1243135, at *10 (D. Vt. Apr. 30, 2025);

    b.   A memorandum from Andre Watson (Senior Official, Homeland Security Investigations) to John Armstrong (Senior Bureau Official, Department of State)

stating that Rümeysa Öztürk had engaged in "anti-Israel activism." John Hudson, *No Evidence Linking Tufts Student to Antisemitism or Terrorism, State Dept. Office Found*, Wash. Po. (Apr. 13, 2025) https://perma.cc/KRB2-AVXF;

c.  A March 2025 State Department memorandum finding that neither DHS nor ICE nor Homeland Security Investigations had produced any evidence showing that Rümeysa Öztürk had engaged in antisemitic activity or made public statements indicating support for a terrorist organization. *See id.*;

d.  A document dated March 21, 2025 in which the State Department informed DHS that the revocation of Öztürk's visa had been "approved." *See id.*;

e.  An April 9, 2025 memorandum from the Deputy Assistant Secretary of State for Visa Services to ICE regarding the revocation of Efe Ercelik's visa. *Ercelik v. Hyde*, No. 25-CV-11007, slip op. at 17 (D. Mass. May 8, 2025);

f.  A March 22, 2025 communication from DHS/ICE to the State Department seeking the Department's determination as to whether Mohammed Hoque's visa should be revoked. *Hoque v. Trump*, No. 25-cv-01576, slip op. at 4 (D. Conn. May 5, 2025); and

g.  A May 23, 2025 memorandum from the State Department informing DHS/ICE that Mohammed Hoque's visa had been revoked. *See id.*

4.  Documents and communications with Betar US, Canary Mission, and the Heritage Foundation concerning the Targeted Noncitizen Students or Faculty Members.

5.  Communications, memoranda, policies, procedures, and directives concerning the inspection, review, monitoring, or surveillance of noncitizens' social media accounts or activity

for pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activity, including:

    a.   The State Department's new guidance to consular officers on reviewing visa applicants' social media, referred to in paragraph 16 of the declaration from John Armstrong submitted in support of the government's opposition to Plaintiffs' preliminary injunction motion; and

    b.   The Secretary of State's communication to State Department employees on March 25, 2025, titled "Enhanced Screening and Social Media Vetting for Visa Applicants." Ken Klippenstein, *Trump Admin Spies on Social Media of Student Visa Holders*, Substack (Mar. 28, 2025), https://perma.cc/FV5L-MUNA; and

6.   Memoranda, policies, procedures, directives or guidance concerning the implementation or enforcement of Executive Orders 14,161 and 14,188 related to the revocation of visas or green cards, or the surveillance, arrest, detention, or deportation of noncitizen students or faculty members for pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activity, including:

    a.   Any reports issued by the Attorney General, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security pursuant to Section 3(a) of Executive Order 14,188; and

    b.   Communications from the State Department to Covered Institutions directing them to report international students for participating in "proscribed antisemitic actions," "terrorist activity," or "endorsing or espousing terrorism." Prem Thaker, *SCOOP: Trump Admin Forcing Schools to Report International Students for*

9

*Protest Activity or 'Antisemitic Actions,'* Zeteo (May 16, 2025),

https://perma.cc/XD4N-BSZC.

7.   Communications with Covered Institutions concerning non-citizen students or faculty members who have been accused or suspected of engaging in speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including the list of students provided by DHS to Columbia University that was referenced by White House Press Secretary Karoline Leavitt in her press briefing on March 11, 2025.

Dated:      May 19, 2025
            New York, NY

SHER TREMONTE LLP

By: ___ */s/ Noam Biale* _____
Michael Tremonte
Noam Biale
Alexandra Conlon
Courtney Gans
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu


*Attorneys for Plaintiffs*

To:        Ethan B. Kanter (via email)
           Harry Graver (via email)
           Lindsay M. Murphy (via email)
           Shawna Yen (via email)
           Sarmad Khojatesh (via email)

*Attorneys for Defendants*

11

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

                Plaintiffs,

     v.

MARCO RUBIO, ET AL.

              Defendants.

