# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, ET AL.,

                Plaintiffs,

       -v-

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT OF
STATE, ET AL.,

                Defendants.

Civil Action No. 1:25-cv-10685-WGY

Declaration of William S. Walker

## DECLARATION OF WILLIAM S. WALKER

I, William S. Walker, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      Todd Lyons, Acting Director of ICE, has delegated to me the authority to assert the deliberative process privilege and law enforcement privilege on his behalf regarding the documents at issue in this litigation.

2.      I am the Acting Deputy Executive Associate Director for Homeland Security Investigations (HSI) at U.S. Immigration and Customs Enforcement (ICE) within the U.S. Department of Homeland Security (DHS). This is a career position, not political, and is the second-highest ranking position at HSI. In this role, I oversee a workforce of more than 10,000 employees, including special agents, criminal analysts, mission support personnel and contract staff assigned to more than 237 offices throughout the United States and more than 56 countries around the world.

3.      I previously served as the Acting Assistant Director ((A) AD) for Domestic Operations at HSI. As the (A) AD, I was responsible for oversight of 30 HSI Special Agents in

Charge, 237 domestic field offices, and more than 7,100 special agents, ensuring all field operations are working to efficiently execute the agency mission. I began my career with the U.S. Government as an Inspector with the former U.S. Customs Service at the Port of Philadelphia. Over a career that spans 26 years, I have served as a Deputy Special Agent in Charge, an Assistant Special Agent in Charge, and a Supervisory Special Agent with HSI. Prior to my time as (A) AD for Domestic Operations, I served as the Special Agent in Charge of HSI's New York Field Office, where I oversaw more than 700 investigators whose mission was investigating, disrupting, and dismantling transnational criminal organizations and two terrorist networks.

4.    This declaration is based on my personal knowledge and experience as a law enforcement officer and information provided to me in my official capacity.

5.    I am aware of the instant lawsuit been filed in the U.S. District Court for the District of Massachusetts. I understand that ICE is a named defendant.

6.    I submit this declaration to explain the assertion of the law enforcement privilege (LEP) and deliberative process privilege (DPP) with respect to highly sensitive information that Plaintiffs seek the court to compel be publicly released. Specifically, Plaintiffs attempted to elicit such information during the June 11, 2025, deposition of Andre Watson, the Assistant Director (AD) of HSI's National Security Division (NSD). The material sought is subject to the law enforcement privilege (LEP) and deliberative process privilege (DPP). ICE's equities would be harmed by the release of this information, as discussed in greater detail below, because public release of this information would undermine ICE's law enforcement efforts.

7.    Based upon my personal review and knowledge of the information solicited by Plaintiffs, I am formally asserting LEP and DPP over the answers to following questions, which the government withheld as privileged:

**Material Subject to the LEP:**

a. <u>June 11, 2025 Deposition of AD Watson, page 244:16 through page 245:11</u>:

    i. "Q: Do you recall whether there was any -- do you recall the kinds -- well, this will draw an objection, but do you recall whether there was any evidence attached to the report of analysis that you received?" [Answer withheld as privileged.]

    ii. "Q: Were you provided any primary source information regarding Mr. Khalil's activities?" [Answer withheld as privileged.]

    iii. "Q: Were you provided, for example, with any flyers from protests that Mr. Khalil allegedly led?" [Answer withheld as privileged.]

b. <u>June 11, 2025 Deposition of AD Watson, page 260:11 through page 263:12</u>:

    i. "Ms. Conlon:  Okay. So before I continue questioning, I'm just going to make a record of the topics that I would cover with Mr. Watson with respect to the four other targeted noncitizens . . . First, the content of any referral made under this new process to the Department of State, including its basis; second, the content of the accompanying letter; third, the HSI profile of the targeted noncitizen; fourth, the report of analysis concerning the targeted noncitizen; fifth, communications with anyone concerning the decision to take action against the targeted noncitizen and the nature of the actions that was discussed. I've lost count of the number, but next, communications concerning the manner in which any subsequent action would be taken against a targeted noncitizen, including with respect to the manner of their arrest and detention … to complete it, and more generally and most

importantly, the basis of the referral determinations, the reason these noncitizens were referred."

[Withholding as privileged any information beyond the "practices, policies, and protocols, generally in play at the time" of the enforcement actions in question.]

**Material Subject to the LEP and DPP:**

c.  June 11, 2025 Deposition of AD Watson, page 249:22-24 through page 250:2:

  i.  "[Q]: If, in your estimation, Mr. Khalil had sided with terrorists, would the paperwork that you sent to the Department of State have invoked a terrorism-related ground for his removal?" [Answer withheld as privileged.]

8.     HSI, the largest investigative arm of DHS and component of ICE, holds broad criminal and administrative investigative authorities, which it employs to disrupt national security and transnational criminal threats to the United States. HSI is authorized to conduct, and does conduct, both criminal and administrative investigations into national security and public safety threats related to immigration and transnational crime. In many cases, the final disposition of an investigation depends on the evidence gathered, and it can be impossible to know in the early stages whether the ultimate result will be criminal prosecution, administrative proceedings, both, or neither. Public disclosure of protected information could also harm the collaborative relationship between ICE and other federal government agencies, counterparts by inhibiting the current willingness – and even creating a disincentive – to share information between and among federal agencies. The post-9/11 model of "need to share" with respect to investigative information has permitted front-line agents and officers to make informed decisions at critical junctures. When agencies and departments work in isolation, such achievements simply are not possible. Any

degradation of information-sharing relationships could lead to poor coordination of investigative efforts, potentially harming public safety and national security.

9.    The release of the information that Plaintiffs seek would reveal sensitive information subject to LEP.  This includes information regarding the evidence considered in deciding whether to take enforcement action against specific individuals. The revelation of such information could undermine the efforts of HSI to carry out its mission of identifying criminal and national security activities and eliminating vulnerabilities that pose a threat to our nation's borders, as well as ensuring economic, transportation, infrastructure, and national security.

10.    In carrying out its mission, ICE depends on the use of law enforcement and investigative techniques, methods, and procedures not widely known to the public; this information is LEP. Put simply, the release of information Plaintiffs seek would compromise ICE's ability to perform its mission and is properly designated LEP. Disclosure of law enforcement privileged information could provide those who wish to harm the United States with valuable information about how the U.S. Government detects, investigates, and thwarts activity that impacts public safety and national security and violates U.S. laws. Disclosure of any such existing information related to investigative processes, coordination with law enforcement partners, or insight into the types of information contained in law enforcement checks could significantly undermine future law enforcement efforts. As described in this declaration, disclosing information that could ultimately provide bad actors with the information they need to evade, or otherwise thwart, U.S. law enforcement efforts has potentially grave consequences for national security and public safety.

11.    In addition to the threat posed by general release, if subjects of investigations were to obtain LEP related to the investigations into their activities, should any exist, they could identify

what behaviors are of interest to federal law enforcement, the sources of the information, and/or the methods that the U.S. Government used to gather the information. Such knowledge could allow bad actors to change their behavior in order to evade law enforcement. Hypothetically, even the date on which an investigation began provides valuable insight, in that it can alert an individual to an event that may have triggered the interest of law enforcement. Further, even information regarding closed investigations could provide awareness of investigative techniques that can aid bad actors in avoiding detection by law enforcement agencies or could alert them to potential methods the government has used to obtain specific derogatory information. Disclosure of such types of information increases the likelihood that subjects and potential subjects of investigations will develop methods to obscure or alter such information and behavior and thereby circumvent the agency's efforts to collect information and evidence to thwart serious violations that may affect the national security.

12.    The information withheld under the deliberative process privilege includes the considerations ICE made in deciding the type of enforcement action that would be appropriate with regard to a specific individual.  To create a coordinated and cohesive Executive Branch policy, ICE employees routinely communicate not only with each other, but also with other DHS components, and other federal agencies. Such communications are part of a larger strategic decision-making process, often to effectuate polices programs, executive orders, or other documents. It is crucial that these pre-decisional and deliberative communications be protected because informed and frank discourse among federal officials ensures that ideas, even those that are unpopular, are fully and properly considered by decisionmakers prior to making final decisions.

13.    If disclosed, the release of information ICE has withheld here as DPP could chill an exchange of information between federal agencies, other DHS components, and ICE offices

and employees, thus impeding their decision-making process. This is especially true where, as here, the opinions, proposals, and recommendations of ICE employees may concern controversial approaches to the government's border security and immigration enforcement and ICE's priorities. If ICE employees are aware that their opinions, deliberations, and recommendations may be subject to public disclosure–and the scrutiny and critics that may follow, the candor of their views could be chilled. This chilling effect is magnified when those opinions, deliberations, and recommendations are taken out of context. It is thus critical that pre-decisional and deliberative communications and procedures be protected from disclosure based on DPP.

14.     Given the sensitive and privileged nature of the information, there are no precautions that would allow ICE to safely release this information to Plaintiffs or the public at large.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th Day of June 2025.

**WILLIAM S WALKER**

Digitally signed by WILLIAM S WALKER
Date: 2025.06.27 11:40:31 -04'00'

_____
William S. Walker
Acting Deputy Executive Associate Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL., | ) ) ) | Civil Action No. 1:25-cv-10685-WGY |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) |  |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., | ) ) ) ) |  |
| Defendants. | ) ) ) ) |  |

### DECLARATION OF GARY M. LAWKOWSKI

I, Gary Lawkowski, declare:

1.      I currently hold the position of Deputy Assistant to the President and Deputy Counsel to the President.  I joined the White House Counsel's Office as a deputy on January 20, 2025.  In this capacity, I am responsible for, among other things, providing legal advice to White House staff, including advice on matters involving the invocation of the presidential communications privilege.

2.      I submit this declaration formally invoking the presidential communications privilege with respect to several documents and communications requested in discovery by Plaintiffs, including a document submitted for *in camera* review.  I base this declaration on my personal knowledge, information made available to me in the performance of my duties, and my knowledge of the issues being litigated in the above-captioned case.

3.      I am aware that, upon consultation with the Office of the Counsel to the President, the United States has withheld certain documents and communications on the basis of the presidential communications privilege.

4.      On behalf of the Office of the President, I hereby assert the presidential communications privilege with respect to all portions of one document identified in the Government's Index as Exhibit A.  The assertion of privilege is based on my personal review of this document.  In making this declaration, I have also relied on the description of the document provided by my staff and on the description of the document contained in the Government's Index.

5.      I understand that the Department of State is also asserting the deliberative process privilege with respect to this document.  The fact that my assertion is limited to the presidential communications privilege is in no way intended to suggest that this document or portions of this document is not protected in whole or in part by other privileges.

6.      The document as to which the presidential communications privilege is being asserted consists of a report from the Department of State that was solicited by the President of the United States in Section 3 of Executive Order 14,188, *Additional Measures to Combat Anti-Semitism.*  It was transmitted to a Deputy Assistant to the President for circulation and consideration by White House advisers with broad and significant responsibility for investigating and formulating confidential advice to the President. In particular, the withheld document is a March 2025 report entitled "Report on Department of State Authorities to Counter Anti-Semitism and Recommendations for Familiarizing Institutions of Higher Education with the Security and Related Grounds for Visa Inadmissibility," to Julie M. Stufft, Deputy Assistant to the President and Executive Secretary, National Security Council, from Lisa D. Kenna,

Add.507

Executive Secretary, Department of State.  The report includes a "recommendations" section, as requested by the President, regarding actions and authorities withn the jurisdiction of the Department of State to combat anti-semitism as well as for familiarizing institutions of higher education with the security and related grounds for visa inadmissibility to inform confidential deliberations.  The document addresses potential policies and guidance for the Government to pursue regarding combatting anti-semitism and familiarizing insitutitons of higher education with the security and related grounds for visa inadmissibility.

7.    Additionally, I hereby assert the presidential communications privilege with respect to all portions of communications from the White House, including Assistant to the President and Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller and counsel from the Office of White House Counsel, alluded to and discussed in part in the deposition of Senior Bureau Official John Armstrong.  The assertion of privilege is based on my personal review of the transcript for SBO Armstrong's deposition.  In making this declaration, I have also relied on the description of the communications provided by my staff.

8.    I understand that the Department of State is also asserting the deliberative process privilege with respect to these communications.  The fact that my assertion is limited to the presidential communications privilege is in no way intended to suggest that these communications or portions of these communications are not protected in whole or in part by other privileges.

9.    These communications as to which the presidential communications privilege is being asserted consists of interagency telephonic meetings regarding immigration policy.  In particular, the withheld communications occurred primarily in and around March 2025 and included senior White House and cabinet-level officials, such as Assistant to the President and

3

Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller and counsel from the Office of the White House Counsel. The communications addressed ongoing efforts and potential policies and guidance for the Government to pursue regarding immigration policy, including the specific discussion of one or more executive order issued by the President.

10.    These communications were solicited and received by senior presidential advisors or their staff, including Assistant to the President and Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller and counsel from the Office of the White House Counsel. Mr. Miller is a high-ranking White House staff member who provides support and advice to the President and his senior adivsors. The Office of White House Counsel advises the President, the Executive Office of the President, and the White House staff on legal issues pertaining to the President and the White House.

11.    The document and communications as to which the presidential communications privilege is being asserted were solicited and received by immediate presidential advisors or their staff who have broad and significant responsibility for investigating and formulating advice to be given to the President with respect to decision-making on the subject of immigration policy. I believe that, without the protection of the presidential communications privilege over the communications described above, presidential advisors and their staffs would be chilled from having candid conversations with senior officials in cabinet agencies, gathering relevant information, exploring alternatives, and providing fully informed recommendations regarding the performance of the President's duties.

Add.509

12.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27 day of June 2025.

Deputy Counsel to the President

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, ET AL.,

     Plaintiff,

   -v-

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT OF
STATE, ET AL.,

     Defendant.

Civil Action No. 1:25-cv-10685-WGY

Declaration of John Armstrong

**DECLARATION OF JOHN ARMSTRONG
ASSERTING LAW ENFORCEMENT PRIVILEGE**

I, John Armstrong, hereby declare under penalty of perjury:

1. I am the Senior Bureau Official within the U.S. Department of State's Bureau of Consular Affairs. I am a career member of the Senior Foreign Service with the rank of Counselor. Prior to becoming the Senior Bureau Official, I briefly served as the Deputy Assistant Secretary for Overseas Citizen Services. I served overseas as the Consul General in Lima, Peru; as Economic Counselor in Warsaw, Poland; as Consular Section Chief and Acting Deputy Chief of Mission in Nassau, Bahamas; Deputy Consul General in Kyiv, Ukraine, and Nonimmigrant Visa Chief in Bucharest, Romania. I have also previously served domestic assignments in Washington, D.C., as Director of the Office of Eastern European Affairs, Director of the Washington Passport Agency, Senior Political Officer on the Russian Desk, and Belarus Desk Officer.

2. As the Senior Bureau Official, I routinely engaged with matters directly involving United States and foreign law enforcement. In this role, I oversee issues related to the arrest,

detention, or welfare of United States citizens abroad. This often requires coordination with agencies such as the Federal Bureau of Investigation, Department of Homeland Security, and foreign police authorities. I also work closely with interagency partners on efforts to detect and prevent passport and visa fraud. These investigations often require sensitive investigative information.

3. This declaration is based on my personal knowledge and vast professional experience. In my official capacity as Senior Bureau Officer, I have exercised oversight on matters involving United States citizen services abroad. These matters include law enforcement coordination.

4. I am aware of the instant lawsuit that has been filed in the U.S. District Court for the District of Massachusetts. I understand that Marco Rubio in his official capacity as Secretary of State, in addition to the Department of State are named defendants.

5. I submit this declaration to explain the assertion of the law enforcement privilege (LEP) with respect to highly sensitive information that Plaintiffs seek the court to compel be publicly released.

6. The authority to assert the law enforcement privilege in these proceedings for the Department of State has been delegated to me in Department Delegation of Authority No. 577, as published in the Federal Register, and a Delegation of Authority approved on June 27, 2025, and pending publication in the Federal Register.