Case No. 1:25-cv-10685 (WGY)

## **PLAINTIFFS' FIRST SET OF**
## **INTERROGATORIES DIRECTED AT DEFENDANTS**

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure and Local Civil Rules for the District of Massachusetts 26.1 and 33.1, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel hereby request that Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") answer the following interrogatories (the "Interrogatories" and each individually an "Interrogatory") under oath and serve the answers within fourteen (14) days of service of this request.

### **INSTRUCTIONS**

1. The instructions provided in Local Rule 33.1 are incorporated by reference.

2. Whenever an Interrogatory asks for the identity of an individual, please set forth the following information:

a. The individual's name;

b. The individual's title or occupation;

c. The individual's present or last known residential address; and

d. The individual's present or last known business address.

3. In answering these Interrogatories, Defendants are required to furnish all information known or available to them, regardless of whether this information is possessed by Defendants or by their agents, employees, representatives, investigators, or by their attorneys or other persons who have acted on their behalf, or by any corporation, partnership, or other legal entity.

4. If any of these Interrogatories cannot be answered in full, after exercising due diligence to secure the information to do so, answer to the extent possible, specifying the reasons for Defendants' inability to answer the remainder and stating whatever information, knowledge, or belief Defendants have concerning the unanswered portion. In addition, specify the person or persons Defendants have reason to believe may have the information and/or knowledge to answer such interrogatory or any part thereof.

5. The Interrogatories are continuing in nature. If, after answering these interrogatories, Defendants obtain or become aware of further information responsive to these Interrogatories, Defendants are required to provide a supplemental interrogatory answer.

6. State whether the information furnished is within the personal knowledge of Defendants and, if not, the name of each person to whom the information is a matter of personal knowledge.

7. If Defendants believe that an Interrogatory seeks privileged information, state the grounds for the privilege assertion in sufficient detail to enable Plaintiffs to challenge your claim.

8.  If Defendants object to any portion of any Interrogatory herein, identify the portion of the Interrogatory to which Defendants object and respond to the remainder of the Interrogatory.

## **DEFINITIONS**

1.  The definitions provided in Federal Rule of Civil Procedure Rule 34(a) and Local Rule 26.5(c) are incorporated by reference.

2.  "Adverse action" means investigating, monitoring, surveilling, revoking the visa or lawful permanent residency of, terminating the status of, determining the removability of, or seizing, arresting, detaining, removing, or transferring to a detention facility in Louisiana.

3.  "And" and "or" shall be construed in the conjunctive or disjunctive as necessary to bring within the scope of the Request all responses that might otherwise be construed as outside its scope.

4.  "Any" shall be construed to include the word "all" and "all" shall be construed to include the word "any."

5.  "Communication", as defined in Local Rule 26.5(c), means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

6.  "Covered Institution" means the following colleges and universities: Arizona State University, Columbia University, Cornell University, Georgetown University, Harvard University, Minnesota State University System, Tufts University, University of California System, University of Massachusetts System, and University of Texas System

7.  The term "document" and "documents" mean any and all items referred to as "documents" in Federal Rule of Civil Procedure 34 and as "writings" and "recordings" in Federal Rule of Evidence 1001. By way of example and without limitation, the terms "document" and "documents" include the original, all drafts, and all non-identical copies, regardless of origin or location, of the following: notes, correspondence (including by letter, by e-mail, or by SMS text

message, or by iMessage), internal communications, e-mail, ledger books, log books, statements, memoranda, policies, procedures, directives, instructions, guidance, summaries of records of conversations, reports, video tapes, audio tapes, minutes or records of meetings, summaries of interviews or investigations, maps, and photographs. The term "document" shall include data stored and organized electronically.

8.  "Identify," when referring to a person, means to give the names, titles, organizational roles, and job descriptions of all U.S. Government officials, officers, agents, employees or contractors.

9.  "Including" shall be construed to include the phrase "without limitation."

10.  The term "Targeted Noncitizen Students or Faculty Members" means the following individuals:

    a.  Mahmoud Khalil;

    b.  Mohsen Mahdawi;

    c.  Rümeysa Öztürk;

    d.  Yunseo Chung;

    e.  Efe Ercelik;

    f.  Mohammed Hoque;

    g.  Ranjani Srinivasan;

    h.  Badar Khan Suri; and

    i.  Momodou Taal.