7. Based upon my personal review and knowledge of the information solicited by Plaintiffs, I am formally asserting LEP over the documents and information identified below, which the government withheld as privileged:

**Material Subject to the LEP:**

    i.  Department of State Guidance to the field (posts worldwide involved in providing visa services) in the form of cables, memoranda, and webinar presentations relating to implementation of Executive Orders No. 14161 and No. 14188, social media vetting, security in visa adjudications, visa ineligibilities, visa applicant qualifications, including for students and exchange visitors, and visa revocations

    ii.  Portions of the deposition of Senior Bureau Official John Armstrong related to Department of State decisions involving the Five Targeted Noncitizens, based upon the rough transcript of that deposition that is currently available (Defendants have not yet had an opportunity to identify/request any necessary corrections to the transcript)

    iii.  Nonpublic versions of the Foreign Affairs Manual/Foreign Affairs Handbook dealing with visa ineligibilities, visa applicant qualifications, including for students and exchange visitors, and visa revocations

    iv.  Interrogatory responses related to the above

8.  The Department of State, particularly the Bureau of Consular Affairs, performs security vetting, in collaboration with interagency law enforcement and other partners, of millions of U.S. visa applicants and visa holders annually. That security vetting involves law enforcement, intelligence, and national security resources and equities.

9.  The documents and information withheld contain law enforcement and national security terminology, techniques, processes, procedures, and other information compiled for law enforcement and intelligence purposes, including fraud prevention. Disclosure of this

information would reveal highly sensitive screening and vetting techniques that are used by law enforcement and intelligence partners and could allow visa applicants to avoid fraud detection or national security review and reasonably be expected to risk circumvention of the immigration, criminal, and/or anti-terrorism laws.

10. The release of the information that Plaintiffs seek would reveal sensitive information subject to LEP. This includes information related to how potential visa ineligibilities are assessed throughout the visa application process and throughout the period of the visa's validity. The revelation of such information could undermine Department of State and U.S. Government to uphold U.S. immigration laws and identify national security and public safety threats.

11. Visa security vetting techniques, methods, and procedures are not widely known to the public because the release of such LEP information would compromise the U.S. Government's ability to continue properly vetting visa applicants and visa holders. Disclosure of law enforcement privileged information could provide those who wish to harm the United States with valuable information about how the U.S. Government detects, investigates, and thwarts activity that impacts public safety and national security and violates U.S. laws. Disclosure of any such existing information related to investigative processes, coordination with law enforcement partners, or insight into the types of information contained in law enforcement checks could significantly undermine future law enforcement efforts.

12. As described in this declaration, disclosing information that could ultimately provide bad actors with the information they need to evade, or otherwise thwart, U.S. law enforcement and national security efforts has potentially grave consequences for national security and

public safety.

13. Given the sensitive and privileged nature of the information, there are no precautions that would allow the Department of State to safely release this information to Plaintiffs or the public at large.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th Day of June 2025.

John Armstrong
Senior Bureau Official
Bureau of Consular Affairs
U.S. Department of State

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
AMERICAN ASSOCIATION OF             )
UNIVERSITY PROFESSORS,              )
                                    )
AMERICAN ASSOCIATION OF             )
UNIVERSITY PROFESSORS -- HARVARD    )
FACULTY CHAPTER,                    )
                                    )
AMERICAN ASSOCIATION OF             )
UNIVERSITY PROFESSORS AT NEW        )
YORK UNIVERSITY,                    )
                                    )    CIVIL ACTION NO.
RUTGERS AMERICAN ASSOCIATION OF     )    25-10685-WGY
UNIVERSITY PROFESSORS-AMERICAN      )
FEDERATION OF TEACHERS, and         )
                                    )
MIDDLE EAST STUDIES ASSOCIATION,    )
                                    )
                  Plaintiffs,       )
         v.                         )
                                    )
MARCO RUBIO, in his official        )
capacity of Secretary of State,     )
and the DEPARTMENT OF STATE,        )
                                    )
KRISTI NOEM, in her official        )
capacity as Secretary of Homeland   )
Security, and the                   )
DEPARTMENT OF HOMELAND SECURITY,    )
                                    )
TODD LYONS, in his official         )
capacity as Acting Director of      )
U.S. Immigration and                )
Customs Enforcement,                )
                                    )
DONALD J. TRUMP, in his official    )
Capacity as President of            )
the United States, and             )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                  Defendants.       )
_____)

YOUNG, D.J.                                June 27, 2025

**ORDER**

1.    The plaintiffs' motions for further discovery, ECF
Nos. 153 and 155, are DENIED in view of the defendants
representations concerning discovery already provided and to be
provided

2.    Upon further reflection, no witness shall testify
anonymously in this case ,save upon a far more compelling
showing than alluded to thus far.

There is altogether too much fear of our government abroad
in our land today.  Courts are part of government.  It is in the
dignified courtrooms of our nation that most precious aspect of
our First Amendment rights are hammered out.  All participants
in the trial process, be they litigants, witnesses, or
attorneys, are engaging in the central practice of the First
Amendment -- the right formally to petition our government.
U.S. Const., Amdt. 1; Borough of Duryea, Pa. v. Guarnieri, 564
U.S. 379, 387 (2011) ("[T]he right of access to courts for
redress of wrongs is an aspect of the First Amendment right to
petition the government.") (quoting Sure-Tan, Inc. v. NLRB, 467
U.S. 883, 896-897 (1984)); Franchini v. Investor's Bus. Daily,
Inc., 981 F.3d 1, 8 (1st Cir. 2020).

This is why those courageous law firms who stood up to retribution were so swiftly and emphatically vindicated. See Perkins Coie LLP v. U.S. Dep't of Just., No. 25-CV-716, --- F.Supp.3d ----, ----, 2025 WL 1276857, at *49 (D.D.C. May 2, 2025); Jenner & Block LLP v. U.S. Dep't of Just., No. 25-CV-916, --- F.Supp.3d ----, ----, 2025 WL 1482021, at *26 (D.D.C. May 23, 2025); Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President, No. 25-CV-917, --- F.Supp.3d ----, ---- - ----, 2025 WL 1502329, at *33-34 (D.D.C. May 27, 2025); Susman Godfrey LLP v. Exec. Off. of President, No. CV 25-1107 (LLA), 2025 WL 1779830, at *1 (D.D.C. June 27, 2025).

This Court is a safe place. The plaintiffs and their witnesses may fully participate in the trial process without fear of retribution knowing they are protected by this Court's order. Indeed, were there to be any violation traceable to any of these defendants, it would prove the plaintiff's case. Likewise, law enforcement officers testifying about enforcement of the laws passed by the Congress of the United States will receive the same courtesy and respect that has long been a hallmark of this Court. Any retribution from any quarter by anyone will be met with the full rigor of the Court's resources.

It is only when people believe that the civil court's are faltering, not doing their job, that authoritarians rush in with martial law. See e.g. Ex parte Milligan, 71 U.S. 2 (1866).

One of America's finest jurists, Circuit Judge Richard S. Arnold of Arkansas, had this to say to fellow judges, "There has to be a safe place.  We have to be it."

For 235 years of continuous sittings, the United States District Court for the District of Massachusetts has been that "safe space."  We shall not falter.

**SO ORDERED.**

William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE

[4]

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,<br><br>*Defendants*. | No. 1:25-cv-10685-WGY<br><br>**NOTICE OF SEALED SUBMISSION OF DOCUMENTS FOR *IN CAMERA, EX PARTE* REVIEW** |

Pursuant to the Court's invitation to submit documents subject to privilege for *in camera* inspection, the Government respectfully submits the attached email correspondence, and associated attachments, concerning enforcement actions against specific non-party individuals. The Government wishes to emphasize that these documents are for *in camera* review only and that the Government does not waive any applicable privileges. Note, these documents do not contain privilege redactions. While these documents do contain information subject to the law enforcement and deliberative process privileges, additional privileges may also be applicable. However, undersigned counsel just received them on July 1, 2025, and a final privilege review has not been completed. These documents have not been filed in any other proceedings or otherwise shared with the specific non-party individuals discussed therein. Therefore, these documents have been withheld from Plaintiffs in full. The government is providing the documents to the Court at this time to ensure that the Court has the documents in advance of trial.

1

Respectfully Submitted,

BRETT A. SHUMATE                                WILLIAM KANELLIS
*Assistant Attorney General*

                                                *Ethan B. Kanter*
DREW C. ENSIGN                                  ETHAN B. KANTER
*Deputy Assistant Attorney General*             *Chief, National Security Unit*
                                                *Office of Immigration Litigation*
                                                *P.O. Box 878, Ben Franklin Station*
                                                *Washington, D.C. 20001*

*Dated: July 2, 2025*                           *Counsel for Defendants*

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL.,<br><br>*Defendants.* | No. 1:25-cv-10685-WGY<br><br>**NOTICE OF MANUAL FILING, IN CAMERA AND EX PARTE** |

**DEFENDANTS' OBJECTIONS TO DISCLOSURE OF,**
**AND ASSERTIONS OF PRIVILEGE OVER, SUBSET OF**
**IN CAMERA DOCUMENTS IDENTIFIED BY THE COURT ON JULY 8, 2025**

In accordance with the Court's instructions from the bench on July 8, 2025, that Defendants raise any objections to the disclosure of certain in camera documents prosed by the Court before 10:45am on July 9, 2025, Defendants hereby submit the enclosed privilege log (partially redacted for privilege in the public filing).  Additionally, Defendants will submit, in camera and ex parte, an unredacted version of the privilege log, along with a copy of the documents proposed by the Court for disclosure to Plaintiffs on July 9, bearing transparent redaction boxes over information that the Government has identified as privileged.

1

Respectfully Submitted,

BRETT A. SHUMATE
*Assistant Attorney General*                      WILLIAM KANELLIS

DREW C. ENSIGN                                    *Ethan B. Kanter*
*Deputy Assistant Attorney General*               ETHAN B. KANTER
                                                  *Chief, National Security Unit*
                                                  *Office of Immigration Litigation*
                                                  *P.O. Box 878, Ben Franklin Station*
                                                  *Washington, D.C. 20001*

*Dated: July 8, 2025*                             *Counsel for Defendants*

2

Defendants' Privilege Log for Subset of In Camera Documents Identified by the Court on July 8, 2025

| Beg. Bates Number | En. Bates Number | Custodian | Document Title | Document Date | From | To | Email CC | Email/Memo Subject | Privilege Designation | Privilege Description | Filing Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 00001 | 00002 | | | 03/07/2025 | Watson, Andre | Whiting, Andrea Toll | | | none | none | Filed on June 11, 2025 In Camera Submission as law enforcement sensitive, with protective order not yet entered, and regarded as outside the scope of this case as an unresolved issue in the subject's case (a point since clarified), and has not been disclosed publicly, but Defendants would be willing to share it subject to an Attorneys Eyes Only restriction. |
| 00003 | 00003 | William Walker | | 03/09/2025 05:56:44 PM | LE/PII [LE/PII]@hsi.dhs.gov] | LE/PII Walker, William S [William.S.Walker@hsi.dhs.gov] | | Re: Draft Statement/Response | Law Enforcement, Personally Identifiable Information | LEP, PII - Contains names and contact information of non-public facing Homeland Security Investigations law enforcement personnel which, if disclosed, could compromise the safety of such individuals | Filed on July 2, 2025 In Camera Submission |
| 00004 | 00004 | William Walker | | 03/09/2025 06:48:29 PM | LE/PII [LE/PII] | LE/PII Walker, William S [William.S.Walker@hsi.dhs.gov] | | RE: Draft Statement/Response | Law Enforcement, Personally Identifiable Information | LEP, PII - Contains names and contact information of non-public facing Homeland Security Investigations law enforcement personnel which, if disclosed, could compromise the safety of such individuals | Filed on July 2, 2025 In Camera Submission |
| 00005 | 00010 | LE/PII | | 03/23/2025 07:35:37 PM | LE/PII [LE/PII]@ice.dhs.gov] | LE/PII [LE/PII]@ice.dhs.gov] | LE/PII [LE/PII]@ice.dhs.gov]; LE/PII [LE/PII]@ice.dhs.gov]; LE/PII [LE/PII]@ice.dhs.gov]; LE/PII [LE/PII]@ice.dhs.gov] | FW: Signed memo | Law Enforcement, Personally Identifiable Information, Attorney-Client Privilege, Attorney Work Product | LEP, PII - Contains names and contact information of non-public facing Homeland Security Investigations law enforcement personnel which, if disclosed, could compromise the safety of such individuals; ACP/AW: consists of correspondence between attorneys for ICE's Office of the Principal Legal Advisor (OPLA) and employees of ICE Homeland Security Investigations (HSI) and Enforcement and Removal Operations (ERO) about questions surrounding the applicability of a particular removability charge under the Immigration and Nationality Act; updates from ERO to OPLA attorneys regarding issues with arresting a person of interest; ERO employee discussing the use of law enforcement systems and databases to conduct investigations with OPLA attorneys; and conversations between OPLA attorneys discussing HSI investigation results and issues surrounding that person of interest. | Filed on July 2, 2025 In Camera Submission |
| 00011 | 00015 | | Action Memo for the Secretary | 3/8/2025 | Armstrong, John | U.S. Secretary of State | | Removal of [specific individual LPRs], under Section 237(a)(4)(C) of the Immigration and Nationality Act | Deliberative Process, Personally Identifiable Information | DP: contains candid, internal deliberations assessing pre-decisional recommendations on enforcement actions regarding a specific non-citizen (see Armstrong Declaration at Dkt. # 170-8); PII: DOB of non-party individuals on p. 00011 | Filed on June 11, 2025 In Camera Submission, withheld from Plaintiffs in full; Privilege declaration filed in support of opposition to Plaintiffs' motion to compel and upheld on June 30, 2025 when the Court denied the motion to compel (Dkt. # 174) |
| 00016 | 00019 | | Action Memo for Senior Bureau Official John Armstrong | 3/21/2025 | Wilson, Stuart | Armstrong, John | | (SBU) Revocation of F1 Visa for Rumeysa OZTURK | Deliberative Process, Personally Identifiable Information | DP: contains candid, internal deliberations assessing pre-decisional recommendations on enforcement actions regarding a specific non-citizen (see Armstrong Declaration at Dkt. # 170-8); PII: DOB of non-party individual on p. 00016 | Filed on June 11, 2025 In Camera Submission, withheld from Plaintiffs in full; Privilege declaration filed in support of opposition to Plaintiffs' motion to compel and upheld on June 30, 2025 when the Court denied the motion to compel (Dkt. # 174) |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


Date: *July 8, 2025*                                          By: *Ethan B. Kanter*
                                                              ETHAN B. KANTER
                                                              *Chief, National Security Unit*
                                                              *Office of Immigration Litigation*
                                                              *P.O. Box 878, Ben Franklin Station*
                                                              *Washington, D.C. 20001*

Add.525

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| AMERICAN ASSOCIATIONS OF UNIVERSTIY PROFESSORS, ET AL., |
| *Plaintiffs*, |
| v. |
| MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, ET AL., |
| *Defendants.* |

No. 1:25-cv-10685-WGY

**DEFENDANTS' MOTION TO PARTIALLY RECONSIDER THE COURT'S ORDER HOLDING THE GOVERNMENT WAIVED ALL PRIVILEGES OTHER THAN THE LAW ENFORCEMENT PRIVILEGE OVER IN CAMERA SUBMISSIONS**

Defendants respectfully ask this Court to partially reconsider its bench order of July 7, during the 2 p.m. housekeeping conference, determining that Defendants waived all privileges for the documents produced to the Court in camera, e parte and directing Defendants to submit a detailed privilege log limited to the law enforcement privilege for all documents produced in camera, e parte. *See* Electronic Order, Dkt. 184.

(1)    After briefing by the parties on Plaintiffs' June 24 motion to compel, this Court declined to order Defendants to produce the documents that Defendants had submitted in camera on June 11th. *See Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 17 6322, 1 (D. Mass. June 30, 2025), Dkt. 174. Defendants re uest that the Court reaffirm its determination that they need not produce those documents. Included in that first in camera submission are some of the documents the Court identified in a packaged provided to Defendants on Tuesday, July 8th: the first document of the package (a letter authored by Andre Watson, numbered at pages 15-16

1

of 337), and the last two documents of the package (State Department action memos, which are deliberative documents).