11.  The terms "you" and "your" refer to each of the defendants individually responding to these requests.

## INTERROGATORIES

1.   Identify the persons who are or were involved in proposing or taking adverse action against any of the Targeted Noncitizen Students or Faculty Members, including everyone from the most senior agency officials (*e.g.*, Secretary Rubio and Secretary Noem) down the chain to the most junior agency officials, officers, employees, agents, contractors, or consultants.

2.   Identify the persons who are or were involved in the inspection, review, monitoring, or surveillance of the Targeted Noncitizen Students or Faculty Members' social media accounts or activity.

3.   Identify the persons who are or were involved in taking adverse action against any non-citizen student or faculty member at a Covered Institution based in whole or in part on speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel.

4.   Identify the persons who are or were involved in communications between you and any Covered Institution concerning non-citizen students or faculty members believed or suspected to have engaged in speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including the persons at the Department of Homeland Security who communicated with Columbia University, as referenced by White House Press Secretary Karoline Leavitt in her press briefing on March 11, 2025.

5.   Identify the persons who are or were involved in the identification of non-citizen students or faculty members at Covered Institutions who were targeted for any adverse action based in whole or in part on speech or activities deemed or suspected to be pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel, including the persons who were involved in creating, compiling and sharing the list of students provided by the Department of

Homeland Security to Columbia University, as referenced by White House Press Secretary Karoline Leavitt in her press briefing on March 11, 2025.

6.   State the basis of or for your claim, assertion, allegation, or contention that your taking adverse action against any of the Targeted Noncitizen Students or Faculty Members was lawful.

7.   State the basis of or for your claim, assertion, allegation, or contention that any of the Targeted Noncitizen Students or Faculty Members engaged in pro-Palestinian, anti-Semitic, anti-Zionist, pro-terrorist, pro-Hamas, pro-Jihadist, or anti-Israel speech or activities.

8.   State the basis of the State Department's decision to revoke the visas of any of the Targeted Noncitizen Students or Faculty Members under 8 U.S.C. § 1201(i).

9.   State the basis of Secretary of State Rubio's determination that any of the Targeted Noncitizen Students or Faculty Members is removable under 8 U.S.C. § 1227(a)(4)(C).

10. Identify all documents you created, consulted, referenced, or relied on in determining whether to take adverse action against any of the Targeted Noncitizen Students or Faculty Members.

11. State the basis of the State Department's decision to make "silent" the revocation of any of the Targeted Noncitizen Students' or Faculty Members' visas or green cards, *i.e.*, not to notify the Targeted Noncitizen Student or Faculty Member of the revocation..

12. Describe in detail the reasons why the agents who arrested Rümeysa Öztürk and Badar Khan Suri were wearing civilian clothes, hoods, and masks, without their official badges visible.

13. Describe in detail your transfer of Mahmoud Khalil and Rümeysa Öztürk from the location of their arrest to a detention facility in Louisiana, including your decision to transfer them and your reasons for transferring them.

14. Describe in detail your decision to and reasons for arresting Mohsen Mahdawi at the time and location of his U.S. Citizenship and Immigration Services interview in Colchester, Vermont on April 14, 2025.

Dated:      May19, 2025
            New York, NY

SHER TREMONTE LLP

By:  ____/s/ Noam Biale_____
Michael Tremonte
Noam Biale
Courtney Gans
Alexandra Conlon
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
Zimmer, Citron & Clarke, LLP

130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
*edwina@zimmercitronclarke.com*

*Attorneys for Plaintiffs*

To:    Ethan B. Kanter, Esq. (via email)
Harry Graver, Esq. (via email)
Lindsay M. Murphy, Esq. (via email)
Sarmad Khojateh, Esq. (via email)
Shawna Yen, Esq. (via email)