(2)     Defendants re uest that the Court reconsider its decision that they waived all privileges as to the first in camera submission, as they did timely assert appropriate privileges and provided relevant declarations including, among others, from the White House.

(3)     Defendants re uest that the Court reconsider its decision that they waived all privileges over the second in camera submission, filed on July 2nd, Dkt. 181, because Defendants reasonably relied on authority holding that the privilege is not waived for documents produced in camera.

## I.     <u>Three Groups of Documents at Issue</u>

There are three groups of documents at issue. The <u>**first**</u> is the set the Defendants provided the Court for its in camera review on June 11th. *See* E h. A, Notice of Manual Filing, Dkt. 131 (unsealed version). These are the documents litigated in a motion to compel following which the Court declined to order produced to Plaintiffs. *See AAUP*, 2025 WL 17 6322, 1, Dkt. 174.

Defendants provided the Court the <u>**second**</u> assemblage of documents on July 2nd for review in camera. *See* Dkt 181. Defendants are preparing a privilege log for those documents as the Court re uired by Friday at noon. But there is one document from the first submission that was duplicated in the second in camera submission, which can be found on pages: 15-16, 20-21, 52-53,

56-57 (the same document appears in the second in camera submission four separate times). This document is duplicative of E hibit B to Defendants' first in camera submission, litigated over privileges claimed (as described above), and which the Court included in the subset of documents it handed to Defendants on July 8. (Pages 15-16).

Finally, the Court, in its July 7 remarks, referenced a <u>**third**</u> in camera e parte submission of documents, but Defendants have only made two such submissions. Defendants did submit a third

group of documents to the Court in camera on June 27, 2025, *see* Dkt.    167, but that submission consisted of unredacted versions of documents that had been produced to Plaintiffs with privilege redactions, and which were subject to Plaintiffs' June 24, 2025, Motion to Compel, *see* Dkt. 153, 155. The Court denied that motion, *see* Dkt    174. Additionally, the documents in the June 27 submission relate to the vetting and management of visa issues, which this Court e pressly e cluded from its July 7 bench order.

**II.    Discussion**

    **1. Defendants submitted the in camera documents in good faith, without believing they waved any privileges, and the Court has already ruled that the Defendants may withhold certain documents.** In response to the Court's invitation to submit documents for in camera review, Defendants produced several to the Court on June 11th and identified the items that were withheld from Plaintiffs in full due to being law enforcement sensitive and not having been produced or litigated in the individual proceedings of the noncitizens they concerned, and identified additional items that were privileged including under the presidential communications and deliberative process privileges. *See* E  h. A, Notice of Manual Filing, Dkt.    131 (unsealed version). Defendants did not propose to rely on the material produced in camera to present their case and defend against Plaintiffs' claims but sought only to provide the Court with information it re uested about enforcement actions taken in individual cases, while also protecting the law enforcement sensitivities of the documents undisclosed in the individual noncitizens' proceedings (particularly in the absence of a case protective order at the time) and preserving applicable privileges over them. Defendants likewise did not intend to rely on the second set of documents provided to the Court on July 2nd. As Defendants said in their notice of filing, the documents had only recently come to their attention and counsel received them the day before they provided them to the Court. *See* Notice of Submission, Dkt.    181. Because Defendants wanted to immediately provide the

3

documents given the Court's emphasis on e pedition in this Rule 65(a)(2) proceeding, a proper privilege review was not possible.

Defendants believed they were not waiving applicable privileges by providing the documents in camera. *See United States v. Zolin*, 4 1 U.S. 554, 568-56 (1 8 ) (holding that providing privileged materials in camera does not have the legal effect of terminating the privilege). The in camera process the Court described made particular sense here given there was little time in this e pedited Rule 65(a)(2) proceeding for the careful, multi-level review of potential privileges to assert, as well as briefing and arguing privilege issues. And given that in camera review is typically used to determine whether privileges apply, Defendants had believed they would at least be given the opportunity to formally assert the relevant privileges should the Court deem their production to Plaintiffs necessary. *See Logue v. Rand Corp.*, 610 F. Supp. 3d 3 , 401 (D. Mass. 2022) (noting that in camera reviews should be encouraged and when the assertion of privilege is subject to legitimate dispute, the desirability of in camera review is heightened ) ( uoting *In re Grant Jury Subpoena*, 662 F.3d 65, 70 (1st Cir. 2011)); *see also* May 6, 2025, Dkt. 87, Tr. at 1 ( The government has a deliberative privilege. I must honor it. ).

Indeed, it appeared that the Court agreed when, after full briefing, it denied Plaintiffs' June 23 motion to compel production of all the documents provided in camera up to that point. *See* Motion to Compel, Dkt. 153 (sealed); Order, Dkt. 174 at 1. But the Court's July 7th bench order reversed course. Thus, Defendants re uest that the Court reconsider its bench order to give effect to the issues already litigated and decided that Defendants did not have to produce those documents.

**2. Additionally, Defendants did timely assert privileges over the June 11 in camera filing.** First, Defendants identified which documents were subject to privilege in the Notice of Manual Filing of the in camera materials. *See* E h. A. Then, Defendants formally invoked those

4

privileges in response to Plaintiffs' motion to compel by providing agency declarations detailing the bases for its deliberative process and presidential communications privilege assertions. *See* Opp'n to Mot. to Compel, Dkt. 170; *see also Huntleigh USA Corp. v. United States*, 71 Fed. Cl. 726, 727 (2006) (re uirements for privilege assertion are satisfied through production of a declaration or affidavit by the agency head in response to a motion to compel); *accord Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1306 (Fed. Cir. 2006) (following majority in holding that the head of department need not invoke the privilege). This included a declaration from John Armstrong, Senior Bureau Official of the U.S. Department of State's Bureau of Consular Affairs, who is authorized to assert the deliberative process and law enforcement privileges, E hs. B at  6   C at  6.

Defendants also provided a declaration from Gary Lawkowski, Deputy Assistant and Deputy Counsel to the President, who is responsible for matters involving the invocation of the presidential communications privilege. *See* E h. D at  1. A finding that the presidential communications privilege is waived is especially troubling given that *before* the White House needs to formally invoke the privilege, the party making the discovery re uest must show  a heightened need for the information sought.  *See Dairyland Power Co-op. v. United States*, 7  Fed. Cl. 65 , 662 (2007) (citing *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004) and *In re Sealed Case*, 121 F.3d 72  (D.C. Cir.1  7)). There has yet to be such a showing and concomitant finding. Nevertheless, the White House, before it needed to, provided a declaration asserting the privilege. So, Defendants timely asserted the privileges over documents in the first in camera production.[1]

---

[1] In their response to Plaintiffs' motion to compel, Defendants also noted that they had learned on the filing date of their response that one document in their June 11 in camera submission also contained third-party agency information that was law enforcement privileged. *See* Dkt. 170 at 11, n.2.  Defendants asked the Court for permission to supplement their opposition to formally invoke

Because Defendants timely asserted the privileges, the parties litigated the privileges' validity, and the Court already declined to pierce the privileges, Defendants respectfully re uest that the Court reconsider its July 7 order that they waived all privileges for the documents produced in the first in camera submission, and that it not re uire the government to produce them or create a privilege log limited to the law enforcement privilege.

Also included in this re uest for reconsideration is a document provided to the Court as part of the second in camera submission because it is duplicative of one the Court already declined to order produced in the first submission. *See, supra*,   I. Defendants included the document in the second submission for conte t and completeness because it was attached to multiple emails being newly provided in the second in camera filing, not because it differs in any way or because Defendants intended to rely on it. The Court declined to order this document produced in its June 30th decision. *See AAUP*, 2025 WL 17 6322  1, Dkt. 174.

**3. The Court should reconsider its ruling that Defendants have waived all privileges over the second in camera submission.** The waiver includes information subject to the attorney client privilege, the deliberative process privilege, and the law enforcement privilege. E hibit E is an e ample of the type of privileges the Court has decided the government has waived. This is the privilege log Defendants have prepared for the subset of in camera documents the Court indicated on Tuesday, July 8, that it intended to give to Plaintiffs e cepting the Government's objections. The log also shows the Defendants do not intend to be over inclusive in their assertions of privilege. *See* Dkt.   18 . Defendants reasonably e pected that they were not waiving the privilege by providing the documents for in camera review where they had no intention of relying on them at trial and

---

that privilege should the Court deem such an invocation necessary. *Id.* Because the act of invoking the privilege over that information would reveal the underlying information subject to the privilege assertion, Defendants will submit a supporting declaration to the Court in camera and e  parte on Friday in response to the Court's order.

provided them because the Court had e pressed an interest in seeing such information. *See* June 2, 2025, Tr. at 32 (e pressing interest in seeing the arrest plans). In this case, the conse uences of waiver are significant because it involves not only the deliberative process privilege but also the attorney client privilege.

Should the Court deny this motion, Defendants respectfully re uest a stay of any order the Court may issue to produce the documents so that the Solicitor General can evaluate whether to seek mandamus relief before the privileges are irretrievably lost.

In any event, Defendants are preparing a privilege log for the documents in the second in camera submission and will file it by Friday.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

WILLIAM KANELLIS

DREW C. ENSIGN
*Deputy Assistant Attorney General*

*Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

PAUL F. STONE
*Deputy Chief, National Security Unit*
*Office of Immigration Litigation*

Dated: July 8, 2025

*Counsel for Defendants*

**MEET AND CONFER CERTIFICATION**

In accordance with Local Rules 7.1(2) and 37.1, the parties previously met and conferred concerning these documents as they were already the subject of Plaintiffs June 24 Motion to compel.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: July 8, 2025

By: *Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATIONS OF
UNIVERSTIY PROFESSORS, ET AL.,

*Plaintiffs*,                    No. 1:25-cv-10685-WGY

v.

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT OF
STATE, ET AL.,

*Defendants.*

**DEFENDANTS' MOTION TO CLARIFY JULY 9 BENCH RULING**

Defendants respectfully ask this Court to clarify its order of July 9 as to whether it pertains

to their motion to reconsider its determination that the Government waived certain privileges. *See*

Exh. A. Motion to Reconsider, Dkt. # 190. The Court gave its July 9 instructions in the context of

its discussion on the package of six in camera documents it ordered the Government to produce.

*See* July 9, 2025, Tr.at 81. Defendants do not understand the Court's order concerning privilege to

extend beyond that package of documents to include other documents in the Government's June 11

in camera submission, because doing so would be contrary to the Court's order declining, after full

briefing from the parties, to order the Government to disclose those documents. *See* Exh.A, Motion

to Reconsider at 4; *See Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL

1796322, *1 (D. Mass. June 30, 2025), Dkt. # 174 (denying the motion to compel).  It would also

be inconsistent with the Government having properly invoked critical privileges, including

assertion of the Presidential Communications Privilege in its June 11 in camera submission, and

then by providing a White House declaration formally invoking the privilege in response to

Plaintiffs' Motion to Compel. *See* Exh. A at 4-6. *See United States v. Zolin*, 491 U.S. 554, 568-569

(1989) (holding that providing privileged materials in camera does not have the legal effect of

terminating the privilege).

The Government needs clarity on the breadth of the Court's July 9 bench ruling to confirm whether the Court has found the Government to have waived properly invoked privileges in the first in camera submission. This is because a finding of waiver of weighty privileges like the Presidential Communications Privilege, will require rapid review within the Government, including the White House and the Office of the Solicitor General, to determine whether to petition the Court of Appeals for mandamus and move for an emergency stay.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
*Deputy Assistant Attorney General*

Dated: July 9, 2025

WILLIAM KANELLIS

*Ethan B. Kanter*
ETHAN B. KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, D.C. 20001*

PAUL F. STONE
*Deputy Chief, National Security Unit*
*Office of Immigration Litigation*

*Counsel for Defendants*

2

**MEET AND CONFER CERTIFICATION**

In accordance with Local Rules 7.1(2) and 37.1, the parties previously met and conferred concerning these documents as they were already the subject of Plaintiffs June 24 Motion to compel.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


Date: July 9, 2025                         By: *Ethan B. Kanter*
                                           ETHAN B. KANTER
                                           *Chief, National Security Unit*
                                           *Office of Immigration Litigation*
                                           *P.O. Box 878, Ben Franklin Station*
                                           *Washington, D.C. 20001*

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                             No. 1:25-cv-10685-WGY
                             Volume 3, Page 149 to 174
 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
               Plaintiffs
 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10               Defendants

11
                         *********
12

13
                      For Bench Trial Before:
14                    Judge William G. Young

15

16
                      United States District Court
17                    District of Massachusetts (Boston.)
                      One Courthouse Way
18                    Boston, Massachusetts 02210
                      Monday, July 7, 2025
19

20                       ********

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23               United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhr3tubas@aol.com

25
```

```
 1                A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5      Knight First Amendment Institute at Columbia
        University
 6      475 Riverside Drive, Suite 302
        New York, NY 10115
 7      (646) 745-8500
        E-mail: Ramya.krishnan@knightcolumbia.org
 8   and
     COURTNEY GANS, ESQ.
 9   NOAM BIALE, ESQ.
        Sher Tremonte LLP
10      90 Broad Street, 23rd Floor
        New York, NY 10004
11      (212) 540-0675
        Email: Cgans@shertremonte.com
12      For Plaintiffs

13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16      DOJ-Civ
        P.O. 878
17      Ben Franklin Station
        Washington, DC 20044
18      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20      United States Attorney's Office
        1 Courthouse Way, Suite 9200
21      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
22      For Defendants