*Attorneys for Defendants*

# EXHIBIT E

| | |
|---|---|
| **From:** | Murphy, Lindsay M. (CIV) |
| **To:** | "Ramya Krishnan"; "Noam Biale"; "Alexander A Abdo"; "Alexandra Conlon"; "Courtney Gans"; "Jameel Jaffer"; "Michael Tremonte"; "Scott Wilkens"; "Xiangnong Wang"; "Talya R Nevins"; "Jackson Busch" |
| **Cc:** | Busen, Jesse (CIV); Hennes, Stefanie (CIV); Kanellis, William G. (CIV); Kanter, Ethan (CIV); Moss, Benjamin M. (CIV); Santora, Victoria M (CIV); Stone, Paul (CIV); Strokus, Jessica D. (CIV); Yen, Shawna (USAMA) |
| **Subject:** | RE: AAUP: Position on Motion to Seal Portion of AR Supplement |
| **Date:** | Friday, June 13, 2025 5:59:00 PM |
| **Attachments:** | AAUP Responses to Plaintiffs First Set of Requests for Production FINAL.pdf |
| | AAUP v. Rubio Defendants Prod Vol 01_6.13.25.pdf |
| | image001.jpg |

Thanks, Noam and Ramya. And sorry for leaving some of your team members off my prior message. Attached, please find Defendants' responses and objections to your requests for production along with associated documents. We are still finalizing our responses to your ROGs and will have those to you as soon as possible, but likely not before Monday.

We are still waiting on agency approval to file one remaining document under seal. Because the document is law enforcement sensitive, the agency is not comfortable producing it without a protective order in place. So, we will be delayed in getting this document to you.

Best,

Lindsay

---

Ramya Krishnan
Friday, June 13, 2025 3:39 PM
Noam Biale ; Murphy, Lindsay M. (CIV) ; Alexander A Abdo ; Alexandra Conlon ; Courtney Gans ; Jameel Jaffer ; Michael Tremonte ; Scott Wilkens ; Xiangnong Wang ; Talya R Nevins ; Jackson Busch
Busen, Jesse (CIV) ; Hennes, Stefanie (CIV) ; Kanellis, William G. (CIV) ; Kanter, Ethan (CIV) ; Moss, Benjamin M. (CIV) ; Santora, Victoria M (CIV) ; Stone, Paul (CIV) ; Strokus, Jessica D. (CIV) ; Yen, Shawna (USAMA)
[EXTERNAL] Re: AAUP: Position on Motion to Seal Portion of AR Supplement

Hi Lindsay, just adding a few more lawyers from our team to this chain.

Ramya

---

**From:** Noam Biale <NBiale@shertremonte.com>
**Date:** Friday, June 13, 2025 at 2:40 PM
**To:** Murphy, Lindsay M. (CIV) <Lindsay.M.Murphy@usdoj.gov>, Alexander A Abdo <alex.abdo@knightcolumbia.org>, Alexandra Conlon <Aconlon@shertremonte.com>, Courtney Gans <CGans@shertremonte.com>, Jameel Jaffer <jameel.jaffer@knightcolumbia.org>, Michael Tremonte <MTremonte@shertremonte.com>, Ramya Krishnan <ramya.krishnan@knightcolumbia.org>, Scott Wilkens <scott.wilkens@knightcolumbia.org>
**Cc:** Busen, Jesse (CIV) <Jesse.Busen@usdoj.gov>, Hennes, Stefanie (CIV) <Stefanie.Hennes@usdoj.gov>, Kanellis, William G. (CIV) <William.G.Kanellis@usdoj.gov>, Kanter, Ethan (CIV) <Ethan.Kanter@usdoj.gov>, Moss, Benjamin M. (CIV) <Benjamin.M.Moss2@usdoj.gov>, Santora, Victoria M (CIV) <Victoria.M.Santora@usdoj.gov>, Stone, Paul (CIV) <Paul.F.Stone@usdoj.gov>, Strokus, Jessica D. (CIV) <Jessica.D.Strokus@usdoj.gov>, Yen, Shawna (USAMA)

<Shawna.Yen@usdoj.gov>

**Subject:** Re: AAUP: Position on Motion to Seal Portion of AR Supplement

> **This Message Is From an External Sender**
> This message came from outside your organization.

Hi Lindsay,

No objection. Can you give us a sense of the volume of documents you'll be disclosing?