23

24

25
```

1    P R O C E E D I N G S

2    (Resumed, 2:00 p.m.)

3    THE COURT:  Well let's start with the question

4    that was raised.  Ms. Belmont brought to my attention a

5    concern about timing, and you're right to be concerned,

6    because you're not going to get through if you proceed

7    at the slow pace that the trial begins.  But that's

8    routine in a trial, that the first couple of witnesses

9    always take longer because we're feeling each other out,

10   learning how a trial, with the specific players,

11   including the judge, works.

12   So here's the rule on timing.  We said it was a

13   9-day trial, so you're entitled to nine 3 1/2 hour days.

14   If we lose time for technology, that's part of the human

15   condition, it's just going to be lost to you.  If I --

16   Wednesday's an example, drop an hour, you haven't lost

17   it, that's on me, and I take that very seriously.  I

18   still think we can get done within that time, um, and I

19   intend to.  There's a lot of material, written material

20   that, um, properly is before the Court.

21   So, um, I keep time, there's no appeal, it's

22   divided equally, and I will announce it at the end of

23   every day.  So that's as to time.

24   Now the only other thing I wanted to say, other

25   than generally, I'm happy to be off and running, I think

1   the openings were very helpful and the examination of

2   witnesses are professional, and other than you ought to

3   pick up the stroke, it's fine.

4        I've got this problem, and it is a problem.  The

5   government has made three ex-parte submissions of a

6   mass -- not an unmanageable mass, but a large number of

7   documents, in response to the Court's invitation that I

8   would receive such documents, um, and honor the law

9   enforcement privilege.  They've taken advantage of that.

10  The most recent, um, submission was this morning.  There

11  was one late Wednesday, and the original one was earlier

12  than that, as I told you, um, in camera, in this session

13  of the Court, meaning I'm the only one who's looked at

14  it.

15       So the one that was submitted Wednesday late, it

16  got to me on Thursday and I took it home over the

17  weekend.  I've looked it over.  I don't purport to say

18  that I've looked it over page by page, but I've looked

19  it over.  And it started with a rather interesting cover

20  sheet which said, "These materials have not been filed

21  in any other case."  Interesting.  And then it says,

22  "And we reserve all the privileges that we have,

23  attorney-client, the government deliberative privilege

24  and the like."

25       Now look, that's not the way it works.  All those

1    supposedly reserved privileges, they're all waived.  You

2    can't dump a bunch of documents on the Court and say,

3    "Well you go through them and really decide what our

4    privileges are."  Never asserted.  They're all waived.

5         As to the law enforcement privilege, in one

6    respect, and I have received such materials, as it's

7    played out, they may well be peripheral, but maybe not.

8    I received materials about the State Department's

9    upping, or changing, or making more details, their

10   management of the grant of visas.  That's inextricably

11   intertwined with national security.  I honor that

12   absolutely.  Nobody's going to look at any of that,

13   except me.  And as yet, I'm not sure how that figures in

14   this case at all.  I'll absolutely protect those.

15        As to the rest of it, you've taken -- and I speak

16   to the government's attorneys, far too broad a position

17   on what's entitled to the law enforcement privilege.

18   When I said I would honor that, what I meant was, and I

19   think the law, um, backs it up, I meant like disclosure

20   of things that would, um, frustrate or inhibit or foul

21   up an ongoing government investigation, like if there's

22   -- and what I say now is not from my review of the

23   materials, I'm making this up.

24        Let's say there's some human intelligence out

25   there, undercover officers out looking around, um,

1   that's fine.  If that's disclosed to the Court, I would

2   treat that completely confidential.  Likewise, if

3   there's some technology that, um, we don't know about,

4   pole cameras, um, I'm making this up, drones that fly

5   over crowds with super, um, fascinating face-recognition

6   um, material, boy, I'd be interested in that, but that's

7   something new that the government has.  I've never heard

8   about it and I just made it up.

9       About the only other example I can think of, but I

10   don't mean this to be exhaustive, is, um, if you have

11   any Title III data in there, since that's so private.

12   If you have any wiretap data.  But I saw none.  That is

13   entitled, it seems to me, to, um, have that privacy

14   maintained, um, with some limitations.

15       So what do I do with the rest of it?  And, um, I'm

16   candidly not clear.  I think, because I have every

17   reason to believe that defense counsel have acted in

18   complete good faith, I'm not going to say, "Well, I'm

19   going to go through it and everything that I don't see

20   fits, I'm just turning over to the plaintiffs."  I'm

21   not.  If you think, as I have more expressly explained

22   the limits of the law enforcement privilege, that I've

23   missed something, and I could well have, my review is

24   far from complete, um, you can -- in sort of a privilege

25   log after the horse is out of the barn, by Friday at

1    noon, detail it for me.  "This page reveals whatever."
2    And it had better be specific or I'll rule that you've
3    waived it.  If it's only part of the page, the privilege
4    can be asserted only as to Paragraph 3, or Paragraph 3
5    of the first paragraph.  And I will look at it and I
6    will see whether I agree.
7         Now my guess is, from what I've looked at -- for
8    instance, things that I thought the government was going
9    to -- the public officials were going to disclose, I
10   mentioned them at our very first meeting, I see some
11   operations orders for arrests.  That interests me.  I
12   think that should be disclosed.  Nothing I'm saying now
13   prevents it from being disclosed.  But I'm not ordering
14   that it be disclosed today.  Trial is not going to stop
15   while we sort through these materials.
16        Given the ruling I just made, everything except
17   for new visa business, I'm going to share with my own
18   team, my chambers team, my law clerks, and we're going
19   to have to index it, um, I don't know, by alleged target
20   individual or by alleged -- not alleged, but by, um,
21   information, if there's information of a witness, by
22   witness, and I'm going to treat it as follows.
23        It's -- this material came from the defendant.  I
24   am going to presume it's authentic.  And I'm going to
25   treat it as an admission.  Um, to the extent that it

1    helps the plaintiffs, and I'm not saying it does, I'm

2    going to treat it all as an admission.  And it can be

3    used by the Court to fill in any blanks that might exist

4    in the plaintiff's case.  I'm making no normative

5    judgment here.  I'm justifying -- because I'm not

6    disclosing it after weeks gone by, and I expect the

7    plaintiffs to have most of their case in by then, and

8    then we'll see.

9        Once I've got it indexed, if anyone takes the

10   stand -- the opening suggests there will be government

11   witnesses taking the stand, um, having done numerous

12   criminal cases, I'm going to use it like prior

13   statements of that witness, and it's within the Court's

14   power to disclose it at that time, if I think it will

15   help cross-examination.  But if it's all in accord with

16   what I'm being shown, um, I will understand that.

17       I'm not confident of that ruling.  I don't fault

18   the defendant public officials, and as I've said, I

19   think they've acted in complete good faith, but I'm not

20   clear what to do with it.  But I am going to be looking

21   it over very carefully.

22       Two small points.  There's another assented-to,

23   um, amendment to the protective order.  That's allowed.

24   And I was given -- and I haven't looked at it, except,

25   um, briefly, plaintiffs' pretrial brief.  But when

1    Ms. Belmont gave it to me, she said, "This is filed

2    under seal."  What do you mean?  It looks to me like the

3    same brief I've already read.  But maybe there's a

4    little more.  And I don't see why anything now is filed

5    under seal.  I'm trying to honor that.

6        I'll stop now.  Now is the time for questions and

7    clarifications.  What's you've heard, up to this point,

8    are rulings.  And we'll start with the plaintiffs.

9        MS. CONLON:  Thank, your Honor, and good

10    afternoon.  We haven't met.  I'm Alex Conlon for the

11    plaintiffs.  That's Conlon, C-O-N-L-O-N.

12        THE COURT:  Yes, Ms. Conlon.

13        MS. CONLON:  Okay.  So a couple of things on the

14    materials your Honor alluded to, including our brief,

15    but I'll go in the order you addressed them.

16        THE COURT:  Please proceed.

17        MS. CONLON:  Because we are, as you know, having

18    to take certain witnesses out of order, the government

19    officials, some of them are testifying Wednesday of this

20    week, that is Peter Hatch from the Office of

21    Intelligence, which is within the Homeland Security

22    Investigations Division of the Department of Homeland

23    Security, and I raise that because I expect, though of

24    course don't know, that materials the Court has received

25    are likely relevant to his work.

1      THE COURT:  That's information I need to know and

2  very helpful.  Keep going.

3      MS. CONLON:  There's more.

4      On Friday, John Armstrong, who is the Senior

5  Bureau Official --

6      THE COURT:  His name was mentioned before, right?

7      MS. CONLON:  Yes, in the Bureau of Consular

8  Affairs, within the State Department, is also

9  testifying.

10      THE COURT:  All right.

11      MS. CONLON:  As is Marian Smith, who I understand

12  also works in the Bureau of -- I think of Consular

13  Affairs, as a Special Advisor, or Senior Advisor, and

14  having deposed some of them and been present for all of

15  them, I expect we will ask them about things that are

16  relevant to this issue your Honor has raised, about

17  documents.

18      THE COURT:  Thank you.

19      MS. CONLON:  That's the first thing to flag.

20      Second, um, and jumping forward to the pretrial

21  brief, that was filed under seal because it was before

22  trial began and the protective orders governed all

23  pretrial submissions.  And so in adherence to that

24  protective order we filed, it's under seal.

25      THE COURT:  So now it need not be under seal?

1        MS. CONLON:  That would be our position, yes.

2        THE COURT:  Fine.  And we'll treat it as not under

3    seal.  Thank you.

4        MS. CONLON:  Yes.

5        We did have other housekeeping matters, but we

6    should stick with this, right?

7        THE COURT:  Let's stick with this, because I saw

8    Ms. Santora, and then we'll go to housekeeping issues in

9    general.

10       MS. CONLON:  Thank you.

11       THE COURT:  All right.  Ms. Santora?

12       MS. SANTORA:  Thank you, your Honor.  Just a

13   clarifying question from the government.

14       When you were discussing the ex-parte materials

15   and asking us to submit a privilege log to you, were you

16   referring to all of the ex-parte materials we filed or

17   just the ones we filed on Wednesday?

18       THE COURT:  I was referring to all because I,

19   um -- naturally I'm going to look at all of them, and if

20   I've missed something.  See my concern is -- I guess I'm

21   faulting you, but not really, my concern is I am going

22   to honor everything I said I would honor.  I'm giving

23   you a week's chance to point out specifically to me some

24   of the law enforcement privilege or national security

25   privilege that I should honor.

1          Does that answer your question?

2          MS. SANTORA:  Yes, thank you, your Honor.

3          THE COURT:  All right.

4          Now --

5          MR. ABDO:  Your Honor, if I could just make a --

6    just a note on the timing, and I apologize for standing

7    up.  I'm another "Alex," Alex Abdo, spelled A-B-D-O.

8          Just with respect to the timing, it would be

9    extraordinarily helpful if we had an understanding from

10   the government, before the testimony on Wednesday from

11   one of the officials, whether there's additional

12   information they're planning on releasing to us so we

13   can rely on it in taking the testimony of those

14   individuals.

15         THE COURT:  It would be.  I live in the real

16   world.

17         MR. ABDO:  Well it's one small subcategory.  We

18   have access to the certified administrative record,

19   about 30 pages of the 50 have been filed under seal.  We

20   have been planning on relying on that record during some

21   of the examination of the witnesses, and on review of

22   those 30 pages, it's hard to imagine that the government

23   could possibly satisfy the stringent standards for

24   sealing.  The government itself has filed, I think,

25   three of the relative documents in other proceedings

1  publicly.

2       THE COURT:  I will do the best I can.

3       MR. ABDO:  Thank you, your Honor.

4       MS. SANTORA:  Your Honor --

5       THE COURT:  We're not arguing about this, he

6  questioned it and I answered.

7       MS. SANTORA:  No, no, I have another point, your

8  Honor, just on the privilege log.

9       Are we also able, in that privilege log, to

10  identify material that, um, the Court has said would be

11  deliberative?

12       THE COURT:  No, and the reason for that is, um, I

13  thought -- there's no basis for dumping material on me

14  and then saying, "Oh, by the way, this is deliberative,

15  take a look at it ex-parte in camera."  No.

16       All right.  Now housekeeping.  We'll start with

17  the plaintiffs.

18       MS. CONLON:  Oh, sorry.

19       THE COURT:  No, please don't say "Sorry."  As the

20  great Henry Friendly used to say, and I'm not great, he

21  would say, "This is what they pay me for."

22       (Laughter.)

23       THE COURT:  So here we are.  Go ahead.

24       MS. CONLON:  Okay.

25       So recognizing the reality of the material the

1    Court must review and the government needing time to
2    submit this privilege log to the Court, I have two
3    requests that I'd ask you to consider.
4        The first is either arranging -- you know
5    encouraging the government to present all of its
6    officials in the second week, so that we can have the
7    benefit of whatever documents we will receive, or
8    alternative having an agreement -
9        THE COURT:  I didn't say that you're going to
10   receive any.
11       MS. CONLON:  To the extent that we would, or
12   alternatively, and what seems more expedient, would be
13   that to the extent we question someone whose testimony
14   is relevant to materials we later receive, and have
15   subsequent questions, that we be permitted to make an
16   application to your Honor to ask that the person come
17   back, if there's something they need to be asked about
18   with respect to those documents.
19       THE COURT:  The honest answer is this.  Of course
20   you may make an application.  This is a live case.  I'm
21   very keen that we get the case before me in the 9 days
22   allotted.  What happens then is, um, as transparent as I
23   can be, is unknown to the Court.  I think the spectrum
24   is I'll think that I can say something, um, I'll think
25   that I need to order, given your point, some further

1    hearing, and I have -- you can't take up the rest of the

2    month, but you're top of mind during this month, or,

3    sort of the other end of the spectrum, I will be

4    satisfied with the evidentiary presentation, but the

5    issues are such that I will say -- and you'll want to do

6    this in the second week -- again, all of you, or at

7    least you plaintiffs, you're interested in expedition,

8    and I don't in any way suggest that the public officials

9    are delaying things, I don't think they are, but you'll

10   want to be proselytizing me with proposed findings and

11   rulings.

12         So we get done, we get done with the final

13   arguments, which are within these time limits, and I say

14   "Thank you very much, it's under advisement."  And then

15   the burden is on me and I can sort out justly whatever I

16   think I need to sort out.  I think that's the spectrum.

17         So of course you may make application, because you

18   will have lived the trial over these two weeks, and I

19   will entertain it, um, given all the evidence set before

20   me.

21         Does that answer the question?

22         MS. CONLON:  I think it does.  Thank you.

23         THE COURT:  Okay.

24         Other housekeeping matters from the plaintiff?

25         MS. CONLON:  Yes, I have some more.  Some are

1  easy.  I'll skip to those first.

2       There are, as your Honor knows, certain witnesses

3  who will be testifying remotely, and we are asking for a

4  time that we can work with the Court's Deputy to make

5  sure that we all are able to do that properly, so we

6  don't slow anything down.

7       THE COURT:  She will make herself available.

8       MS. CONLON:  Thank you, your Honor.

9       With respect to exhibits, I just wanted to address

10 something that happened earlier today and give the Court

11 a little context, which is just to say, as your Honor I

12 think has observed, the parties are still working

13 through the process of identifying what can get a

14 number, because it is agreed to.  As a consequence, um,

15 certain things that currently have a letter, are

16 lettered differently by both sides, because we haven't

17 -- lead plaintiffs haven't had an opportunity to finish

18 reviewing what we received yesterday.  So I want to

19 apologize to the Court about that.

20      THE COURT:  No apology is necessary.  We've tried

21 cases before.  What makes a difference to me, and my

22 practice, when something is offered, is to, um, admit

23 it, if I do admit it, and repeat -- or not repeat, give

24 it the number or ask counsel to give the number.  That's

25 what the Courtroom Deputy is taking down.  That's what's

1  on the record for the Court of Appeals, believing I

2  should make an adequate record.

3      MS. CONLON:  Right.

4      THE COURT:  On those that are offered, I -- that I

5  do not accept -- "I" was an example, I said, "No, it's

6  excluded, I."  So whatever letter you've given it, I

7  will repeat, and that will be the record that the Court

8  has both for its work -- in other words for

9  identification, is not going to form the basis of the

10 finding of a fact.

11     MS. CONLON:  Right.

12     THE COURT:  And again, to make things plain to the

13 Court of Appeals, I've looked at it and relied on it or

14 not.

15     Go ahead.

16     MS. CONLON:  Thank you, and that is helpful, and

17 we are going to work on it with opposing counsel this

18 afternoon.

19     THE COURT:  I can tell you a funny story about a

20 lengthy case where we got into two letters, but I will

21 not.  You can --

22     MS. CONLON:  Okay, your Honor.  Now I have two

23 more issues to address.  Maybe it's three.

24     First, because we are doing some witnesses out of

25 order, um, you will find, for example, a video we sought

1    to introduce earlier today, we're seeking to present an

2    authentication witness for tomorrow.  This is a function

3    of scheduling only.  Mr. Biale had tried to offer it for

4    a subject connection, of course your Honor had no

5    information about the witness schedule or anything else.

6          Is it helpful to the Court if we flag this sort of

7    thing to you ahead of time in terms of the witness

8    order?  I would think so.

9          THE COURT:  Yes, I will accept all the help I can

10   get.

11         MS. CONLON:  And speaking of the witness order, in

12   an effort to ensure that we don't have down time, which

13   is to say, with plaintiff witnesses in part and

14   government witnesses in part going out of order, we're

15   cognizant there may be certain gaps of time that we

16   can't fill.

17         THE COURT:  No, no, no --

18         MS. CONLON:  We're trying to fill them is my

19   point.

20         THE COURT:  Yeah, fill them.  In other words, we

21   can start with a witness and stop with that witness and

22   jump to another witness.  I want to come on the bench at

23   9:00, stay on the bench till 10:45, if I can, take a

24   recess -- I need the recess, and come back on the bench

25   at 11:15, and stay on the bench till 1:00.  We did very

1    well today.  Obviously I can work that half-hour.

2    Wednesday, you lose an hour, that's my concern, a

3    15-minute break, so we've made up 15 minutes out of that

4    hour that you've lost.  And so on.

5            MS. CONLON:  So this -- I'm sorry, I didn't mean

6    to interrupt you.

7            THE COURT:  No.

8            MS. CONLON:  So in an effort to expedite this, we

9    have told the government when we are putting on our

10   witnesses and when we know there will be availability

11   for a government witness to testify, which is how I know

12   that certain government officials are meant to go this

13   week.  I understand your Honor doesn't want to referee

14   disputes between the parties about ministerial things,

15   so I am asking on the record for the government to

16   disclose their schedule as soon as possible for the

17   second week, because we also have out-of-order witnesses

18   for the second week, so we can collaborate on that.

19           THE COURT:  That would be helpful.

20           MS. CONLON:  So two things.

21           First, thank you for explaining the Court's

22   process with respect to time and time limits, and

23   obviously the parties were not aware that there is any

24   tracking of which amount of time was used by which party

25   on any given day.

1          THE COURT:  You could have found out by asking the

2     Courtroom Deputy.

3          MS. CONLON:  No, we did not think to do that

4     obviously, and have regrets, clearly.  But my question

5     is this, going forward.

6          Is it the Court's practice, that if there is time

7     remaining in the schedule, that one party has hit their

8     limit -- so I'm thinking about us, because we bear the

9     burden here, and I expect, as you saw today, that our

10    witnesses' direct examinations may take longer than

11    their cross-examinations do, and I'm wondering how the

12    Court manages -- how sort of strictly delineated is the

13    --

14         THE COURT:  Pretty strictly.

15         MS. CONLON:  Okay.

16         THE COURT:  For instance, I've heard -- we're not

17    entirely done with Witness Number 2 and I recognize that

18    we're just getting off the ground.

19         MS. CONLON:  Yes.

20         THE COURT:  So I understand the gravamen of those

21    witness's testimony, we get one who's a professor, we

22    get a second one who is also a professor, but she is in

23    Mesa as well.  So sort of under 403, this is not an

24    invitation to anything, but these are the questions you

25    should be asking.  I imagine you can call another one