Noam



**Noam Biale**
90 Broad Street, 23rd Floor | New York, NY 10004
tel: 212.300.2445 | fax: 212.202.4156
nbiale@shertremonte.com
www.shertremonte.com

This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

Murphy, Lindsay M. (CIV) <Lindsay.M.Murphy@usdoj.gov>

Friday, June 13, 2025 2:09:39 PM

Alexander A Abdo <alex.abdo@knightcolumbia.org>; Alexandra Conlon <Aconlon@shertremonte.com>; Courtney Gans <CGans@shertremonte.com>; jameel.jaffer <jameel.jaffer@knightcolumbia.org>; Michael Tremonte <MTremonte@shertremonte.com>; Noam Biale <NBiale@shertremonte.com>; Ramya Krishnan <ramya.krishnan@knightcolumbia.org>; scott.wilkens <scott.wilkens@knightcolumbia.org>

Busen, Jesse (CIV) <Jesse.Busen@usdoj.gov>; Hennes, Stefanie (CIV) <Stefanie.Hennes@usdoj.gov>; Kanellis, William G. (CIV) <William.G.Kanellis@usdoj.gov>; Kanter, Ethan (CIV) <Ethan.Kanter@usdoj.gov>; Moss, Benjamin M. (CIV) <Benjamin.M.Moss2@usdoj.gov>; Santora, Victoria M (CIV) <Victoria.M.Santora@usdoj.gov>; Stone, Paul (CIV) <Paul.F.Stone@usdoj.gov>; Strokus, Jessica D. (CIV) <Jessica.D.Strokus@usdoj.gov>; Yen, Shawna (USAMA) <Shawna.Yen@usdoj.gov>

AAUP: Position on Motion to Seal Portion of AR Supplement

Hi Noam,

We're finalizing our RFP responses and objections and should have them to you shortly. We also have some additional documents to share. Because at least one of the documents is law enforcement sensitive and non-public facing, and a general protective order has yet to be entered, we'd like to submit it as a sealed supplement to the AR so that it cannot be shared outside of this litigation. We're still evaluating two other documents to determine if they should be sealed as well. Do Plaintiffs have any objection to our motion to submit these documents under seal?

Thanks,

Lindsay

# EXHIBIT F

| From: | Murphy, Lindsay M. (CIV) |
|---|---|
| To: | "Alexander A Abdo"; "Alexandra Conlon"; "Courtney Gans"; "Jackson Busch"; "jameel.jaffer"; "Michael Tremonte"; "Noam Biale"; "Ramya Krishnan"; "scott.wilkens"; "Talya R Nevins"; "Xiangnong Wang" |
| Cc: | Busen, Jesse (CIV); Hennes, Stefanie (CIV); Kanellis, William G. (CIV); Kanter, Ethan (CIV); Moss, Benjamin M. (CIV); Santora, Victoria M (CIV); Stone, Paul (CIV); Strokus, Jessica D. (CIV); Yen, Shawna (USAMA) |
| Subject: | AAUP: Responses and    bjections to Plaintiffs" Interrogatories |
| Date: | Saturday, June 21, 2025   :   :00 PM |
| Attachments: | 06.21.2025 AAUP Defs Responses and    bjections to Plfs First Set of Interrogatories.pdf |

Hi Noam,

Attached, please find Defendants' responses and objections to Plaintiffs' interrogatories. Please note that we will be following up on Monday with our verifiers' signatures. They weren't all available to sign tonight, but we wanted to get our response to you as soon as they were ready.

Lindsay

Lindsay M. Murphy

Deputy Chief, National Security Unit

Office of Immigration Litigation    General Litigation and Appeals

Civil Division

U.S. Department of Justice

(202) 616-401

    This e-mail and any attachments may contain information that is private, confidential, or privileged. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, ET AL.,

                    Plaintiff,

      -v-

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT OF
STATE, ET AL.,

                    Defendant.

Civil Action No. 1:25-cv-10685-WGY

Declaration of John Armstrong

# DECLARATION OF JOHN ARMSTRONG
# ASSERTING DELIBERATIVE PROCESS PRIVILEGE

I, John Armstrong, hereby declare under penalty of perjury:

1. I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru; as Economic Counselor in Warsaw, Poland; as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas; Deputy Consul General in Kyiv, Ukraine; and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russian Desk, and Belarus Desk Officer.

2. As the Senior Bureau Official, I play a central role in formulating and implementing

policies related to the protection of U.S. citizens abroad, visa and passport issuance, and consular operations globally. In this capacity, I routinely participate in internal deliberations with Department officials and interagency partners concerning complex policy issues, operational planning, and diplomatic strategy.