```
 1   who's much the same as what we've heard, obviously there
 2   will be some differences, but you call another.  Once
 3   I've had three, that's pretty much it for that type of
 4   thing.
 5          MS. CONLON:  Right.
 6          THE COURT:  That of course is flexible, but that's
 7   true of others as well, other types of witnesses.
 8   That's the best I can say.
 9          But you want to know if you can get extra time?
10   Not likely.
11          MS. CONLON:  If it's available.
12          THE COURT:  Not likely.  If you can finish the
13   case earlier, so much the better, because we come to the
14   part that is most clearly my responsibility.  Look,
15   you're trying a fine case, but I take it very seriously,
16   and I'm saying that this case is novel and complex and
17   I'm, um -- there may be things I want you to brief.
18   Well I can think of one, um, just jumping ahead.
19          MS. CONLON:  Please.
20          THE COURT:  I wasn't too taken by this "nuances of
21   the First Amendment answer" that I got from defense
22   counsel, so I want to be very clear on whether a lawful
23   noncitizen has the same right to free speech as does a
24   citizen of the United States?  And I don't suggest that
25   because the First Amendment speaks of "persons," that
```

1  that answer is unequivocally "Yes."  I said that

2  earlier.  But I want to know all the law on that.

3        And while you've tweaked me as to things that I

4  want to know, I want to know, um -- I'll be asking this,

5  and this more or less goes to the government, um,

6  officials, I want to know whether anywhere in any of

7  these papers there's some -- on the part of the alleged

8  targeted individuals, there is some, um, criminal

9  activity other than embarrassment to the foreign policy

10  of the United States?  Though you pretty much have to

11  understand that I think the facts of that Congressional

12  enactment plays a significant role here.  I'm not

13  hesitant in telling you what's on my mind.  But believe

14  me when I say, the Court is completely without an agenda

15  here, that I am eager for the vigorous presentation of

16  counsel.

17        Go ahead.

18        MS. CONLON:  I think that's it, from us.  Thank

19  you so much.

20        Go ahead.

21        THE COURT:  Yes.  Good afternoon, your Honor, my

22  name is Jessica Strokus on behalf of defendants.

23        THE COURT:  Thank you.

24        MS. STROKUS:  I heard your Honor mention that you

25  would like to start at 9:00 a.m., and we have a request

1    for you, that this Friday, can we begin at 8:30 a.m.?

2    We have a witness who will be testifying remotely from

3    Jamaica, and because of her schedule she has limited

4    time to present her testimony and really only this day

5    is available.  If the Court would be amenable to

6    starting at 8:30 a.m.?  And that is 7:30 a.m., Jamaica

7    time.  And it would allow for sufficient time for both

8    direct and cross, we believe.

9        THE COURT:  Why can't she give us time in the

10   ordinary hours that the Court sits?

11       MS. STROKUS:  I understand, your Honor.  She is a

12   State Department official who will be at the end of a

13   patch-out.  She is on TDY, on Temporary Duty Station, in

14   Washington, D.C., she is moving from Jamaica, um, and

15   that is the day that she is able to testify.

16       THE COURT:  Well I intend to start -- I've kept

17   going for a number of years on my schedule.

18       MS. STROKUS:  I understand.

19       THE COURT:  You've made the request.  I think a

20   half an hour, she can give it to us.  Promptly 9:00.

21       MS. STROKUS:  Thank you, your Honor.

22       THE COURT:  Any other housekeeping matter?

23       MS. CONLON:  I'm reminded of one last one.  So as

24   your Honor may recall from the pretrial memo in which

25   each side laid out its anticipated witnesses, the

1   government identified four officers who are referred to

2   ASAC, A-S-A-C, or DSAC, D-S-A-C, who we understand to be

3   supervisory ICE agents, who we understand were involved

4   in the arrest of four of the five targeted noncitizens.

5   Those witnesses have, for scheduling reasons, not been

6   available to be deposed until this week and next, and

7   the government is making them available, for which we

8   are grateful, but we have hit -- we are going to hit our

9   10th deposition, which is what's permitted under the

10   local rules, and there are four people remaining, which

11   would take us to 11.

12         THE COURT:  By agreement, I have no comment.

13         MS. CONLON:  No, there is no agreement.  We are

14   making a request, but as I understand it -- and I will

15   of course let Mr. Kanellis speak, there's no agreement

16   on the last deposition that we're seeking.

17         MR. KANELLIS:  Your Honor --

18         THE COURT:  We're talking about one deposition,

19   right?

20         MS. CONLON:  One deposition, 4 hours long.

21         MR. KANELLIS:  Your Honor, we sought a deposition

22   because we were unable to travel here the other day.

23   That was not -- that was not permitted to us.  We have

24   asked for them to identify witnesses and they waited.  I

25   see no desire on our behalf to suddenly extend this

1    comity that we sought to them when they denied us the

2    ability to depose the witness who testified today.  So

3    that's --

4         THE COURT:  It seem to me that you can work it

5    out.  We'll receive the testimony of the witness, but

6    whether you get a deposition or not, that's something

7    you can work out.

8         All right, thank you all.  9:00 tomorrow morning.

9    And we'll recess.  At which time there will be a joint

10   exhibit list, start to finish.

11        Thank you.

12        (Ends, 2:45 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5     hereby certify that the forgoing transcript of the

6     record is a true and accurate transcription of my

7     stenographic notes, before Judge William G. Young, on

8     Monday, July 7, 2025, to the best of my skill and

9     ability.

10

11

12

13

    /s/ Richard H. Romanow 07-9-25
14  _____
    RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                            No. 1:25-cv-10685-WGY
                             Volume 2, Page 78 to 121
4

5    AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                Plaintiffs
6

7    vs.

8

9    MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10              Defendants

11
                          * * * * * * * * *
12

13
                        For Bench Trial Before:
14                      Judge William G. Young

15

16
                     United States District Court
17                   District of Massachusetts (Boston.)
                     One Courthouse Way
18                   Boston, Massachusetts 02210
                     Wednesday, July 9, 2025
19

20                        * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhr3tubas@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3    RAMYA KRISHNAN, ESQ.
      CAROLINE DeCELL, ESQ.
 4    ALEXANDER ABDO, ESQ.
      SCOTT B. WILKENS, ESQ.
 5    ALEXANDRA CONLON, ESQ.
         Knight First Amendment Institute at Columbia
 6       University
         475 Riverside Drive, Suite 302
 7       New York, NY 10115
         (646) 745-8500
 8       E-mail: Ramya.krishnan@knightcolumbia.org
   and
 9    COURTNEY GANS, ESQ.
      NOAM BIALE, ESQ.
10       Sher Tremonte LLP
         90 Broad Street, 23rd Floor
11       New York, NY 10004
         (212) 540-0675
12       Email: Cgans@shertremonte.com
         For Plaintiffs
13

14    ETHAN B. KANTER, ESQ.
      WILLIAM KANELLIS, ESQ.
15    VICTORIA M. SANTORA, ESQ.
      JESSICA STROKUS, ESQ.
16       DOJ-Civ
         P.O. 878
17       Ben Franklin Station
         Washington, DC 20044
18       (202) 616-9123
         Email: Ethan.kanter@usdoj.gov
19   and
      SHAWNA YEN, ESQ.
20       United States Attorney's Office
         1 Courthouse Way, Suite 9200
21       Boston, MA 02210
         Email: Shawna.yen@usdoj.gov
22       For Defendants

23

24

25
```

1                          I N D E X

2

3      WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

4

5      PETER HATCH  (Continued.)

6         By Ms. Conlon          12

7         By Ms. Strokus

8

9

10                       E X H I B I T S

11                       (None marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        (Resumed, 11:00 a.m.)

3        THE COURT:  All right.  We'll start with this

4   issue which Ms. Strokus characterizes as a "percolating

5   issue."

6        But, Mr. Kanellis --

7        MR. KANTER:  Mr. Kanter, your Honor.

8        THE COURT:  Mr. Kanter.  I'm sorry.  And I have

9   read your briefs, and I am appreciative about them, and

10  in at least one respect I do reconsider my order.  And

11  let me say I appreciate the careful way you have, um,

12  suggested redactions in the subset of materials.  And

13  you're absolutely right in at least two respects.

14  There's no reason to disclose e-mails or cell phones,

15  you can redact those.

16        I guess I do want to say one other thing.  I don't

17  understand why you're objecting so vigorously to this

18  subset?  And I'll tell you why.

19        What I get from this -- the whole exercise is

20  trying to persuade me, is this shows officers of the

21  government -- some are attorneys, actually seeking to

22  follow the law, to bring the conduct of enforcement

23  agents and the like, in accordance with the law.  And it

24  reveals the process that they went through to follow the

25  law.  That's what I get about it.  And that's really

1   what drew my interest.  There's a larger group of

2   material, but that's what drew my interest to this

3   subset.  I'll say no more.

4        Why shouldn't I, um, subject to the protective

5   order that it's used, "Just for the purposes of this

6   litigation.  It's not to be spread around.  We'll see if

7   any of it gets in evidence."  I'll hear you.

8        MR. KANTER:  Thank you, your Honor.

9        I will start with one clarification in light of

10  the examination that is, um, we're in the middle of, and

11  that was the reference to the so-called "ROAs," "Reports

12  Of Analysis," and Ms. Conlon can correct me, I thought I

13  heard, um, her to say that some of the ROAs are in the

14  subset.  They are not.

15       MS. CONLON:  And I stood up to say exactly that.

16  I wanted to indicate to the Court that I think I made a

17  mistake.

18       THE COURT:  Okay, so we're not talking about that.

19       MR. KANTER:  I just want to --

20       THE COURT:  Go ahead, as to the materials I have

21  here.

22       MR. KANTER:  To begin with and that I think as

23  the -- and that three of the documents in the subset --

24  this is the thing.  There were two in-camera

25  submissions.  The third, we explained the confusion

1    there, which had to do with merely, you know -- the

2    first in-camera submission was redacted and we provided

3    it to the plaintiffs, it's been the subject of the

4    plaintiffs' motion to compel, which your Honor decided

5    in the government's favor, denying the plaintiffs'

6    motion to compel.

7        So the point regarding the subset that I wanted to

8    make was that the first document in the subset and the

9    last two were part of what was litigated in that motion

10    to compel.  That's the only sort of point of

11    clarification.  Because, um, the documents in the subset

12    straddled the two submissions.

13        THE COURT:  Understood.  All right.  I don't want

14    to take up your time.

15        MR. KANTER:  Yes.

16        THE COURT:  But let me say this.  On this issue,

17    and indeed throughout the litigation I've made it clear,

18    that I'm not impugning in any way the good faith of

19    counsel for the defense, or of the plaintiffs.  All

20    right?  Trials are living things.  Now -- it's one thing

21    in the run-up to a trial, you're ruling on discovery

22    motions, but now it's put to me.  I am the factfinder

23    here.  I take that with extraordinary seriousness.

24        And so now -- though in a jury-waived case I'm

25    perfectly able to look at something and say -- for

1    instance, I've adhered to the enhanced Visa scrutiny.  I

2    think "Well that's national security, put that out,"

3    we're dealing with people who at one time we invited in

4    and we gave them Visas, green cards, and the like, and

5    that's what I'm looking at.  And that's the class, if I

6    think of it as a class, the class of people who these

7    lawyers represent.

8         So putting that to one side, I look at the rest of

9    it, some of it's interesting to me.  And I'm not judging

10   anything, I'm simply telling you why it's interesting to

11   me.

12        MR. KANTER:  Your Honor, I take your point --

13        THE COURT:  So you tell me why I should put it

14   aside and not have it part of the record.

15        MR. KANTER:  Exactly.  I will offer this up.  That

16   it is a difficult calculus that often the law

17   enforcement, um, officers and investigators, and so

18   forth, are confronted with.

19        THE COURT:  Except where's the government if I

20   reveal any of it?

21        MR. KANTER:  We represent the defendant agencies.

22        THE COURT:  Correct.

23        MR. KANTER:  And those agencies reviewed these

24   documents carefully, at multiple levels, and it's --

25   it's a question.  As your Honor pointed out, there are

1    instances in which the government may choose to -- not

2    with waiving a privilege, but nevertheless turn

3    something over.  And in the case we have decided that

4    certain materials will only be shown attorneys' eyes

5    only.  That is an ongoing discussion and consideration.

6         But I take the point your Honor is making, which

7    is we're saying this goes to the matters at issue in the

8    factfinding of the Court.  And you're asking why is it

9    that the government would stand on its privileges with

10   respect to some of that information?  I take that point.

11   I will take it back to the agencies.  And -- but, you

12   know, we, um, we want to represent the agencies, extend

13   the privileges that are theirs to assert.  And, um --

14        THE COURT:  All right, here's what we're going to

15   do.  Now -- you go ahead and do that, but -- and I'll

16   take responsibility.

17        By 5:00 this afternoon, redact -- if I've missed

18   any, all cell phone numbers, all e-mail addresses, and

19   otherwise turn it over.  Subject to a complete call-back

20   if the agency -- because the question is am I going to

21   have it as part of the record or not?  It's attorneys'

22   eyes only, it's used for the purposes of this

23   litigation.  That's the order.  Let's call the witness

24   back and we'll run till 12:00.

25        MR. KANTER:  I take the order, I'm not challenging

1    it --

2          THE COURT:  Feel free in the appropriate way.

3          MR. KANTER:  A point of information, which is we

4    have redacted and we've shown the Court our redactions

5    with respect to what you just referenced.  Already it is

6    before your Honor.  And secondly, to the extent that

7    your Honor is proposing to turn over material that is

8    outside those redactions, we would request a stay of the

9    ruling so the Solicitor General can decide whether or

10   not to seek mandates.  But I don't understand your Honor

11   to be turning over material that we have redacted.

12         THE COURT:  Wait a minute.  Wait a minute.  I

13   just -- I just -- yes, and I've made --

14         MR. KANTER:  We provided redactions.

15         THE COURT:  I know you have, and I've sustained so

16   much of them as, um -- excuse me.  I've sustained so

17   much of them as excised cell phone and e-mail addresses.

18   You're going to have to do it again, because as to the

19   rest of it, I overrule it.  Now you make a motion to

20   stay --

21         MR. KANTER:  I make a motion to stay.

22         THE COURT:  Of course, which is your right.  I

23   allow the motion until 9:00 tomorrow morning.  You will

24   then turn it over unless there is a stay from some court

25   of competent jurisdiction.  I have the obligation to try

1  this case and there's exigencies in moving through the

2  case.  That's the order of the Court.

3       All right.

4       MR. WILKENS:  Your Honor, may I be briefly heard

5  for the plaintiffs?  Scott Wilkens.

6       THE COURT:  Well I don't think you'll be part of

7  it, but, Mr. Wilkens, we've got a witness coming in, but

8  it's always a pleasure for you to fill the time.

9       (Pause.)

10       MR. WILKENS:  I will sit down, your Honor.  Thank

11  you.

12       THE COURT:  Well there's no need, I spoke

13  seriously.