3. This declaration is based on my personal knowledge and vast professional experience. In my official capacity as Senior Bureau Officer, I have exercised oversight over matters involving United States citizen services abroad. These matters all encompass the sensitive deliberative process of the Department.

4. I am aware of the instant lawsuit that has been filed in the U.S. District Court for the District of Massachusetts. I understand that Marco Rubio in his official capacity as Secretary of State, in addition to the Department of State are named defendants.

5. I submit this declaration to explain the assertion of the deliberative process privilege (DPP) with respect to highly sensitive information that Plaintiffs seek the court to compel be publicly released.

6. The authority to assert the deliberative process privilege in judicial and administrative proceedings for the Department of State has been delegated to me in Department Delegations of Authority No. 479 and No. 577, as published in the Federal Register.

7. Based upon my personal review and knowledge of the information solicited by Plaintiffs, I am formally asserting DPP over the documents and information identified below, which the government withheld as privileged:

   **Material Subject to the DPP:**

        i. Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with

the Security and Related Grounds for Visa Inadmissibility

    ii.  Portions of the deposition of Senior Bureau Official John Armstrong, related to interagency and Presidential communications, based upon the rough transcript of that deposition that is currently available (Defendants have not yet had an opportunity to identify/request any necessary corrections to the transcript)

   iii.  Portions of the deposition of Senior Bureau Official John Armstrong related to the draft report, prepared for the White House concerning a "catch and revoke" policy implementing Executive Orders No. 14161 and No. 14188, based upon the rough transcript of that deposition that is currently available

   iv.  Portions of the deposition of Senior Bureau Official John Armstrong related to Department of State decisions involving the Five Targeted Noncitizens, based upon the rough transcript of that deposition that is currently available

    v.  Department of State action memoranda to the Secretary of State concerning Removal or Determinations of Deportability (three) and to Senior Bureau Official John Armstrong concerning a visa revocation (one)

   vi.  Interrogatory responses related to the above

8. As the lead federal agency for United States foreign affairs, the Department of State is responsible for advancing American interests abroad, promoting peace and security, and implementing the President's foreign policy. The Department engages with foreign governments, global organizations, and domestic agencies on a broad range matters pertaining to human rights, counterterrorism, immigration, and U.S. citizen protection abroad. Mission fulfilment is reliant upon candid internal deliberations and robust

interagency coordination to develop effective strategies, perform adequate risk assessment, and respond to complex global issues.

9.  With regard to the report named in this declaration and identified in the Government's Index as Exhibit A, it was prepared to support internal agency deliberations within the Department, across interagency partners, and with the President and his advisors. This document is both pre-decisional and deliberative in nature. It reflects internal agency assessments, legal and policy interpretations, and potential courses of action that have not been finalized or adopted. Sensitive foreign policy and national security matters are contained within this report.

10. The release of the information that Plaintiffs seek would reveal sensitive information subject to DPP. This includes information pertaining to diplomatic engagement strategies, policy proposals, and interagency coordination. The revelation of such information could undermine the efforts of the Department to carry out its mission of promoting peace and security through robust and candid internal deliberations.

11. In carrying out its mission, the Department of State depends on candid internal deliberations and the ability of its personnel to provide frank assessments without the fear of premature and improper disclosure. Put simply, the release of the information Plaintiffs seek would compromise the Department's ability to perform its mission and is properly designated DPP. Disclosure of deliberative process privileged information could provide those who wish to harm the United States with valuable information in the form of a roadmap to the government's internal decision-making processes. This roadmap would reveal strategic priorities, vulnerabilities, or areas of uncertainty that our adversaries could exploit.

12. If disclosed, the release of information the Department has withheld here as DPP could chill an exchange of information between federal agencies, thus impeding their decision-making process. This is especially true where, as here, the opinions, proposals, and recommendations of Department employees may concern controversial approaches to the government's foreign affairs priorities. If Department employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure –and the scrutiny, potential misinterpretation and critics that may follow, the candor of their views could be chilled. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure based on DPP.

13. Given the sensitive and privileged nature of the information, there are no precautions that would allow the Department of State to safely release this information to Plaintiffs or the public at large.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th Day of June 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State