14       Yes, Mr. Biale?

15       MR. BIALE:  Your Honor, briefly there's another

16  issue.

17       We have a lawyer who went down to New York for the

18  deposition that was --

19       THE COURT:  Oh, I know.  That's right.

20       You know I'm troubled by this nonproduction of

21  witnesses.  I sense some gamesmanship here.  Having said

22  that, I'm not going to compel his attendance.  It bears

23  on the Court's assessment of these witnesses when he's

24  called upon to testify.  Believe me, it bears on it that

25  he was not produced against this background.

1          I have urged cooperation in significant respects,

2    though I don't challenge anyone's good faith, there has

3    not been cooperation.  I need to get through the trial.

4    The parties are benefitted if I get through the trial.

5    Now let's get the witness in here.

6          (Pause.)

7          THE COURT:  Where'd he go?

8          MS. SANTORA:  Your Honor, Victoria Santora for the

9    defendants.  If I may?  We were not able to respond to

10   the motion to compel, but I do just want to note that as

11   plaintiffs --

12         THE COURT:  You just won it?

13         MS. SANTORA:  So I did -- just to the extent that

14   you said that you will consider the witness's conduct in

15   not appearing at trial, I do want to note that it was a

16   logistical issue more on the part of the attorneys than

17   on the witness.

18         THE COURT:  Then it could be worked out rather

19   than having to make motions.  You know we have days.  We

20   have a weekend here.

21         MS. SANTORA:  I agree, your Honor.  And we are

22   willing to cooperate with opposing counsel.

23         THE COURT:  I expect it.  And that's helpful.

24   Thank you, Ms. Santora.

25         What happened to -- usually when we have a jury

1    and we have sequestered witnesses and they don't come

2    when you call them, I tell stories about the courtroom

3    to the jury.

4         MS. CONLON:  We'll hear your stories, your Honor.

5         THE COURT:  No, here he is.

6         (Mr. Hatch, the witness, enters courtroom.)

7         THE COURT:  And, Ms. Conlon, you may continue.

8         MS. CONLON:  Thank you, your Honor.

9

10   DIRECT EXAMINATION BY MS. CONLON:  (Continued.)

11   Q.  Okay, Mr. Hatch, before the break you were

12   describing for the Court, um, the instructions that you

13   received at the March meeting with HSA leadership

14   concerning student protestors.  One of the things you

15   said was that you were directed, um, to review and

16   analyze whether any of the student protestors had, for

17   example, supported terrorist organizations.

18         Did anybody specify Hamas in particular in the

19   meeting?

20   A.  I don't --

21         MS. STROKUS:  Objection, your Honor, to the extent

22   it calls for the deliberative process in the discussions

23   in the meeting.

24         THE COURT:  Oh, actually, Ms. Strokus, you're

25   right, you must ask were any of the directions relative

1    to Hamas?

2         MS. CONLON:  Yes, I will rephrase it.

3         THE COURT:  (To the witness.)  Do you see the

4    line?  Not the discussions, but the directions about

5    what you were going to do.

6         Did anyone mention that you were, among other

7    things, going to take a look at Hamas or pro-Hamas

8    activity?

9         THE WITNESS:  Um, yes, we -- the -- supporting

10   Hamas would be, um, relative to a violation of law.  So

11   it would be standard practice for an analyst to that

12   anyway.  However, um, my direction to the team, um, was

13   to look for, um -- as an example, to look for Hamas, any

14   statements in support of Hamas, or any activities.

15        THE COURT:  And a question for me.

16        Hamas was a designated terrorist organization well

17   before January 20th of this year, correct?

18        THE WITNESS:  Yes, your Honor, that's correct.

19        THE COURT:  All right.

20        Go ahead, Ms. Conlon.

21        MS. CONLON:  Thank you.

22   Q.  You were just talking about the directions that you

23   gave to others, but I want to bring it back to the

24   directions you received from HSI leadership before we

25   discuss what you may have directed others to do.  So

1   sticking with what you were directed to do as a result

2   of this meeting.

3        Were you specifically directed to look at whether

4   student protesters supported Hamas as opposed to just

5   all foreign terrorist organizations, was there any

6   specific direction concerning Hamas?

7   A.  I don't recall receiving any specific direction to

8   me to look at Hamas.

9   Q.  You don't recall anything in the meeting about

10  student protestors resulting in a direction to review

11  whether the student protestors expressed support for

12  Hamas?

13       MS. STROKUS:  Objection, your Honor, deliberative

14  process privilege.  He's asking about --

15       THE COURT:  Please.  Please.  I'm not a fan of

16  speaking objections.  It's sufficient, and I think it is

17  your right, to say "Objection, deliberative process

18  privilege."  That calls into mind what we're talking

19  about.  If I need argument, I'll ask for it.

20       This is directions.  It's limited to directions.

21       And do you understand the question?

22       THE WITNESS:  Yes, but I think, um, counsel

23  rephrased the question from one to the other.

24       THE COURT:  Go ahead.

25  A.  So I do not recall receiving any specific direction

1      from my supervisors to, um, focus directly and solely on

2      Hamas.

3      Q. Do you recall receiving any direction to focus on

4      any particular foreign terrorist organization?

5      A. I recall receiving direction to focus on violations

6      of the U.S. law. I don't -- I don't recall any

7      instruction to me specifically to Hamas.

8      Q. Well earlier when you were answering the Court's

9      questions about the instructions you received, you give

10     certain examples of the kind of things that the Office

11     of Intelligence was supposed to be on the lookout for.

12     And your examples, as I recall, included inciting

13     violence, supporting terrorist organizations, etc.

14         But it's true that the direction was actually

15     broader, it was to look for any potential violations of

16     Title VIII, correct?

17     A. Yes, any violations of U.S. law.

18     Q. Including Title VIII?

19     A. Our organization specializes in immigration and

20     customs law.

21     Q. And the examples you were giving were examples that

22     might be particularly relevant to the review of a

23     student protester's conduct, is that correct?

24     A. Yes. You're asking me to speculate and those are

25     the ones that would be -- those are the ones that I can

1  think of that would be relevant right now.

2  Q.  Well you are an authority here, so I'm happy to have

3  your understanding of it.

4        Now when you say "supporting terrorist

5  organizations," in this context, were you given any

6  direction about what "supporting" means here for the

7  work of the Office of Intelligence?

8  A.  I was not.

9        THE COURT:  From something you said earlier, I got

10  the sense, but let's see if I heard it right.  And

11  thereafter you carried out that mission, but you carried

12  it out in your usual way?

13        THE WITNESS:  Yes, sir.

14  Q.  What kind of evidence does the Office of

15  Intelligence look for as indicative potentially that a

16  noncitizen supports a foreign terrorist organization?

17  Can you -- I'm trying to understand what you mean when

18  you say "supporting a terrorist organization"?

19        MS. STROKUS:  Objection, your Honor.

20        THE COURT:  Yeah, sustained.

21  Q.  What does "supporting a terrorist organization" mean

22  when you say it?

23  A.  (Pause.)  Again the analyst looks for indicators,

24  does not make the judgment on whether the activity

25  actually supports or doesn't support terrorism.  So we

1  look for activities, um, such as, um, support for a

2  terrorist -- statements in support of a terrorist

3  leader, um, everything from that to material support,

4  which would be providing money to a terrorist

5  organization or making, um, donations to an organization

6  that's affiliated with a terrorist organization.  But I

7  really don't want to say any more detail than that.

8       THE COURT:  And that's perfectly acceptable to the

9  Court.  Let me give you this example.

10       If you find out that a person was saying, um,

11  statements like this, "Hamas is right, what Hamas is

12  doing is right for the situation, or for the Middle

13  East, or just right."  And I'll stop there.

14       How does that fit or doesn't it?

15       THE WITNESS:  Yes.  In that example, the analyst

16  would be, um, within policy to include that statement,

17  because again the analyst is just collecting the facts.

18       THE COURT:  Right.

19       THE WITNESS:  If the person actually didn't say

20  that or someone alleged they say that and the analyst

21  found out that they didn't say that, then they would

22  write the facts and not the allegations.  So it's just

23  factfinding.

24       If they, um, made a statement in support of the

25  Yankees, the analyst wouldn't put it in there because

1   it's not related to a national security or public safety

2   issue.  Although in the case of the Yankees, it might

3   be.

4   Q.  Are you a Nationals' fan?

5   A.  I'm a Red Sox fan.

6   Q.  Oh, then you're in the right place.

7       So the Court gave you an example of a statement

8   that say, for example, "Hamas is right," that could be

9   relevant to, um, an analyst's compiling of a report of

10  analysis about a student protester.

11      Could a statement like "Free Palestinian" be

12  similarly relevant?

13  A.  Again all of these are on a case-by-case basis.  But

14  it could be, depending on the circumstances of that

15  individual.  But as long as that statement was factual

16  and we could corroborate that it was made by the

17  individual under the circumstances described.

18  Q.  And just to understand the flip side of it.  Could a

19  statement condemning the actions or the existence of

20  Israel still be relevant to a report of an analyst in

21  the same way?

22  A.  Again, it depends on the circumstances of the

23  individual.  It depends on the individual circumstances.

24  But the analyst would -- as long as that statement is

25  factual, the analyst would not be against policy in

1    including that in the Report Of Analysis.  And it isn't

2    the, um, the presence or existence of a Report of

3    Analysis does not presume guilt or innocence, it's just

4    factfinding.

5    Q.  Okay.  So it's fair to say the analyst's job is to

6    include whatever facts could be relevant to a

7    determination that a person, um, act contrary to U.S.

8    law and that could include the person's speech, correct?

9    A.  That's correct.  It includes all kinds of

10   activities.

11   Q.  Now, um, this -- back to the March meeting -- we'll

12   move on from it momentarily, but back to this March

13   meeting where you received this guidance to produce

14   these reports.

15        A team was formed to carry out that line of

16   effort, correct?

17   A.  I don't believe the team was formed during that

18   meeting, I think the team was formed after that meeting,

19   maybe a week after, several days after.  I don't know

20   the exact timeframe.

21   Q.  And for our ease of reference here, that team's

22   nickname was the Tiger Team?

23   A.  It was called the "Tiger Team," yes.

24   Q.  And the Tiger Team included senior officials

25   carrying out this line of effort?

```
 1   A.   The Tiger Team consisted of not senior officials, it
 2   consisted of analysts, an agent, um, and led by the unit
 3   chief you mentioned earlier, Roy Stanley.  He was not
 4   the unit chief at the time -- he was not the division
 5   chief at the time, he was the unit chief.
 6   Q.   Were you part of the Tiger Team?
 7   A.   No, I was not part of the Tiger Team.
 8   Q.   Who, um, briefed you on the progress of the Tiger
 9   Team?
10   A.   Um, the unit chief, often through my deputy Brad
11   Edder, was the one briefing me on the activities, or the
12   progress of the Tiger Team.
13   Q.   Now the Tiger Team, which was formed shortly after
14   this March, um, meeting had rolling discussions over the
15   following days about its work, right?
16   A.   I believe they had daily discussions.
17   Q.   "Daily," you said?
18   A.   Within the team, you're asking me about discussions
19   within the team?
20   Q.   Actually, um, now understanding you're not a part of
21   the team, I'm interested in your contact with the team.
22        So how often did you speak with the team?
23   A.   I did not speak with the team as a group, I spoke
24   with the team leader maybe once a day on all issues, not
25   just, um, the team's issues, and specifically with the
```

1  team, um, I mean over the last -- over -- maybe

2  initially once a day.  But after weeks, when the team

3  was home, maybe every other day, um, three times a week

4  maybe.

5  Q.  And the team itself, so far as you knew, did its

6  work on a daily basis, right?

7  A.  Yes.

8  Q.  When you had discussions with senior leadership

9  about the work of the Tiger Team, those discussions

10  included the people you mentioned earlier, Derrick

11  Gordon, Robert Handler, William Walker, Roy Stanley, is

12  that right?

13  A.  Yes.

14  Q.  Okay.  So I want to talk about the Tiger Team's

15  process for this line of effort.

16      The Tiger Team was -- well, withdrawn.

17      At the March meeting, I understand that a

18  procedure to expedite this work was set up, and I'm

19  thinking of what you said in your deposition, in

20  particular that the Office of Intelligence would do the

21  factfinding, the National Security Division of Homeland

22  Security Investigations would compile the information in

23  a letter to the State Department, and the State

24  Department would make the decision on what action to

25  take.

    1          Is that a fair summary of the process that emerged

    2     as a result of this meeting?

    3     A.  Yes, that's a fair summary of the three steps.

    4     Q.  Okay.  Now you have said, a couple of times, that

    5     Reports Of Analysis that the Office of Intelligence

    6     created did not have a recommendation of actions to

    7     take, right?

    8     A.  That's correct.

    9     Q.  The recommendations for any actions to take it

   10     overlaid when the Report Of Analysis goes from the

   11     Office of Intelligence to the National Security

   12     Division, correct?

   13     A.  The National Security Division is the first step in

   14     the decision-making process on making judgments or

   15     assessments of the facts collected in the ROA.

   16     Q.  And it's your understanding that the National

   17     Security Division conveys its views of the next

   18     appropriate step in a letter that the National Security

   19     Division sends to the State Department, correct?

   20          MS. STROKUS:  Objection, your Honor, this calls

   21     for speculation.  He does not work in the National

   22     Security --

   23          THE COURT:  Well we'll see if he knows, whether he

   24     worked there or not.

   25          Is that correct?

1    THE WITNESS:  That is the description of the
2  process.  How the mechanics worked and how it was
3  conveyed to the State Department?  I don't know the
4  details of that.
5  Q.  Well we talked in your deposition, right, about how
6  the National Security Division would send a letter to
7  the Department of State called a "DHS referral."  Do you
8  remember that?
9  A.  Yes, only because you showed me -- I did not know it
10  was even called a "DHS referral."  I just knew it as the
11  National Security Division's letter.
12  Q.  Okay.  So from your perspective, the way it works
13  is, you, your Office of Intelligence gives the report to
14  the National Security Division, and that division, which
15  is led by Andre Watson, gives a letter, we'll call it
16  the "DHS letter," to, um, the State Department?
17  A.  That's how I understand it.
18  Q.  Okay.  Now the first instance of a recommendation
19  being made by anyone in the chain of decision-makers
20  occurs in that step that the National Security Division
21  takes, correct?
22  A.  Yes, that's not made in the Office of Intelligence.
23  Q.  And I mention this, but just for clarity.
24    The head of the National Security Division is
25  Andre Watson, is that right?

1  A.  That's correct.

2  Q.  And he is the person who sends the letters that come

3  from the Office of Intelligence -- or I'm sorry,

4  withdrawn, and strike that.

5      He's the person who sends the letter from the

6  Department of Homeland Security to the Department of

7  State conveying both the ROA produced by the Office of

8  Intelligence and the letter from the Department of

9  Homeland Security, correct?

10  A.  He's the one who signs the letter?  I do not know

11  how it gets sent.

12  Q.  Yes, a good distinction.  He's the signer.  We don't

13  know who the sender is.

14      Okay.  So you understood and understand that this

15  three-step process is intended for the State Department

16  to be able to make a determination, one way or the

17  other, about whether a person's Visa, in the case of a

18  Visa holder, should be revoked, correct?

19  A.  No.

20  Q.  Okay, tell me what's wrong with that?

21  A.  I think that's -- that may -- the State Department

22  can use the ROA and the information we collect in

23  whatever way they need to to make decisions related to

24  the State Department.  I think Visa revocations is one

25  way they may use it.  But it may not be the only way.

1    Q.   Okay.  Are you talking right now about how it

2    generally works or how it worked in this 3-step process

3    on student protesters?

4    A.   It's my understanding that this way would include --

5    what I just said would include both of your scenarios.

6    Q.   All right.  And to be clear, what you're saying is

7    that it would be up to the State Department to determine

8    what the appropriate action was to take?

9    A.   That's correct.

10   Q.   And that could include you understood and understand

11   a Visa revocation, right?

12   A.   It could include a Visa revocation.

13   Q.   And it could include a determination that a lawful

14   permanent resident is removable, correct?

15   A.   It could anything under their authorities and I

16   believe in that case -- the example you just mentioned

17   is one of their authorities.

18   Q.   Now this process was -- the 3-step process was

19   developed in conjunction with, um, Mr. Watson, who again

20   is the head of the National Security Division, right?

21   A.   Yes, but I don't -- this process could have existed.

22   It's not a complicated process of factfinding, a letter

23   to the authoritative decision-maker.  So, um, this could

24   have been used -- like I said, Title VIII's been around

25   since the 1950s.  This process would have been possible,

1  um, would have been acceptable at any time since Title

2  VIII.

3  Q.  It may have been.  But you've been in your job for 6

4  years, and until the Tiger Team was formed and this

5  meeting occurred, you had never seen the process work

6  this way, is that right?

7  A.  That's right, since 2019, I had never seen it used.

8  Q.  And it is, as you say, a simple and sort of

9  expedient process, just three steps, but to you it was

10  new, correct?

11  A.  Yes, for me it was new.

12  Q.  Now when the State Department did act on these

13  referrals, that information traveled back to DHS,

14  correct?

15       MS. STROKUS:  Objection, your Honor, calls for

16  speculation?

17       THE COURT:  Well I don't know that he knows, but

18  we'll see.

19       If you know the answer, you may give it.

20  A.  I don't know the process for how it got back to, um

21  -- I don't know the steps it took or the pathway it took

22  to get back to HSI.

23       THE COURT:  That's his answer.

24  Q.   In this case, you were in Tiger Team discussions,

25  consistent with this process, where you understood that

1  the Tiger Team received updates on whether the State

2  Department had acted on its referrals, correct?

3  A.  Yes, I believe that through National Security

4  Division representatives, um, I believe the team knew if

5  there was an action taken.

6  Q.  An action like an arrest?

7  A.  Yes.

8  Q.  An action like detention?

9  A.  Yes.

10  Q.  Now you said earlier --

11  A.  It did not go through me.

12  Q.  Right.

13  A.  So I'm making a, um, a speculation just from what I

14  saw.  But I did not dictate the process or have

15  usability of how the mechanics worked.

16  Q.  When you say it's speculation, but it's also from

17  what you saw, referring to what you saw, you mean the

18  meetings that you heard, whether or not you led them,

19  correct?

20  A.  Well I would hear back potentially from the unit

21  chief or Brad Edder, my deputy, that there had been an

22  action taken.

23  Q.  Well it is not required that the State Department

24  let the Department of Homeland Security know that it's

25  taking an action on a referral, right?

```
 1           MS. STROKUS:  Objection, calls for speculation.
 2           THE COURT:  Sustained.  Sustained.
 3   Q.  In your experience, you often do not learn whether
 4   or not the State Department has acted on a referral that
 5   HSI has sent, correct?
 6   A.  Me personally?  No.
 7   Q.  And it's your understanding that HSI often is not
 8   informed of what happens to a referral that it sends to
 9   the State Department, right?
10   A.  You ask me?  I'm only speaking for the Office of
11   Intell.  HSI?  You'd have to ask -- that's the
12   operational part, the investigative part, the law
13   enforcement part of the agency, not the intelligence
14   part.  So I don't have visibility in how or when or
15   under what circumstances they would or would not be
16   notified.
17   Q.  And when you say "HSI," the operations part is
18   separate from the Office of Intelligence, are you
19   referring to Mr. Watson of the National Security
20   Division?
21   A.  The National Security Division.  The other divisions
22   I mentioned in my deposition, all, um, none of them
23   report to me, um, they all report to the same deputy
24   that I do.  So, no, I don't have any authority over
25   them.  I don't have, um -- I'm not required to have
```

1    visibility of their actions.

2    Q.   Just a moment.  (Pause.)

3         It is your understanding that HSI leadership has

4    had ongoing conversations with State Department

5    employees about the student protesters, correct?

6    A.   It is my understanding that, um, HSI -- members of

7    HSI have had conversations with the Sate Department.  I

8    don't know if I'm qualified to make the determination if

9    they're ongoing or at what frequency.

10   Q.   Okay.  So this three-step simple process, um,

11   required HSI to reallocate some of its personnel, right?

12   A.   It required me to reallocate some of my analysts,

13   um, because of the workload.

14   Q.   People were moved from the Counterterrorism

15   Intelligence Unit to work on this effort, correct?

16   A.   From the Counterintelligence Unit, the

17   Counterterrorism Intelligence Unit, from the Cyber

18   Intelligence Unit, from the Global Trade Intelligence

19   Unit, from all different parts of HSI intelligence.

20   Q.   And that was, as you say, because of the workload?

21   A.   That's correct.

22   Q.   Now, um, I want to talk about that workload and what

23   it resulted in.

24        Here hours of labor were generated in response to

25   lists of names of student protesters, right?

1  A.  Yes, but we were working off a number of sources,
2  including lists.
3  Q.  Now you saw a number of sources, but the lists were
4  communicated to you through Derrick Gordon, correct?
5  A.  They were communicated to the leadership, including
6  through the people we mentioned before.
7  Q.  None of the student protester names came to you from
8  any source other than HSI leadership, correct?
9  A.  They always came through, um, HSI, um, yes,
10  leadership positions.  We did not get -- I did not get
11  any lists sent to me directly from anyone outside the
12  agency.
13  Q.  These names were given to you.  Were they given to
14  you in a written form or verbally?
15  A.  Again, um -- I think most of them were -- I don't
16  know how they were --
17  Q.  If you don't recall --
18  A.  I don't recall how.
19  Q.  Okay.
20  A.  And again, they usually did not go through me
21  either, they went to my deputy or to the team leader.
22  Q.  The names went from Mr. Gordon either to you or to
23  your deputy or the leader of the Tiger Team, is that
24  right?
25  A.  That's correct.

1   Q.  And actually, I understand just now, and I can

2   understand why, you don't recall how the names were

3   transmitted to you.  I'd like to see if we can refresh

4   your recollection.  So just give me one moment to see if

5   I can find something that might be useful.  (Pause.)

6        Okay, I'd like to show you -- or actually we don't

7   even need to use the screen, because you have a binder.

8   Could you just look for me at Page 88 of the transcript,

9   and would you review just Lines 15 to 22.  And when

10  you've had a moment to do that, just let me know that

11  you've done that, and then I'd like to ask you a

12  question.

13       MS. STROKUS:  Your Honor, can I request that we do

14  actually use the screen as well here for the

15  government's counsels' purpose?

16       THE COURT:  You don't have it?  Yes, that may be

17  done if it can be done.  But you may press on,

18  Ms. Conlon.

19       MS. CONLON:  I can press on.  Okay, we'll start

20  putting it up.

21       (On screen.)

22  Q.  Okay.  Does looking at Page 88 refresh your

23  recollection at all as to whether you received any names

24  and requests to generate reports from Mr. Gordon in

25  writing or orally?

1    A.  Yes, in my deposition I said verbal, but when you

2    asked me about it now, I was thinking about the Canary

3    list, which was over 5,000 names, and I don't think we

4    got them verbally.

5    Q.  I will turn to that in a moment.

6         THE COURT:  Wait, I'm now not understanding.  The

7    what list, um, over 5000 names?

8         THE WITNESS:  The Canary Mission list.

9         THE COURT:  Oh, the Canary Mission list had over

10   5,000 names.  So it didn't make any sense when you said

11   you got that verbally.  You mean someone said, "Here is

12   a list that the Canary Mission has put together?

13        THE WITNESS:  Yes.

14        THE COURT:  I just want to understand.

15        THE WITNESS:  Yes, sir.  And actually, um, I need

16   to correct myself, because, um, when I was answering the

17   question I was thinking of the Canary Mission list,

18   which is thousands of names, and I was thinking we would

19   not have gotten that verbally.  But actually we, um, the

20   direction was to look at the website and that was a

21   verbal direction, so.  I'm trying to recall a

22   conversation from a long time ago.

23        THE COURT:  And I'm equally trying to understand.

24   So here's what I understand.

25        Because the Canary Mission had a website, you were

1    directed to take a look at this website for leads?

2         THE WITNESS:  That's correct, yes, sir.

3         THE COURT:  All right.

4    Q.  Okay.  The direction to look at the Canary Mission

5    website for its list was given to you in the March

6    meeting that was discussed or was it given to you at

7    another time?

8    A.  I don't recall when it was given to us.

9    Q.  And do you recall who gave you the direction?

10   A.  I don't remember who mentioned it.

11   Q.  Do you recall in what setting you received the

12   direction, like a briefing, a meeting?

13   A.  I don't know.

14   Q.  Okay.  But your understanding is that the Office of

15   Intelligence should generate Reports Of Analysis on the

16   names of persons on the Canary Mission's website lists,

17   is that correct?

18   A.  That we should look at the individuals named in the

19   Canary Mission website and, um, in that process, when we

20   look at an individual and do research on an individual,

21   it is our process to do an ROA when we have relevant

22   information and activities.

23        THE COURT:  So that's over 5,000 people, is that

24   right?

25        THE WITNESS:  Yes, sir.

1       THE COURT:  Yeah.  Okay.

2       THE WITNESS:  Which shows why we needed a Tiger

3 Team.  A normal division, a normal unit or section or

4 group of analysts, um, operating in our normal

5 organizational construct couldn't handle that workload.

6       THE COURT:  Yes.  Thank you.

7 Q.  And was there a particular timeframe in which the

8 Tiger Team needed to try to get through this very long

9 list?

10 A.  We are an organization or an agency that, um, in a

11 world where, um, taking months to do things is not

12 acceptable.  So, yeah, it -- we were not -- I was not

13 going to be allowed to say we've got 5 -- well you know

14 a small number of analysts on this, it's going to take

15 them 6 months to get through 5,000 names.  I was not

16 given a deadline.  But I knew from how we were organized

17 and how we worked that we needed to work through this

18 expeditiously.

19 Q.  What is your understanding of why the Canary

20 Missions list was the list to use for this project?

21 A.  It was one -- it was a list that made accusations

22 or, um, asserted a lot of information like, um, these

23 protesters are involved in violent activities, are

24 condoning or supporting violence, possibly even

25 terrorist organizations, and that list was, I think,

1  visible to -- or known to a lot of people.  And because
2  we're one of the agencies that is responsible for
3  investigating this type of activity, as it relates to
4  immigration and customs offenses, it seemed natural that
5  we would get the list and have to review it.
6  Q.  And when you say "get the list," um, is it your
7  understanding Canary Mission provided the list to
8  someone in the government?
9  A.  I don't -- I don't know how we, um, got the
10 notification.  I don't know who notified us that this
11 website exists.  But I can say that Canary Mission is
12 not part of the U.S. government.  It is not information
13 that we would take as an authoritative source or -- and
14 we did not work with the individuals who created the
15 website.  I don't know who creates the website.  We
16 don't have a relationship with the creators of the
17 website.
18 Q.  You had never, prior to 2025, been asked to
19 specifically review people identified on the Canary
20 Mission website, right?
21 A.  I did not know the Canary Mission website existed
22 until I think after March, March or later of this year.
23 Q.  But you have since then seen the Canary website?
24 A.  I have looked at the Canary Mission website once.
25 Q.  What was the occasion that led you to look at it?

1    A.  I was curious, because I had heard of it.

2    Q.  Do you recall approximately how long ago that was?

3    A.  Maybe March, April.

4    Q.  Do you have an understanding of what Canary Mission

5    does, like, as an organization, what it is?

6    A.  No, I don't have any details on what, um -- only in

7    what type of information was presented on the website.

8    Q.  And in broad strokes, do you understand that Canary

9    Mission identifies people who allegedly promote hatred

10   of the United States, Israel, and the Jewish people?

11        MS. STROKUS:  Objection.

12        THE COURT:  Well on this foundation, I'm going to

13   sustain that.  He's told us what he knows about it.

14   Q.  So it's fair to say that what you know about it

15   comes from what's on this website?

16   A.  Yes, that's correct.

17   Q.  Okay.  Do you have an understanding of how Canary

18   Mission identifies the people on its website?

19        MS. STROKUS:  Objection, your Honor.

20        THE COURT:  Well I'm going to let him answer that

21   yes or no.

22        Do you have an understanding?

23        THE WITNESS:  No.

24        THE COURT:  That may stand.

25   Q.  Do you have any understanding of what process they

1    use or don't to verify the information they put on the
2    website?
3         MS. STROKUS:  Objection, your Honor.
4         THE COURT:  Well you know she's objecting
5    vigorously and there's no foundation for this.  He
6    answered no to the last question.  He looked at the
7    website once.  An understanding?  I suppose he might
8    have an understanding if there was some statement from
9    some other person or a source.  But this isn't
10   discovery.
11        MS. CONLON:  No, your Honor, I don't want to touch
12   on anything that could be deliberative, but I want to
13   better understand this witness's understanding of the
14   work that he was doing.
15        THE COURT:  I have it.
16        MS. CONLON:  Okay.
17        THE COURT:  Again, this isn't a game, you're
18   trying to persuade the factfinder here.  And here's what
19   I'm getting from this witness.
20        That, um, they got the -- I shouldn't even say
21   "got the list," somebody had access to this website.
22   Somebody, a superior, said, "Look here, check these
23   people out."  Well that's not precisely what he said,
24   but the transcript will govern.  And he got on it.  And
25   that because there's a reference to Canary Mission, he

1  went and looked at it once and saw whatever he saw.  And

2  he's careful to point out, "They're not us."  His

3  looking at it told him that they make accusations.  And

4  I will tell you, it's significant to me that he said,

5  "We approached it with an independent view," not simply

6  accepting accusations that they got.  Now it's not a

7  discovery deposition.  I think we've gotten his

8  knowledge.  But I'll ask this question.

9       Have I accurately characterized your testimony?

10  Because I didn't use your words exactly and I was just

11  saying this is what I'm hearing.

12       Have I accurately characterized it?

13       THE WITNESS:  Yes, your Honor.

14       THE COURT:  All right.  I think that's what he

15  knows.

16       MS. CONLON:  And, your Honor, if that's all he

17  knows, that's all he knows.  But we heard about a list

18  of 5,000 people on the website.  And I appreciate this

19  isn't discovery, but it's news to us that that is how it

20  worked.

21       THE COURT:  Well it's news to me, and I find it

22  very interesting.  But I'm telling you what I got from

23  it.  And now we've gotten it, so let's move on.

24  Q.  So, Mr. Hatch, um, understanding that you have not

25  spent time looking at the website, have you seen Reports

1  of Analysis that were generated in response to the

2  directive to look at the Canary Mission website?

3  A.  We, um -- the analysts wrote ROAs on personnel or

4  individuals who are named in the website.

5  Q.  To your knowledge, did the analysts include, in

6  their ROAs, the allegations from the Canary Mission

7  website as relevant -- as information that could be

8  relevant to a potential violation of Title VIII?

9      MS. STROKUS:  Objection, your Honor.

10      THE COURT:  Sustained.  The best evidence are the

11  ROAs.

12      MS. CONLON:  And, your Honor, it's ironic because

13  I don't have them and I wish I did.

14      THE COURT:  I understand.

15      MS. CONLON:  But I can't offer them to you.

16      THE COURT:  And we will see about that.  Because

17  they would seem, at least with respect to the target

18  individuals, to be relevant.  Perhaps they should have

19  been prepared.  I've made a ruling now with respect to a

20  subset of documents.  It's clarified that I don't have

21  them.  I'm wondering about that.

22      Go ahead.

23      MS. CONLON:  Okay.  I'm sorry, I'm getting a

24  correction from somebody.  (Talks to co-counsel.)  Yes.

25  Okay.

1      It is our understanding that the Court did receive

2   all 5 of the Reports of Analysis on the targeted

3   individuals in a production -- a document production to

4   the Court on June 11th, that is, um --

5          (To co-counsel.)  I think that's correct?

6          THE COURT:  Well I'll look at what I have,

7   physically.

8          MS. CONLON:  Okay.  And for the Court's ease of

9   reference, we understand that to be Docket 131, that

10  docket entry.

11         THE COURT:  Thank you.

12         MS. CONLON:  Okay.

13  Q.  Now, um, you said that the project was to look at

14  this list from Canary Mission.  Did the list of student

15  protesters -- it included information of student

16  protesters identified through other means apart from

17  simply Canary Mission?

18         MS. STROKUS:  Objection, your Honor, a

19  mischaracterization of testimony.

20         THE COURT:  Well let me ask this question.

21         She started out saying how much -- how many ROAs

22  did you look at, and you used the word the "student

23  protester effort," and as you started, I didn't know

24  what you were talking about.

25         Do we now understand that's the Tiger Team's work

1  after you got this list?  Well I shouldn't even say "got

2  this list," after the list was provided on the website?

3      THE WITNESS:  Yes, your Honor.  But the Canary

4  Mission wasn't the only, um, group of students.  It was

5  most of it.

6      THE COURT:  Yes.

7      THE WITNESS:  But it wasn't the only way that we

8  received, um, information on protesters.  And also there

9  were duplicates, we received information about the same

10  protester from multiple sources.  But Canary Mission was

11  the most inclusive of that.

12      THE COURT:  Do you recall other sources?  Without

13  revealing investigatory matters.

14      THE WITNESS:  There was another website that does

15  the same thing.  I don't remember the name of it.  Um,

16  and --

17      THE COURT:  If I suggested "Betar"?

18      THE WITNESS:  That sounds right, sir.

19      THE COURT:  Okay.  Go ahead.

20      THE WITNESS:  And then we would get individual

21  names or we could even get a list from a police

22  department if any protesters were arrested.  We could

23  get that.

24      So the list, um, came in from all different

25  directions.  The team -- the source of the information

```
1   was not necessarily relevant to the analyst, because the
2   analysts were doing factfinding, and the analysts were
3   not reporting, um, that, um -- where the name came from,
4   because They're independent from that.  Nor would
5   they -- it's not our standard practice, it's not within
6   policy for us to report other people's uncorroborated
7   allegations or assertions.  Everything, like I said
8   before, needs to be collaborated.
9        THE COURT:  So these sources though that you've
10  now identified, as far as my notes, they came down from
11  Mr. Jordan, is that right?
12       THE WITNESS:  Mr. Gordon.
13       THE COURT:  Mr. Gordon.  They all come down from
14  him.  But of course you're looking at them.  And you can
15  see if a police department -- for instance, if it
16  arrested someone at a protest, whether it fit within the
17  scope of what the Tiger Team was doing?
18       THE WITNESS:  Yes, sir.
19       THE COURT:  All right.  I think that it's noon.  I
20  am -- and I apologize for this, the time is not counted
21  against you, but we'll start promptly at 9:00 a.m.
22  tomorrow morning.
23       The total elapsed time for the plaintiffs is 2
24  days, 15 minutes.  For the defense, 2 hours, 30 minutes.
25       We'll recess till 9:00 a.m. tomorrow morning.
```

1   We'll recess.

2         THE CLERK:  All rise.

3         (Adjourned, 12:00 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5    hereby certify that the forgoing transcript of the

 6    record is a true and accurate transcription of my

 7    stenographic notes, before Judge William G. Young, on

 8    Wednesday, July 9, 2025, to the best of my skill and

 9    ability.

10

11

12

13
     /s/ Richard H. Romanow 07-9-25
14   _____
     RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF MASSACHUSETTS (Boston) |
| 3 | No. 1:25-cv-10685-WGY |
| | Volume 1, Page 1 to 71 |
| 4 | |
| 5 | AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al, |
| | Plaintiffs |
| 6 | |
| 7 | vs. |
| 8 | |
| 9 | MARCO RUBIO, in his official capacity as |
| | Secretary of State, et al, |
| 10 | Defendants |
| 11 | |
| | ********* |
| 12 | |
| 13 | |
| | For Bench Trial Before: |
| 14 | Judge William G. Young |
| 15 | |
| 16 | |
| | United States District Court |
| 17 | District of Massachusetts (Boston.) |
| | One Courthouse Way |
| 18 | Boston, Massachusetts 02210 |
| | Thursday, July 10, 2025 |
| 19 | |
| 20 | ******** |
| 21 | |
| 22 | REPORTER: RICHARD H. ROMANOW, RPR |
| | Official Court Reporter |
| 23 | United States District Court |
| | One Courthouse Way, Room 5510, Boston, MA 02210 |
| 24 | rhr3tubas@aol.com |
| 25 | |

```
 1               A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
        Knight First Amendment Institute at Columbia
 6      University
        475 Riverside Drive, Suite 302
 7      New York, NY 10115
        (646) 745-8500
 8      E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10      Sher Tremonte LLP
        90 Broad Street, 23rd Floor
11      New York, NY 10004
        (212) 540-0675
12      Email: Cgans@shertremonte.com
        For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16      DOJ-Civ
        P.O. 878
17      Ben Franklin Station
        Washington, DC 20044
18      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20      United States Attorney's Office
        1 Courthouse Way, Suite 9200
21      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
22      For Defendants

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   PETER HATCH  (Continued.)

 6     By Ms. Conlon          10

 7     By Ms. Santora

 8

 9

10                      E X H I B I T S

11

12        EXHIBIT 232............................... 29

13        EXHIBIT 233............................... 47

14        EXHIBIT 234............................... 53

15        EXHIBIT 235............................... 60

16        EXHIBIT 236............................... 66

17

18

19

20

21

22

23

24

25
```

1    P R O C E E D I N G S

2    (Begins, 9:00 a.m.)

3    THE COURT:  Let me simply repeat, as I have

4    allowed internet access in these proceedings, that if

5    you are accessing these proceedings by the internet, the

6    rules of court remain in full force and effect, that

7    means there is no taping, streaming, rebroadcast, screen

8    shots, or other transcription of these proceedings.

9    It is very important that you keep your microphone

10   muted, and if you do not keep it muted, I will have to

11   cut you off from access.

12   Now there's before the Court, and I've reviewed

13   it, the defendants' motion to clarify the July 9 bench

14   ruling.  There's no reason to clarify.  This is an

15   attempt to cabin in the Court's ruling.  The transcript

16   makes clear it applies to all the documents that were

17   furnished, and I stand on that ruling.

18   Now, again the question, Mr. Kanter, you've

19   complied with the Court's order?

20   MR. KANTER:  Yes, your Honor.

21   THE COURT:  Thank you.

22   MR. KANTER:  All the documents that have been

23   furnished to the government in the subset have been

24   turned over to the plaintiffs before the deadline.

25   THE COURT:  And that was the Court's order.  I'm

```
 1 | satisfied with that.
 2 |        I have also, because it was a matter of issue
 3 | yesterday, reviewed the documents that I have and I have
 4 | ROAs for certain of the so-called "targets" here, and
 5 | the Watson letters, as soon as I can make copies,
 6 | they'll be turned over to you.
 7 |        All right.
 8 |        MR. BIALE:  Your Honor, I just wanted to confirm
 9 | what Mr. Kanter said, and we received a traunch of 18
10 | pages of document.  I don't know -- just putting that on
11 | the record so that --
12 |        THE COURT:  Well you may have.  You know I really
13 | have no reason to, um, impugn anyone's good faith and
14 | I'm not starting to.
15 |        MR. BIALE:  Neither do I.
16 |        THE COURT:  Please recall the witness.
17 |        MS. CONLON:  Your Honor, I'm sorry, but before we
18 | begin, is there any possibility we could have -- the
19 | ROAs are the documents this witness is familiar with,
20 | helps oversee the preparation of, and knows about.  If
21 | there's any chance I can have them before I question
22 | him?  I don't need a break, if I could have them so I
23 | can --
24 |        THE COURT:  I'm doing the best I can.
25 |        MS. CONLON:  Thank you.
```

1      THE COURT:  As soon as we copy them, you will have

2  them.

3      MS. CONLON:  I'm trying to suggest that even if

4  it's in the course of the examination, I would take them

5  if I could, so I can discuss them with him.

6      THE COURT:  And you understand the Court's

7  procedure.

8      MS. CONLON:  Yes.

9      THE COURT:  When I have them, and I have looked at

10  what I intend to give you, I have a good --

11      Yes, Mr. Hatch, come on up.

12      MS. CONLON:  Thank you.

13      MR. KANTER:  Your Honor, I have one question for

14  the Court.

15      THE COURT:  Yes, while the witness is returning.

16      MR. KANTER:  And this is for the purpose of, um,

17  the consideration by the government to file a mandamus

18  petition.

19      THE COURT:  Yes.

20      MR. KANTER:  And I want to be accurate in the

21  scope of that petition.  Because your Honor indicated

22  that it's an order related to the subset that I have

23  turned over and complied with.  The most -- what I would

24  like to clarify --

25      THE COURT:  The order did, yes, and I'm satisfied

1  with your compliance with the order.

2      MR. KANTER:  What my question pertains to is an

3  in-camera submission on June 11th that has documents

4  that are not included in that subset.

5      THE COURT:  Yes.

6      MR. KANTER:  And which, if your Honor has ordered

7  that the privileges covering those other documents have

8  been waived, the government will likely be seeking

9  mandamus to overturn that order.

10     THE COURT:  I have made myself clear on the

11 record, and I think I am only reiterating because the

12 record will govern.

13     I have said that as to the mass of documents that

14 the government has voluntarily submitted to it,

15 evidently to further its case, I have determined that

16 those documents relating to any changes in Visa

17 applications, because they implicate national security,

18 are privileged.  I am treating them as in-camera, which

19 I mean the only eyes on those documents are my eyes.

20 And as to the remaining documents, I have overruled the

21 assertions of privilege.  I have ordered the production

22 of certain of them.  It seems to me the government has

23 complied.

24     MR. KANTER:  We have, your Honor.

25     THE COURT:  I'm now, um, going to -- and they come

1  out of what's Exhibits B through K.  But you'll have to

2  give me a moment to look it over.  They are the ROAs and

3  the Watson letters and such attachments to particular

4  ROAs that existed.

5          MR. KANTER:  Has your Honor --

6          THE COURT:  That does not exhaust the total

7  documents that I have.  And as to those I've said -- I

8  think I can reiterate --

9          MR. KANTER:  You said Friday noon was to assert

10  LEP on those documents.

11          THE COURT:  That's correct.

12          MR. KANTER:  Thank you, your Honor.

13          THE COURT:  I said I was in a quandary, and I'm

14  trying properly to manage the case.  And that is what

15  I'm trying to do.

16          MR. KANTER:  As to the document over which --

17          THE COURT:  Wait.

18          MR. KANTER:  -- over which --

19          THE COURT:  Wait a minute.  Wait a minute.

20          MR. KANTER:  Yes.

21          THE COURT:  I want to start taking testimony,

22  because time counts.  All right?  We can talk about it

23  this afternoon.

24          Where is Mr. Hatch?

25          MS. CONLON:  Mr. Hatch was in the hallway.  He is

1  being retrieved.

2        THE COURT:  Well -- but I want to use the time,

3  Mr. Kanter.

4        MR. KANTER:  Yes, I was asking specifically about

5  the indication of the Presidential communications

6  privilege with respect to a report sent by the Agencies

7  to President Trump, as requested in his executive order.

8  The government invoked the Presidential communications

9  privilege.  Your Honor held that --

10       THE COURT:  I ordered the documents turned over to

11  me.  And as to that -- as to that, I, um, I think I am

12  premature to say I overrule that.  You've now identified

13  that.  As to that, it's under advisement.

14       Does that answer your question?

15       MR. KANTER:  Yes.

16       THE COURT:  And as to that, um -- actually I

17  appreciate your correcting me because I accurately

18  restated what earlier I had done.  I am again reading

19  these materials, working with them, and reflecting.  And

20  as to the document that you just made reference, it's

21  under advisement.  I have not overruled the privilege.

22  Nor have I sustained it.

23       MR. KANTER:  At the risk of --

24       THE COURT:  No, the witness is here.

25       MR. KANTER:  Okay, thank you, your Honor.

 1          THE COURT:  I'm going to allow her to use it with
 2     the witness.
 3     A.  (Looks.)
 4          THE COURT:  Mr. Hatch, I'm simply -- feel free to
 5     look at anything, but the way I have them clipped
 6     together, they may pertain to individuals other than
 7     Ms. Ozturk, because I clipped the documents all
 8     together.  But I think she wants to ask you about
 9     Ms. Ozturk and a report -- yeah, why don't you stop
10     there.
11          MS. CONLON:  Yes.  Okay.
12     Q.  Mr. Hatch, having reviewed this document, do you
13     recognize what it is?
14     A.  It is a subject profile of, um, Ms. Ozturk.
15     Q.  And when you say "subject profile," that means the
16     HSI subject profile?
17     A.  It's the Report of Analysis.
18     Q.  They are the same thing, the HSI profile and a
19     Report of Analysis?
20     A.  A subject profile is a Report of Analysis.
21     Q.  I see.  Is this a fair and accurate copy of the
22     subject profile that the Office of Intelligence created
23     concerning Rumeysa Ozturk?
24     A.  It appears to be.
25     Q.  Okay.

1      MS. CONLON:  I am offering what was EK for

2  evidence as Exhibit 232.

3      THE COURT:  And I just want to be clear, the

4  documents you looked at -- we've both been looking at

5  together, down to Exhibit I, the page that says "Exhibit

6  I," are those pages, is that how they appeared in the,

7  um, report?  Does the question make sense?  Is that --

8  there's attachments, for instance.  And were those

9  attachments part of that report?

10     THE WITNESS:  I don't -- I don't remember, um,

11  this report specifically, but it would be within policy

12  to include these other attachments.

13     THE COURT:  And, um, as you look at the document,

14  that's the type of material that would, in the ordinary

15  course, be attached to such a report?

16     THE WITNESS:  Yes, that's correct, sir.

17     THE COURT:  All right.

18     EK is -- with the pages he's identified, may be

19  admitted as Exhibit 232.  The defendants' rights are

20  saved.

21     (Exhibit 232, marked.)

22     MS. CONLON:  And if the Court would permit me to

23  publish it, while we speak about it, so the government

24  and everybody has it.  As well as I'm covering, to be

25  clear, personal identifying information that is on it in

1　terms of Social Security number or anything else.

2　　　MS. SANTORA:  Your Honor, we object to the showing

3　of the document publicly.

4　　　THE COURT:  Overruled.  It's a public trial.  I've

5　admitted it in evidence.

6　　　MS. SANTORA:  This document, I believe, is

7　confidential pursuant to the terms of the protective

8　order and --

9　　　THE COURT:  Well, but the protective order is

10　between you and them.  I preside.  Now they may use it

11　as evidence.  The public is entitled to know what I'm

12　going to base my findings on.  And it may be used.  And

13　if I were to base them on anything else, um -- let me

14　give you an example here, because this troubles me.

15　　　I agreed with Mr. Kanter that I may have spoken

16　too quickly in overruling a Presidential privilege.  But

17　if that's so, why was the document given to me, the

18　judge who must make the findings of fact?  One can only

19　infer from the submission of the document to me that it,

20　one, was relevant, two, it was authentic, and three,

21　somehow it was intended to persuade me of something.

22　　　Now if the privilege is upheld as to that

23　document, then I'll be clear as to what I'm going to do,

24　I'm going to set it aside, it won't have any bearing on

25　this case at all.

1          Now you say that's so here.  I disagree.  I've

2      made my rulings.  I express no opinion on any of this,

3      but I'm going to look at it.  As other documents as to

4      which I have overruled the privilege.

5          MS. SANTORA:  Your Honor, if I may?  We did submit

6      this document, um, in-camera at your invitation to us to

7      submit it.

8          THE COURT:  Yes, and I've ruled for the

9      law-enforcement privilege, which you have significantly

10     interpreted overbroadly, and I have rejected that.

11         MS. SANTORA:  I just want to reiterate what

12     Mr. Kanter said, that it is our position that this

13     document is law-enforcement privileged and we do intend

14     to submit a privilege log for it on Monday.

15         THE COURT:  I understand that.  I understand that

16     and we're going forward.  I've said your rights are

17     saved.

18         Go ahead.

19     Q.  Now, Mr. Hatch, this is Exhibit 232 on the screen.

20     I have put Post Its over things like Social Security

21     numbers that I'm not planning to ask you about.  I'd

22     like to turn your attention to the top left corner where

23     it says "Analysis Findings."

24         Here the first sentence indicates that Ms. Ozturk,

25     who is a Visa holder, is, quote, "A co-author of an